# 23-7087

# United States Court of Appeals

*for the*

# Second Circuit

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

– v. –

JOHN GORE THEATRICAL GROUP, INC.,

*Respondent.*

———————————————

ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD
IN CASE NO. 02-CA-286802

## BRIEF AND SPECIAL APPENDIX FOR RESPONDENT

MARK THEODORE
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

– and –

HENRIQUE N. CARNEIRO
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Respondent*

CP COUNSEL PRESS     (800) 4-APPEAL • (326572)

Case: 23-7087, 01/02/2024, DktEntry: 47.1, Page 2 of 40

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Respondent John Gore Theatrical Group, Inc. ("John Gore") hereby identifies The John Gore Organization, Inc. ("JGO") as its sole corporate parent. JGO is not a publicly held corporation. No publicly held corporation owns any stock in John Gore.

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

JURISDICTIONAL STATEMENT .........................................................................2

STATEMENT OF THE ISSUES..............................................................................3

STATEMENT OF THE CASE..................................................................................3

    A.    The Parties ...............................................................................................3

    B.    AEA's Information Requests and the Parties' Correspondence ............4

    C.    Procedural History ..................................................................................6

        1.    *The ALJ's Decision* ....................................................................6

        2.    *The Board's Decision*.................................................................8

STANDARD OF REVIEW ......................................................................................8

SUMMARY OF ARGUMENT .................................................................................9

ARGUMENT ..........................................................................................................10

    A.    John Gore Established A "Legitimate and Substantial" Confidential Interest .................................................................................12

        1.    *The Information That AEA Requested Was Inherently Sensitive*................................................................................12

        2.    *John Gore Did Not Waive Its Argument or Raise It in An "Untimely" Fashion*................................................................16

    B.    John Gore Presented Extensive Evidence Establishing the High Likelihood that AEA Would Misuse the Requested Information........19

        1.    *Evidence of Prior Disclosures* .......................................................19

        2.    *AEA Refused to Provide Assurances That It Would Not Publicize Confidential Information about John Gore's Finances* ...............................................................................20

CONCLUSION.......................................................................................................21

ii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Beverly Enters., Inc. v. NLRB,*
  139 F.3d 135 (2d Cir. 1998) ....................................................................9

*Crozer-Chester Med. Ctr. v. NLRB,*
  976 F.3d 276 (3d Cir. 2020) ..................................................................13

*Detroit Edison Co. v. NLRB,*
  440 U.S. 301 (1979)................................................................................11

*Detroit Newspaper Agency,*
  317 N.L.R.B. 1071 (1995) ......................................................................11

*Elec. Contractors, Inc. v. NLRB,*
  245 F.3d 109 (2d Cir. 2001) ....................................................................9

*Finch, Pruyn & Co.,*
  349 N.L.R.B. 270 (2007) ........................................................................12

*Fitspot Ventures, LLC v. Solomon Bier,*
  2015 WL 5145513 (C.D. Cal. Sept. 1, 2015) ...............................13, 14

*Ford Motor Co. v. NLRB,*
  441 U.S. 488 (1979)................................................................................18

*Good Life Beverage Co.,*
  312 N.L.R.B. 1060 (1993) ...........................................................11, 12, 16

*GTE Cal., Inc.,*
  324 N.L.R.B. 424 (1997) ........................................................................11

*In re Watkins Contracting, Inc.,*
  335 N.L.R.B. 222 (2001) ...............................................................11, 15

*Island Creek Co.,*
  292 N.L.R.B. 480 (1989) ........................................................................12

iii

*Laborers Int'l Union of N. Am. v. NLRB,*
  945 F.2d 55 (2d Cir. 1991) ...................................................................9

*N. Ind. Pub. Serv. Co.,*
  347 N.L.R.B. 210 (2006) ........................................................11, 14, 19

*NLRB v. Caval Tool Div.,*
  262 F.3d 184 (2d Cir. 2001) ................................................................8

*NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp.,*
  789 F.2d 121 (2d Cir. 1986) .......................................................13, 14

*Novelis Corp. v. NLRB,*
  885 F.3d 100 (2d Cir. 2018) ................................................................9

*Olivetti Off. U.S.A., Inc. v. NLRB,*
  926 F.2d 181 (2d Cir. 1991) .......................................................12, 20, 21

*Pennsylvania Power & Light Co.,*
  301 N.L.R.B. 1104 (1991) ............................................................11, 21

*Red Tree Inv., LLC v. Petróleos de Venezuela, S.A.,*
  82 F.4th 161 (2d Cir. 2023) ...............................................................18

*Rivkin v. Century 21 Realty LLC,*
  494 F.3d 99 (2d Cir. 2007) ................................................................18

*Serv. Emps. Int'l Union, Loc. 32BJ v. NLRB,*
  647 F.3d 435 (2d Cir. 2011) ................................................................9

*TDY Indus., LLC d/b/a ATI Specialty Alloys & Components,*
  *Millersburg Ops.,*
  369 N.L.R.B. No. 128 (2020) ........................................................15, 16, 17

*United States v. Menendez,*
  48 F.3d 1401 (5th Cir. 1995) .............................................................18

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951).............................................................................9

**STATUTES**

29 U.S.C. § 160..................................................................................2

iv

29 U.S.C. § 152 ....................................................................................................3

29 U.S.C. § 158 ..............................................................................................4, 6, 7

## PRELIMINARY STATEMENT

The National Labor Relations Act ("NLRA") requires an employer to furnish information relevant to the enforcement of a collective bargaining agreement if the union requests it. But the NLRA contemplates reasonable limitations on such disclosures where the employer has a "legitimate and substantial" confidentiality interest in the information. If an employer meets that standard, the parties to the collective bargaining agreement are supposed to negotiate and arrive at a mutually acceptable solution.

The Actors' Equity Association ("AEA"), a labor union representing theater performers, admitted to misusing—"multiple times"—employers' financial information and proprietary investment information. The Respondent in this case, John Gore Theatrical Group, Inc. ("John Gore"), is at risk of joining those ranks.

In connection with an alleged violation of their collective bargaining agreement, AEA served John Gore with information requests seeking sensitive financial information and proprietary investment information. For example, the requests sought the names of "each theatrical production" in which John Gore had a "financial interest" or a "managerial interest," the extent of its financial interests, and information about John Gore's and its various affiliates' organizational structures, including the names of shareholders, owners, members, and whether there was any cross-ownership between the affiliated entities. John Gore indicated its

willingness to turn over the requested data. But in light of its sensitivity, as well as AEA's demonstrated inability or unwillingness to keep confidences, John Gore asked for the mildest form of reassurance from AEA: a simple non-disclosure agreement prohibiting publication of the information. AEA signaled its agreement at first, but then reversed course. Rather than negotiate further, AEA preemptively filed an unfair labor practice charge with the National Labor Relations Board (the "Board").

Disregarding overwhelming evidence that John Gore had a legitimate and substantial confidentiality interest in the information, the Board ordered the company to turn over the entirety of AEA's request, without limitation on its use. The Board now applies to this Court for enforcement of that order. The Court should deny that application because John Gore has decisively established the legitimacy of its confidentiality interest.

## JURISDICTIONAL STATEMENT

The Board applies for enforcement of the July 31, 2023 Decision and Order entered by the Board in *John Gore Theatrical Group, Inc.* and *Actors' Equity Association*, which is reported at 372 N.L.R.B. No. 114. The Board had jurisdiction over the proceedings below pursuant to 29 U.S.C. § 160(a). This Court has jurisdiction over the Board's application for enforcement pursuant to 29 U.S.C. § 160(e) because Respondent conducts business in this Circuit. The application was

timely because the NLRA sets no time limit on such filings.

## STATEMENT OF THE ISSUES

1.     Does substantial evidence support the Board's finding that John Gore did not establish a "legitimate and substantial" confidentiality interest?

2.     Did the Board err in refusing to give full consideration to John Gore's argument that the information requested by the union was inherently sensitive?

## STATEMENT OF THE CASE

### A.   The Parties

John Gore presents theatrical plays and musicals. A-69–70. It serves as a "middleman" between touring productions and venues, managing long-term relationships with the venues and facilitating the booking of large shows. *Id.* It is also a member of the Broadway League—a multiemployer member organization of theater owners and operators, producers, presenters, and general managers, as well as suppliers of goods and services to the Broadway industry. A-79; A-81.

AEA is a labor organization within the meaning of § 2(5) of the NLRA. A-19; A-336. The Broadway League and AEA are parties to a Short Engagement Touring Agreement (a "SET Agreement") establishing rules governing the employment of theater professionals in connection with productions lasting up to four weeks. A-19; A-81; A-130. Through its Broadway League membership, John Gore recognizes AEA as the exclusive bargaining representative for all theater

professionals whose employment is governed by the SET Agreement.  A-336.

**B.  AEA's Information Requests and the Parties' Correspondence**

On July 6, 2021, AEA notified the Broadway League that it was evaluating a "possible grievance."  A-284.  AEA expressed a "concern[]" that John Gore had violated the SET Agreement by diverting productions to an affiliate that was not a member of the Broadway League and thus not bound by it.  A-19–20; A-284.

Purporting to exercise its rights under §§ 8(a)(1) and (5) of the NLRA, which sets forth employers' and unions' duties to exchange information relevant to their employer-union relationship, AEA presented forty-nine document requests and attached filings from the offices of the secretary of state in Texas, Georgia, and North Carolina evidencing a corporate relationship between John Gore and the purported affiliate.  A-284–98.  In its request, AEA asked John Gore to disclose the names of "each theatrical production" in which it had a "financial interest" or a "managerial interest," the extent of the financial interests, and information about John Gore's and its various affiliates' organizational structures, including the names of shareholders, owners, members, and whether there was any cross-ownership between the affiliated entities.  A-285–90.  AEA expressed a "willing[ness] to discuss the terms of an appropriate confidentiality agreement."  A-290.

John Gore emailed AEA its initial response, taking the position that a substantial portion of the requested information was confidential—"proprietary" and

4

"non-public." A-304. "[A]s a regular practice," it explained, John Gore asks "recipients of such information to sign a non-disclosure agreement" that "will not interfere with [the recipient's] ability to use the information to bring claims pursuant to the collective bargaining agreement." *Id.* Here, John Gore had a special reason for seeking an NDA: on "multiple occasions" in the past, AEA had published employers' information to the public. A-58–59 (Trial Tr. 54:20–55:1). John Gore attached, and requested that AEA sign, a draft confidentiality agreement. A-304–11.

On October 4, rather than execute the confidentiality agreement or negotiate over its terms, AEA expressed doubts about whether "any of the requested information should be subject to an NDA," and asked John Gore to "explain . . . [the] rationales for seeking confidential treatment for each specific category of information responsive" to the information requests. A-316. John Gore's counsel promptly committed to respond "as soon as possible" after informing AEA that he would be in a hearing for the next few days. *Id.*

The very next day, AEA for the first time confirmed its position that *none* of the material it sought was confidential. A-315. It gave John Gore 48 hours to respond—another unilaterally-imposed deadline. *Id.* AEA then issued an ultimatum on October 13: "If, by 4:00 pm this afternoon, you have not provided us with (a) any documents that you deem non-confidential, and (b) an explanation of why your

5

client believes the remaining responsive documents are confidential, we will file a[n unfair labor practice charge.]" A-317. At 3:38 PM that afternoon, John Gore sent specific responses to each of AEA's forty-nine information requests. A-318–30. John Gore's response concluded with a request that AEA return a signed non-disclosure agreement "within a reasonable period of time." A-330.

With no further explanation or correspondence, AEA filed a charge with the NLRB on November 26, 2021. A-98. The NLRB issued a complaint on June 16, 2022, alleging that John Gore violated §§ 8(a)(1), (5) by "failing and refusing to bargain collectively and in good faith . . . ." A-102–06.

### C. Procedural History

#### 1. The ALJ's Decision

The ALJ presided over a trial on August 30, 2022. A-4–93. In two key rulings, the judge excluded most of the documentary evidence showing that AEA and its members had frequently leaked confidential information entrusted to them by employers. A-81–82 (Tr. 77:18–78:6); A-88 (Tr. 84:4–9). In the first ruling, the ALJ excluded an email from The Broadway League's general counsel to member employers expressing frustration over the fact that AEA leaked to the New York Times an agreement the two entities had recently entered into. A-81–82 (Tr. 77:18–78:6). In another, he excluded in its entirety a three-hour YouTube video, live-streamed to over five thousand viewers, in which an actor disclosed confidential

information obtained from a Broadway League employer member. A-88 (Tr. 84:4–9). Instead, the ALJ merely allowed John Gore's general counsel to be asked questions about the content of the three-hour video and admitted it "solely as a reference to what it is [the witness] was talking about, on the face of it, and that is all." *Id.*

The ALJ opined that John Gore's general counsel "struggled at times to recall specifics" about the YouTube video, and on that basis found her testimony to be less credible than that of AEA's witness, its own counsel. A-340. Though the parties did not dispute whether the requested information was relevant to the AEA's performance of its duties as a collective bargaining representative, the ALJ extensively analyzed the issue and held that all the information was relevant. A-340–41. After trial and post-trial briefing, the ALJ concluded that John Gore violated NLRA §§ 8(a)(1), (5). A-342–43.

The ALJ then decided that John Gore was not entitled to any accommodative bargaining at all. A-341–42. Disregarding its first response to AEA, *see* A-304, the ALJ found that John Gore failed to specifically articulate its interest in keeping the requested information confidential "other than the fact that it has a third-party confidentiality agreement concerning [the information]," A-342. The ALJ reasoned that "a confidentiality agreement alone is insufficient to create a legitimate and substantial confidentiality interest" triggering a union's duty to accommodative

bargaining. *Id.*

The ALJ entered an order requiring John Gore to furnish all the information in AEA's July 6, 2021 information request. A-343–44. John Gore timely excepted. A-349–59.

### 2. The Board's Decision

The Board affirmed in a perfunctory opinion. SPA-1–2 n.3 (372 N.L.R.B. No. 114, slip op. 1 n.3). It incorporated the ALJ's decision in its entirety, left undisturbed the ALJ's credibility findings, affirmed the ALJ's crucial evidentiary rulings with no analysis of its own, and repeated the ALJ's reliance on the proposition that the mere existence of a confidentiality agreement does not suffice to establish a legitimate confidentiality interest. *Id.* The Board concluded further that the confidentiality agreement did not cover the information requested by the Union and that John Gore waived any argument that the requested information was inherently sensitive. *Id.*

The Board applied to this Court for enforcement of its Order. Dkt. No. 1 in Case No. 23-7087 (2d Cir. Sept. 12, 2023). John Gore timely responded. Dkt. No. 29 in Case No. 23-7087 (2d Cir. Oct. 16, 2023).

## STANDARD OF REVIEW

The Court affords the Board "a degree of legal leeway." *NLRB v. Caval Tool Div.*, 262 F.3d 184, 188 (2d Cir. 2001). However, judicial review of the Board's

8

decisions is not "a mere 'rubber stamp.'" *Laborers Int'l Union of N. Am. v. NLRB*, 945 F.2d 55, 58 (2d Cir. 1991). To be upheld, the Board's decision must be grounded in "complete" reasoning. *Id.* A Board decision must "accurately reflect[] its own caselaw," and the Board may not "exceed[] the bounds of its discretion" by "depart[ing] from prior interpretations of the [NLRA] without explaining why that departure is necessary or appropriate." *Serv. Emps. Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 442 (2d Cir. 2011).

This Court must examine whether the Board's factual findings are supported by "substantial evidence in light of the record as a whole," which means "more than a mere scintilla" of evidence. *Elec. Contractors, Inc. v. NLRB*, 245 F.3d 109, 116 (2d Cir. 2001). And the Court must consider "whatever in the record fairly detracts" from the Board's factual conclusions. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The Board's legal conclusions are reviewed for a "reasonable basis in law," *Novelis Corp. v. NLRB*, 885 F.3d 100, 106 (2d Cir. 2018), and its application of law to facts is reviewed *de novo*. *Beverly Enters., Inc. v. NLRB*, 139 F.3d 135, 140 (2d Cir. 1998).

## SUMMARY OF ARGUMENT

John Gore established a legitimate and substantial confidentiality interest in the requested information. The Board's order to the contrary is not supported by

9

substantial evidence. The evidence in the record demonstrates that AEA requests sensitive information under circumstances showing a high likelihood AEA will misuse it absent any safeguards. John Gore presented unrebutted evidence of AEA's past failures to keep private information confidential. AEA failed to assure John Gore that it would preserve the confidentiality of John Gore's financial information. And John Gore is subject to confidentiality agreements it risks breaching if it turns over the requested information with no use limits. These circumstances establish a legitimate and substantial confidentiality interest.

The Board also failed to consider fully John Gore's argument that the requested information was inherently sensitive. The Board incorrectly concluded that John Gore waived that argument. And although the Board purported to analyze the merits of the argument irrespective of waiver, its analysis was incomplete.

This Court should deny the Board's application for enforcement and remand with instructions to dismiss the charge and complaint.

## **ARGUMENT**

### **JOHN GORE DID NOT VIOLATE THE NLRA WHEN IT INSISTED ON THE EXECUTION OF AN NDA BEFORE DISCLOSING CONFIDENTIAL COMPANY INFORMATION.**

An employer is entitled to place reasonable limits on the disclosure of information that is relevant to the enforcement of a collective bargaining agreement if the employer advances a "legitimate and substantial" confidentiality interest.

10

*Pennsylvania Power & Light Co.*, 301 N.L.R.B. 1104, 1105 (1991); *see also Detroit Edison Co. v. NLRB*, 440 U.S. 301, 315 (1979). There is no exhaustive list of informational categories deserving of the "legitimate and substantial" label. *N. Ind. Pub. Serv. Co.*, 347 N.L.R.B. 210, 211 (2006). Rather, it depends on a variety of case-specific factors. *Pennsylvania Power & Light Co.*, 301 N.L.R.B. at 1105 (validity of confidentiality interest "necessarily depends on the particular circumstances of each case"); *Good Life Beverage Co.*, 312 N.L.R.B. 1060, 1062 n.9 (1993) (duty to furnish requested information "cannot be defined in terms of a per se rule").[1]

For one, the strength of an employer's claim to confidentiality is necessarily informed by the requested information's sensitivity. *In re Watkins Contracting, Inc.*, 335 N.L.R.B. 222, 226 (2001). Information is more likely to be deemed "sensitive" where its release requires at least one layer of third-party consent. *Id.* The strength of the claim also turns on the likelihood that the union will misuse the requested information or publicize it over the employer's objection. Thus, the Board has

---

[1] As some examples, the Board has recognized legitimate and substantial confidentiality interests in "highly personal information," "substantial proprietary information," and "that which could reasonably be expected to lead to harassment or retaliation." *Detroit Newspaper Agency*, 317 N.L.R.B. 1071, 1073 (1995). It has done the same for names and phone numbers of customers whose complaints led to an employee's discharge, *GTE Cal., Inc.*, 324 N.L.R.B. 424, 426 (1997), and interview notes "created under an express promise of confidentiality," *N. Ind. Pub. Serv. Co.*, 347 N.L.R.B. at 211.

considered whether the union "offered reasonable assurances that it would respect the confidentiality of the [employer's] documents," and whether the assurance is "in any way unsatisfactory" to the employer. *Island Creek Co.*, 292 N.L.R.B. 480, 491 (1989); *Olivetti Off. U.S.A., Inc. v. NLRB*, 926 F.2d 181, 188–89 (2d Cir. 1991). Where there is significant evidence of prior leaks or unauthorized disclosures, the employer's claim is weightier. *Olivetti Office*, 926 F.2d at 189; *Good Life*, 312 N.L.R.B. at 1061–62.

In light of these principles, there is no question that John Gore established a "legitimate and substantial" confidentiality interest. The Board's conclusion to the contrary is not supported by substantial evidence.

## A. John Gore Established A "Legitimate and Substantial" Confidentiality Interest.

### 1. The Information That AEA Requested Was Inherently Sensitive.

The information requested by AEA included the names of "each theatrical production" in which John Gore had a "financial interest" or a "managerial interest," as well as the amount of John Gore's financial participation. That is sensitive information of competitive significance, in which John Gore has a legitimate confidentiality interest. *See Finch, Pruyn & Co.*, 349 N.L.R.B. 270, 275–76 (2007). It is also financial information subject to heightened sensitivity.

The Board characterized this claim as an impermissible "blanket statement"

12

and "conclusory use" of the descriptor of the term "sensitive." SPA-1 (372 N.L.R.B. No. 114, slip op. at 1 n.3). That is simply untrue. The record shows that John Gore communicated its concerns about sensitivity in various ways—none of them conclusory.

First, as John Gore explained in its very first substantive response to AEA, the extent of its financial participation in each production in which it maintains a financial or managerial interest is "proprietary" information. A-304. This concern was phrased in a concise way because it is self-evident. There is no bright line rule requiring explanations of a particular length.

In addition, John Gore is subject to confidentiality agreements covering this information. Contrary to the Board, John Gore did not simply rely on the *fact* of the confidentiality agreements. Though the mere fact that information is covered by a preexisting confidentiality agreement does not by itself render that information sensitive as a matter of law, *see NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp.*, 789 F.2d 121, 130–31 (2d Cir. 1986) ("the mere promise of confidentiality is not [itself] a defense" to a union's information request); *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276, 294 (3d Cir. 2020) (same), an express promise of confidentiality is, at the very least, evidence of the underlying information's sensitivity. *See Fitspot Ventures, LLC v. Solomon Bier*, 2015 WL 5145513, at *3 (C.D. Cal. Sept. 1, 2015) (confidentiality agreement "is evidence that

13

[party] treats [relevant] information as highly confidential and took reasonable steps to maintain the secrecy of its information"); *N. Ind. Pub. Serv. Co.*, 347 N.L.R.B. at 211–12. And as this Court has explained, the underlying *purpose* of a confidentiality agreement may help explain, and thus establish, the sensitive nature of information that comes within the agreement's terms. *Pratt & Whitney*, 789 F.2d at 130–31.

John Gore entered into these third-party confidentiality agreements to assist its investment partners—production companies—with taking control of the flow of information about shows, including details about casting, branding, and even the names of certain touring productions. One provision especially demonstrates this. It provides that John Gore is prohibited from "disseminating any disparaging comments related to" productions and "shall not reveal in *any manner or medium* any confidential, sensitive, or non-public information . . . concerning the business, affairs, or transactions of the Production, Managing Member, any cast, crew, or company member . . . ." A-122 (emphasis added). The same agreement specifically limits John Gore's ability to "participat[e] in any activity in any public form or on the Internet that involves posting" about the productions it has invested in. *Id.* And all of this is subject to the production company's "prior written consent"— underscoring the provision's role in public-relations strategy. *Id.* These are not ordinary confidentiality provisions, and they supply ample explanation for John

14

Gore's assertion of confidentiality here.

In addition, John Gore is a presenter whose business consists of linking production companies with large venues, A-69–70, so its financial health depends on diligent maintenance of its relationships with production companies. It therefore has a heightened interest in complying with these confidentiality agreements. *See Watkins Contracting, Inc.*, 335 N.L.R.B. at 226 (third-party consent requirement indicates information is sensitive).

The Board erroneously concluded that the confidentiality agreements only cover information disclosed to John Gore as a "consequence" of its investments in Broadway productions. That is both incorrect and beside the point. The agreements provide that John Gore agrees "to keep in confidence . . . *any* non-published information" about theatrical productions it invests in. A-124 (emphasis added). And in any event, the extent of John Gore's financial participation in any given show is, by definition, information John Gore possesses as a result of that investment.

Regardless, the Board missed the point in focusing on whether the confidentiality agreement in fact applied to the requested information. The agreement is at the very least ambiguous, such that a lawsuit alleging breach would not be frivolous. The Board thus placed John Gore at risk of litigation with its confidentiality agreement counterparties. *See TDY Indus., LLC d/b/a ATI Specialty Alloys & Components, Millersburg Operations*, 369 N.L.R.B. No. 128, slip op. at 3

15

(2020) ("liability concerns" give rise to a legitimate and substantial confidentiality interest).

Oddly, the Board focused almost exclusively on distinguishing one case, *Good Life Beverage Co.*, that John Gore had raised below. 312 N.L.R.B. 1060. But that case is squarely on point. There, union auditors sought financial information that was relevant to the union's duty to bargain collectively. There, like here, the employer raised confidentiality concerns because the union had failed to keep financial information confidential in the past. There, like here, the employer never refused to provide the requested information. And the Board concluded there was "no question" the employer had established the validity of its confidentiality interest. *Id.* at 1060–62.

Even if the Board were correct that *Good Life* is inapposite, the Board should not have failed to consider John Gore's remaining arguments and citations, including its analogy to the facts in *TDY Industries*, where the Board inferred the existence of a legitimate and substantial confidentiality interest even without support from specific evidence in the record.

### 2. *John Gore Did Not Waive Its Argument or Raise It in An "Untimely" Fashion.*

Although John Gore consistently maintained before the ALJ and the Board that the information AEA sought implicated confidentiality concerns, the Board faulted the company for the supposed "untimeliness" of its argument. According to

the Board, "a respondent normally must raise any confidentiality claim in its initial response to the information request," SPA-1 (372 N.L.R.B. No. 114, slip op. at 1 n.3 (citing *TDY Industries.*, 369 N.L.R.B. No. 128, slip op. at 2)), which it believed had not occurred here.

The Board's reasoning holds no water. First, there is no rule dictating that confidentiality must be invoked in the employer's very first response to the union's information request. *TDY Industries* simply described this as what "normally" happens. Second, John Gore *did* invoke confidentiality in its first substantive response. It objected on the bases that its investment information was proprietary and that the identities of its affiliates' managers were not public. A-304. There was no need to be more specific. After all, in *TDY Industries* itself, the company representative had raised what were described generically as "confidentiality concerns" about the union's request for information. 369 N.L.R.B. No. 128, slip op. at 3. The Board found the company's conduct proper, even though "the specific confidentiality concerns . . . [were] *not in the record*." *Id.* (emphasis added). *TDY Industries* proves there is no rule conditioning the availability of an argument on whether that specific argument was raised in the employer's initial response to the union.

The "timeliness" rule the Board applied is, in reality, a supercharged waiver rule in disguise. But the waiver doctrine in administrative tribunals is supposed to

17

parallel the waiver doctrine federal courts use. *United States v. Menendez*, 48 F.3d 1401, 1413 (5th Cir. 1995). And in the Second Circuit, an issue need not be addressed "explicitly by name" to be preserved. *Rivkin v. Century 21 Realty LLC*, 494 F.3d 99, 104 n.11 (2d Cir. 2007). This Court can consider, and the Board should have considered, John Gore's mere "rewording" of points it raised not only before the ALJ, but also as early as its first response to AEA. *See Red Tree Inv., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 174 (2d Cir. 2023). The Board may not simply displace this Court's waiver rules with its own.

The draconian rule that the Board invented would require an employer to foresee and raise every specific basis for confidentiality at the outset of negotiations. It would also require the Board to put an artificial gloss on a complex factual record by designating a particular communication as the "initial response," which has definitional problems. Such an inquiry would invariably be arbitrary in cases involving extensive correspondence. It would also be inconsistent with "the primary function and responsibility of the Board," which is to "apply[] the general provisions of the [NLRA] to the complexities of industrial life" and "[appraise] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979).

In any event, John Gore's confidentiality claim was timely raised even under

18

the Board's conception of timeliness. Statutory protections for inherently sensitive information are rare, so the main source of such protections is contract law. And as explained above, such agreements are evidence that a party has a reasonable interest in protecting covered information from unqualified disclosure. *N. Ind. Pub. Serv. Co.*, 347 N.L.R.B. at 211. John Gore's emphasis on the proprietary nature of the requested information, as well as its consistent reliance on its confidentiality agreements, are not neatly separable from its argument that the requested information is "inherently sensitive." John Gore was not required to recite the talismanic phrase "inherently sensitive" to ensure that its argument would receive full consideration by the Board.

**B.      John Gore Presented Extensive Evidence Establishing the High Likelihood that AEA Would Misuse the Requested Information.**

The record is rife with unrebutted evidence showing a high likelihood that AEA would misuse or publicly disclose the information it received from John Gore. That evidence reinforced the strength of John Gore's claim.

### 1.      *Evidence of Prior Disclosures*

At the hearing before the ALJ, John Gore's witness testified that she was "aware of instances where [AEA's] membership has taken to social media, or other public platforms, to reveal what we believe to be confidential information of other parties." A-178 (Tr. 74:15–19). The ALJ found her to be an "honest" witness. A-340. John Gore also introduced proof of a three-hour YouTube live stream in which

19

an AEA member disclosed Broadway League members' personal information.  A-125.

Furthermore, on cross-examination, AEA's witness *volunteered* that the union had failed to keep similar employers' private information confidential "on multiple occasions."  A-58–59 (Tr. 54:23–55:1) ("Q. I expressed to you that [sic] the company's position that the information given to Equity often finds its way out into the public? A. On multiple occasions, yes.").  And after further questioning, AEA's witness confirmed he "didn't necessarily disagree that that happened."  A-59.

### 2.    *AEA Refused to Provide Assurances That It Would Not Publicize Confidential Information about John Gore's Finances*

Under this Court's precedents, the union's failure to assure the employer that it will keep the latter's financial information confidential tends to reinforce the employer's legitimate confidentiality interest.  *Olivetti Office*, 926 F.2d at 188–89.  It is undisputed that AEA's information requests targeted John Gore's financial and investment information.  It is also undisputed that AEA walked back from its initial openness to a confidentiality agreement, taking the position that none of the responsive documents were confidential.  AEA admitted that it made no efforts to carry forward the negotiations concerning John Gore's proposed nondisclosure agreement.  And AEA admitted that, as a general matter, its members "do not like

20

. . . to enter into nondisclosure agreements." A-55–56.

In other words, AEA failed to assure John Gore that it would not publicize the latter's financial information. But rather than view this evidence as contributing to the legitimacy of John Gore's confidentiality interest, the Board ignored it altogether. Indeed, the Board mischaracterized John Gore's arguments about AEA's inability to offer any assurance, referring to the argument as an improper attempt to "satisf[y] its defense burden by offering a nondisclosure agreement as an accommodation." *See* SPA-1 (372 N.L.R.B. No. 114, slip op. at 1 n.3). The Board's position conflicts with the law. In *Olivetti Office*, this Court made clear that an employer's confidentiality interest is strengthened when a union indicates it does not intend to maintain the confidentiality of the information it receives. 926 F.2d at 188–89.

On these facts, it is irrelevant—even if correct—that a conclusory assertion of confidentiality does not suffice to establish a legitimate and substantial interest. *See Pennsylvania Power & Light Co.*, 301 N.L.R.B. at 1105. John Gore did not rely on any one piece of evidence in this way.

## CONCLUSION

The Court should deny the Board's application for enforcement and remand with instructions for the Board to dismiss the charge and complaint.

21

Dated:  January 2, 2024                    Respectfully submitted,

                                          /s/ Mark Theodore

HENRIQUE N. CARNEIRO              MARK THEODORE
PROSKAUER ROSE LLP               PROSKAUER ROSE LLP
Eleven Times Square              2029 Century Park East
New York, NY 10036               Suite 2400
Tel: (212) 969-3993              Los Angeles, CA 90067
hcarneiro@proskauer.com          Tel: (310) 284-5640
                                 mtheodore@proskauer.com

*Counsel to Respondent John Gore Theatrical Group, Inc.*

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,732 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated:  January 2, 2024

/s/ Mark Theodore
Mark Theodore

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated:  January 2, 2024

/s/ Mark Theodore
Mark Theodore

# Special Appendix

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Decision and Order, dated July 31, 2023 ................... SPA-1

SPA-1

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**John Gore Theatrical Group, Inc. *and* Actors' Equity Association.**[1] Case 02–CA–286802

July 31, 2023

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS WILCOX AND PROUTY

On December 6, 2022, Administrative Law Judge Jeffrey P. Gardner issued the attached decision. The

---

[1] We have amended the caption to reflect the correct name of the Union.

[2] The Respondent has implicitly excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] For the reasons stated by the judge and for the separate and independent reasons set forth below, we affirm the judge's conclusion that the Respondent violated Sec. 8(a)(5) and (1) of the Act by failing and refusing to furnish relevant information requested by the Union. We agree with the judge that the Respondent failed to sustain its confidentiality defense for information that was subject to third-party confidentiality agreements and nonpublic organizational information.

To begin, we find no merit in the Respondent's argument that it satisfied its defense burden by offering a nondisclosure agreement as an accommodation for its confidentiality interests. It is well established that the party raising a confidentiality interest must initially establish that the interest is legitimate and substantial. *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 370 NLRB No. 72, slip op. at 1 fn. 2 (2021); *Pennsylvania Power Co.*, 301 NLRB 1104, 1105 (1991). The Respondent failed to do so here.

The Respondent asserts that it established a confidentiality interest based on third-party confidentiality agreements that it had entered. In the circumstances of this case, however, we find that the agreements do not establish a legitimate and substantial confidentiality interest. Here, the Union requested information to ascertain whether the Respondent was diverting production funds in violation of the operative collective-bargaining agreement. The restrictions in the confidentiality agreements prohibit the Respondent from disclosing information that it was privy to *as a consequence* of any investments. Whether or not the Respondent made those investments (the information requested by the Union) is not information that the Respondent was privy to as a consequence of its investments and, accordingly, is not covered by the terms of the confidentiality agreements.

In any event, the mere existence of a confidentiality agreement, of course, does not suffice to establish a legitimate confidentiality interest for purposes of Sec. 8(a)(5) of the Act. See *Crozer-Chester Medical Center v. NLRB*, 976 F.3d 276 (3d Cir. 2020), enfg. in relevant part *Delaware County Memorial Hospital*, 366 NLRB No. 28, slip op. at 1 fn. 2, 9 (2018). In *Crozer-Chester Medical Center v. NLRB*, the Third Circuit observed that:

> Any two parties can agree to keep certain matters secret, but that does not mean that those matters are inherently sensitive . . . . [The respondent employer] does not provide, nor can we locate, any authority permitting an employer to withhold relevant information from a union

Respondent filed exceptions and a supporting brief, the General Counsel and Charging Party filed answering briefs, and the Respondent filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions,[3] and to

---

> based solely on a contractual interest. And that makes sense because allowing employers to withhold relevant information on such a basis would allow private parties to undermine the NLRA's statutory scheme. We therefore agree . . . that [the respondent employer's] contractual interest here did not trump its statutory duty to furnish relevant information to the Union.

976 F.3d at 294.

Additionally, we find no merit in the Respondent's argument, raised for the first time on exception, that the information subject to third-party confidentiality agreements was inherently sensitive investment information. This argument is untimely. *TDY Industries, LLC d/b/a ATI Specialty Alloys & Components, Millersburg Operations*, 369 NLRB No. 128, slip op. at 2 (2020) ("[A] respondent normally must raise any confidentiality claim in its initial response to the information request."). Moreover, even if it had been timely raised, the case the Respondent relies upon, *Good Life Beverage Co.*, 312 NLRB 1060 (1993), is factually distinguishable. In *Good Life Beverage Co.*, the union requested an audit due to the dire financial crisis the employer was in, specifically requesting data regarding certain expenses, salaries, cost of goods sold, and financial statements for the year. Id. at 1060–1061. The Board found that there was "no question" that the employer had legitimate and substantial confidentiality interests in the sensitive financial information. Id. at 1061. Here, by contrast, the Union did not seek an audit, but rather has requested that the Respondent identify in which theatrical productions the Respondent and its subsidiaries have an equity, financial, or managerial interest, and the nature of that interest. There is no overlap in the substance of the requests, and the Respondent gives no further explanation as to how they are comparable. Furthermore, the Respondent's statement that the information is "sensitive investment information" is insufficient because it is a blanket statement that relies entirely on the Respondent's conclusory use of the descriptor "sensitive." See *Pennsylvania Power*, 301 NLRB at 1105 (blanket statements are insufficient to establish a confidentiality interest). Thus, unlike in *Good Life Beverage Co.*, the Respondent did not establish a legitimate and substantial confidentiality interest in the information covered by third-party confidentiality agreements.

We also agree with the judge's finding that the Respondent failed to establish a confidentiality defense regarding the nonpublic organizational information in any case because its claim that the Union tended to publicize private information was not substantiated. As the judge found, the Respondent's witness in support of this claim was "uncertain of specifics and unable to explain" why the Respondent was justified in failing and refusing to furnish the information. The Respondent argues on exception that the judge improperly excluded additional evidence showing that the Union tended to publicize private information. Specifically, the judge excluded an email that asserted the Union had leaked to the press a private settlement between the Union and another employer because it

372 NLRB No. 114

2                                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

adopt the recommended Order as modified and set forth in full below.[4]

### ORDER

The National Labor Relations Board orders that the Respondent, John Gore Theatrical Group, Inc., New York, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively with Actors' Equity Association (the Union) by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) To the extent it has not already done so, furnish to the Union in a timely manner the information requested by the Union in paragraphs 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45 of its July 7, 2021 information request.

(b) Post at its New York, New York facility copies of the attached notice marked "Appendix."[5] Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since October 13, 2021.

(c) Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. July 31, 2023

_____
Lauren McFerran,                    Chairman


_____
Gwynne A. Wilcox,                   Member


_____
David M. Prouty,                    Member

(SEAL)         NATIONAL LABOR RELATIONS BOARD

---

postdated the events at issue in this case by several months. The Board reviews a judge's exclusion of evidence for abuse of discretion. We have carefully examined the record and find no basis for reversing the judge's exclusion of the evidence.

Finally, the Respondent's exceptions note an inadvertent error in the judge's decision. The judge stated that the Respondent has "not turned over any of [the] documents" that are responsive to the requests for non-public organizational information. In fact, the Respondent provided one document that was partially responsive to some of the information requests. We accordingly correct the judge's decision and order the Respondent to furnish the requested information to the extent it has not already done so. This inadvertent error does not otherwise affect the disposition of this case.

In adopting the judge's conclusion that the Respondent failed to sustain its confidentiality defenses, Member Prouty would not rely on the judge's finding that the Respondent effectively held the non-public organizational information hostage to pressure the Union to sign a confidentiality agreement covering additional matters subject to the already-existing third-party confidentiality agreements.

[4] We shall modify the judge's recommended Order to conform to his unfair labor practice findings, to the Board's standard remedial language, and in accordance with our decision in *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022). We shall substitute a new notice to conform to the Order as modified.

[5] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."

If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

SPA-3

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT refuse to bargain collectively and in good faith with the Actors' Equity Association (the Union) by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of our unit employees.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, furnish to the Union in a timely manner the information requested by the Union in paragraphs 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45 of its July 7, 2021 information request.

JOHN GORE THEATRICAL GROUP, INC.

The Board's decision can be found at www.nlrb.gov/case/02-CA-286802 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington D.C. 20570 or by calling (202) 273-1940.



*Tanya Khan, Esq.,* for the General Counsel.
*Mark Theodore, Esq.* and *Ariel Brotman, Esq.,* for the Respondent.
*Eyad Asad, Esq.,* for the Charging Party.

### DECISION

#### STATEMENT OF THE CASE

JEFFREY P. GARDNER, Administrative Law Judge. The charge was filed on November 26, 2021, and the complaint was issued on June 16, 2022. The complaint alleges Respondent violated Sections 8(a)(5) and (1) by failing and/or refusing to provide information requested by the Charging Party Union.[1]

On August 30, 2022, pursuant to the Board's decision in *William Beaumont Hospital*, 370 *NLRB* No. 9 (2020), I conducted a trial via Zoom Government during which all parties were afforded the opportunity to present their evidence. At trial, the parties stipulated to certain jurisdictional facts, and submitted a series of Joint Exhibits (Jt. Exhs. 1 through 13).[2] After the trial, the parties filed timely briefs, which I have read and considered. Upon consideration of the briefs, and the entire record, including the testimony of witnesses and my observation of their demeanor, I make the following:

#### FINDINGS OF FACT

##### I. JURISDICTION

Respondent admits, and I find, that it is a domestic corporation with headquarters located in New York, New York, and facilities located throughout the United States, including a facility located at 1619 Broadway, New York, New York. Respondent further admits, and I find, that it has been engaged in the business of presentation of, and investment in, theatrical plays and musicals, that in conducting its business operations it annually derives gross revenue in excess of $500,000 and purchases and receives goods and services valued in excess of $5000 from points outside the state of New York.

Therefore, I find that Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. In addition, Respondent admits, and I further find, that the Union, Actors' Equity Association is a labor organization within the meaning of Section 2(5) of the Act.

---

[1] The complaint was subsequently amended at trial to stipulate to Respondent's description of its business operations as "presentation of and investment in" rather than "production of" theatrical plays and musicals.

[2] Abbreviations used in this decision are as follows: "Tr." for the Transcript, "GC Exh." for the General Counsel's exhibits and "R. Exh." for Respondent's Exhibits. Specific citations to the transcript and exhibits are included only where appropriate to aid review and are not necessarily exclusive or exhaustive.

4                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

II. ALLEGED UNFAIR LABOR PRACTICES

Background

Pursuant to a Short Engagement Touring Agreement (SET Agreement) between Actors' Equity Association (the Union) and the Broadway League, a multiemployer member organization of theater producers of which Respondent is a member, Respondent has recognized the Union as the exclusive bargaining representative of all the Actors (Principals, Chorus, Stage Managers and Assistant Stage Managers) employed by them, for the purpose of collective bargaining and the administration of matters within the scope of the SET Agreement, the most recent of which has been in effect since April 29, 2019, and ran through November 1, 2020. (Jt. Exh. 1).[3]

Based on public filings that came to the Union's attention, a question arose as to whether Respondent was diverting productions covered by the SET Agreement to an entity called Networks Presentations and/or its affiliates, prompting the Union to investigate a potential grievance. That investigation led to the Union making a series of information requests on the subject of Respondent's business relationships that are at issue herein.

The Union's Information Requests

On July 7, 2021, the Union sent a letter[4] by email requesting that Respondent furnish the Union with a series of information. That letter was addressed to Bernard Plum,[5] an attorney with Mr. Theodore's firm which represented the Broadway League. The information requested by the Union included the following:

1. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had an equity interest and describe that equity interest. For purpose of this letter, "theatrical production" is defined as any live musical and/or dramatic production….

6. For the period January 1, 2018 through the present, identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had an equity interest and describe that equity interest.

9. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

14. For the period January 1, 2018 through the present, identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

17. Identify all employees, officers, shareholders, directors, partners, or members of any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary who are also employees, officers, shareholders, directors, partners, or members of Networks and/or Networks Presentationns, LLC, a Texas Limited Liability Company. For each such officer, shareholder, director, partner, and member, state their position at each such entity, and, if the individual had any equity interest in the entity, state the percentage of such interest.

18. Identify all individuals identified in response to request number 17 who are or were at any time in the period from January 1, 2018 to the present officers, shareholders, directors, partners, or members of Networks. For each such officer, shareholder, director, partner, and member, state (a) the individual's position at Networks; (b) the individual's ownership interest in the Networks and any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary; and (c) the periods of time in which they had those ownership interests.

19. Identify each partnership and/or corporation affiliated with each of the following: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc. and describe each affiliation.

21. For the period January 1, 2018 to the present, identify by production all theatrical productions in which any of the following - JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary – had an equity, financial or managerial interest which subsequently were produced by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company and, for each such play or musical, describe the equity, financial or managerial interest.

25. Was any shareholder or member of JGO a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in JGO and Networks, and state the periods in which they had those ownership interests.

31. Please describe the relationship between Key Brand Family Holdings and The John Gore Organization. Please describe the relationship between Key Brand Family Holdings, *the entity listed in the Texas filing*, and Key Brand Family Holdings, Inc., *the entity listed in the Georgia filing*. Please describe the relationship between Key Brand Family Holdings, Inc. and the John Gore Organization.

33. Please describe the relationship between John Gore Family Holdings, Inc. and the John Gore Organization.

---

[3] Although Respondent denied in its Answer that it employs any actors, it stipulates that it is bound by the SET Agreement, and by Board law with regard to the Union's requests for information herein.

[4] The email was sent on July 7, 2021, though the letter attached to it was dated July 6, 2021.

[5] All of the Union's requests and correspondence relevant to this matter were made through counsel, specifically Hanan Kolko, Esq. All of Respondent's correspondence and production were likewise made through counsel, specifically Mark Theodore, Esq.

SPA-5

JOHN GORE THEATRICAL GROUP, INC.                                    5

35.  Please identify all shareholders, owners and/or members of JGO between January 1, 2018 and the present and state the percentage of their ownership.

36.  Please identify all shareholders, owners, and/or members of John Gore Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

37.  Please identify all shareholders, owners, and/or members of John Gore Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

38.  Please identify all shareholders, owners, and/or members of Key Brand Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

39.  Please identify all shareholders, owners, and/or members of Key Brand Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

42.  Please identify all corporate parents, affiliates, and subsidiaries of the following: JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, and John Gore Family Holdings, Inc.

45.  Was any officer, director, member or managing member of JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, or John Gore Family Holdings, Inc. also an officer, director, member or managing member of Networks or Networks Presentations, LLC between January 1, 2018 and the present? If so, please identify the officer/director/member/managing member and his/her role in each company between January 1, 2018 and the present.

(Jt. Exh. 2).[6]

The information request specifically stated that the Union was "willing to discuss the terms of an appropriate confidentiality agreement" and set a deadline of July 31, 2021, for receipt of the requested information. (Jt. Exh. 2).

On or about July 30, 2021, Respondent replied by email to the Union's information request, acknowledged receipt, and indicated that it would be in touch the following week.  (Jt. Exh. 3). When Respondent did not get in touch by August 24, 2021, the Union sent a follow-up email, noting that no additional response had been forthcoming, and "as a courtesy" extending the due date to September 3, 2021. (Jt. Exh. 4).

On August 26, 2021, Respondent sent an email apologizing for its delay, and advising that it would not be able to meet the new September 3, 2021 requested deadline.  Respondent did state, however, that it would begin work on it and would send a response as soon as possible, hopefully no later than the middle of September 2021. (Jt. Exh. 5).  The Union wrote back on August 30, 2021, to indicate that it would extend the deadline again, "on a non-precedential basis," to September 17, 2021. (Jt. Exh. 6).

Respondent wrote to the Union on September 17, 2021, to report that it was finalizing its response, and would get it to the Union by the end of day Monday, September 20, 2021. (Jt. Exh.

7).  On September 23, Respondent wrote to advise that it was compiling responses to the information request, but asserted for the first time that:

> "It appears a good deal of the information requested is confidential, in that it is considered proprietary. Most of it is non-public, of course.  John Gore as a regular practice requests recipients of such information to sign a non-disclosure agreement, which is attached.  The agreement will not interfere with your client's ability to use the information to bring claims pursuant to the relevant collective bargaining agreement." (Jt. Exh. 8).

Respondent requested that the Union execute and return the agreement, and Respondent would be ready to provide the responses to the Union's information request.

The Union acknowledged receipt of Respondent's email the same day and indicated it would review.  However, on October 4, 2021, the Union wrote to Respondent indicating that it did not understand why any of the requested information should be subject to a non-disclosure agreement (NDA).  The Union requested that Respondent explain its rationale for seeking confidential treatment for each category of information responsive to its request. (Jt. Exh. 10).

Thereafter, the parties exchanged emails over the following days as to when Respondent should be expected to provide the rationales and/or responsive documents, and on October 13, 2021, the Union advised Respondent that if it did not provide the Union by the end of the day with any responsive documents that were non-confidential and an explanation for why it considered other documents confidential, it would file an unfair labor practice charge. (Jt. Exh. 11).

Respondent provided its response that day, identifying various of the Union's requests as not being relevant or indicating that it was not in possession of responsive documents.  For purposes of the information requests at issue in this case, Respondent stated that those information requests sought confidential information, and would be provided once a confidentiality agreement was reached by the parties.

With regard to request nos. 1, 6, 9, 14 and 21, Respondent advised that the information being sought was its equity interests in productions and was confidential because "the equity arrangements are covered by confidentiality agreements with other entities.  For the remainder of the Union's requests." (Jt. Exh. 12). With regard to request nos.17–19, 25, 31, 33, 35–39, 42 and 45, Respondent maintained the information was confidential because it "is not within the public domain and is held confidential" by Respondent. (Jt. Exh. 12).

It is undisputed that Respondent did not provide any documents responsive to any of the Union's July 7, 2021 information requests that are included in the complaint.  The complaint alleges Respondent's unlawful failure to respond as of October 13, 2021, the date of Respondent's written response seeking confidentiality protections.

---

[6]  The complaint lists only the numbered paragraphs that appear here: 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45 are requests which Respondent is alleged to have unlawfully failed to respond.  The omitted paragraphs between 1 and 49 that appeared in the Union's July 7, 2021 information request are not at issue in this matter.

6                  DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

### III. CREDIBILITY DETERMINATIONS

Union Attorney Hanan Kolko testified at the hearing about his communications with Respondent's counsel. I found his testimony to be consistent with documentary evidence in the parties' Joint Exhibits and found his demeanor to be forthright and honest. He was extremely well-prepared with knowledge of the information requests that were made and had a clear recollection of the substance of conversations he had with Mr. Theodore on the subject over the course of two-plus months beginning in November 2021. Mr. Theodore did not testify at the hearing.

Respondent's General Counsel, Sheila Lavu, testified at the hearing about Respondent's position regarding confidentiality. I also found her testimony to be honest, though hesitating at times. Her knowledge was not as comprehensive as that of Mr. Kolko, and she struggled at times to recall specifics. In particular, when testifying as to a YouTube video which Respondent offered as justification for withholding information, she seemed uncertain of specifics, and unable to explain why that video justified withholding the information sought here.

### Analysis

#### 1. All of the information sought by the Union is relevant.

The Supreme Court has long held that an employer must provide a union, on request, with relevant information that is necessary for the proper performance of its duties as the exclusive bargaining representative. *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 153 (1956). Indeed, the Supreme Court has held that an employer's duty to bargain collectively extends beyond periodic contract negotiations and includes its obligation to furnish information that allows a union to decide whether to process a grievance under an existing contract. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436 (1967).[7]

> "A labor organization's right to information exists not only for the purpose of negotiating a collective-bargaining agreement, but also for the proper administration of an existing contract, including the bargaining required to resolve employee grievances." *Southern California Gas Co.*, 344 NLRB 231, 235 (2005) (*citing Hobelmann Port Services*, 317 NLRB 279 (1995); *Westinghouse Electric Corp.*, 239 NLRB 106, 107 (1978).

Accordingly, the Board has long held that Section 8(a)(5) of the Act obligates an employer to furnish requested information which is potentially relevant to the processing of grievances. "An actual grievance need not be pending, nor must the requested information clearly dispose of the grievance." *United Technologies Corp.*, 274 NLRB 504 (1985). However, if there does exist a pending grievance, "an employer's duty to furnish information relevant to the processing of a grievance does not terminate when the grievance is taken to arbitration." *Lansing Automakers Federal Credit Union*, 355 NLRB 1345, 1353 (2010).

Information requests regarding bargaining unit employees' terms and conditions of employment are "presumptively relevant" and must be provided. *Whitesell Corp.*, 352 NLRB 1196, 1197 (2008), adopted by a three-member Board, 355 NLRB 649 (2010), enfd. 638 F.3d 883 (8th Cir. 2011). There is no burden on the part of the Union to prove the relevance of or explain the need for this type of presumptively relevant information.

By contrast, where the requested information is not directly related to the bargaining unit, the information is not presumptively relevant, and the requesting party does have the burden of establishing the relevance of the requested material. *Disneyland Park*, 350 NLRB 1256, 1257 (2007); *Earthgrains Co.*, 349 NLRB 389 (2007). Even in those situations where a showing of relevance is required, whether because the presumption has been rebutted or because the information requested concerns non-unit matters, the standard for establishing relevancy is the liberal, "discovery-type standard." *Alcan Rolled Products*, 358 NLRB 37, 40 (2012). *Caldwell Mfg. Co.*, 346 NLRB 1159, 1160 (2006).

While none of the information sought by the Union in this case would appear to fall under the presumptively relevant category, it is undisputed that all of the requests at issue seek relevant information.[8] The parties are in agreement that apart from the issue as to whether there is a need for specific confidentiality arrangements for any of the requested information, the Union is otherwise entitled to the information it sought.

#### 2. Respondent failed and refused to furnish the Union with relevant information

The General Counsel alleges, and I find, that Respondent violated Section 8(a)(5) and (1) of the Act when, since October 13, 2021, Respondent failed or refused to provide the Union with relevant information, which it requested and is entitled to as the exclusive collective-bargaining representative of the unit.

Respondent's argument to the contrary relies solely on its position that the information the Union sought was confidential, requiring the Union to engage in "accommodative bargaining." The obligation to engage in accommodative bargaining arises in circumstances where a union requests otherwise relevant information for which an employer has "legitimate and substantial" confidentiality interests." *Pennsylvania Power & Light Co.*, 301 NLRB 1104 (1991). "The party asserting confidentiality has the burden of proof. Legitimate and substantial confidentiality and privacy claims will be upheld, but blanket claims of confidentiality will not." Id. at 1105. And, significantly, "[t]he appropriate accommodation necessarily depends on the particular circumstances of each case." Id.

Here, Respondent's position regarding confidentiality can be broken down into two categories of requests. For the first category, request nos. 17–19, 25, 31, 33, 35–39, 42 and 45, Respondent nominally asserted during the parties' communications that it "considers this information confidential" because the information "was not in the public domain." Nevertheless, at all times, including at trial and in its posttrial brief, Respondent has maintained that it would turn over this information if the confidentiality concerns involving the second category of requests were resolved.

---

[7] This is often referred to as "policing the contract." See, e.g., *United Graphics, Inc.*, 281 NLRB 463, 465 (1986).

[8] As to certain of the Union's original requests, Respondent took the position that those requests did not seek relevant information. However, none of those requests are at issue here.

JOHN GORE THEATRICAL GROUP, INC.                                        7

The second category of requests, found in request nos. 1, 6, 9, 14 and 21, seek information that Respondent asserts is covered by third-party confidentiality agreements it has with other entities. Respondent maintains that information is therefore not permitted, let alone required, to be turned over without having a separate confidentiality agreement with the Union. It is this second category of request that is at the heart of the parties' dispute.

With regard to this second category of requests, other than the fact that it has a third-party confidentiality agreement concerning them, Respondent has not articulated specifically why the Union is not entitled to them. But a third-party confidentiality agreement alone is insufficient to create a legitimate and substantial confidentiality interest. *Delaware County Mem. Hosp.*, 366 NLRB No. 28 (2018), *enf'd. in relevant part*, *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3rd Cir. 2020). Respondent also has not provided the Union with a copy of the third-party agreements themselves.

Given these circumstances, I find that Respondent has not met its burden of proof in establishing that any of the requested information comes with the "legitimate and substantial" confidentiality interests required to withhold it from the Union pending accommodative bargaining. Indeed, Respondent has effectively held hostage information in the first category in order to pressure the Union to sign a confidentiality agreement Respondent proposed and which the Union had no reasonable opportunity to bargain over.

Accordingly, I find Respondent's failure to provide the Union with any of the requested information violates Section 8(a)(5) and (1) of the Act.

### CONCLUSIONS OF LAW

1. Respondent, John Gore Theatrical Group, Inc., is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, Actors' Equity Association, is a labor organization within the meaning of Section 2(5) of the Act and represents a bargaining unit comprised of workers employed by the Respondent.

3. Since on or about October 13, 2021, Respondent has committed unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act by refusing to bargain collectively with the Union by failing and refusing to furnish it with certain information it requested on July 7, 2021, that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of Respondent's unit employees.

4. The Respondent's above-described unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

### REMEDY

Having found that the Respondent has engaged in conduct in violation of Section 8(a)(5) and (1) of the Act, I shall recommend that it cease and desist from engaging in such conduct and take certain affirmative action designed to effectuate the policies of the Act.

In particular, I shall recommend that, to the extent it has not already done so, Respondent shall timely furnish the following information to the Union: all of the information in the Union's July 7, 2021 information request nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45.

I shall also recommend that Respondent be required to notify its employees that the Union is entitled to request and receive information related to its role as collective-bargaining representative, and Respondent will not withhold from the Union information which the Union is lawfully entitled to request and receive.

Therefore, Respondent will be ordered to post and communicate by electronic post to employees the attached Appendix and Notice. On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[9]

### ORDER

Respondent, John Gore Theatrical Group, Inc., its officers, agents, and representatives, shall

1. Cease and desist from

(a) Refusing to bargain collectively with the Union, Actors' Equity Association, by failing and refusing to and/or unreasonably delaying in providing the Union information requested that is necessary and relevant to its role as the exclusive representative of the Respondent's unit employees at its 1619 Broadway, New York, New York facility.

(b) In any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the purposes and policies of the Act.

(a) Furnish to the Union, in a timely manner, all of the information requested in the Union's July 7, 2021 correspondence paragraph nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45.

(b) Within 14 days after service by the Region, post at its 1619 Broadway, New York, New York location copies of the attached notice marked "Appendix."[10] Copies of the notice, on forms provided by the Regional Director for Region 2 after being signed by Respondent's authorized representative, shall be posted by Respondent, and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to the physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent

---

[9] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[10] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

8                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since October 13, 2021.

(c) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

#### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT refuse to bargain collectively and in good faith with the Union, Actors' Equity Association, by failing and refusing to furnish it with requested information in a timely manner that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of our unit employees at our 1619 Broadway facility.

WE WILL NOT in any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of our employees in the Unit.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.

WE WILL furnish to the Union in a timely manner the information it requested in its July 7, 2021 information requests nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42, and 45.

JOHN GORE THEATRICAL GROUP, INC.

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/02-CA-286802 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

