# 23-7087

# United States Court of Appeals

*for the*

## Second Circuit

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

– v. –

JOHN GORE THEATRICAL GROUP, INC.,

*Respondent.*

ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD
IN CASE NO. 02-CA-286802

## JOINT APPENDIX
### Volume 1 of 2 (Pages A-1 to A-283)

<table>
<tr>
<td>

RUTH E. BURDICK
BRADY FRANCISCO-FITZMAURICE
MILAKSHMI V. RAJAPAKSE
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

*Attorneys for Petitioner*

</td>
<td>

MARK THEODORE
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

HENRIQUE N. CARNEIRO
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Respondent*

</td>
</tr>
</table>

CP COUNSEL PRESS      (800) 4-APPEAL • (326572)

i

## TABLE OF CONTENTS

**Page**

*Volume 1*

Certified List of the National Labor Relations
Board, dated October 2, 2023 ................................ A-1

Transcript of Hearing Before the ALJ, dated
August 30, 2022 ..................................................... A-4

    GC Exhibits 1A-F .................................................. A-94

    Respondent Exhibit 1 ............................................ A-121

    Respondent Exhibit 2 ............................................ A-123

    Respondent Exhibit 4 ............................................ A-125

    Joint Exhibit 1 ..................................................... A-126

*Volume 2*

    Joint Exhibit 2 ..................................................... A-284

    Joint Exhibit 3 ..................................................... A-299

    Joint Exhibit 4 ..................................................... A-300

    Joint Exhibit 5 ..................................................... A-301

    Joint Exhibit 6 ..................................................... A-302

    Joint Exhibit 7 ..................................................... A-303

    Joint Exhibit 8 ..................................................... A-304

    Joint Exhibit 9 ..................................................... A-313

    Joint Exhibit 10 ................................................... A-314

    Joint Exhibit 11 ................................................... A-317

    Joint Exhibit 12 ................................................... A-318

ii

| | Page |
|---|---|
| Joint Exhibit 13 | A-331 |
| Administrative Law Judge's Order, dated December 6, 2022 | A-335 |
| Order Transferring Proceeding to the Board, dated December 6, 2022 | A-347 |
| Respondent's Exceptions to the Administrative Law Judge's Order, dated January 3, 2023 | A-349 |
| Respondent's Brief in Support of its Exceptions to the Administrative Law Judge's Order, dated January 3, 2023 | A-360 |
| Charging Party's Answering Brief to Respondent's Exceptions, dated January 31, 2023 | A-386 |
| Respondent's Reply Brief, dated February 14, 2023 | A-398 |

A-1

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

|  |  |  |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | No. 23-7087 |
| Petitioner | ) | |
| | ) | Board Case No. |
| v. | ) | 02-CA-286802 |
| | ) | |
| JOHN GORE THEATRICAL GROUP, INC., | ) | |
| | ) | |
| Respondent | ) | |

_____ )

**CERTIFIED RECORD OF THE NATIONAL LABOR RELATIONS BOARD**

Pursuant to authority delegated in Section 102.115 of the National Labor Relations Board's Rules and Regulations, 29 C.F.R. § 102.115, I certify that I am transmitting all documents, transcripts of testimony, exhibits, and other material which constitute the record before the Board in *John Gore Theatrical Group, Inc.*, Case No. 02-CA-286802.

_____
Roxanne L. Rothschild
Executive Secretary
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570-0001
(202) 273-2960

October 2, 2023

A-2

## INDEX TO AGENCY RECORD

| VOLUME I | - | TRANSCRIPT OF HEARING | Pages |
|---|---|---|---|
| | | Volume 1 – August 30, 2022 | 1-89 |

| VOLUME II | - | EXHIBITS | Pages |
|---|---|---|---|
| | | GC Exhibits 1(a-f) | 90-118 |
| | | Respondent Exhibits 1, 2, 4 | 119-128 |
| | | Joint Exhibits 1-13 | 129-351 |

VOLUME III - PLEADINGS

| Date | Documents | Pages |
|---|---|---|
| 12/06/22 | Administrative Law Judge's Order | 352-363 |
| 12/06/22 | Order Transferring Proceeding to the Board | 364-365 |
| 01/03/23 | Respondent's (Gore Theatrical) Exceptions to the Administrative Law Judge's Order | 366-376 |
| 01/04/23 | General Counsel's Request for Extension of Time to File Answering Brief | 377 |
| 01/04/23 | Executive Secretary's Letter Granting Request for Extension of Time to File Answering Brief | 378 |
| 01/31/23 | General Counsel's Answering Brief to Respondent's (Gore Theatrical) Exceptions | 379-390 |

A-3

<u>VOLUME III - PLEADINGS</u> (cont'd)

| <u>Date</u> | <u>Documents</u> | <u>Pages</u> |
|---|---|---|
| 01/31/23 | Charging Party's (Actor's Equity Association) Answering Brief to Respondent's (Gore Theatrical) Exceptions | 391-421 |
| 02/14/23 | Respondent's (Gore Theatrical) Reply Brief | 422-431 |
| 07/31/23 | Decision and Order (372 NLRB No. 114) | 432-439 |

A-4

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 2

In the Matter of:

John Gore Theatrical Group,        Case No.    02-CA-286802
Inc.,

            Respondent,

and

Actors' Equity Association,

            Charging Party.

_____

_____

Place: New York, New York

Dates: August 30, 2022

Pages: 1 through 89

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

A-5

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

## REGION 2

| In the Matter of: | |
|---|---|
| JOHN GORE THEATRICAL GROUP, INC., | Case No. 02-CA-286802 |
| Respondent, | |
| and | |
| ACTORS' EQUITY ASSOCIATION, | |
| Charging Party. | |

The above-entitled matter came on for hearing, via Zoom videoconference, pursuant to notice, before **JEFFREY GARDNER**, Administrative Law Judge, at the National Labor Relations Board, Region 2, 26 Federal Plaza, Room 36-130, New York, New York 10278, on **Wednesday, August 30, 2022, 10:04 a.m.**



A-6

2

<u>A P P E A R A N C E S</u>

**On behalf of the Charging Party:**

    **EYAD ASAD, ESQ.**
    **HANAN KOLKO, ESQ.**
    COHEN, WEISS, AND SIMON
    900 Third Avenue, Suite 2100
    New York, NY 10022-4869

**On behalf of the Respondent:**

    **MARK THEODORE, ESQ.**
    **ARIEL BROTMAN, ESQ.**
    PROSKAUER ROSE, LLP
    Eleven Times Square
    Eighth Avenue & 41st Street
    New York, NY 10036-8299

**On behalf of the General Counsel:**

    **TANYA KHAN, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    26 Federal Plaza, Suite 3614
    New York, NY 10278-3699



A-7

3

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Hanan Kolko | 24 | 46 | | | |
| Sheila Lavu | 64 | | | | |



www.escribers.net | 800-257-0885

A-8

4

E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-1(a) | 10 | 11 |
| GC-1(b) | 10 | 11 |
| GC-1(c) | 10 | 11 |
| GC-1(d) | 10 | 11 |
| GC-1(e) | 10 | 11 |
| GC-1(f) | 10 | 11 |
| **Respondent:** | | |
| R-1 | 70 | 71 |
| R-2 | 71 | 73 |
| R-3 | 74 | |
| R-4 | 78 | 84 |
| **Joint:** | | |
| J-1 | 12 | 14 |
| J-2 | 12 | 14 |
| J-3 | 13 | 14 |
| J-4 | 13 | 14 |
| J-5 | 13 | 14 |
| J-6 | 13 | 14 |
| J-7 | 13 | 14 |
| J-8 | 13 | 14 |
| J-9 | 13 | 14 |



A-9

| | | | |
|---|---|---|---|
| J-10 | | 13 | 14 |
| J-11 | | 14 | 14 |
| J-12 | | 14 | 14 |
| J-13 | | 14 | 14 |



www.escribers.net | 800-257-0885

A-10

6

P R O C E E D I N G S

JUDGE GARDNER: Good morning. This is a formal hearing for the National Labor Relations Board in John Gore Theatrical Group, Inc., case 2-CA-286802. The Charging Party is Actors' Equity Association, and the complaint was issued by the Regional office in New York, Region 2.

My name is Jeffrey P. Gardner, and I am the administrative law judge who will be presiding over the hearing and issuing a decision in this case.

Because of the ongoing COVID-19 pandemic, and with the agreement of all parties, the hearing is being conducted remotely using the Zoom for Government videoconferencing platform. The procedures and protocols for the Zoom hearing were previously discussed with the parties during one or more prehearing conferences, and detailed written instructions and protocols were also included in the case management order, which issued prior to the Zoom hearing. I expect everyone to comply with them and to handle yourselves with the same professionalism you would during an in-person trial.

Because conducting or participating in a Zoom hearing may still be new to some, there may be times when things move a bit slower than they would during an in-person hearing. Technical issues do occasionally arise due to a slow or lost internet connection, or other video or audio problems; however, they should not cause extended delays, assuming everyone has



A-11

7

carefully read and followed the written instructions and protocols.

For those who have joined us only to observe the hearing, you will be keeping both your audio and your video output turned off at all times. I also want to remind everyone, both participants and observers, that no videotaping or audio recording is permitted. Only the court reporter may record the hearing in order to prepare the official record of the proceedings. Any violation of this instruction or other disruption will result in your immediate removal and possible referral to both Zoom and federal authorities, or other sanctions.

So why don't we get started with counsel stating their appearances for the record, starting with the General Counsel.

MS. KHAN: For the General Counsel, Tanya Kahn, T-A-N-Y-A K-H-A-N.

JUDGE GARDNER: And for the Charging Party?

MR. ASAD: Eyad, E-Y-A-D, Asad, A-S-A-D, from Cohen, Weiss, and Simon, LLP.

JUDGE GARDNER: And will the Charging Party have any representative joining for the proceedings?

MR. ASAD: No.

JUDGE GARDNER: Okay.

And for the Employer?

MR. THEODORE: Mark Theodore, M-A-R-K T-H-E-O-D-O-R-E,



www.escribers.net | 800-257-0885

A-12

8

from Proskauer Rose, counsel for Respondent.

And Judge, I can just introduce -- we also have at our table Ariel Brotman, A-R-I-E-L B-R-O-T-M-A-N, who is an attorney at Proskauer. And Ms. Sheila, S-H-E-I-L-A, Lavu, L-A-V-U, the General Counsel of John Gore Theatrical Group, Inc.

JUDGE GARDNER: And we got to meet Ms. Lavu. Is Ariel Brotman on a different camera connection?

Good morning. I don't know if you're going to be taking a witness or participating or what have you. If you do and when you do, you'll obviously join by video and unmute. But for now, we're going to have Ms. Brotman and Ms. Lavu off camera and muted. Thanks.

All right. Let me start by saying that if settlement discussions are desired at any time during this trial, I will be glad to grant a reasonable recess for that purpose. Trial developments sometimes change attitudes and make settlement more possible than had been thought.

Accordingly, I am advising you now, before I have heard any of the testimony, that I do intend to offer an opportunity for settlement discussions at two specific stages of the trial. First, at the conclusion of the General Counsel's case, and second, at the end of the trial. If by inadvertence, I overlook that matter, please do call that to my attention. And in addition, as the trial proceeds, opportunities for



www.escribers.net | 800-257-0885

A-13

9

discussion of settlement will always be available upon request of the parties.

So before we -- we receive the formal papers, let's just talk on the record about how and when the parties have shared, or will share exhibits with the other parties, witnesses, myself, and the court reporter.  I'm going to ask each party to describe for the record what they have done or intend to do, starting with the General Counsel.

MS. KHAN:  General Counsel sent yesterday to all parties, including court reporter and to you, Judge Gardner, Joint Exhibits numbered 1 through 13, and the formal papers.

JUDGE GARDNER:  Thank you.  And I did receive that.

And Charging Party?

MR. ASAD:  We have no exhibits other than General Counsel's joint exhibits.

JUDGE GARDNER:  Okay.

And Respondent?

MR. THEODORE:  Shortly before our witness testifies, we will email all of the exhibits, which are few, I think three or four, to all the parties, including Your Honor and the court reporter.

JUDGE GARDNER:  Okay.  All right.  That should -- I think that should work for everyone, including the court reporter, so thank you.

At this time, I will invite the General Counsel to



A-14

10

introduce and describe the formal papers, which I believe all parties already have in their possession.

MS. KHAN: Would you like me to share it on the screen, or just describe them?

JUDGE GARDNER: Maybe if you share on the screen the index page and then go through each item.

MS. KHAN: Sure. Can everyone see what I have here?

MR. ASAD: Yes.

MS. KHAN: So GC Exhibit 1(a) is the index; 1(b) is the charge that was served -- or the charge dated November 26th, 2021; GC Exhibit 1(c) is the affidavit of service for the charge served on November 26th, 2021; 1(d) is the complaint and notice of hearing in this case that was issued on June 16th, 2022; General Counsel's Exhibit 1(e) is the affidavit of service for the complaint notice of hearing issued on June 16th, 2022; and General Counsel's Exhibit 1(f) is Respondent's answer to the complaint dated June 30th, 2022.

JUDGE GARDNER: Okay. And you are moving that into evidence?

MS. KHAN: Yes, I will be moving -- moving that into evidence.

JUDGE GARDNER: Okay. Is there any objection --

MR. ASAD: No objection.

JUDGE GARDNER: -- to --

MR. THEODORE: No objection, Your Honor.



A-15

11

JUDGE GARDNER:  And thank you.  We may have spoken over each other, I believe it was because I was about to say, so typically if the General Counsel is seeking to admit a document, I'll ask if there's any objections, and -- and let's hear first from the Charging Party on that, and then from the Respondent on that, and then we'll switch that when a party is seeking to introduce exhibits.

So hearing no objections, General Counsel Exhibit 1, the formal papers are received.

**(General Counsel Exhibit Numbers 1(a) through 1(f) Received into Evidence)**

MS. KHAN:  Okay.

JUDGE GARDNER:  Okay.  Before we go any further, is anyone going to be requesting a witness sequestration order in this case?

MS. KHAN:  No, not from the General Counsel.

MR. ASAD:  No, Your Honor.

MR. THEODORE:  No, Your Honor.

JUDGE GARDNER:  Okay.  So we'll slip by that.  And we will go next to address subpoenas and other procedural matters, if any.

So Ms. Kahn, are there any subpoena issues or other procedural matters to address from the General Counsel's point of view?

MS. KHAN:  No subpoena matters, but would now be



A-16

12

appropriate for me to introduce the Joint Exhibits and have them moved into evidence?

JUDGE GARDNER: Sure. That would be great, but let me just first ask if there are any procedural matters that either of the other parties wanted to bring to my attention prior to that.

Mr. Asad?

MR. ASAD: No, Your Honor.

JUDGE GARDNER: Mr. Theodore?

MR. THEODORE: No, Your Honor.

JUDGE GARDNER: Okay. Go ahead, then.

MS. KHAN: Okay. I can just, since all the parties have the joint exhibits, instead of just going through each page, I will just describe each joint exhibit through their number and what they are.

JUDGE GARDNER: Yes.

MS. KHAN: So Joint Exhibit 1 is the short engagement touring agreement rule book for 2019 to 2020.

Joint Exhibit 2 is the July 6th information request from Actors' Equity Association to John Gore Theatrical Group.

JUDGE GARDNER: That is July 6th, 2020 --

MS. KHAN: '21, yes, I -- I apologize. I'll make sure -- all the dates, except for the last, are '21, but I'll read the full date. I apologize.

Joint Exhibit 3 is an email from the Employer's --



www.escribers.net | 800-257-0885

A-17

13

Respondent's counsel to Actors' Equity counsel dated July 30th, 2021.

Joint Exhibit 4 is an email dated August 24th, 2021.

Joint Exhibit 5 is an email dated August 26th, 2021.

Joint Exhibit 6 is an email dated August 30th, 2021.

Joint Exhibit 7 is an email dated September 17th, 2021.

JUDGE GARDNER: Before you keep going --

MS. KHAN: Sure.

JUDGE GARDNER: -- are all of these emails between counsel for Respondent and the Charging Party?

MS. KHAN: They're between Respondent counsel and Charging Party counsel, yes.

JUDGE GARDNER: Okay, go ahead. Joint 8?

MS. KHAN: Joint Exhibit 8 is an email dated September 23rd, 2021, with nondisclosure agreement attachment to it.

Joint Exhibit 9 is an email dated September 23rd, 2021.

Joint Exhibit 10 is an email dated October 4th and 5th, 2021.

Joint 11 is an email dated October 13th --

JUDGE GARDNER: Yep.

MS. KHAN: -- oh I'm sorry.

JUDGE GARDNER: Joint 10, I guess that's a -- a string of emails that spans two days?

MS. KHAN: Two days, yes.

JUDGE GARDNER: Okay.



A-18

14

MS. KHAN: Joint 11 is an email dated October 13th, 2021.

Joint 12 is an email dated October 13th, 2021, with an attachment.

And Joint 13 is a letter dated January 25th, 2022.

JUDGE GARDNER: And who is that to and from?

MS. KHAN: It is from Respondent counsel to Charging Party counsel.

JUDGE GARDNER: Okay. Those are the joint exhibits?

MS. KHAN: Yes, Joint Exhibits 1 through 13.

JUDGE GARDNER: Okay. Are you moving those into evidence?

MS. KHAN: Yes, I am.

JUDGE GARDNER: Any objection?

MR. THEODORE: No, Your Honor.

MR. ASAD: No, Your Honor.

JUDGE GARDNER: Okay. Joint Exhibits 1 through 13 are all received.

**(Joint Exhibit Numbers 1 through 13 Received into Evidence)**

JUDGE GARDNER: All right. If you don't know, let me tell you that we do have the ability to create breakout rooms. If for some reason during the hearing anybody needs a sort of private space to meet with representatives or co-counsel, I can create breakout rooms that operate like, you know, a -- a side caucus room in an in-person hearing. The -- no one else will be able to hear or see you, and you can return to the full hearing when you're ready. So you'll just let me know if at


www.escribers.net | 800-257-0885

any point that is something that you need.

Can I ask if the General Counsel wants to make an opening statement before we begin with the presentation of testimony?

MS. KHAN: I do have an opening statement, yes.

JUDGE GARDNER: Okay. You can go ahead.

MS. KHAN: Okay.

Good morning, Your Honor, counsel for the General Counsel will show Respondent in this matter unlawfully failed and refused to provide information to the Union, which is relevant to and necessary for the union's representational duties, in violation of Section 8(a)(5) of the National Labor Relations Act.

Actors' Equity Association represents actors and touring productions produced by Respondent and other signatories to the short engagement touring agreement, or SETA. Under rule 7 of SETA, all contracts of employment are bound by the rules of the agreement, by not only the signatories of SETI -- of SETA, or by any and all corporations, co-partnerships, enterprises, and/or groups which said signers or each of them directs, controls, or is interest in and hereby agreed to be adopted as their contract by each of them.

Upon information and belief, Actors' Equity Association researched whether Respondent was diverting productions to a nonunion entity and found that it had a significant affiliation with an entity called Networks.



A-20

16

In order to investigate further and decide whether or not a grievance should be filed in this matter, Actors' Equity Association sent Respondent a request for information on July 6th, 2021. The information request contained 49 paragraphs, broadly seeking information related to Respondent and Networks. Respondent did not respond to Actors' Equity information request until September 23rd, when Respondent first raised that much of the information provided -- or requested was confidential.

Thereafter, on October 13th, Respondent answered Actor Equity -- Actors' Equity's information request but for 18 of the 49 paragraphs requesting information. Respondent maintained that information was either subject to a third-party agreement or broadly confidential, and that they would need a nondisclosure agreement and other accommodations regarding how the information would be handled by Actors' Equity.

Actors' Equity agreed to negotiate a nondisclosure agreement for information subject to third party agreements. When informed Respondent that does not explain how other information sought, not subject to a third party agreement were still confidential under Board law.

Respondent has failed to sufficiently support its burden as to why information not subject to third party agreements is confidential, and therefore would require accommodation, and is therefore unlawfully refusing to provide information to Actors'



**A-21**

17

Equity, in violation of the Act.  Thank you.

JUDGE GARDNER:  I just want to ask you -- (indiscernible).

MR. THEODORE:  We lost you there, Judge.

MR. ASAD:  I'm sorry, Your Honor.  We -- we can't hear you.

MS. KHAN:  Yeah, you -- you cut out.

JUDGE GARDNER:  How about now?

MS. KHAN:  Better.

JUDGE GARDNER:  Okay.  I wanted to ask for the 18 paragraphs that are the subject of this complaint, are they divided into two subsets, one that -- one set that are subject to third party agreements of some sort, and another subset that are not?

MS. KHAN:  Correct.  There are some that are subject to third party agreement, and there are some that the -- that Respondent is asserting are confidential.

JUDGE GARDNER:  Okay.  And is the Respondent also asserting that the third party agreement ones are confidential?

MS. KHAN:  Correct, and they would need a nondisclosure agreement to release that information.

JUDGE GARDNER:  And then the ones that are not the subject of a third party agreement, is Respondent maintaining that -- that those are confidential, too, they just aren't subject to the third party agreement?

MS. KHAN:  Correct.



**A-22**

18

JUDGE GARDNER: Okay. So we'll hear more about that as we go through. I wanted to ask about the complaint and answer, but in your case, I guess the complaint, paragraph 2(a), the last line alleges that Respondent is engaged in the production of theatrical plays and musicals, and the answer, while admitting to most of the allegation, but specifically denies that last line and asserts instead that it's in the business of presentation of, and investment in theatrical plays and musicals.

Is the -- is that of any significance to the General Counsel, or did you want to amend the complaint to -- to allege that that's what they do? Or are you going to be putting on evidence to -- to prove otherwise?

MS. KHAN: The General Counsel doesn't raise issue with the Respondent's clarification, but for the clarity of the record, we would stipulate that -- how Respondent clarified in their answer, we would accept that.

JUDGE GARDNER: Okay.

Mr. Asad, did you want to make any separate opening statement?

MR. ASAD: No, we adopt the General Counsel's opening. Yeah, thank you.

JUDGE GARDNER: Mr. Theodore, do you want to make an opening statement?

MR. THEODORE: I do, Your Honor.



A-23

19

So good morning, Your Honor.  As you can tell from the pleadings and the pretrial discussions, this is an information request case, which automatically puts it into a case that is fairly well-defined in the law.

We admit in our answer the information sought is relevant.  The Respondent has never taken a position otherwise.  The case is fairly unique, however.  There are two classes of information that Respondent considers to be confidential and worthy of protection from disclosure outside the grievance procedure.

The first class of information, which is embodied in Respondent's responses to Charging Party's information requests 1, 6, 9, 14, and 21, which are detailed in Joint Exhibit 12, asserts the information sought is prohibited from disclosure by a confidential -- confidentiality agreement with a third party.  That two parties have agreed to be legally bound by such a provision by definition makes the information confidential for purposes of the National Labor Relations Act.

While the obligation to provide information under the Act is liberal discovery type standard, liberal does not mean unlimited.  The term liberal discovery type standard comes from civil litigation.  Such information would not be turned over in litigation without addressing the third party legal obligations.

In civil litigation, it is commonplace to provide



A-24

20

confidential information to an opposing party under some type of protective order. That's all Respondent asked for here. Respondent sent a draft nondisclosure agreement to the Charging Party, which is Joint Exhibit 8. This was the easy part. The Charging Party was obligated to engage Respondent in discussions over how to make sure the information could be turned over and respect the confidentiality agreements with third parties.

The evidence will demonstrate Charging Party did nothing to engage in any discussions over confidentiality. Indeed, in the last Joint Exhibit, 13, the last official correspondence between the parties, Respondent pointed out that as of January 2022, three months after providing its initial response, Charging Party still had made no engagement on the issue of confidentiality. Charging Party did not, during the relevant time frame, or since then, make a counterproposal or any kind of suggestion as to how to resolve the issue. Instead, it stuck to its position that the information is not confidential, and that it should be allowed to receive the information and use it any way it wants, even beyond the -- the grievance procedure.

The second class of information, confidential information concerns, that raised by what Respondent had to do with nonpublic information that the union seeks. This encompasses Respondent's response in Joint Exhibit 12 to item 17, and the



**A-25**

21

other remaining items that are listed in the complaint. Respondent considers this information confidential and asks that it be protected from disclosure to the public due to the fact, as will be demonstrated, that Charging Party has a tendency to disclose information to its members, who then disclose it to the public. Respondent's concerns were hardly alleviated in this regard when there was no engagement by Charging Party over this issue.

We would ask that the complaint be dismissed. The Charging Party has failed in its obligation to engage with Respondent to address what are real objective concerns about confidentiality of the information requested. Thank you.

JUDGE GARDNER: Okay. And is there -- with regard to one or the other of these, there's an agreement that the information is relevant, but is the General Counsel alleging that it's presumptively relevant, or -- but that it is -- and nevertheless, the General Counsel has, or rather the Charging Party, has established the relevance based on the circumstance of the case?

MS. KHAN: The Charging Party has established the relevance under the circumstances of the case.

JUDGE GARDNER: And no one's claiming that -- that this type of information is presumptively relevant, but that in fact instead, it is -- the relevance has been established, and the Respondent does not dispute that relevance.



www.escribers.net | 800-257-0885

**A-26**

22

So I guess the issue for me is how to treat Respondent's claim of confidentiality for all of the documents, or a subset of it being the additional circumstance of -- of the third party agreements impacting it, and the conduct of the parties, I guess, maybe more so the -- the Charging Party, in terms of their obligations to, I'll say bargain over accommodations for confidential information.  Do I understand the case so far?

MS. KHAN:  Correct.

MR. THEODORE:  Thank you, Your Honor.

JUDGE GARDNER:  Okay.  So is there anything else before we hear from our first witness?

MS. KHAN:  Nothing from the General Counsel.

MR. ASAD:  Nothing from the Charging Party either.

MR. THEODORE:  Nothing from Respondent, Your Honor.

JUDGE GARDNER:  Okay.  Would the General Counsel please call their first witness?

MS. KHAN:  Okay.  So our first -- our first witness will be Hanan Kolko.

MR. KOLKO:  Good afternoon.

JUDGE GARDNER:  Okay, Mr. Kolko.  Can I ask you to raise your right hand, please?

Whereupon,

<u>**HANAN KOLKO**</u>

having been duly sworn, was called as a witness herein and was examined and testified, telephonically as follows:



A-27

23

JUDGE GARDNER: Okay. You can put your hand down, and please state your full name for the record, and -- and spell both your first and last name.

THE WITNESS: Hanan, H-A-N-A-N, last name is Kolko, K-O-L-K-O.

JUDGE GARDNER: Thank you. And there's just a few things I want to remind you about before the attorneys start asking you questions.

First, it's very important that you listen carefully to each question before answering. Don't start speaking or answering until you're sure the question is finished. The court reporter is recording and cannot have more than one person speaking at a time.

Second, if someone objects during the attorney's question, hold off on answering and wait for me to rule on the objection.

And third, let us know immediately if you are having any trouble with your audio or video. You can -- if you're having trouble communicating, you can wave your hand in front of the camera so we can see it, but we want to make sure you're hearing us and seeing us, and we're hearing you and seeing you.

And last, but not least, if you lose your video or audio completely, for example, if your device shuts down or you lose your internet, just check the power and your other connections, and just reboot and reconnect, and we'll be here waiting for you, all right?



A-28

24

THE WITNESS:  Thank you, Judge.

JUDGE GARDNER:  Okay.

Go ahead, Counsel.

MS. KHAN:  Thank you, Your Honor.

**DIRECT EXAMINATION**

Q    BY MS. KHAN:  Good morning, Hanan.  How are you?

A    I'm well, thank you.

Q    Okay.  And Mr. Kolko, can you please tell me, who are you employed by?

A    Cohen, Weiss and Simon.

Q    And what position do you currently hold at Cohen, Weiss and Simon?

A    I'm a lawyer there, and I'm a partner at the firm.

Q    And are you familiar with Actors' Equity Association?

A    Yes.

Q    How are you familiar with Actors' Equity Association?

A    Two fold.  A, it's a -- it's a client of the firm, but B, it -- it's a union that's got a public prominence, and so I'm generally aware of it.

Q    Okay.  And are you familiar with the Broadway League?

A    Yes.

Q    And can you describe, what is the Broadway League?

A    It's a multi-employer association that bargains with Actors' Equity.

Q    Okay.  And can you describe for me what the short -- short



A-29

25

engagement touring agreement is?

A    Sure.  People call that the SET agreement.  It is one of the agreements between the Broadway League and Equity, and it applies to touring shows, as opposed to shows on Broadway.  It applies to shows that go out on tour.

Q    Okay.  And are you familiar with John Gore Theatrical Group?

A    Yes.

Q    And how are you familiar with John Gore Theatrical Group?

A    Well, A, it's a signatory to the SET agreement, and B, it's -- it's -- it's -- it's a big employer, it's a big act -- it's a big participant in -- in the theatrical world.

Q    Okay.  I'm going to show you what's already been moved into the record and pre-marked as Joint Exhibit 2.  I'm going to share it here on the screen so everyone can see it, but -- can you see the document?

A    Yes.

Q    Okay.  Do you recognize this document?

A    Yes.

Q    Can you describe for me what this document is?

A    Yes.  It's an information request that I sent on July 7th to Bernie Plum on behalf of Equity, with regard to John Gore organization or what I'll call Gore, and it -- and it was -- it was sent on July 7th, although it's dated July 6th.

Q    Okay.  And just quickly, who is Bernard Plum?



www.escribers.net | 800-257-0885

A-30

26

A He's a partner at Proskauer, and he represents the Broadway League. He certainly represented them at that time, and I understand he still represents the League now.

Q Okay. After sending this document on July 6th or July 7th, as you stated, did you receive a response to this?

A Yes.

Q Okay. I'm going to show you what's been pre-marked as Joint Exhibit 3. And I'm just going to scroll down because of the -- if there's marks here at the top. Do you recognize this document?

A Yes.

Q Can you describe for me what this document is?

A Yeah, that's a July 30, 2021 email I received from Bernie Plum in response to the information request that I had sent him on July 7th. And it -- it tells me that he's been engaged by Gore in connection with that.

Q Okay. And did you receive a response or a follow-up to this email on July 30th?

A I did not, no.

Q Okay. I'm going to show you now what's been pre-marked as Joint Exhibit 4. Do you recognize this document?

A Yes.

Q And can you describe for me, please, what this document is?

A Sure. In Bernie Plum's July 30th email, he said he was



www.escribers.net | 800-257-0885

**A-31**

27

going to be getting back to me the following week.  He did not, and so on August 24th, I sent him this email as a follow-up and to say that we wanted the responsive information by September 3rd of '21.

Q    Okay.  And did you receive a response to this August 24th email that you sent to Bernard Plum?

A    Yes.

Q    Okay.  I'm going to show you what's been pre-marked as Joint Exhibit 5.  Do you recognize this document?

A    Yes, this is Bernie Plum's August 26th email to me, in response to my August 24th email, and he tells me that he's not going to be able to give me a response by September 3rd because of Labor Day and Rosh Hashanah, and so he said he thought he could get me a response by no later than the middle of September.

Q    Okay.  And I'm going to show you what's been pre-marked as Joint Exhibit 6.  Do you recognize this email?

A    Yes.

Q    And can you just describe briefly what this email is?

A    Sure.  It's my response to Bernie Plum's email of the 26th.  I sent it on Monday, the 30th, saying effectively that without prejudice to Equity's rights, and on a nonprecedential basis, we would extend the deadline for a response to the July 7th information request to September 17th.

Q    Okay.  And did you receive a response from Respondent


www.escribers.net | 800-257-0885

A-32

28

on -- on September 17th to your information request?

A    Well, I didn't get a substantive response, but I got an email from Bernie Plum, telling me that he would get me materials for a response on the 20th of September.

Q    Okay.  And I'm just going to show you what's Joint Exhibit 7.  Can you describe this document?

A    Sure.  That's the email that I got on Friday, the 17th of September, telling me that they were finalizing a response to the July 7th information request, and planned to get it to me by the end of the day on Monday, which was -- which would've been the -- the 20th of September.

Q    And did you receive a response to those documents by the 20th?

A    No.

Q    Okay.  And I'm going to show you what's Joint Exhibit 8. Can you describe for me -- do you recognize this document?

A    Yes.

Q    Can you describe for me what this document is?

A    Sure.  It is an email I got from Mark Theodore on the afternoon of September 23rd.  Mark Theodore is Bernie Plum's partner.  And what he's telling me is that most of the responsive information is nonpublic and considered proprietary, and Gore routinely asks recipients of that type of information to sign an NDA.  And he attached an NDA for my review, and he represented that the NDA wouldn't interfere with Equity's



**A-33**

ability to use the information under the relevant collective bargaining agreements and asked me to sign it and send it back to him.

Q     Okay.  And I'm just going to scroll down.  Is this the NDA that was attached to that email?

A     Yes.

Q     Okay.  I'm going to show you what's been pre-marked as Joint Exhibit 9.  Do you recognize this document?

A     Yeah.  So we had an email exchange on the 23rd.  And in my email of the 23rd at 12:30, I asked if he was going to be sending me a similar or identical proposed NDA in connection with what that says there, the Nederlander information request.

Q     Okay.  And -- sorry, I apologize.

A     On behalf of the Union on July 7th, I had also sent to Bernie Plum a similar information request with regard to Nederlander, which was another signatory.  And so in my September 23rd email, I was asking whether I was going to get an identical NDA or something different.  And then in an NDA in a response -- in an email response a couple of hours later, on the afternoon of the 23rd, Mark said, this is the client's, NDA.  He'll check to see what Nederlander wants to do.  And just by way of explanation for the judge, there's no claim against Nederlander.  Nederlander has nothing to do with this charge.

Q     Okay.  Thank you.  I'm going to show you what's been



A-34

30

marked as Joint Exhibit 10.  And I'm just going to scroll down a little bit.  Do you recognize this document?

A    Yeah.  So I'm going to actually -- if you could just scroll down a little bit more.

Q    Uh-huh.

A    Yeah.  So thanks.  So on -- on October 4th of '21, I sent an email to Mark saying, we don't understand why any of the requested information that we've asked for should be subject to an NDA.  Tell us your client's rationale for seeking confidential treatment as to each of the specific category of information that we've asked for.  Because we asked for about 45 different types of information, so I wanted to get the specific rationales for each of the -- to the extent that it appeared to me that they were seeking confidentiality for everything,  I wanted the specific rationales for each of the types of information sought.  And that -- that was what my October 4 email said.

Q    Okay.  And then just scrolling up.  Can you just describe what the rest of this document says?

A    Yeah, sure.  Mark responded later that morning, saying he would get back to me with a rationale, but he was in a hearing. I then responded, I think on the 5th, saying that we didn't agree that any of the material was confidential, but that since we had asked for this stuff on July 6th, almost three months ago, we wanted rationales as to why the responsive documents



A-35

31

were confidential by the end of the day on the 7th of October.

Q    Okay.  And just scrolling up a little bit more.  Can you just describe the remainder of this document?

A    Yeah.  Mark sent back an email on the 5th in the morning saying that, you know, we had talked about a September deadline.  We raised the issue of confidentiality.  Now we understand your client's taking the position that none of the information is confidential.  I responded by saying, look, you've had this for three months and that you should probably be able to tell us why your client thinks that all of the documents have to be treated as confidential.  And so I said, from our point of view that the deadline still stands.  That was the October 7th deadline.  And what I was trying to get was the specific rationales for each of the categories that Gore was seeking to be treated as confidential.

Q    Did you receive a response by October 7th?

A    No.

Q    Okay.  I'm going to show you now what's been pre-marked as Joint 11.  Do you recognize this document?

A    Yes.

Q    And can you just briefly describe what it is?

A    Yes.  It was an email I sent on the morning of the 13th of October, basically saying, if by 4:00 this afternoon you don't give us, A, the documents you think are nonconfidential and B, an explanation as to why your client thinks the remaining



A-36

responsive documents are confidential, we're going to file a ULP.

Q    Okay.  And I'm going to show you what's been pre-marked as Joint 12.  And I'll scroll down.  But do you recognize this document?

A    I do.

Q    Okay.  And can you describe what this is?

A    Yes.  It's an email along with an attached letter I got from Mark Theodore.  I think the email was sent by a colleague of his at the firm.  And it transmitted a response to the July 7 information request.  I remember getting it on the afternoon of October 13th because I was on the way to Newark Airport.  I was going away for a little bit.  So I remember getting it in the car as I was on Routes 1 and 9, getting off from Newark.

Q    Okay.  And is -- as I scroll down, is this the attachment to that email?

A    Yes.

Q    Okay.  So after receiving this document was the -- was Actor's Equities' information request from July 7th fulfilled?

A    No.

Q    Okay.  And did you have -- after receiving this document dated October 13th from -- the -- from Respondent, did you have a follow up conversation with Respondent regarding the October 13th response?

A    Yes.



A-37

33

Q    When?

A    On November 3rd, I spoke to Mark Theodore.

Q    Okay.  And how was the conversation?  Was it in person, on the telephone?

A    No.  All of my conversations with -- with Mark were via telephone.  He was in Los Angeles, and I'm in New Jersey.

Q    Okay.  And can you describe to me what the conversation was on November 3rd?

A    Yeah.  So what I said was, from the board's point of view, there are three buckets of information that are entitled to confidential treatment.  One is information that's protected by the attorney client privilege.  And I said, we're not asking for any of that.  Number two is information that's of a personal nature, such as a person's Social Security number or information about a person's medical condition.  And I said, we're not asking for that.  And number three is information that's a trade secret or proprietary.  And I said, of the information that you want an NDA for, tell me why that's a trade secret or proprietary.  And he said that, broadly there were two types of information for which he was seeking an NDA, and one related to investments that Gore had in productions.  And the other related to, broadly, what he called ownership.  And I specifically asked him for the rationales for why he sought an NDA for requests 1, 6, 9, 14, 17, 18, 19, 21, 25, 31, 33, 35 through 39, 42, and 45.  And what he said was that with



www.escribers.net | 800-257-0885

A-38

34

regard to, broadly, the ownership group, he didn't have -- he couldn't fit it into one of those buckets that I talked about. That it's -- his client considered it to be confidential, he's telling me, but he couldn't fit it into one of those three conceptual buckets. With regard to the requests that sought information about Gore investments into productions, he said that some of that was subject to nondisclosure agreements with third parties. He said to me at some point in that conversation, that his client was concerned that Actors' Equity members often put stuff up on social media, and his client didn't want material that they provided to the Union to end up on social media. He said, you know, he didn't want to see it on YouTube. At some point in the conversation, he said that, you know, when Gore invests in these productions, they don't control whether they're Union or not. That was getting more to the substance of whether Gore is investing in nonunion productions and what the implications of that were. But again, I said, look, with regard to trade secrets, in my mind, there are two broad categories. One is kind of -- kind of Federal Rule 26 trade secrets. For instance, the formula for Reese's Pieces. Right? Like, you're entitled, a business is entitled to maintain the confidentiality of something like that. And then the other thing I said was, things the release of which would cause competitive harm to the releasing business. And so what I said was, for instance, if -- if Gore has plans to open



www.escribers.net | 800-257-0885

A-39

35

up a theater in Chicago in the future, and it wants to keep that secret because it doesn't want its competitors to know and then be able to adjust, that's a thing where there would be competitive harm, so that would be a thing where there would be a legitimate confidentiality. And I said, of the things -- not -- not counting the third-party NDA stuff, but -- but the other stuff, does it fall into one of those two categories? And he didn't -- he didn't say yes. The answer was essentially no, he couldn't fit it into those categories. And so that's -- to the best of my knowledge, that's the conversation of November 3rd. On the substance, I will also say that we -- we schmoozed a little bit on the call, although we didn't know each other. We are in the same world. And so we kind of exchanged pleasantries. We -- we shot the breeze for a little bit.

Q    Okay. And how long, in total, would you say this conversation was on the -- on the 3rd?

A    I would say it was -- it was 20-odd minutes, but definitely five or six minutes were shooting the breeze.

Q    Okay. Did you have another conversation with Respondent regarding the information request after November 3rd?

A    Yes.

Q    Do you recall the date?

A    Yes, it was on the 11th. It was -- it was the following week.



36

Q    And can you describe for me that conversation?

A    Yeah, so there, I said that I wanted to get the rationale for the requests for which they sought confidentiality that weren't the ones covered by the third-party agreements. And I asked if they had any kind of specific rationale for that category, and he said no. And I specifically asked them for -- for the rationales that they had for 17, 18, 19, 25, 31, 33, 35 through 39, 42 and 45. Those were the requests where they said they wanted an NDA, but not where they said that there's a third-party NDA covering them. And so I was trying to focus on the specific rationales for the Employer's request for an NDA for those. And other than telling me earlier in the conversation that he didn't have a specific rationale, he said that they wanted to try to work it out, but they wanted some agreement with regard to how it was going to be used.

Q    Okay.

JUDGE GARDNER: Question. You, Mr. Kolko, are rattling off the paragraph numbers. I mean, just so smoothly and comprehensively. And I'm wondering if these are -- like there's a stock list of 1 through 49, and so of course, you know what those are? Or are you just -- just so intimately familiar with this case that you can rattle those numbers off as quickly as that?

THE WITNESS: No, actually, Judge, there's not a stock list. No. This is not an off-the-rack suit. The information



**A-41**

37

request was a custom suit. And honestly, I prepared for this, and -- and I wanted to make sure that I accurately described what I was asking Counsel about. And so I was trying to make sure that I was describing in that November 11th conversation, the requests where the Respondent sought confidentiality, but wasn't asserting that it was subject to a third-party NDA. That was kind of what I was trying to focus on in that conversation. But I prepared because I haven't testified before, and so I was nervous.

JUDGE GARDNER: Okay. Very good. Go ahead, Ms. Khan.

Q BY MS. KHAN: Okay. Was there anything else discussed in that November 11th conversation with Mr. Theodore?

A I don't remember. If there was, I don't remember it.

Q Okay. Did you have a -- any additional conversations with Respondent on the information request after November 11th?

A Yes.

Q Okay. Do you recall the date?

A Yeah. It was December 9th, and it was after we had filed the ULP. I think we had filed the ULP either the week of Thanksgiving or the week after Thanksgiving.

Q And can you describe for me what the conversation was on this -- on December 9th?

A Yeah. My memory is that Mark called me. He said he didn't have a proposal, but he wanted to check in. In that conversation, he said something to the effect of, they needed



A-42

38

an NDA, but he didn't need a kidney.  And I understood him to be saying that it didn't need to be such an onerous NDA.  And in that conversation, a couple of times, he said to me something to the effect of, if we can resolve the material covered by a third-party NDA, I think the rest of it will go away.  And something to the effect of, I think I can then push back on my client.  And he reiterated in that conversation that his client didn't want to end up seeing this stuff on Twitter.

Q    Did you ever receive another version of an NDA from Respondent in this, besides the one sent previously on the 13th of October?

A    No.

Q    Okay.  Did you have an additional conversation -- any additional conversations with Respondent after December 9th on the information request?

A    Yes.

Q    Do you recall the date of that next conversation?

A    Yes.

JUDGE GARDNER:  Hang on (audio interference).

THE WITNESS:  Sorry.  I lost -- I lost my feed for a second -- yes.  I did have another conversation.  I had a very brief conversation on the evening of the 22nd of December --

MS. KHAN:  We lost you again.

JUDGE GARDNER:  Uh-oh.

A    Sorry about that.  I had a conversation on the evening of



**A-43**

39

the 22nd of December, maybe 6:30 or so Eastern.  And I -- you know, we exchanged pleasantries.  I was going away for the holiday, but I said that I wanted to be able to get the material that wasn't covered by the third-party NDAs.  That is basically, I understood that there was two buckets, the stuff not covered by the third-party NDAs, I had not gotten a satisfactory explanation for why it should be treated confidential.  So in the -- the quick call on the 22nd of December, I said, get me the stuff that's not covered by the third-party NDAs.  That was a very quick call.  I was headed for the holidays, and I assumed he was close to the holidays as well, you know, going somewhere.  I don't know.

Q    And what was Respondent counsel's response to you saying that?

A    You know, I don't remember a specific response.  I mean, we probably wished each other Merry Christmas or whatever.  It was a quick call.

Q    Okay.  Did you have a -- did you receive any additional information after December 22nd?

A    Well, I -- I did.  A couple of things happened in between then and when I got it, but yes.

Q    Okay.  And so was there -- between -- after December 22nd did you have an additional conversation with Respondent?

A    I did, yes.

Q    What -- do you recall the date of that?



A-44

40

A    Yeah, it was January 6th.  It was after the holiday.  I called him to check in to see where things were and to see what I could get.  And he said that because of Omicron and the impact it was having on Broadway, that his client's energies were completely taken up with Omicron.  And that was not much of a substantive conversation.  We commiserated about the -- about the impact that Omicron was having on -- on the theater, actually, and on people that we knew.  It was pretty -- it was not the best time, and so it was not a substantive conversation.  I understood that Gore was really dealing with a more immediate crisis.

Q    Okay.  After January 6th, did you have additional conversations with Respondent on the information request?

A    Yeah.  On either January 13th or 14th I asked kind of what he had for me, and he said he was in the process of checking with his client and would get back to me.  That was a very quick call.  I was actually away for a week and so I was trying to minimize the amount of work I was doing.

Q    Okay.  And after the 13th to the 14th, did you have additional conversations?

A    Yeah, it was either the 13th or 14th.  It wasn't both days.  I'm not sure which of those days it was.

Q    Okay.  But did you have another conversation after that?

A    Yeah, we spoke on the 20th.  And in that call, I said that I wanted to get the stuff that wasn't covered by the third-



A-45

41

party NDA. I didn't want my receipt of that material to be held up by the bargaining over what we would do with regard to the stuff covered by third-party NDAs. And I said that my client was unhappy with his client. I probably said they were pissed off at him. And I said it seemed to my client like there were something to hide. And he said something to the effect of, I'll tell my client, you're yelling at me. And I said, you know, Mark, that's not our relationship. I'm actually not yelling at you, but yeah, we're pissed off.

Q   Okay. And I'm now going to show you what's been pre-marked as Joint 13. Do you recognize this document?

A   Yes.

Q   Can you describe for me what this document is?

A   Yeah. It's a letter that I got that was emailed to me on January 25th from Mark Theodore. And it responds to some of our information requests by giving us a chart of productions that Gore invested in. And it also makes an information request to Equity.

Q   Okay. Does this January 25th, 2022 response from John Gore, does that fulfill the July 6th information request that the -- that Actors' Equity sent?

A   Not entirely, no.

Q   Okay. So after you received this document, did you have additional follow up conversations with Respondent on the information request?



www.escribers.net | 800-257-0885

A-46

42

A    Yes.

Q    Okay.  Do you recall when?

A    Yeah.  We spoke on the evening of the 27th.  And I said that I wanted to get the stuff that wasn't covered by a third-party confidentiality agreement.  I didn't want that -- I didn't want that stuff held hostage by the bargaining over the third-party confidentiality agreement.  And he said something to the -- to the effect of he would see what he could do.  And that was the last call we had before the issuance of the complaint, to my -- to my knowledge.

Q    And has -- since January 25th, has there been any additional information responsive to the July 6th information request sent to Actors' Equity?

A    No.

Q    Okay.

MS. KHAN:  Nothing further, Your Honor.

JUDGE GARDNER:  Okay.

Mr. Asad, did you have any questions for the witness?

MR. ASAD:  No, Your Honor, I don't.

JUDGE GARDNER:  (Audio interference).

MR. THEODORE:  Your Honor, you're breaking up again.

JUDGE GARDNER:  It might be -- my setup has the microphone further away from me.  (Audio interference) hear me okay now?

MS. KHAN:  It's choppy a little bit.

JUDGE GARDNER:  I was asking if Mr. Theodore wanted to



www.escribers.net | 800-257-0885

A-47

43

cross-examine the witness.

MR. THEODORE: Yes. Did this witness give an affidavit?

MS. KHAN: Yes.

MR. THEODORE: And all statements that he's given, I would like to see.

MS. KHAN: Okay. I will send that over.

JUDGE GARDNER: And what is it that you're going to be sending, Ms. Khan?

MS. KHAN: I will be sending to Mr. Theodore the -- Mr. Kolko's affidavit that he was given in support of the charge.

JUDGE GARDNER: How many --

MR. THEODORE: Are there any other state -- I'm sorry, Your Honor. Go ahead.

JUDGE GARDNER: How many pages is that affidavit?

MS. KHAN: I'll tell you right now. It's 12 pages.

JUDGE GARDNER: Okay. And Mr. Theodore was about to ask, as I was. Are there any other statements that would fall under Jencks that General Counsel will be turning over?

MS. KHAN: No, Your Honor. Just the -- just the affidavit. And I apologize. Just to clarify, the statement is actually 10 pages, the document is 12, but the last two were just template pages. So it's ten pages of relevant statements.

JUDGE GARDNER: And you're going to email that to Mr. Theodore?

MS. KHAN: Yes.



A-48

44

JUDGE GARDNER: Mr. Theodore, does -- is Brotman need copies? Is she going to be reviewing this?

MR. THEODORE: If you wouldn't mind, I can send it to her, too. And we're mindful that we'll delete it after we're done with it for sure.

MS. KHAN: I'll send it to Ms. Brotman as well.

JUDGE GARDNER: Okay. Being transmitted by email to Mr. Theodore and Ms. Brotman, for preparation for the cross-examination of Mr. Kolko. It's ten pages. How long would you like to review that before you begin your cross, Mr. Theodore?

MR. THEODORE: Your Honor, given Mr. Kolko's testimony, I don't think it'll be very long. If you could just put the three of us on our side into a breakout room, and I think -- I don't think it'll be longer than 10 or 15 minutes.

JUDGE GARDNER: Okay. Okay.

MR. THEODORE: If that's okay.

JUDGE GARDNER: And then we can -- just for ease, we're doing -- I think we're all in different places. So I don't know if you have plans to print that out, or if you're just going to view it electronically.

MR. THEODORE: I'm not going to print -- I'm not going to print it out. I will -- we will share it, with your permission, with the client, the General Counsel, and then just discuss, you know -- and then we'll have a few questions for Mr. Kolko, and I think we'll be done.



A-49

45

JUDGE GARDNER: Okay. Just so -- anyone who is going to be viewing, we just need to make sure that they understand that they -- if they make a -- if they print it or make a physical copy, it will need to be destroyed at the conclusion. And if there is an electronic copy that is transmitted, it should not be saved. It should be deleted and removed from the deleted box, also, at the conclusion. So we'll review that, and you'll need to confirm that on the record when we -- when we finish with the witness.

So right now, I am going to create a breakout room. Room number 1. There it is. Respondent to (audio interference) General Counsel (audio interference) at all. And I (audio interference) -- if there's a breakout with the General Counsel that would include the Union?

MS. KHAN: Yes.

JUDGE GARDNER: All right. So for Respondent, I'm going to assign Ms. Brotman, Mr. Theodore and (audio interference).

MR. THEODORE: And I'm just confirming that we received, Your Honor. Thank you.

JUDGE GARDNER: Okay. Thank you. And I'm going to assign right now Ms. Khan, Mr. Asad to the General Counsel room. After Mr. Kolko finishes his testimony, I will add him for future breakouts to that room. But right now, Mr. Kolko is going to stay in main room with myself and the court reporter. Okay?



A-50

46

So we're going to take about a 15 minute break.  It's 11:06.  So we'll come back at 11:20.  If you aren't back on your own, I'll summon you from the breakout rooms.  Mr. Kolko, you're welcome to get up from your chair and use the restroom, grab a drink, whatever it might be.  But you're not going to be speaking with anyone about your testimony or the case, okay?

THE WITNESS:  I'm just going to step away.  Thank you, Judge.

JUDGE GARDNER:  I'm opening the rooms now, so you should get a pop up on your screens.  And I probably could have said all those things off the record, but right now we are going to go off the record.

(Off the record at 11:06 a.m.)

JUDGE GARDNER:  Mr. Theodore, are you ready to proceed?

MR. THEODORE:  I am, Your Honor.

JUDGE GARDNER:  Go ahead.

### CROSS-EXAMINATION

Q    BY MR. THEODORE:  Good morning, Mr. Kolko.

A    Good morning.

Q    So I just wanted -- I only have a few questions for you. In your original information request in July of 2021, which is Joint Exhibit 2, if we could bring that up, you made 49 separate requests for information, is that correct?

A    Yes.

Q    Okay.  And in that --



A-51

47

MR. THEODORE:  And Your Honor, I'm asking Ms. Brotman, will bring up the exhibit for me, if that's okay.

JUDGE GARDNER:  Yeah.

MS. BROTMAN:  Do you see it?

MR. THEODORE:  Yes.  And could you scroll down, Ariel?  If you just go to the last paragraph.

Q    BY MR. THEODORE:  Now, you wrote this letter, Mr. Kolko?

A    I was -- I was the main author, Mark.  You know, in a law firm, there's never one set of eyes.

Q    Okay, fair enough.  But you ended up signing it and sending it, correct?

A    Yes.

Q    And you sent this -- even though it's dated the 6th, you sent it the 7th, correct?

A    Yes.

Q    And if I can just draw your attention to this final paragraph, which appears to be on page 7 of your letter.  Do you see that?

A    Yes.

Q    And it says, starting with the second sentence, "Equity is willing to discuss the terms of an appropriate confidentiality agreement, should you believe that any information or documents responsive to these requests are confidential."  First of all, did I read that correctly?

A    Yes.



A-52

48

Q    Okay.  So you were inviting Gore to -- if -- if it considered some things confidential, that you would engage on a nondisclosure agreement, correct?

A    Yeah.  Yes.

Q    Okay.  And I just wanted to make sure, for purposes of the record, that you were acting as an agent of Equity, correct?

A    Yes.

Q    Okay.  And you -- and I was the principal agent for Gore. You're not aware of any other agent for Gore, right?

A    You -- it transitioned from Bernie Plum to you, once you sent me the email September 23rd.

Q    Right.  And -- but you and I had spoke about all the substantive pieces of it?

A    Yeah.  I don't think I had a substantive conversation with Bernie Plum.  I think it was on the emails that are in the record.

Q    Okay.  And we -- we communicated by letter with each other, correct?

A    Yeah.  You sent me the letter of October 13th and January 25th.  Yes.

Q    Okay.  And we communicated by telephone as well?

A    Yes.

Q    And email?

A    Yes.

Q    Do you have my cell phone number?



A-53

49

A    Yeah.  I think -- I'm 99 percent certain that I do.

Q    Yes.  And I have yours?

A    I'm almost 100 percent certain because I think every call we had was on my cell phone.

Q    Okay.  So -- and you were making -- when we were speaking about these issues with Gore, you were speaking as an agent of Equity, correct?

A    I was their attorney.  Yeah, I think I was acting as their agent.  Yes.

Q    For purposes of the information request.

A    Yeah.  Yes.

Q    You're their attorney, also.  And -- okay.  And -- so we -- we, ultimately I sent you, which is Joint Exhibit 8 in the document that has a draft nondisclosure agreement?

A    Yes.

MR. THEODORE:  And Ariel, you don't need to bring that up.

Q    BY MR. THEODORE:  And you replied eventually, and I think it's Joint 9, that you -- you said you would review it, correct?

A    Yeah.

Q    Okay.  And then ultimately, you took the position that you didn't -- you didn't agree that any of the information was confidential.  Is that correct?

A    Well, I said I needed an explanation for you as to why the material you sought confidential treatment for was con -- the



www.escribers.net | 800-257-0885

A-54

50

rationale for seeking that treatment.

Q    Okay.  And -- but you stated that you didn't believe in that -- in the email, that any of the information was confidential.  Isn't that correct?

A    Well, the October 4th email says what it says, Mark.

MR. ASAD:  Could you -- could you just share the email that you're referring to?  Yes, sure.  It's -- it's Joint Exhibit 10.  It's October 5 email.

THE WITNESS:  Yeah.  Yeah, actually, it was not October 4th, it was October 5.  I think what I said in the October 5 email of 12:01 p.m., was that you should be able to promptly explain why your clients believe all of the documents have to be treated as confidential.  So I was asking for the rationale for the assertion that all of it had to be subject to an NDA.

Q    BY MR. THEODORE:  Okay.  And if you look at the first email in this chain, you did -- you did say, right, first, we do not agree that any material responsive to the information request is confidential?

A    Yeah.  Early in the morning -- yeah.  Again, Mark, the October 5th email is 6:43 a.m. speaks for itself.  A, we don't agree that it's confidential, but B, give us your rationales as to why the documents are confidential by October 7th.  So that email says what it says, and it says, hey, we don't think it's confidential, but B, give us the rationales.

Q    No, I understand.  And for purposes of -- I'm not trying



A-55

51

to argue with you, Hanan.  For purposes of the record, all of the documents speak for themselves, but you testified as to all of them anyway.  So I'm just following up on some of them.  Okay.  So when I sent you the letter on October 13th responding to the information request, I articulated with respect to some of the items that they were covered by confidentiality agreements.  Isn't that right?

A     Yes.

Q     Okay.  And it's true that Equity has never made a counteroffer with respect to a nondisclosure agreement?

A     We never sent back to you a draft nondisclosure agreement. That's true.

Q     Okay.  And -- yeah, you never said, hey, you know, yours is too onerous.  Here's -- here's one we'd be willing to sign?

A     That's correct.

Q     Okay.  And you never invited anybody to sit down and say, hey, let's sit down and talk about the scope of a nondisclosure agreement?

A     Well, I spent a lot of time talking to you to try to get a detailed rationale for you -- from you as to why Gore wanted to keep -- wanted to have much of this subject to an NDA.  So I did that.  But it is true that you and I did not talk about what the NDA would look like.  That's true.

Q     Okay.  And at some point you told me during our conversations that the members at Equity do not like Equity to



A-56

52

enter into nondisclosure agreements.  Isn't that right?

A    I'm -- I'm sure that I said that to you, yes.

Q    And that's a fact, right?  They don't -- they don't like it because they mistrust the members or want transparency. Isn't that right?

A    So I'm going to be careful.  There's probably 40,000 members.  I don't know what all of the members think.  I know what I was told.  And I think what I told you what I was told.

Q    Right.  Right.  But you were stating that -- that's one of the reasons, right?  That you -- that you were having difficulty entering into a nondisclosure agreement.  Isn't that right?

A    Well, that and the fact that you weren't giving me a good rationale for why you wanted a nondisclosure agreement for much of what I was asking for.

Q    Okay.  And with respect to the other items that are in -- let me ask you this.  Did you ever -- you never asked to even see the -- the third-party confidentiality agreements, did you?

A    I did not.  And I think -- I didn't want to get into that conversation while the other stuff was being held up.  I didn't want -- I didn't want the other stuff to be held hostage to third-party NDA stuff, and so I thought it was a two-step process, and you never got me what I needed to get to step two.

Q    And you've -- you've been a labor lawyer for a number of years?



www.escribers.net | 800-257-0885

A-57

53

A    You're looking at my gray hair, yeah.

Q    And you -- you've engaged in a -- in a capacity as a person who engages in collective bargaining on behalf of your clients?

A    Yes.

Q    And it's routine, is it not, that there are tradeoffs in negotiations?

A    In bargaining?  Yeah.

Q    Okay.  And so it's not -- it's not uncommon for a party to hold on to something in order to get something else.  Isn't that correct?

A    In contract bargaining, yes.  In talking about nondisclosure agreements, I don't think it's comparable to say that a party can hold on to material that it doesn't have a rationale for treating confidential in order to get better terms for material that it does have a rationale for.  So to the extent you're making that analogy, I don't think that that's an apt analogy.

Q    But I guess what -- I want to make sure that you're understanding the question.  And I think you are.  But I'm asking -- I'm asking something a little more specific, which is, I'm not asking why you did or not -- did not do something.  I'm asking in bargaining, there -- it is often the case that there are tradeoffs, correct?

A    Yes.



www.escribers.net | 800-257-0885

A-58

54

Q    And that's not limited to what I think you termed it, as contract bargaining, right?  There's lots of things.  That's not limited to contract bargaining, correct?

MR. ASAD:  I'm just going to object.  I just think that this is just a little bit vague and going a little bit afield.

JUDGE GARDNER:  Well, I mean, I don't want to listen.

MR. ASAD:  I'm sorry.  I can't hear you, Judge Gardner.  Sorry.

JUDGE GARDNER:  I'm going to overrule the objection.  But let's get to the point.

MR. THEODORE:  Right.

Q    BY MR. THEODORE:  Yeah, I just wanted to make -- I'm just confirming, I think, what are -- what are basic things that there are -- there are bargaining that is outside of actual contract bargaining, correct?

A    Yes.

Q    Party engaging.  Okay.  And there are tradeoffs associated with that, correct?

A    Yes.

Q    Okay.  So with respect to the, sort of, second group of confidentiality, which is about the nonpublic information of the organization, which starts in the company's response to item 17 of Joint Exhibit 12.  I expressed to you that the company's position that the information given to Equity often finds its way out into the public?



www.escribers.net | 800-257-0885

A-59

55

A    On multiple occasions, yes.

Q    And I cited to you YouTube videos and tweets where it occurred.  Isn't that right?

A    Yeah.  I think one time you'd said you didn't want stuff to end up on YouTube, and one time you said you didn't want stuff to end up on Twitter.

Q    Okay.  And you didn't necessarily disagree that that happened, right?

A    I think that that's right.  I don't think I said no, it doesn't happen.  I think that that's correct, Mark.

Q    Okay.  And that sort of -- and that -- and that was a concern that was raised by me about how this information would be treated.  Isn't that right?

A    Yes.

Q    And so in asking about protection for the second, sort of, tranche of information, I signaled to you that we were willing to try to find some accommodation just about how it would be used, if it wasn't a full NDA.  Isn't that right?

A    Yeah, but you never gave me a proper rationale as to why any of it should be -- as to why that second bunch should be subject to an NDA at all.

Q    Well, I understand that's your position.  I'm just saying that that was the concern of Respondent, right?  That it needed to have some kind of information -- some kind of protection over the use of that information.



A-60

56

A    Yes.  You definitely said you didn't want it out there on social media.  You repeatedly said you were trying to get what you could get from the client.  But at the end of the day, we got nothing.

Q    Now, you said at some point when you were in --

MR. THEODORE:  Ariel, if you'd bring up Joint Exhibit 13.  That -- let me wait till it comes up.  And just scroll down a little bit.  Right there.

Q    BY MR. THEODORE:  Now, I think you said, and I just wanted to make sure that the record is clear on this, that this was the first time we made an information request of Equity?

A    No, no.  If I said that I was wrong.  I think you had -- I think that that the request that is on the second page of the January 25th letter, I am 99 percent sure was also in the October 13th letter.

Q    Okay.  I just wanted to make sure that that was clear.  It came out -- I don't think you were, you know, it just seemed -- I think the way it was said.  Okay, so -- at any point -- eventually -- so Equity had not answered the information request from --

MR. THEODORE:  Strike that.  I don't need that.

Q    BY MR. THEODORE:  So you're aware that Equity reached a settlement agreement with the Broadway League concerning the use of nondisclosure agreements in the industry?

A    So I'm not the main lawyer at Cohen Weiss who handles


www.escribers.net | 800-257-0885

A-61

57

Equity stuff.  I am generally aware that there was some agreement reached in connection with Rudin, but the truth is -- sorry about that.  I lost my --

Q    Hang on.  Yeah.

A    Yeah.  Sorry about that.  So I'm not the main lawyer at Cohen Weiss who handles Equity matters.  I'm generally aware that there was some deal reached with regard to -- to nondisclosure agreements with -- with Rudin, whatever the Rudin organization is called, but only in the broadest sense.  And I genuinely don't know the details.  I just wasn't involved in that.

Q    Understood.

MR. THEODORE:  Your Honor, I don't have anything further.  Thank you, Mr. Kolko.

THE WITNESS:  Thanks, Mark.

JUDGE GARDNER:  Okay.

THE WITNESS:  You can call me Hanan.

MR. THEODORE:  Hanan.

JUDGE GARDNER:  Did the General Counsel have any redirect in response to that cross?

MS. KHAN:  General Counsel does not have any redirect.

JUDGE GARDNER:  Okay.  So Mr. Theodore and Ms. Khan --

MR. ASAD:  Your Honor, could I just have a -- I'm sorry.  Could I just have a moment with the General Counsel in a breakout room?



www.escribers.net | 800-257-0885

A-62

58

JUDGE GARDNER:  Sure.  Hang on.

THE WITNESS:  Do I have time to go get -- fill my water cup?  Do I have two minutes here?

JUDGE GARDNER:  Yeah.  Why don't we take -- we'll go off the record for a five minute break.  I haven't (audio interference).

MR. THEODORE:  Thank you.

THE WITNESS:  Thanks very much.

MR. ASAD:  Thank you, Your Honor.

JUDGE GARDNER:  We're off the record.

(Off the record at 11:47 a.m.)

JUDGE GARDNER:  Okay.  There -- appears there's nothing further for Mr. Kolko as a witness, so I thank you.  I appreciate your participation today.  You are welcome to remain in the hearing as an observer.  I'm just going to ask you to drop off of the video.  And if you are leaving altogether, enjoy the rest of your(audio interference).

Mr. Theodore and Ms. Brotman, if you have made -- well, I'm just going to ask you to make a representation on the record of what, if any, copies you've made of the affidavit, and what you -- what steps you've taken to destroy those.

MR. THEODORE:  Your Honor, I made no copies.  We did not print out the affidavit, and I'll represent for myself and Ariel and Sheila that it has been deleted from both our inboxes and our deleted items files.



A-63

59

JUDGE GARDNER: Okay. Thank you very much.

Any other witnesses for the General Counsel?

MS. KHAN: No further witnesses from the General Counsel.

JUDGE GARDNER: Is the Charging Party planning to put on any separate case in chief?

MR. ASAD: No, Your Honor.

JUDGE GARDNER: Okay. As I indicated at the start of the hearing, at the close of the General Counsel's case, I was going to offer the parties an opportunity to discuss settlement. And so now is that time.

Is there any inclination to -- you know, to take an early lunch and you'd have the opportunity to have any such discussions before resuming after lunch with Respondent's case? Does that make sense? Anyone?

Or alternatively, let me ask Mr. Theodore, how long do you anticipate your case lasting?

MR. THEODORE: Your Honor, I think we just have one brief witness. And I, you know, estimation of time, it will be less than Hanan's testimony and you know, it's just a witness to confirm the -- mostly the existence of the third-party agreements. And you know, the -- the -- some other items. So it would be fairly quick if we wanted to try to push -- push through, at least from my estimation.

JUDGE GARDNER: Maybe that makes more sense. Although first, let me get an answer to my question whether -- is anyone



A-64

60

inclined to engage in settlement discussions at this time?

MS. KHAN: General Counsel is always willing to engage in settlement discussions, but that doesn't matter. The parties aren't.

JUDGE GARDNER: That -- that does not appear to be where we are right now.

Mr. Theodore? Responding Party?

MR. THEODORE: I think we're always open as well. But I don't know that anything would -- that anything has changed from the case, Your Honor.

JUDGE GARDNER: Okay. Is there -- and here we are, fast forward to the end of August 2022. And do I understand correctly that the Respondent is prepared to turn over 30 of the documents requested if there were a satisfactory NDA?

MR. THEODORE: That's absolutely correct, Your Honor, with respect to those items that -- that are identified as covered by third-party agreements, yes.

JUDGE GARDNER: With respect to the others?

MR. THEODORE: I think as part of our defense, we would want some kind of agreement about how it could be used, whether it's a full NDA or something less, I think.

JUDGE GARDNER: I'm only talking in terms of potential settlement. And it's -- from the position of the Charging Party, again, only for purposes of settlement, are the -- is it the case that the Charging Party just is not inclined to enter



A-65

61

into any kind of NDA?  Or is there some acceptable language that the Charging Party would agree to?  Or is it, like, in principle they don't want to sign one?

MR. ASAD:  Well, you know, I would just echo Mr. Kolko's testimony, which is that absence of a rationale for the confidentiality of the information, we would be hard pressed to enter into --

JUDGE GARDNER:  There is obviously a rationale.

MR. ASAD:  I'm sorry.  You're -- you're cutting out, Judge.

JUDGE GARDNER:  There's a -- rationale has been apparently expressed with regard to those items subject to third-party agreements.

MR. ASAD:  Right.  Those -- those are third-party agreements.  Right.  I mean, I think we need to do some exploration as to what those limits are in the third-party agreements.

JUDGE GARDNER:  It's 2022.  Has no exploration happened to this point?

MR. ASAD:  I'm sorry, I didn't catch what you said.

JUDGE GARDNER:  Has there been no exploration of that?

MR. ASAD:  Of the third-party agreements?

JUDGE GARDNER:  Yeah.

MR. ASAD:  No, we don't know -- we don't know what the contents are of those third-party agreements.  As we've been



A-66

62

saying, the -- there's been two tranches of documents that have been withheld.  One set pertains the ownership of those docum -- of -- of various entities, hasn't been turned over for just for bald confidentiality reasons.  And the other set is the third-party agreements.  And so we just we haven't even got the stage of looking into the third-party agreements because we just haven't we haven't received the other set of documents yet.

JUDGE GARDNER:  You haven't received third-party agreements?  All you have is the assertion that they exist?

MR. ASAD:  That's correct.

JUDGE GARDNER:  Is that the correct understanding?

MR. ASAD:  Yeah.  That's right.

JUDGE GARDNER:  All right.  Well, we're going to take lunch.  And we're going to come back at 1:00 and hear Respondents.  And --

MS. KHAN:  Okay.

MR. THEODORE:  1:00, Your Honor?  Okay.

JUDGE GARDNER:  And have a -- an early finish this afternoon.

MS. KHAN:  Okay.

JUDGE GARDNER:  I should say for those of you are still here, you can -- you can leave the meeting or stay in the meeting.  Just make sure that you mute, and you know, you shut your video, but also make sure to mute your line because I will



A-67

63

be keeping the meeting open. And we'll see you at 1. All right?

MS. KHAN: Thank you.

(Off the record at 11:55 a.m.)

JUDGE GARDNER: Back on the record.

MR. THEODORE: Okay. Ms. Brotman will email the exhibits to everybody right now, in advance, consistent with the case management order. And if you want to give us one moment for everybody to receive those, Your Honor.

JUDGE GARDNER: How many are we expecting?

MR. THEODORE: There are four exhibits.

JUDGE GARDNER: Okay. This will be R1-4.

MR. THEODORE: Correct. We'll also have Ms. Brotman show them during the testimony, of course, but --

JUDGE GARDNER: Yes. All right. And let's go ahead and go off the record until we all have those and can take a look. Just for, you know, about three minutes. Hopefully, they'll come.

(Off the record at 1:07 p.m.)

JUDGE GARDNER: Go ahead, Mr. Theodore. You can call your first --

MR. THEODORE: Thank you, Your Honor. Respondent calls Sheila Lavu.

JUDGE GARDNER: All right. Good afternoon.

THE WITNESS: Good afternoon.



A-68

64

JUDGE GARDNER:  Would you please raise your right hand?

Whereupon,

**SHEILA LAVU**

having been duly sworn, was called as a witness herein and was

examined and testified, telephonically as follows:

JUDGE GARDNER:  Okay.  Thank you.  You can put your hand

down.  Would you please state your full name for the record,

and spell both your first and last name?

THE WITNESS:  Sheila Lavu, S-H-E-I-L-A L-A-V-U.

JUDGE GARDNER:  Okay.  Thank you.  I know you've been

present for the hearing thus far.  So you heard my earlier

instruction.  But just as a quick reminder, please do remember

to wait for each question to be completed before answering.  If

someone objects, please wait until I rule on that objection

before answering.  If there are technical issues, let us know

that immediately, so there's no confusion on whether anyone is

being understood.  Last but not least, if you lose your video

and audio altogether, just sign back in and we'll pick up where

we left off.  Okay?

THE WITNESS:  Thank you.

JUDGE GARDNER:  Go ahead, Mr. Theodore.

**DIRECT EXAMINATION**

Q    BY MR. THEODORE:  Thank you, Your Honor.  Good afternoon,

Sheila.

A    Good afternoon.



A-69

65

Q      You work for John Gore Theatrical Company, Inc.?

A      I work for John Gore Theatrical Group, Inc.

Q      Group.  Okay.

A      And I am the general counsel and secretary.

Q      Okay.  How long have you been in that role?

A      I've been in that role since July 1st, 2020.

Q      Okay.  And prior to that, did you have a role with the company?

A      Yes.  Prior to that, I had a role with the company as well as its parent organization and other affiliates.  I had been associate general counsel since January 2013.

Q      Okay.  And in your role as general counsel you -- you were a lawyer, correct?

A      Correct.

Q      Okay.  And can you just tell us briefly what your duties are as the general counsel and secretary?

A      Sure.  I am monitoring anything that implicates the law with our company.  As part of that, I also monitor labor relations.

Q      Okay.  And can you tell us what John Gore Theatrical Group, Inc. does?

A      Yes.  John Gore Theatrical Group, Inc. is a presenter of Broadway touring shows.  The company assists in providing -- in formulating relationships with venues where touring productions are able to be presented to the public across North America.



www.escribers.net | 800-257-0885

A-70

66

Q    And in that role as a presenter, is that a term of art in the industry?

A    Yes.

Q    And it's -- is there any additional definition than what you gave to it?

A    Well, the presenter is really responsible, I almost think of it as a middleman, for assisting with -- with booking the productions to visit the venues in different places and managing long-term agreements with the venues.  However, the presenter is not the same thing as a producer, meaning that we are not involved with the creative aspects of the show, employing the actors, you know, and the logistics of -- of getting the show up and running.  There are essentially three different parties, in my mind from where I'm sitting, that need to be in place to present the show.  And that's the venue where the show is happening, the producer who is in charge of, again, employing the actors, and having the show go on, and then the presenter who is helping unite those two and bring the show to fans across -- across North America.

Q    Okay.  Thank you.  And the time frame we're really looking at in this case starts last summer.  And if we go from -- well, let me go back to January of 2021 to the present time.  How -- how many actors has -- did John Gore Theatrical Group employ?

A    Zero.

Q    Okay.  And you're familiar with the information requests



www.escribers.net | 800-257-0885

**A-71**

67

made by Equity in this case, correct?

A    Yes, I am.

Q    Okay.  And how did you become aware of it?

A    It was sent to me or my team by Bernie Plum, who is -- who received it in his capacity as counsel to the Broadway.

Q    Okay.  And did you have a role in John Gore Theatrical Group's response to the information request?

A    I did.  I reviewed the information request and assisted with providing the responses that were given to Equity, as well as determining which responses we believed would require a confidentiality agreement because the information was not public or subject to a third-party confidentiality agreement.

Q    Okay.

     MR. THEODORE:  And if we could bring up Joint Exhibit 8. Is this the one with the -- hold on a second.  Is this the right one?  Oh, yeah.  There we go.  And this, you're familiar -- is this the -- yeah, okay.  If you could scroll down Ariel, to the attachment to this email.  Stop right there.

Q    BY MR. THEODORE:  Sheila, are you familiar with this document that's marked confidentiality agreement?

A    Yes, I am.

Q    How are you familiar with it?

A    This is a -- this is a template confidentiality agreement that our company uses for many matters.  And it was modified, as you see in the second paragraph, to add a description of --



A-72

68

of the transaction, which is the information request that was sent to Bernie Plum by Cohen, Weiss and Simon.

Q    Okay.  And to your knowledge, why -- why was this sent to the Union?

A    To my knowledge, it was sent to the Union because -- my understanding was that we could request that items be treated confidentiality -- with confidentiality because the information request sent by Cohen, Weiss and Simon in July had an invitation to discuss confidentiality and potentially enter into a nondisclosure agreement first.  And second, because we viewed some of the information as confidential and wanted to have an understanding that it would be used in connection with this matter and with Equity pursuing any charges, but not used in a -- in a public forum for other purposes.

Q    And what -- what response to this proposed confidentiality agreement did John Gore Theatrical Group receive?

A    The first response from counsel was that they would review it.  And then two or three weeks later, John Gore Theatrical Group received a response that Equity and its counsel did not view any of the information as confidential, and it did not seem that they would entertain a confidentiality agreement.

Q    Okay.

MR. THEODORE:  And if -- Ariel, if we could show Joint Exhibit 12, please.  And if you could scroll down to the attachment.



A-73

69

Q    BY MR. THEODORE:  Do you recognize -- do you recognize this document, Sheila?

A    Yes, I do.

Q    Okay.  What is it?

A    This is the response that John Gore Theatrical Group submitted via its counsel at Proskauer to Equity.

Q    And -- and what was your role in -- in this letter?

A    I -- I helped provide the answers that were given to some of the questions and helped determine which we believed were subject to confidentiality.  Q    Okay.

MR. THEODORE:  And if you could scroll down, Ariel, to the first item response.

Q    BY MR. THEODORE:  And it says -- and you know, the document speaks for itself, but it -- it says that there -- the arrangements are covered by confidentiality agreements with other entities.  Did I read that portion correctly?

A    Yes.

Q    And to what does that refer?

A    John Gore Theatrical Group makes investments in various productions, and when an investment is made, paperwork is signed with the production in which there are various confidentiality provisions imbedded.

Q    Okay.  And -- and your belief was that those agreements were -- were -- covered the request for information?

A    Can you repeat the question?



www.escribers.net | 800-257-0885

A-74

70

Q    Yeah, sure.  And -- and -- what was your belief with respect to these third-party agreements that you just referred to, and providing the information sought in -- in item one here?

A    My belief was that we -- we, John Gore Theatrical Group, were prohibited from sharing those agreements with Equity and its counsel without some type of understanding, or confidentiality agreement in place.

Q    Okay.  And -- and a number of the items in -- in this document refer back to one, and those -- and -- and so the basis for those items would be the same basis for confidentiality?

A    Yes.

Q    Okay.

MR. THEODORE:  And Ariel, can you pull Respondent's 1, and we'll mark this document as R-1 for identification.

Q    BY MR. THEODORE:  And it -- there's a lot of redactions, but you do recognize this document?  Or do you recognize this document, Sheila?

A    Yes, I do.

Q    Okay.  And it -- it appears to be two pages?

A    Yes.  Because other parts of it are redacted.  But it is an investment agreement that our company signed with a production.  Most of it is redacted, but there's a confidentiality provision below.



www.escribers.net | 800-257-0885

A-75

71

Q    Okay.  And if we would scroll down to that.  And is this an actual example of an agreement that covers information responsive to the Union's request?

A    Yes, it is.

Q    Okay.  And this Section 15.10 we can all read, but what is that?

A    That's a confidentiality section.

Q    Okay.

MR. THEODORE:  I would move Respondent's 1 into evidence.

JUDGE GARDNER:  Any objection?

MS. KHAN:  Can I just -- no -- no objection from General Counsel.

JUDGE GARDNER:  Okay.  Charging Party?

MR. ASAD:  No.  No objection.

JUDGE GARDNER:  R-1 is received.

**(Respondent Exhibit Number 1 Received into Evidence)**

MR. THEODORE:  Excuse me.  I have an alarm going off. Hang on a second.  Some kind of alert in the area.  Sorry about that.  I -- I didn't hear what the response was, Your Honor.

JUDGE GARDNER:  There was no objection, and R-1 is received in evidence.

MR. THEODORE:  Thank you.  Ariel, can you show Respondent's 2, please, for identification?

Q    BY MR. THEODORE:  Now, Sheila, if you would take a look at this document and Ariel, if you would scroll down, as well, on



A-76

72

this one. What is this document?

A    This is an example of an investment agreement that our company signed to invest in a production.

Q    Okay. And it's the -- the 15.1.25 which is in there. What is that?

A    That is a confidentiality section that requires us to not share any non-publicly available information with any other party.

Q    Okay. And --

A    Except for representatives who need to know.

Q    Okay. And is this, Respondent's 2, an actual agreement that covers items that are requested in the Union's request for information?

A    Yes.

Q    And do the -- the confidentiality agreement in this document, is different than the one in Respondent's Exhibit 1; can you explain what happened?

A    Yes. These are -- these -- these confidentiality provisions in these third-party agreements can take different forms. And you know, the -- the producer usually determines that form. And we -- we sign as an investor; we have to agree to it.

Q    Okay. And -- and --

MR. THEODORE: Respondent moves Respon -- R-2 into evidence.



A-77

73

JUDGE GARDNER:  Excuse me.  Any objection?

MS. KHAN:  No objection from General Counsel.

MR. ASAD:  No objection.  Thank you.

JUDGE GARDNER:  R-2 is received.

**(Respondent Exhibit Number 2 Received into Evidence)**

Q    BY MR. THEODORE:  And approxi -- and approximately how many of these agreements exist for the items that are responsive to the Union's information request?

A    I -- I don't have that number offhand, Mark, I think it is somewhere between 50 and 100.

Q    Okay.

A    Because the information request dates back to 2018.

Q    Thank you.

MR. THEODORE:  And Ariel, we can clear the screen.  Thank you very much.

Q    BY MR. THEODORE:  Now, those -- that's one type of information that John Gore Theatrical Group declined to provide.  There was another starting with --

MR. THEODORE:  And if we could bring Joint Exhibit 12 back up, starting with 17.

Q    BY MR. THEODORE:  And it says the -- well, let me first, what is the italicized portion under 17 represent?

A    That is John Gore Theatrical Group's response to the question in -- that Actors' Equity asked in the information request.



A-78

74

Q    Okay.  And it says that John Gore Theatrical Group considers this information confidential; can you explain why that is?

A    Yes.  John Gore Theatrical Group, Inc. and its parent company are -- are private companies, they're not publicly held.  And so the information that is requested here is of a confidential and proprietary nature.  It's not publicly available.

Q    Okay.  And what -- what concerns prompted -- if -- if any, prompted the -- this kind of a response to the 17 and other items?

A    We had an -- we understand that Equity's counsel would likely share information with Equity, and then Equity would share with its members, which as Mr. Kolko pointed out, I think have, you know, 40,000 members currently, he cited.  And we are aware of instances where the membership has taken to social media, or other public platforms, to reveal what we believe to be confidential information of other parties.  And so we were concerned that our information would be publicly revealed.

       MR. THEODORE:  And -- okay, Ariel, let's bring up Respondent's 3, please.

Q    BY MR. THEODORE:  Sheila, do you recognize this document?

A    I do.

Q    What is it?

A    This is an email that Jason Laks, who is the general



www.escribers.net | 800-257-0885

A-79

75

counsel and executive vice president of labor relations at the Broadway League, sent to Broadway League lead producers and general manager members.

Q    Okay.  And did you receive this in the normal course of business?

A    I did not receive it.  I -- I was -- I didn't receive it, personally, from when Jason Laks sent it, but I received it in the normal course of business from a colleague of mine who was copied on it, and aware of it.

Q    Okay.  And what -- you know, again, without -- we can all read the document, but what happened here?

A    The document refers to a settlement agreement that was entered into between the Broadway League and Actors' Equity Association regarding the use of nondisclosure agreements for productions.  And Mr. Laks is explaining that the Union leaked the agreement to the press, and misrepresented, and made false statements about the substance of the agreement that was breached.  And he also explains that Union leadership was aware of the issue, and had, repeatedly, expressed apologies for how this was handled.

Q    Okay.  And just -- and -- and were you aware that there was an article about this issue that appeared in the press?

A    I was.  There was an article that appeared in The New York Times.

Q    Okay.  And is that the reference of the first line to NYT?



www.escribers.net | 800-257-0885

A-80

76

A    Yes.

MR. THEODORE:  Okay.  I would move Respondent's 3 into evidence.

JUDGE GARDNER:  Any objection?

MS. KHAN:  No objection from General Counsel.

MR. ASAD:  Your Honor, the Charging Party does object. This appears to be something that's unrelated to our information request, and concerns purported, you know, newspaper article that describes a nondisclosure agreement settlement that was reached with Actors' Equity and the Broadway League, and it's just not -- it has no -- appears to be used only for the purpose of showing that -- for -- for bolstering the Employer's argument that sometimes Equity provides information publicly.  But that's not -- that's not -- that's not the issue in this case, and it doesn't -- doesn't -- it's not a defense to their failure to provide the information that the Actors -- Actors' Equity requested in this case.

JUDGE GARDNER:  So it -- I mean -- (indiscernible) (audio interference).

MR. THEODORE:  Your Honor, you're breaking again.

MR. ASAD:  Sorry.  I'm sorry, Your Honor, if I just may just add one other point here.  That this is also -- this postdates the information request, the charge, and the issuance of the complaints.  And so --

JUDGE GARDNER:  I mean that -- what -- Mr. Theodore, what



www.escribers.net | 800-257-0885

A-81

77

do you have to say about the fact that this is a communication from May of 2022; how is that relevant to anything the Employer did, or did not do, or even thought, in the course of -- of that issue here?

MR. THEODORE: It -- it is -- and we -- we're going to have one other -- at least one other example, Your Honor, that there is some case law that suggests that nonpublic information that has been disclosed in the course of it -- of -- of negotiations, can raise a real concern in that all this is is -- you know, Mr. Asad is correct. It does bolster, you know, we -- we're using it to bolster our case. It is not directly related, but it is an -- an example of something that, I think, was fairly acknowledged as a concern, not only in the discussions between myself and Hanan, but -- and -- and just showing that it is something that -- that is a concern to a member of the Broadway League, and -- and John Gore Theatrical Group is a member of the Broadway League.

JUDGE GARDNER: Okay. Well, I agree and was about to admit the document for -- for that reason, and for what Mr. Asad acknowledged, which is that this just goes to bolster the Employer's position which, I assume, is why you are offering it, and it's certainly non-objectionable.

But the fact that this is a document from May, 2022, I think is a real problem. I don't see how this document has any relevance at all. Certainly, this witness can testify if she



A-82

78

has knowledge of specific instances that she wants to describe that happened previously, that did inform the decisions made by Respondent, or if you have a different document for evidence. But no, I'm actually going to reject this, and not admit this into evidence.

**(Respondent Exhibit Number 3 Rejected)**

Q    BY MR. THEODORE:  Okay.  You mentioned, Sheila, that there -- there was a concern about information being put on to social media; do you recall saying that?

MR. THEODORE:  And Ariel, you can take down this exhibit.

A    Yes, I did.

Q    BY MR. THEODORE:  And are you aware of instances where information has gone out to the public that -- by -- from -- from Equity membership that prompted your concerns?

A    Yes, I am.

Q    Okay.  If we can show Respondent's Exhibit 4.  Do you recognize what this is?

A    Yes, I do.

Q    What is it?

A    This is from YouTube.  This is a series that is a video with members of Actors' Equity, and this particular episode focused around the SETA agreement and the financials of one production.

Q    Okay.  And if you look in the middle of this, it says the number of views -- it says 5,087 views.  And then it says



A-83

79

streamed live on April 15, 2021; do you see that?

A    Yes, I do.

Q    Okay.  Now, how did you become aware of this?

A    In the normal course of business, a colleague sent it to me, because people in the industry were aware of it.

Q    And what was your -- did you watch this video?

A    I did.

Q    Approximately how long is it?

A    It was long.  I -- I think a couple of hours.  I don't remember exactly.

Q    Okay.  And what was your impression of what was presented?

A    My impression was I was surprised that the information was being presented for public consumption, and I wondered if -- you know, my impression was that there was confidential information about a production being leaked and being editorialized on -- by the Equity members who were taking part in this show.

Q    Okay.  And -- and did this information involve John Gore Theatrical Group's information?

A    No, it did not.

Q    Okay.  What, if anything, did this video play a part in your decision regarding the response to the Union's information request?

A    This video, frankly, scared me that any information that is provided, even in the context of a legal proceeding, or an



A-84

80

information request is -- could -- could be used in any manner for the general public.

MR. THEODORE: Your Honor, I would move Respondent's 4 into evidence, and I would note as I do, that the -- the link was tested within the last 24 hours, and the link appears in the top bar up there and is still live. And this video is still up on the -- on YouTube.

JUDGE GARDNER: And it is -- if I'm looking at it -- I'm unclear whether that is 3 minutes, 10 seconds, and 47ths of a tenth of seconds. Or is this 3 hours, 10 minutes, and 47 seconds?

MR. THEODORE: It is 3 hours, 10 minutes, and 47 seconds.

JUDGE GARDNER: Okay. And so what are you proposing to do with that?

MR. THEODORE: Well, certainly, this is -- we -- we weren't -- we weren't going to play the whole video, obviously, for the trial. I think that it -- it -- there is information in there that Ms. Lavu is -- has described as being troubling as something that would -- would get out and informed her decision to do that. So we would ask that, you know, that you take notice of -- well, first of all, accept the exhibit, but take notice of the -- the venue.

JUDGE GARDNER: It's one thing to have this -- it's sort of a reference documenting that there was a YouTube video of this type, and that's fine. And I think more important than



A-85

81

anyone watching that video, is hearing from Ms. Lavu what, exactly, she remembers hearing that was upsetting. I mean I -- I'm not -- I'm not expecting that I'm going to get a brief that says, oh, by the way, they said this at hour 2 and 45 minutes. You know, if it's something significant that impacted Ms. Lavu, then we should hear what that is. I -- I don't know if we've heard the extent of that or -- or more, but I mean I don't know that we need to -- I mean I'm -- I'm not intending to watch this three-hour video to hear about it, when I can listen to the witness just tell me what --

MR. THEODORE: Of course.

JUDGE GARDNER: -- highlight.

MR. THEODORE: Of course.

JUDGE GARDNER: I think that would be, for my purposes, that would be adequate. I don't know if you have more questions for her at this point.

MR. THEODORE: Yeah, I could -- I could -- no, I could certainly ask that. And we wanted to make sure that the record had something related to this in there.

Q    BY MR. THEODORE: And Sheila, if you could explain, in -- in -- you know, as specific as you can remember, what was -- what from the video, what kinds of things from the video, prompted your concerns?

MR. ASAD: Your Honor, I'm just going to object to this line of questioning. I'm sorry to interrupt. Just there are a


www.escribers.net | 800-257-0885

A-86

82

number of issues here. Well, actually, I'll withdraw this. I'll just(indiscernible) for cross, thank you.

JUDGE GARDNER: Go ahead, Ms. Lavu.

THE WITNESS: Thank you.

A    I -- I recall that there were members of the Union who were sharing financial information about a production that was presumably confidential. I recall that they posted emails to the video, and were discussing, in depth, details, emails responses, and that's -- that's really the -- the extent of what I recall.

Q    BY MR. THEODORE: Okay. What kind of financial information was -- was provided that you -- if you can recall?

A    I believe there was provided information about how much a tour made, and you know, and -- and things that the tour, again, which was not a tour that I, or my company, was involved in, but things that the tour communicated with -- with Equity members. And also there were items about Equity leadership's communication with its members.

Q    And then you referenced that there were emails that were published in the video. Can you describe, or tell us what you remember seeing?

A    I recall seeing emails that were about payments to actors, and the emails between the production and the actors.

Q    Anything else you could remember about it?

A    No. I mean I -- I -- I did see it back in -- in 2021, and



www.escribers.net | 800-257-0885

A-87

83

it was three hours long, so sorry, I don't remember the specifics. But it did inform my belief that, you know, without what we consider to be a -- a standard confidentiality agreement in place, that any information that we provided would be made public by -- by the membership.

MR. THEODORE: I don't have any further questions. I -- I don't know if we ruled on Respondent's Exhibit 4.

JUDGE GARDNER: No. You're moving R-4?

MR. THEODORE: Yes.

JUDGE GARDNER: Any objection from the General Counsel?

MS. KHAN: Yes. General Counsel objects. We object to R-4. First, I -- I understand that Ms. Lavu has testified to her recollection of the video, but there's still a lot of questions as to, you know, where that information came from, how relevant this is to this considering it's not John Gore. You know, she testified that the emails are between actors and production, so whether or not that that has anything to do with information request from the Union, I don't see the relevance of -- of admitting that into the record.

JUDGE GARDNER: Okay. And does the Charging Party have an objection, as well?

MR. ASAD: Yes. The -- the Charging Party joins in the General Counsel's objection. I just note for, in addition to what the General Counsel -- counsel for the General Counsel indicated, there's no evidence that any of this information in



A-88

84

this video came from Actors' Equity was published to its members. There's no -- there's no -- there's no foundation for that and -- but thank you.

JUDGE GARDNER: Okay. Well let me be clear. I'm not admitting the YouTube video. I'm not going to entertain citations to any portion of that video. We heard the testimony of Ms. Lavu. I am going to admit R-4 solely as a reference to what it is she was talking about, on the face of it, and that is all. So for that purpose, R-4 is received.

**(Respondent Exhibit Number 4 Received into Evidence)**

MR. THEODORE: I have no further questions, Your Honor.

JUDGE GARDNER: Okay. Ms. Khan, did you want to cross-examine the witness?

MS. KHAN: Yeah. Could I have a breakout room with Mr. Asad for 15 minutes?

JUDGE GARDNER: Sure thing. We will -- well, you might recall that you --

MS. KHAN: I can go in a different --

JUDGE GARDNER: The only question is whether, did you want Mr. Kolko, who I think is still here, to join you?

MR. ASAD: Yes.

MS. KHAN: Yes.

MR. ASAD: That would be great.

MS. KHAN: Please. Thank you.

JUDGE GARDNER: I'll assign him to the General Counsel and



www.escribers.net | 800-257-0885

A-89

85

Union breakout room, and you'll recall that you have access to the breakout room.

MS. KHAN:  Yes.

JUDGE GARDNER:  So enjoy.  Okay.

MS. KHAN:  Thank you.

JUDGE GARDNER:  Back at 2:10.  Until then, we're off the record.

MS. KHAN:  Thank you.

(Off the record at 1:54 p.m.)

JUDGE GARDNER:  Ms. Khan, did you have any questions for the witness?

MS. KHAN:  No questions from counsel for General Counsel.

JUDGE GARDNER:  Okay.  And Mr. Asad, were you going to cross-examine the witness?

MR. ASAD:  I have no questions for this witness.

JUDGE GARDNER:  Okay.  So Ms. Lavu, thank you very much for switching seats to become a witness, and now you can switch back.

Okay.  Mr. Theodore, did you have anything else?

MR. THEODORE:  We have nothing further, Your Honor.

JUDGE GARDNER:  Okay.  And I mean I don't think this is a situation that calls for any kind of rebuttal case.

Is there a request for any such thing?

MS. KHAN:  None from the General Counsel.

JUDGE GARDNER:  Okay.  All right.  In that case let me



A-90

86

just review, make sure the court reporter has what they should. The exhibits that have been received as General Counsel's Exhibit 1, the formal papers; Joint Exhibits 1 through 13, that we heard some testimony about; Respondent's Exhibit 1, Respondent 2, and Respondent 4, and I guess you should preserve Respondent's 3 as a rejected exhibit. Do you have all those?

THE COURT REPORTER: Yes, I do.

JUDGE GARDNER: Okay. In that case, I will wrap things up. I'll be preparing and filing with the Board my decision in this proceeding. A copy will be served on each of the parties. You are reminded to refer to the Board's Rules and Regulations for information regarding the filing of briefs and proposed findings for my consideration, and regarding procedures before the Board after the issuance of a judge's decision.

After all the evidence is in, you have a better opportunity to assess your chances regarding the outcome of the issues, than you had at the outset of the trial. All parties should carefully weigh the risks entailed and decide whether an amicable settlement of the issues might not offer a more satisfactory solution. Settlement may be arranged and asked for at any time before I issue my decision.

I am going to allow until October 4th, for the filing of briefs, and any proposed findings and conclusions. Briefs should be filed directly with the Judge's Division office here in New York, regardless of whether they are mailed, or e-filed.



www.escribers.net | 800-257-0885

A-91

87

Please see Sections 102.2 through 102.5 of the Board's rules for filing and service requirements. Any request for an extension of time for the filing of briefs, must be made in writing to Associate Chief Judge Kenneth Chu, and served on the other parties. I would appreciate being copied on that as well, but I do want to note that I am giving 35 days, rather than a shorter period of time, only to allow for potential discussions of the -- a resolution between the parties.

And so it is very unlikely that an extension beyond those 35 days will be granted. That being said, if a request is made, the positions of the other parties regarding the extension, should be obtained, and set forth in advance, and put in the request. And it is the policy of the Division of Judges to grant discretionary extensions only when they are clearly justified.

Requests must contain specific reasons and show that the requesting party cannot reasonably meet the current deadline, and that's but too fine a point, it's a one-day trial, and 35 days is a fairly long time. Okay.

Did anyone want to bring anything else to my attention?

MS. KHAN: Nothing from the General Counsel.

MR. ASAD: Nothing from the Charging Party. Thank you.

MR. THEODORE: Nothing here, Your Honor. Thank you for the extension.

JUDGE GARDNER: Okay. And I will thank you all for your



www.escribers.net | 800-257-0885

A-92

88

professionalism.  In particular, the preparation prior to the hearing to streamline the case and the -- your professionalism throughout this hearing.  So that is much appreciated.  But there being nothing further, the hearing is now closed.  Please enjoy the rest of your afternoon.  And we'll go off the record.

**(Whereupon, the hearing in the above-entitled matter was closed at 2:18 p.m.)**



A-93

89

**C E R T I F I C A T I O N**

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 2, Case Number 02-CA-286802, John Gore Theatrical Group, Inc. and Actors' Equity Association, held at the 26 Federal Plaza, Room 36-130, New York, New York 10278, on August 30, 2022, at 10:04 a.m. was held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.

_____

LEE MILLER

Official Reporter



A-94

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 2

JOHN GORE THEATRICAL GROUP, INC.
AND

ACTORS' EQUITY ASSOCIATION

GENERAL COUNSEL EXHIBIT NO. 1

Case No.

02-CA-286802

A-95

# GC EXHIBIT 1-a

A-96

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**JOHN GORE THEATRICAL GROUP, INC.**
**AND**

**ACTORS' EQUITY ASSOCIATION**

---

**Case No.**

**02-CA-286802**

1-a)     **Index to General Counsel's Exhibit No. 1**

1-b)     **Charge in Case No. 02-CA-286802 dated November 26, 2021**

1-c)     **Affidavit of Service of (b) above dated November 26, 2021**

1-d)     **Complaint and Notice of Hearing in Case No. 02-CA-286802 dated June 16, 2022**

1-e)     **Affidavit of Service of (d) above dated June 16, 2022**

1-f)     **Respondents' Answer to Complaint dated June 30, 2022**

A-97

# GC EXHIBIT 1-b

A-98

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>02-CA-286802 | Date Filed<br>11-26-21 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>John Gore Theatrical Group, Inc. | | b. Tel. No.<br>310-284-5640 |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax. No.<br>310-557-2193 |
| d. Address *(Street, city, state, and ZIP code)*<br>1619 Broadway<br>New York, New York 10019 | e. Employer Representative<br>Mark Theodore<br>Proskauer Rose LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010 | g. e-mail<br>mtheodore@proskauer.com |
| | | h. Number of workers employed<br>200 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)* | j. Identify principal product or service | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)   (5)                                                   of the National Labor Relations Act, and these unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the

meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer has failed and refused to provide information requested by the Union relevant to collective bargaining and/or grievances being investigated by the Union.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
Actors' Equity Association

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>165 West 46th Street<br>New York, New York 10036 | 4b. Tel. No.<br>212-869-8530 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No.<br>212-719-9815 |
| | 4e. e-mail |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*
Actors and Artistes, AFL-CIO

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>212-356-0249 |
|---|---|
| _____          Eyad Asad, Of Counsel<br>*(signature of representative or person making charge)*          *(Print/type name and title or office, if any)* | Office, if any, Cell No.<br>718-496-0249 |
| | Fax No.<br>646-473-8249 |
| Cohen, Weiss and Simon LLP, 900 3rd Ave, NY, NY<br>Address 10022                              Date 11/24/2021 | e-mail<br>easad@cwsny.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

A-99

# GC EXHIBIT 1-c

A-100

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

---

**JOHN GORE THEATRICAL GROUP**

    Charged Party

    and

**ACTORS EQUITY ASSOCIATION**

    Charging Party

**Case 02-CA-286802**

---

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on November 26, 2021, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Mark Theodore, Attorney at Law
Proskauer Rose LLP
2029 Century Park East, 24th Floor
Los Angeles, CA 90067-3010

John Gore Theatrical Group, Inc.
1619 Broadway
New York, NY 10019

| | |
|---|---|
| November 26, 2021 | Rhonda Rhodes, Designated Agent of NLRB |
| Date | Name |
| | /s/ Rhonda Rhodes |
| | Signature |

A-101

# GC EXHIBIT 1-d

A-102

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 02**

**JOHN GORE THEATRICAL GROUP, INC.**

                                      **Case 02-CA-286802**

    **and**

**ACTORS' EQUITY ASSOCIATION**

**COMPLAINT AND NOTICE OF HEARING**

This Complaint and Notice of Hearing is based on a charge filed by Actors Equity Association, National Headquarters (Charging Party). It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that John Gore Theatrical Group, Inc. (Respondent) has violated the Act as described below.

1. The charge in this proceeding was filed by the Charging Party on November 24, 2021, and a copy was served on Respondent by U.S. mail on November 26, 2021.

2. (a) At all material times, Respondent has been a Texas corporation with headquarters located in New York, NY, and facilities throughout the United States, including a facility located at 1619 Broadway, New York, New York (Respondent's facility), and is engaged in the production of theatrical plays and musicals.

(b) Annually in conducting its operations described above in paragraph 2(a), Respondent derives gross revenue in excess of $ 500,000 and purchases and receives goods and services valued in excess of $ 5,000 from points outside the State of New York.

A-103

3.      At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

4.      At all material times, the Charging Party has been a labor organization within the meaning of Section 2(5) of the Act.

5.      (a) The employees of Respondent (the Unit) described in the Short Engagement Touring Agreement between the Broadway League and the Charging Party, and in relevant part set forth below, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All the Actors (Principals, Chorus, Stage Managers and Assistant Stage
> Managers) employed by Respondent

(b) At all material times, Respondent has recognized the Charging Party as the exclusive collective-bargaining representative of the Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which is effective from April 29, 2019 through November 1, 2020.

6.      Since about July 7, 2021, the Charging Party requested in writing that Respondent furnish the Charging Party with the following information:

> 1[1]. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had an equity interest and describe that equity interest. For purpose of this letter, "theatrical production" is defined as any live musical and/or dramatic production.
>
> 6. For the period January 1, 2018 through the present identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had an equity interest and describe that equity interest.
>
> 9. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had a financial interest (by virtue, without limitation,

---

[1] For ease of reference, the numbers listed in this paragraph (1 through 45 with certain omissions of requests that are not part of this complaint) track the numbered requests in the Charging Party letter of July 7, 2021.

2

A-104

of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

14. For the period January 1, 2018 through the present, identify each theatrical production in which JGO affiliate and/or subsidiary has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

17. Identify all employees, officers, shareholders, directors, partners, or members of any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary who are also employees, officers, shareholders, directors, partners, or members of Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company. For each such officer, shareholder, director, partner, and member, state their position at each such entity, and, if the individual had any equity interest in the entity, sate the percentage of such interest.

18. Identify all individuals identified in response to request number 17 who are or were at any time in the period from January 1, 2018 to the present officers, , shareholders, directors, partners, or members of Networks. For each such officer, shareholder, director, partner, and member, state (a) the individual's position at Networks; (b) the individual's ownership interest in the Networks and any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary; and (c) the periods of time in which they had those ownership interests.

19. Identify each partnership and/or corporation affiliated with each of the following: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and Key Brand Family Holdings, Inc and describe each affiliation.

21. For the period January 1, 2018 to the present, identify by production all theatrical productions in which any of the following - JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc, and any JGO affiliate and/or subsidiary - had a, equity, financial or managerial interest which subsequently were produced by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company and, for each such play or musical, describe the equity, financial or managerial interest.

25. Was any shareholder or member of JGO a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in JGO and Networks, and state the periods in which they had those ownership interests.

31. Please describe the relationship between Key Brand Family Holdings and The John Gore Organization. Please describe the relationship between Key Brand Family Holdings, *the entity listed in the Texas filing*, and Key Brand Family Holdings, Inc., *the entity listed in the Georgia filing*. Please describe the relationship between Key Brand Family Holdings, Inc. and the John Gore Organization.

3

A-105

33. Please describe the relationship between John Gore Family Holdings, Inc. and the John Gore Organization.

35. Please identify all shareholders, owners, and/or members of JGO between January 1, 2018 and the present and state the percentage of their ownership.

36. Please identify all shareholders, owners, and/or members of John Gore Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

37. Please identify all shareholders, owners, and/or members of John Gore Family Holdings between January 1, 2018 and the present and state the percentage of shares their ownership.

38. Please identify all shareholders, owners, and/or members of Key Brand Family Holdings Inc. between January 1, 2018 and the present and state the percentage of their ownership.

39. Please identify all shareholders, owners, and/or members of Key Brand Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

42. Please identify all corporate parents, affiliates, and subsidiaries of the following: JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, and John Gore Family Holdings, Inc.

45. Was any officer, director, member or managing member of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings, Inc. also an officer, director, member or managing member of Networks or Networks Presentations, LLC between January 1, 2018 and the present? If so, please identify the officer/director/member/ managing member and his/her role in each company between January 1, 2018 and the present.

7.      (a) The information requested by the Charging Party as described above in Paragraph 6 is necessary for, and relevant to, the Charging Party's performance of its duties as the exclusive collective bargaining representative of the Unit.

(b) Since about October 13, 2021, Respondent has failed and refused to furnish the Charging Party with the information requested by it as described above in Paragraphs 6.

4

A-106

8.      By the conduct described above in Paragraphs 7, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

9.      The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint. The answer must be **received by this office on or before June 30, 2022.**  An answer must be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer

5

A-107

containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

**PLEASE TAKE NOTICE THAT** on **Tuesday, August 30, 2022, at 9:30 a.m.**, and on consecutive days thereafter until concluded, a hearing will be held before an Administrative Law Judge, via videoconference technology (such as Zoom, Skype, WebEx, etc.), or at a location otherwise ordered by the Regional Director or Administrative Law Judge. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.

The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: June 16, 2022

Christen M Ritter

_____
Christen M. Ritter, Acting Regional Director
National Labor Relations Board, Region 2
26 Federal Plaza, Ste. 3614
New York, NY 10278-3699

Attachments

6

A-108

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I. BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II. DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

A-109

Form NLRB-4668
(6-2014)

**in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

A-110

# GC EXHIBIT 1-e

A-111

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**JOHN GORE THEATRICAL GROUP**

**and**                                                    **Case 02-CA-286802**

**ACTORS EQUITY ASSOCIATION, NATIONAL**
**HEADQUARTERS**

**AFFIDAVIT OF SERVICE OF: Complaint and Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, D. Mahr the undersigned employee of the National Labor Relations Board, being duly sworn, say that on 6/16/22, I served the above-entitled document(s) by **E-Issuance,** as noted below, upon the following persons, addressed to them at the following addresses:

Mark Theodore , Attorney at Law
Proskauer Rose LLP
2029 Century Park East, 24th Floor
Los Angeles, CA 90067-3010

John Gore Theatrical Group, Inc.
1619 Broadway
New York, NY 10019

EYAD ASAD , ATTORNEY
COHEN, WEISS AND SIMON LLP
900 Third Ave Ste 2100
New York, NY 10022-4869

Actors Equity Association, National
  Headquarters
165 W. 46th Street
New York, NY 10036

June 16, 2022

_____            D. Mahr, Designated Agent of NLRB
                    Date                                              Name

                                                              /s/ D. Mahr

                                                   _____
                                                              Signature

A-112

FORM NLRB 4338
(6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 02-CA-286802

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements **_will not be granted_** unless good and sufficient grounds are shown **_and_** the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in **_detail_**;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Mark Theodore , Attorney at Law
Proskauer Rose LLP
2029 Century Park East, 24th Floor
Los Angeles, CA 90067-3010

John Gore Theatrical Group, Inc.
1619 Broadway
New York, NY 10019

EYAD ASAD , ATTORNEY
COHEN, WEISS AND SIMON LLP
900 Third Ave Ste 2100
New York, NY 10022-4869

A-113

Actors Equity Association, National
  Headquarters
165 W. 46th Street
New York, NY 10036

A-114

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I. BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II. DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility

(OVER)

A-115

Form NLRB-4668
(6-2014)

of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III. AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

A-116

# GC EXHIBIT 1-f

A-117

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 02

JOHN GORE THEATRICAL GROUP, INC.

Respondent,

- and -

ACTORS' EQUITY ASSOCIATION,

Charging Party.

NLRB Case No.: 02-CA-286802

**RESPONDENT'S ANSWER TO COMPLAINT**

Mark Theodore, Esq.
Ariel Brotman, Esq.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: 310.557.2900
Facsimile: 310.557.2193
Attorneys for Respondent,
JOHN GORE THEATRICAL GROUP,
INC.

A-118

Respondent, JOHN GORE THEATRICAL GROUP, INC., by its attorneys Proskauer Rose LLP, answers the Complaint ("Complaint") in this matter as follows:

1. Respondent admits the allegations contained in Paragraph 1 of the Complaint.

2. (a) Respondent denies that it is engaged in the production of theatrical plays and musicals as alleged in Paragraph 2(a) of the Complaint. Respondent admits the remaining allegations contained in Paragraph 2(a) of the Complaint, and asserts that it is in the business of presentation of, and investment in, theatrical plays and musicals.

(b) Respondent admits the allegations contained in Paragraph 2(b) of the Complaint.

3. Respondent admits the allegations contained in Paragraph 3 of the Complaint.

4. Respondent admits the allegations contained in Paragraph 4 of the Complaint.

5. (a) Respondent admits the bargaining unit described in the Short Engagement Touring Agreement is appropriate as alleged in Paragraph 5(a) of the Complaint. Respondent denies that it employs any actors in the bargaining unit described in Paragraph 5(a) of the Complaint.

(b) Respondent admits the allegations contained in Paragraph 5(b) of the Complaint.

6. Respondent admits the allegations contained in Paragraph 6 of the Complaint.

7. (a) Respondent admits the allegations contained in Paragraph 7(a) of the Complaint.

(b) Respondent admits in part and denies in part the allegations contained in Paragraph 7(b) of the Complaint. Respondent admits that it has not provided the information sought in Paragraph 6 of the Complaint. Respondent denies

that it had any obligation to furnish the information absent an appropriate accommodation such as a non-disclosure agreement, or other appropriate assurances, to protect the confidential or non-public nature of the information.

8. Respondent denies the allegations contained in Paragraph 8 of the Complaint.

9. Respondent denies the allegations contained in Paragraph 9 of the Complaint.

## RESPONDENT'S AFFIRMATIVE DEFENSES

1. The allegations contained in the Complaint fail to state sufficient facts to constitute a claim upon which relief can be granted under the National Labor Relations Act, as amended.

2. A party's legitimate confidentiality concerns justify a refusal to furnish or a delay in furnishing information pursuant to an information request. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 319-320 (1979). The information requested by Charging Party in several of the requests is confidential and covered by third party agreements. Thus, disclosure of this information to Charging Party without appropriate protections would result in a breach by Respondent.

3. Respondent did not disclose non-public and confidential information because Charging Party has a propensity to make such information public.

WHEREFORE, Respondent, John Gore Theatrical Group, Inc., prays that the Complaint be dismissed in its entirety.

Dated: June 30, 2022                          PROSKAUER ROSE LLP


By: _____
Mark Theodore, Esq.
Ariel Brotman, Esq.
Attorneys for Respondent,
JOHN GORE THEATRICAL GROUP, INC.

A-120

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 02

JOHN GORE THEATRICAL GROUP, INC.

               Respondent,

       - and -                            NLRB Case No.: 02-CA-286802

ACTORS' EQUITY ASSOCIATION,

               Charging Party.

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing Answer to the Complaint has been served as

indicated below upon:

Christen M. Ritter                    *By e-filing on Agency Website*
Acting Regional Director
National Labor Relations Board, Region 2
26 Federal Plaza, Suite 3614
New York, NY 10278-3699

Hanan B. Kolko                         *By email*
Cohen, Weiss and Simon LLP
900 Third Ave., Suite 2100
New York, NY 10022-4869
HKolko@cwsny.com

Dated: June 30, 2022

_____
Ariel N. Brotman

**OPERATING AGREEMENT**



**DATED AS OF JUNE 4, 2020**

JohnGore00001

A-122

Section 15.10. <u>Confidentiality</u>. Each Investing Member acknowledges that he shall be privy to certain confidential details about the Company and the Touring Production (jointly, "Production"). Each Investing Member agrees that he shall not, without Managing Member's prior written consent, in each instance, disclose any such information about the Production, directly or indirectly, to any party not at the time of such disclosure an employee or agent of Managing Member to whom it is necessary to disclose such information. Each Investing Member agrees that he shall not reveal in any manner or medium any confidential, sensitive or non-public information obtained as a result of an Investing Member having invested in the Company concerning the business, affairs or transactions of the Production, Managing Member, any cast, crew or company member, or other persons engaged for the Production which has come to such Investing Member's attention, other than if necessary to Investing Member's professional advisors, and shall refrain from revealing such information, and from disseminating any disparaging comments related to the Production, Managing Member or any cast, crew or company member, or other persons engaged for the Production by participating in any activity in any public form or on the Internet that involves posting by Investing Member, either directly or through others that results in a post (including but not limited to blogging; hosting or updating any other form of website; posting comments to any website; posting photos, other graphics, or multimedia materials including to such sharing sites as Instagram and Snapchat; posting documents or links; posting status updates, comments or links; posting materials or links, or sharing or participating in any other way on a theater related website or social networking site like Facebook; or micro-blogging, for example through Twitter; or otherwise in any other manner or medium publishing or disseminating the same). For the purposes hereof, the term "confidential material" shall mean all information in any way concerning the activities, business or affairs concerning the Production and/or Managing Member, including but not limited to marketing plans, creative matters and performance details including performer information for specific performances; provided, however, that the term "confidential material" shall not include information which becomes generally available to the public other than as a result of a disclosure by Investing Member.



JohnGore00002

A-123

\#_____

**OPERATING AGREEMENT**



**Dated as of December 1, 2017**

JohnGore00003

A-124



15.1.25   Agrees to keep all information disclosed to such Investing Member hereunder to the extent such information is not publicly available ("Confidential Information"), including without limitation the terms of this Agreement and any non-published financial information about the Broadway Production and/or the Company, in the strictest of confidence and not disclose such information to any third parties other than such Investing Member's representatives with a need to know; the only party authorized to discuss business and creative matters is the Manager

JohnGore00004

A-125



A-126

Joint Exhibit 1

# Actors' Equity Association

## AGREEMENT AND RULES
## GOVERNING EMPLOYMENT
## UNDER THE
## SHORT ENGAGEMENT TOURING AGREEMENT
## (SETA)

Effective Date: April 29, 2019

Expiration Date: November 1, 2020

**NATIONAL OFFICE**
165 West 46th Street
New York, NY 10036
(212) 869-8530 phone
(212) 719-9815 fax

**HOLLYWOOD OFFICE**
5636 Tujunga Ave
North Hollywood, CA 91601
(323) 978-8080 phone
(323) 978-8081 fax

**CHICAGO OFFICE**
557 West Randolph St
Chicago, IL 60661
(312) 641-0393 phone
(312) 641-6365 fax

**ORLANDO OFFICE**
10319 Orangewood Blvd
Orlando, FL 32821
(407) 345-8600 phone
(407) 345-1522 fax

www.actorsequity.org

A-127

Joint Exhibit 1

A-128

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## TABLE OF CONTENTS

QUALIFICATION FOR USE OF THIS AGREEMENT ....................................1

1. ACTOR'S OBLIGATION TO EQUITY ..................................................6
2. AGENTS ..........................................................................................7
3. ALIENS ............................................................................................7
4. ARBITRATION AND GRIEVANCE ....................................................8
5. AUDITIONS AND INTERVIEWS ......................................................11
6. BILLING .........................................................................................18
7. BINDING EFFECT OF AGREEMENT ...............................................22
8. BLACKLISTING ..............................................................................22
9. BREACHES BY PRODUCER ...........................................................22
10. CHANGES IN CAST:  DUTY OF PRODUCER TO ANNOUNCE .......23
11. CHORUS:  PROVISIONS FOR ADDITIONAL COMPENSATION ......24
12. CLAIMS .........................................................................................28
13. CLOTHES AND MAKE-UP .............................................................29
14. CONTINUOUS EMPLOYMENT.......................................................32
15. CONTRACT ...................................................................................32
16. COSTUME CALLS .........................................................................36
17. DANCE CAPTAIN ..........................................................................36
18. DEFAULTING PRODUCERS ...........................................................37
19. DEFINITIONS ................................................................................38
20. DEPUTIES AND MEMBERS:  NOT TO BE DISCRIMINATED AGAINST .........38
21. DIVERSE AND INCLUSIVE CASTING ............................................39
22. DUES AND INITIATION FEES ........................................................40
23. DUTIES OF THE ACTOR ...............................................................40
24. EQUITY:  SPECIAL PROVISIONS ..................................................40
25. ESTOPPEL ....................................................................................41
26. EXCLUSIVE SERVICE OF THE ACTOR .........................................41
27. GUARANTEED PERIOD OF EMPLOYMENT ...................................42
28. HEALTH FUND ..............................................................................42
29. HOUSING ACCOMMODATIONS AND PER DIEM ...........................42
30. ILLNESS AND SICK LEAVE...........................................................45
31. INJURY:  WORKERS' COMPENSATION INSURANCE......................49
32. INTIMIDATION...............................................................................49
33. JUVENILE ACTORS ......................................................................50
34. LABOR / MANAGEMENT COMMITTEE...........................................51
35. LAWS GOVERNING.......................................................................51
36. LAY-OFFS .....................................................................................51
37. MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND
    BROADCAST PROVISIONS...........................................................54
38. MILITARY SERVICE OF THE ACTOR..............................................65

i

A-129

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

39. NO LOCKOUTS OR STRIKES ................................................................65

40. NON-DISCRIMINATION .....................................................................66

41. NOTICES ............................................................................................67

42. NUDITY ..............................................................................................67

43. NUMBER IN CAST ..............................................................................69

44. PENSION FUND AND 401(k) PLAN ....................................................69

45. PERFORMANCES ...............................................................................70

46. PERFORMANCES LOST .....................................................................74

47. PHOTOGRAPHS, PUBLICITY AND PROMOTION ...............................75

48. PRESS RELEASES .............................................................................77

49. PRODUCTION PROSECUTED .............................................................77

50. PROPERTY; REIMBURSEMENT TO ACTOR FOR LOSS OR DAMAGE ........78

51. RECORDINGS USED IN PRODUCTION ...............................................78

52. REHEARSALS ....................................................................................79

53. REOPENING OF A PLAY .....................................................................85

54. REPLACEMENT OF ACTOR ................................................................85

55. REST PERIODS AND DAYS OFF .........................................................86

56. SAFE AND SANITARY PLACES OF EMPLOYMENT ............................89

57. SALARIES ..........................................................................................94

58. SECRET VOTE ..................................................................................100

59. SECURITY AGREEMENTS .................................................................100

60. SHOWCASE PRODUCTION (NEW YORK AND CHICAGO)/LOS ANGELES 99-SEAT
    THEATRE PLAN/BAY AREA PROJECT POLICY: CONVERSION FROM .........100

61. SOCIAL SECURITY AND UNEMPLOYMENT INSURANCE ...................101

62. STAGE MANAGERS ..........................................................................102

63. TERMINATION ..................................................................................107

64. TRANSFER TO THIS AGREEMENT ....................................................111

65. TRANSITION; AUDIT RIGHTS; MOST FAVORED NATIONS ................114

66. TRANSPORTATION AND BAGGAGE .................................................117

67. UNDERSTUDIES ...............................................................................123

68. UNION EMBLEM ...............................................................................124

69. UNION SECURITY .............................................................................124

70. VACATIONS ......................................................................................125

71. VOLUNTARY CLASSES .....................................................................125

ALTERNATIVE MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING
    AND BROADCAST PROVISIONS FOR DRAMATIC PRODUCTIONS ..........127

A-130

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

This Agreement is made between Actors' Equity Association (hereafter called "Equity") effective this 6th day of June, 2016 through and including April 28th, 2019, and The Broadway League (hereafter called "League") on behalf of its Producer members (hereafter referred to individually as "Producer").

## RECOGNITION

The Producer agrees to recognize Actors' Equity Association as the exclusive bargaining representative of all the Actors (Principals, Chorus, Stage Managers and Assistant Stage Managers) employed by them, for the purpose of collective bargaining and the administration of matters within the scope of this Agreement, as follows:

## AGREEMENT AND RULES GOVERNING EMPLOYMENT
## IN SHORT ENGAGEMENT TOURS

### Qualification for Use of this Agreement

Both touring musical and dramatic productions may use this Agreement, upon qualifying as outlined herein.

**(A) Itinerary Qualification**

The production's initial itinerary for each Booking Season (defined as the 52-week period beginning with the first paid public performance) shall meet the following criteria:

(1) A majority of the engagements of the tour are one week or less; and,

(2) No engagement may be longer than four weeks, except:

(a) that the production may be booked into a series that has a regular subscription series of engagements longer than four weeks (however, if it plays longer than the standard subscription weeks for that market, all Actors shall receive additional compensation equal to the difference between the minimum for their Category and the Production Contract Tier B minimum for their category in addition to their contractual salary, only for the weeks played longer than the standard number of subscription weeks);

(b) if a production plays New York City (see (C)(3) **Salary Adjustments**); and,

(c) when the Company is overseas (outside of the United States, Canada and Mexico), each individual engagement may be no longer than eight weeks.

**(B) Average Weekly Guarantees/Flat Fees**

(1) **Musicals.** The production's average weekly guarantee/flat fee shall be no greater than the dollar figures outlined below, plus a maximum of 10% of the Net Adjusted Gross Box Office Receipts ("NAGBOR").

| | Effective 4/29/2019 | Effective 4/27/2020 |
|---|---|---|
| Category 1 | $319,000 | $329,000 |
| Category 2 | $297,000 | $306,000 |

3

A-131

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

| Category 3 | $275,000 | $283,000 |
| Category 4 | $254,000 | $262,000 |
| Category 5 | $229,000 | $236,000 |
| Category 6 | $208,000 | $214,000 |

(2) **Plays.** To qualify for use of this Agreement, a dramatic production must have a minimum of 15 Equity contracts and have an average weekly guarantee/flat fee of $200,000 per week or less plus a maximum of 10% of NAGBOR.

(3) The appropriate Category shall be based on the average weekly guarantee/flat fee for the Booking Season based on its initial itinerary, excluding four-wall engagements or those engagements that include middle money or similar arrangements. If a week includes split-week engagements, at least one of which includes middle money or similar arrangements, the entire week shall be excluded from the calculation of average weekly guarantee.

(a) The average weekly guarantee shall not include weeks in which there are five or fewer performances, in which the performance salary is pro-rated, or in which there is a half-week of lay-off.

(b) Engagements paid on a flat fee basis will not be considered in calculating the average weekly guarantee unless more than 25% of the weeks of the tour's initial itinerary comprise engagements with flat fees.

(c) Fees for foreign engagements (engagements outside the United States and Canada) shall not be included in the calculation of the average weekly guarantee unless the total number of weeks of foreign engagements is 25% or more of the total weeks of the initial itinerary.

(d) Equity reserves the right to withhold qualification from tours with four or fewer on-stage actors.

(e) **Guarantee Qualification Adjustments.** In determining the Category in which the production shall qualify in 1(B)(1) above, which determines the applicable minimum salaries for the tour, the following adjustments shall be made in calculating the production's average weekly guarantee:

**(i) Average Weekly Guarantee Adjustment Based on Cast Size**

For musical productions only, the average weekly guarantee shall be adjusted by:

| Effective Date: | 4/29/2019 | 4/27/2020 |
|---|---|---|
| | $2,750 | $2,750 |

per week for each Equity contract fewer or greater than the following number of Equity contracts, by Category:

(a) For musicals in Categories One and Two, the number shall be 22;

(b) For musicals in Categories Three and Four, the number shall be 20; and

(c) For musicals in Categories Five and Six the number shall be 18.

4

A-132

Short Engagement Touring Agreement 2019-2020

For example, in February 2020 a musical production with 17 contracts and an average weekly guarantee of $271,000 plus 10% of NAGBOR (a Category Three production under (B)(1) above, but with three fewer than the 20 Actors for Category Three per (B)(1) above) would be treated as a production with an average weekly guarantee of $279,250, moving it from Category Three to Category Two.

Similarly, in February 2020 a production with 27 Actors and an average weekly guarantee of $325,000 plus 10% of NAGBOR (a Category One production under (B)(1) above, but with 5 more than the 22 Actors for Category One per (B)(1) above) would be treated as a production with an average guarantee of $311,250 moving it from Category One to Category Two.

**(ii) Average Weekly Guarantee Adjustment Based on Trucking Costs**

The average weekly guarantee for musical productions may be adjusted by an amount equal to 50% of the average weekly cost of trucking for the applicable Booking Season of the tour, up to a cap of six trucks plus an advance (if any) for Categories 1, 2, and 3; or four trucks plus an advance (if any) for Categories 4, 5, and 6.

(iii) The Category for determining any adjustment pursuant to (i) or (ii) above shall be based on the production's average weekly guarantee before any/either adjustment is applied.

**CALCULATION EXAMPLE**

Continuing the example of the musical production in (3)(e)(i) above, in the first year of the agreement, with 17 Equity contracts and an average weekly guarantee of $271,000 plus 10% of NAGBOR, would be treated as a production with an average weekly guarantee of $279,250 under 1(B)(3)(e)(i) above, moving it from Category Three to Category Two;

In addition, if the tour has six trucks plus an advance, and the average weekly transportation cost of such a tour is $16,000, 50% of that cost ($8,000), can be taken as a credit off of the qualifying average weekly guarantee. Thus, the production would be treated as a production with a $271,250 weekly guarantee, and would pay no less than Category Three minimum salaries to the Actors, because in the first year of the agreement its average weekly guarantee, as adjusted by both cast size and trucking credit, does not exceed $275,000.

**(C) Salary Adjustments**

(1) On a musical production with 10 or fewer actors in the on-stage performing Company, if 50% or more of such on-stage actors have contractual salaries that exceed three times the then current Category One minimum salary, Category One minimum salary shall apply for the entire company.

(2) All dramatic productions qualifying for this Agreement shall pay Actors no less than Category One applicable minimum salary.

(3) If a production plays New York City, all Actors shall receive additional

5

Short Engagement Touring Agreement 2019-2020

compensation equal to the difference between the minimum for their Category and the Agreement and Rules Governing Employment Under the Equity/League Production Contract ("Production Contract") minimum for their position, in addition to their contractual salary. This additional compensation shall be effective as of the first paid public performance in New York City and shall end at the conclusion of the engagement in New York City. (See Rule 57, SALARIES.)

(4) Should a musical production otherwise qualify under the terms of this Agreement, but, as a result of the number of Equity contracts being fewer than the number in (B)(3)(d)(i) above, its average weekly guarantee exceeds the cap on Category One under (B)(1) above, then:

(a) If the production engages 18 or more Actors, it shall be permitted to utilize the terms of this Agreement, but must pay no less than applicable Production Contract Tier D salary as a minimum salary to all Actors; and,

(b) If the production engages fewer than 18 Actors, it may utilize the terms of the applicable Production Contract Tier if the total number in the traveling Company (as defined in the Production Contract) is 30 or more.

**(D) Notice to Equity**

(1) Any Producer who wishes to produce a production under the terms of this Agreement shall notify Equity of its intention to do so as soon as possible, but in no event later than 60 days prior to the first rehearsal for the production. At that time, the Producer shall indicate whether it is a musical or dramatic production, and shall provide Equity with the then-current planned itinerary for the tour, the expected economic terms of those engagements, the production budget, and the Producer's weekly operating budget. The original prospectus and pro-formas, if any, for the production, shall also be provided to Equity. A copy of the bid outlining the financial terms from the trucking company shall be included if the production plans to use the trucking cost offset described in (B)(3)(e)(ii) above.

(2) Should Equity object to the production's qualification to use this Agreement, it shall notify the Producer as soon as possible, but in no event later than 20 business days after receipt of all available information described above. If Equity objects, it shall do so in writing with a statement as to why it does not believe the production qualifies for the intended Category. Failure to object in a timely manner will be a waiver of any future right to object to the use of this Agreement for that production.

(3) Any dispute over a production's qualification for use of this Agreement will be resolved through expeditious arbitration under Rule 4(C), with a hearing held before the first available arbitrator of those named in Rule 4(B), the arbitrator issuing a decision within 14 calendar days after the date of the arbitration.

## 1. ACTOR'S OBLIGATION TO EQUITY

(A) Nothing contained in any employment contract signed by any member of Equity shall be construed so as to interfere with the carrying out of any obligation which a member owes to Equity by virtue of such membership and the Producer shall not only not request or require any member to do any act or thing forbidden

6

A-134

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

by the Constitution and By-Laws of Equity or by the rules or orders of the Council of Equity, or orders of its authorized executives, but will require the Actor to do and/or assent to the Actor doing any and all acts required by the foregoing.

(B) The Producer further agrees that Producer has notice:

(1) That the Associated Actors and Artistes of America is a voluntary Association hereinafter referred to as the "4 A's" and is subject to the Constitution, By-Laws, rules, regulations and orders of the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), from which it derives its charter.

(2) That Equity, deriving its charter from the "4 A's", is in turn subject to the Constitution, By-Laws, orders, rules and regulations of the "4 A's" and the American Federation of Labor-Congress of Industrial Organizations.

(3) That the Actor is directly subject to the Constitution, By-Laws, rules, regulations and orders of the "4 A's" and the Producer agrees that Producer will not require the Actor to do any act or thing forbidden by the Constitution or By-Laws of the "4 A's" or by its rules, orders, or regulations.

(4) All individual contracts of employment shall be subject to all such rules and regulations.

(C) Nothing contained in this Rule shall require the Producer to take any action which is not legally permissible, or shall permit Equity to change, modify, amend, supersede, or impose any conditions or obligations upon the Producer which are not specifically set forth in the Equity Rules Governing Employment or in the basic collective Agreement or in any individual Agreement made with an Actor consistent herewith.

## 2. AGENTS

(A) **Equity Franchise Required**. The Producer has notice that if the negotiations for, or the obtaining of, this contract by the Actor is through any employment agent or personal representative not holding an Equity Franchise or one whose Franchise is not in good standing, the Actor is liable to suspension or other disciplinary action.

(B) **Commissions**. Should the Producer contact the Actor directly and agree with the Actor as to the salary and role, the Producer shall not directly or indirectly require an Agent to intervene to complete the engagement or require the Actor to sign the contract at or through an Agent's office. Any such Agent so engaged does not represent the Actor and should such Agent make a claim for commission, the Actor will notify the Producer accordingly and the Producer agrees to indemnify the Actor and hold the Actor harmless from any such claim.

(C) **Chorus, Commissions Prohibited**. The Producer has notice that Actors performing under a Chorus Contract shall not pay commission to any agent, except as in accordance with the Equity Agency Regulations.

## 3. ALIENS

Non-resident aliens may not be employed without the express consent of Equity.

7

A-135

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 4. ARBITRATION AND GRIEVANCE

Except as otherwise expressly provided in these Rules, any dispute between a Producer and/or the League and the Actor and/or Equity relating to the interpretation or application of the Collective Bargaining Agreement between Equity and the League shall be submitted to the Grievance Committee at the request of either Equity, the Producer, or the League and, if not decided by the Grievance Committee, may be submitted to arbitration as provided below.

(A) **Grievance Committee**.  The Grievance Committee shall consist of up to five representatives of Equity and up to five representatives of the League. In rendering decisions, the Equity representatives and the League representatives shall each cast, in the aggregate, one vote.  No decision of the Committee shall be made in the absence of two concurring votes.  A decision of the Committee (by two concurring votes) on a grievance or dispute shall be final and binding on the parties.

(1) **Expedited Procedures**.  Matters of dispute set forth in paragraph (C) below shall be submitted to the Grievance Committee by written notice (sent by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the appropriate Regional Director of Equity with a copy to the Executive Director and to the Director of Labor Relations of the League with a copy to the Executive Director, which notice shall state that the dispute is subject to expeditious arbitration.  In the case of a grievance or dispute submitted by Equity, a copy of the notice shall be sent to the Producer involved.  The Committee shall meet promptly to consider the grievance or dispute. In the event that the grievance or dispute is not decided by the Committee within 72 hours (including at least two business days) after delivery of notice of the dispute to the Committee, the grievance or dispute may be submitted to arbitration as provided in paragraph (C) below.

(2) Matters of dispute other than those set forth in paragraph (C) below shall also be submitted to the Grievance Committee by written notice (sent by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the appropriate Regional Director of Equity with a copy to the Executive Director and to the Director of Labor Relations of the League with a copy to the Executive Director.  In the case of a dispute submitted by Equity, a copy of the notice shall be sent to the Producer involved. The Committee shall meet promptly to consider the grievance or dispute.  In the event that the grievance or dispute is not decided by the Committee within 30 calendar days after delivery of notice of the dispute to the Committee, the grievance or dispute may be submitted to arbitration as provided in paragraph (D) below.

(B) There shall be a board of seven arbitrators designated to hear and determine disputes between a Producer and/or the League and Equity relating to the interpretation or application of this Agreement. The seven arbitrators are Ralph Berger, John Donoghue, Howard Edelman, Carolyn Gentile, George Nicolau, Martin Scheinman and Alan R. Viani.

(1) The arbitrators shall serve for the duration of the collective bargaining Agreement unless either party, not more than 30 days prior to an anniversary date of the contract, requests in writing, by notice (sent by FAX, Email,

8

A-136

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the other party and to the arbitrator, the termination of their duties as arbitrator. In such event, or in the event an arbitrator should resign or for other reason be unable to perform arbitrator's duties, one or more successors shall be chosen by the mutual agreement of the parties herein or, upon failure of such agreement, an arbitrator shall be selected on a case by case basis pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

(2) An arbitrator shall be selected via an alternate striking process. The parties shall alternate striking first. The striking procedure shall be completed in a telephone call between League staff and Equity staff, and the parties shall use best efforts to complete the strike process prior to the end of the business day following receipt of the demand. Both parties shall then contact the arbitrator selected to determine whether they have a date available in the next 60 days. If not, both parties shall contact the arbitrator last struck to determine whether they are so available, and shall continue in reverse striking order until an arbitrator can be selected.

(3) In the event it is necessary to hold an arbitration outside of New York City, the parties, by mutual agreement, may stipulate in writing to have such arbitration held before the American Arbitration Association in accordance with its Voluntary Labor Arbitration Rules.

(C) **Expeditious Arbitration.** When there is a dispute concerning the termination of an Actor by the Producer for reasons set forth in Rule 54(A), REPLACEMENT OF ACTOR, or in cases where there is a dispute under QUALIFICATION FOR USE OF THIS AGREEMENT; Rules 6(F), BILLING; 11(D)(2) CHORUS: PROVISIONS FOR ADDITIONAL COMPENSATION; 12(B)(2)(c), CLAIMS; 15(F), CONTRACT; 20, DEPUTIES AND MEMBERS: NOT TO BE DISCRIMINATED AGAINST; 23, DUTIES OF THE ACTOR; 37, MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS; 51, RECORDINGS; 56(H), SAFE AND SANITARY PLACES OF EMPLOYMENT (Inherently Dangerous Conditions Prohibited); 57(C), SALARIES/EXTRAORDINARY RISK; 62(G)(2), STAGE MANAGERS; 66(C)(1), TRANSPORTATION AND BAGGAGE and the dispute has not been decided by the Grievance Committee, either Equity, the Producer, or the League shall have the right to invoke the following expeditious arbitration procedure:

(1) The dispute or grievance shall be asserted by a notice given to the other parties in writing (by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery, return receipt requested). A copy of such notice shall be sent to the Arbitrator selected by the parties at an address to be designated by the Arbitrator.

(2) In cases where expedited arbitration is necessary, the parties will poll the arbitrators by telephone to determine which of them is most immediately available. The parties shall select the arbitrator whose availability is most immediate.

(3) The award of the Arbitrator shall be in writing and may be issued with or without opinion. If any party desires an opinion, said party may request same, but such request shall not delay compliance with, or enforcement of,

9

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

the award.

(4) The failure of any party to attend the arbitration hearing as scheduled shall not delay said arbitration and the Arbitrator is authorized to proceed to take evidence and issue an award as though such party were present.

(5) The award of the Arbitrator shall be final and binding on all parties.

(D) **Arbitration.** In matters of dispute, other than those set forth in paragraph (C) above, which have not been decided by the Grievance Committee, the dispute or grievance may be submitted to arbitration by Equity, the Producer, or the League by a written demand for arbitration served upon the other party. The demand shall be sent by FAX, Email, Certified Mail/Return Receipt Requested or hand delivery with delivery acknowledged by a receipt. Hearing shall commence within 30 days following the submission of said notice if possible. The decision of the Arbitrator shall be rendered in writing within 30 days following the conclusion of the hearing. The Producer, Equity, or the League may request an expeditious arbitration pursuant to the procedure set forth in paragraph (C) above. Such request shall be sent by FAX, Email, Certified Mail/Return Receipt Requested or by hand delivery to all other parties (including the League) with delivery acknowledged by a receipt. The expeditious arbitration procedure shall be followed unless the other party objects within 12 hours after receipt of the request by FAX, Email, Certified Mail/Return Receipt Requested or receipted hand delivery. In the event the other party objects, the expeditious arbitration procedure shall not be used. It is understood by the parties that both the Producer and Equity should be permitted to use the expeditious arbitration procedure in cases where prompt award would necessarily limit the amount of damages in issue or in other cases where prompt determination is necessary or especially desirable. However, except in the instances set forth in paragraph (C) above, no party shall have the right to such an expeditious arbitration over the objection of the other party.

(1) The failure of any party to attend the arbitration hearing as scheduled shall not delay said arbitration and the Arbitrator is authorized to proceed to take evidence and issue an award as though such party were present.

(2) The award of the Arbitrator shall be final and binding on all parties.

(E) In the event Equity is given formal notice by the Producer of the discipline of an Actor pursuant to the provisions of Rule 54(A)(1), REPLACEMENT OF ACTOR, or pursuant to the provisions of Rule 30(D), ILLNESS AND SICK LEAVE, the matter shall be considered settled unless submitted by Equity to the Grievance Committee within 10 days and (if not decided by the Grievance Committee) submitted by Equity to arbitration within 10 days of written notice to Equity that the Committee has failed to reach a decision on the matter. In all other cases, the Arbitrator may consider the laches of either side initiating a grievance or arbitration procedure in their consideration of the dispute.

(F) In the event a Producer discharges an Actor in accordance with the provisions of Rule 54(A), REPLACEMENT OF ACTOR, while the production is in a city other than New York and in the event the Producer obtains the written consent of Equity for the discharge of the Actor, the discharge shall be considered justified for the purposes of Rule 54(A) and (B) and shall not be subject to grievance or arbitration procedures. In the event the Producer does

10

Short Engagement Touring Agreement 2019-2020

not receive the aforesaid written consent, the matter shall be subject to grievance or arbitration procedures pursuant to the above provisions only if Equity submits the matter to the Grievance Committee within 72 hours after receipt by it of the Producer's written notice of dismissal and the reasons therefore and (if not decided by the Committee) shall be subject to arbitration only if submitted by Equity to arbitration within five business days of written notice to Equity that the Committee has failed to reach a decision on the matter.

(G) The cost of arbitration, and any compensation to and expenses of the Arbitrator, shall be borne equally by the parties.

## 5. AUDITIONS AND INTERVIEWS

### (A) Principal Interviews/Auditions

(1) **General.** Before any principal performers (other than "star" performers) are hired for a production, there shall be auditions at which performers will be seen, without appointment, for principal roles and for stage manager positions. Subsequent auditions may also be scheduled at this time. The following conditions shall apply:

(a) Among the auditions held for principal roles, there shall be interviews or auditions for Equity performers. The Producer shall follow all Equity rules regarding Equity interviews and auditions.

(b) The Producer is under no obligation to hire any person pursuant to any principal interview or audition procedures including the procedures for Equity performers set forth below.

(c) Auditions by appointment, except appointments taken pursuant to Equity Audition Codes, shall not be permitted prior to the completion of all other principal auditions.

### (2) Equity Principal Interviews/Auditions

(a) Equity Interviews/Auditions for Equity performers shall be conducted in accordance with the following:

(i) No later than two weeks prior to the first Equity interview/audition, the Producer shall submit a complete cast breakdown to Equity for posting at Equity, setting forth a definitive description of each character in the production, indicating which roles, if any, have been cast or are on offer, all stage managerial positions available and stating the agreed upon time, date and location of the interview/audition and specifying the name and title of personnel who are expected to attend the interview/audition. Any audition notice may also state if the actor may submit a recorded audition. If the cast breakdown is distributed to personal managers, agents and/or a breakdown service more than two weeks prior to the first interview/audition, it shall also be submitted to Equity at that time.

(ii) Simultaneously with the Producer's submission to Equity of the cast breakdown, the names of the Producer, composer, lyricist, author, book writer, if any, director, associate or assistant director, musical director, choreographer, stage manager, professional casting director,

11

A-139

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

general manager, company manager and an address to which resumes may be sent are also to be submitted.

(iii) When a role to be cast depicts a person with a specific disability, the Producer agrees to include this information in the casting specifications and, at the same time, to notify Equity of such specifications so that performers with similar disabilities may be informed and given an opportunity to audition for the role.

(iv) There shall be three days during which Equity interviews/auditions shall be held in a theatre, rehearsal hall, or other Equity approved location which is accessible, as defined by federal law, and complies with Equity's safe and sanitary provisions.

(v) The Producer shall consult with Equity with respect to the scheduling of the Equity interview/audition. If more than one such interview/audition has been scheduled for the same day, they shall be within reasonable walking distance of each other. The Producer shall use the facilities of the Equity Audition Center (165 West 46th Street, New York City), if it is available and compatible with the interview/audition requirements of the Producer.

(vi) Equity interviews/auditions must be held in a city designated as an Equity office city.

(vii) The Producer shall schedule the first day of Equity interviews/auditions no earlier than 26 weeks prior to the start of rehearsals. Should more than 26 weeks elapse before rehearsal begins, new Equity interviews/auditions shall be required. Equity shall not unreasonably withhold its permission to extend this period upon application by the Producer.

(viii) The location or time of the Equity interview/audition may not be changed without prior notice to Equity and unless the change can be published in trade publications prior to the interview/audition.

(ix) Equity, at no cost to the Producer, will provide a monitor to organize the scheduled Equity interviews/auditions.

(b) **Equity Principal Auditions.** Principal Auditions for Equity performers shall be conducted as follows:

(i) The Equity auditions will be conducted by the Producer, director, associate or assistant director, any author and/or professional casting director designated in writing by the Producer.

(ii) The Producer agrees to audition at least 115 Equity performers each seven hour day and may see more if time permits (see section (d)(i) below).

(iii) The Equity performer shall be limited to two minutes to present audition material of the performer's choice. Singing may be required for musicals.

(iv) Auditions for Equity performers will be available on a first-come, first-served basis.

12

A-140

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(v) When a performer who identifies as d/Deaf or hard of hearing is sought, or a character who is d/Deaf or hard of hearing is being cast, the Producer shall provide during the audition a qualified interpreter for the d/Deaf (i.e., an interpreter qualified or certified in American Sign Language or oral interpretation).

(vi) All audition material provided by the Producer shall upon request be made available, at a place to be designated by the Producer, at least 48 hours in advance of the audition to performers who are blind or have low vision.

(c) **Equity Principal Interviews.** Interviews for Equity performers and stage managers shall be conducted as follows:

(i) Equity performers and Stage Managers shall have the option to interview on any one of the three days of Equity interviews or auditions.

(ii) The Equity interview shall be conducted by a representative of the Producer with the authority effectively to recommend that the performer be called to a subsequent audition. The Producer, director, assistant director, any author and/or professional casting director are endowed with such authority.

(iii) The Producer agrees to see as many Equity performers as time allows (see (d)(i) below), and shall make best efforts to provide more than one interviewer, if necessary, to accommodate those performers wishing to be interviewed.

(iv) Equity performers will be seen on a first-come, first-served basis.

(v) The Equity interview is not available to any Equity performer who was previously auditioned at an Equity audition for the same production.

**(d) Additional Equity Principal Interview/Audition Provisions**

(i) Each day of Equity interviews/auditions shall consist of seven hours. However, two separate half days of not less than four hours may be substituted and scheduled in place of any one day.

(ii) The Producer shall make the premises available to the Equity monitor and Equity performers one hour prior to commencement of the scheduled interviews/auditions.

(iii) The Producer shall provide a piano and professional piano accompanist who can sight read when Equity auditions for singers are held.

**(e) Subsequent Equity Principal Auditions**

(i) Subsequent to Equity Principal interviews or auditions, Equity performers shall be called to audition at specific times and shall not be called in groups unless for physical screening and/or voice blending.

(ii) Auditions and/or readings, excluding initial interviews/auditions, shall be limited to four in number for an Equity performer and said performer shall be compensated at the rate of one-eighth of minimum salary for each reading and/or audition over four, to which the

13

Short Engagement Touring Agreement 2019-2020

performer is called. The above numerical limitations and payment shall not be applicable to recognized stars or top featured performers.

(iii) Equity franchised agents may accompany their clients to Equity auditions.

(iv) The Producer shall provide a piano and professional piano accompanist who can sight read when auditions for singers are held.

(v) If an Actor is requested to learn specific audition material, including music, for an audition, Producer shall provide all such material at no charge to the actor. If music must be learned, Producer shall provide piano accompaniment via electronic means at no cost to the actor.

(vi) The director or assistant director must be present at all Equity auditions. The musical director or assistant musical director must be present at all auditions for singers and the choreographer or assistant choreographer must be present at all dance auditions. The Producer may request that Equity permit persons of equivalent authority to substitute for the above. If the audition is for screening purposes, a casting director may hold the audition, but there must be subsequent auditions with the persons enumerated in this paragraph present.

(vii) Equity performers must be given specific appointments and not more than 12 auditions may be scheduled in an hour. The Producer shall maintain a written schedule of the names of all performers auditioned and the dates and times of their auditions, a copy of which shall be sent to Equity.

(viii) The Producer, or the Producer's representative, shall keep a sign-in sheet at all callbacks and auditions to denote arrival and departure times of all Equity performers. Performers who are kept at an audition or callback longer than three hours shall be paid $21.00/hour for the fourth hour and for each additional hour or part thereof.

(ix) Should the Producer choose to hold additional Equity interviews or auditions in a city where Equity maintains an office, the Equity interview or audition must be scheduled through the local Equity office and shall follow the designated procedures of that office.

**(B) Principal Replacement Calls**

Each musical and dramatic production employing Principal performers shall conduct not less than one day of principal replacement calls at least every 12 months after the first anniversary date of the first paid public performance. The auditions will be conducted by the Producer, director, assistant director, any author and/or professional casting director designated in writing by the Producer. The Producer is under no obligation to hire any person pursuant to any replacement call procedures including the procedures for Equity performers set forth herein.

**(C) Chorus Auditions**

(1) **General**. Before any chorus performers are hired, there shall be chorus auditions open to all performers. The following conditions shall apply:

14

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(a) Among chorus auditions held, there shall be auditions for Equity performers. The Producer shall follow all Equity rules regarding Equity auditions.

(b) The Producer is under no obligation to hire any person pursuant to any chorus audition procedures including the procedures for Equity performers set forth below.

(c) Auditions by appointment, except appointments taken pursuant to Equity Audition Codes, shall not be permitted prior to the completion of all other auditions.

(d) Any audition notice may also state if the actor may submit a recorded audition.

(2) **Equity Chorus Auditions**.  Chorus auditions for Equity performers shall be conducted as follows:

(a) The Producer shall provide Equity at least two weeks' notice of the first call for Equity chorus auditions and notice of the final call. Equity representatives shall be present at the place of the call.

(b) The Producer shall not hold Equity chorus calls or auditions on any day when an Equity meeting is scheduled, provided that Equity gives notice in advance of such meeting.

(c) Either the director, musical director, composer, or choral director must be present at all Equity auditions for singers.  Either the choreographer, assistant choreographer, or dance captain must be present at all Equity dance auditions.

(d) For productions in which Equity performers are required to sing, there must be an audition for singers at which performers must be given an opportunity to audition in their primary skill before they may be requested to move or dance.  In productions in which Equity performers are required to dance, there must be an audition for dancers at which performers must be given an opportunity to audition in their primary skill before they can be requested to sing.

(e) Dance auditions must be conducted on approved dance surfaces.

(f)  Equity auditions may, if necessary, be held on two separate days, one day for voice and one day for dance and general qualifications.  If said two days are not consecutive, performers shall not be required to report for any purpose on the intervening days. The performers shall not be required, during the audition, to rehearse numbers to be used in the production.  If so required, rehearsals shall be deemed to have begun.

(g) If Equity performers are called for any day, work on any day after the third audition day, or are called for a fourth audition, the performers shall be compensated on the basis of one-sixth minimum salary for each day or part thereof.

(h) For each Equity performer, there shall be a break of at least one hour, after not more than five consecutive hours of audition.  For each hour or part thereof, over five hours without a break, the performer shall be paid $21.00/hour until such break is given.

15

A-143

Short Engagement Touring Agreement 2019-2020

(i) The Producer shall provide a piano and professional piano accompanist who can sight read when auditions for singers are held.

**(D) Chorus Replacement Calls**

Provided the production holds at least one Chorus replacement call prior to the commencement of a second (and of each subsequent) Booking Season, each production employing Chorus performers shall hold Chorus replacement calls as necessary, as determined by the Producer and the creative team. The following conditions shall apply:

(1) Among the chorus replacement calls held, there shall be replacement calls for Equity performers which shall be conducted in accordance with the provisions of paragraph 5(C)(2)above.

(2) The Producer is under no obligation to hire any person pursuant to any chorus replacement call procedures including the procedures for Equity performers set forth herein.

**(E) Additional Equity Interview/Audition Provisions**

**(1) Equity Audition and Interview Code/Safe and Sanitary Provisions**

(a) Whenever Equity auditions or interviews are held, the Producer agrees to provide:

(i) A separate room with seats and open space where the performer may wait and/or warm up.

(ii) Separate change facilities (not lavatories) for men and women required to dance.

(iii) Audition, change and waiting rooms which are properly lighted, ventilated and heated during inclement or cold weather to at least 68 degrees Fahrenheit.

(iv) Smoking shall not be permitted in the interview, audition or waiting room.

(v) Equity reserves the right to approve audition dance surfaces as per Rule 56(E).

(vi) Ample, pure, cool drinking water, and cups where necessary, shall be provided at no cost to the Actor wherever the Actor is required to audition.

(b) When auditions are held in premises which are not accessible, as defined by Federal law, the Producer, upon timely notification, by either the Equity Audition Center or by a performer with a disability who wishes to audition, will arrange accessible audition facilities to accommodate equal access casting for performers with disabilities.

(2) **Liability Insurance**. The Producer shall provide liability insurance to cover all Equity performers at Equity auditions and interviews.

(3) Equity and the League are committed to the belief that auditions must be done live. However, should a key member of the creative team not be able to attend a final Equity callback for a specific Principal role, Principal understudy assignment or a Chorus part or specialty, Recording of Equity performers shall be permitted, provided:

16

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

    (a) Any resulting recording shall only be used internally for casting purposes;

    (b) The recording shall not be released in any medium;

    (c) The Actor and Equity shall receive no less than 24 hours' notice that the audition will be Recorded;

    (d) There will be at least one person with casting authority in attendance at the Recording; and

    (e) After the stated purpose has been accomplished, but no later than 30 days from date of the Recording, the recording shall be destroyed, with written certification to Equity signed by the Producer that no copies were made or retained in any format.

If the Producer desires to take pictures at the time auditions are held, such pictures may be taken with the written consent of the Actor, prior to or subsequent to the auditions, but in no event during auditions.

(4) **Script Review**. It is the intent of the Producer and Equity that casting for all roles be made without bias on the basis of race, ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or beliefs and the parties affirm their commitment to equal employment opportunity, diversity and the elimination of discrimination in theater. In furtherance of this statement the Producer agrees that auditions for all productions and the hiring of Stage Managers will be conducted in such a manner as to provide full and fair consideration to Actors of all races and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), genders/gender identity or expressions, transgender status, ages, religions, national origins, disabilities, familial status, sexual orientations, veteran status, or political persuasions or beliefs and shall not discriminate based upon these characteristics. As an aid in achieving the above-stated goals of non-discrimination, and in pursuance of equal opportunity for all performers, the Producer, at the time of submission of the cast breakdown, but in no event less than five weeks prior to the interviews/auditions, shall submit a script of the play and such other related information as may be relevant, to an advisory committee of Equity consisting of three members of its Equal Employment Opportunity Committee. This committee shall act in an advisory capacity only.

After reviewing the script, the committee shall submit recommendations to, and be prepared to discuss with, the Producer, director, playwright, choreographer and The Broadway League, those roles for which Actors with disabilities, ethnic minorities, seniors and women might be cast. It is understood that the script is delivered confidentially and is not for publication; that the recommendations submitted by the committee are advisory; and that the recommendations of said Advisory Committee shall be made only after an actual reading of the script. It is further understood that the Producer shall have the right to discuss the script and the committee's recommendations with the Advisory Committee.

17

A-145

Short Engagement Touring Agreement 2019-2020

Further, unless otherwise indicated textually or contextually, and consistent with the procedures set forth in Rule 5, auditions for all parts/roles shall be open to all Actors without bias, in which cases casting notices, calls and cast breakdowns shall clearly and unequivocally state that the audition process is open to Actors of all races and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), genders/gender identities or expressions, transgender status, ages, religions, national origins, disabilities, familial status, sexual orientations, veteran status, or political persuasions or beliefs.

(5) **Personal Information.** In consideration of the protection of Actors from unwanted and unauthorized solicitation by third parties, Equity and the Producer agree that an Actor's personal information, including, but not limited to such information as legal name, address, telephone number, e-mail address, and social security number, is provided in confidence, and is to be used solely for purposes of casting and employing Actors, and not for the purpose of soliciting or marketing to Actors or for unsolicited contact of a personal nature. Producer agrees that it will not disclose personal identifying information to third parties for any purposes other than casting or employing Actors, unless Producer has obtained the express written authorization of the Actor.

This provision shall not proscribe Producer's use of an Actor's performing name, headshot or image for purposes of marketing, advertising, or publicity for any show in which the Actor is cast.

This rule is not subject to Rule 9 BREACHES BY PRODUCER of this Agreement. By this agreement, Actor does not waive any claims Actor may have under any applicable federal, state, or local law.

## 6. BILLING

### (A) House Boards

(1) The names of all Actors employed in the production shall be listed on the house boards in front of the theatre in letters no less than one-half inch in height. Such house board shall be entitled "The Company." Stage Managers, Understudies and Swings may be listed separately.

(a) The Producer agrees, in instances where there is no house board outside the theatre, to place one prominently inside the lobby.

(b) At least one such house board with names in alphabetical order shall be displayed so as to be clearly visible to the public at all times.

(2) Should the Producer fail to comply with this clause (A) prior to the first performance on the day following the giving of written notice, by the Actor or Equity, the Producer shall pay the Actor whose name is omitted, one-eighth of contractual salary for each performance that the violation continues to exist.

(B) **Playbill or Program**. A free Playbill or program shall be proffered to every patron prior to patron's arrival at patron's seat. Such program shall contain a listing of all Actors employed in the production together with their named part(s) or function.

18

A-146

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(1) All Principal Actors, Chorus Actors (including Understudies and Swings) and Stage Managers must have a biography in the program or Playbill.

(a) The Actor shall have the right of approval of biographical material, which approval shall be in writing and which shall not be unreasonably withheld. Biographical material not disapproved within 48 hours of its submission to the Actor, shall be considered approved. Biographical material once approved must not be edited except where spatial limitations in the program require editing and then only upon mutual consent, which consent will not be unreasonably withheld. In the event that there are errors in the Actor's bio, Producer agrees to correct such errors in the next printing of the program upon receipt of written notice of said errors. Failure to correct the error as stated above shall require payment of one-eighth contractual salary to the Actor.

(b) The parties agree to use best efforts to limit all biographies in the program or Playbill to biographical data and professional credits.

(c) The Producer may limit biographies for Chorus and Stage Managers to four lines, exclusive of the Actor's name and parts/role played, of biographical data and professional credits only. Actors may review the galley sheet and be permitted to add material to reach four lines.

(2) Biographies for Understudies to Stars and Featured Principals will be inserted in the program when Producer chooses, per Rule 10(A), CHANGES IN CAST: DUTY OF PRODUCER TO ANNOUNCE, to announce their appearance by insert. Such biography may be limited to 50 words.

(3) In the event that there are errors or omissions in the printed cast listing or the omission of a biography in the Playbill or program, the Producer agrees, upon receipt of notice of such an omission or error and within 24 hours of the first business day free of travel, to place in the Playbill or program a photocopied or printed slip correcting the omission or error. In the event that advertising appears on the insert, the focus of the insert shall be the cast change announcement. Producer agrees to correct such omission or error and to correct errors in biographical material in the next printing of the Playbill or program, provided such notice is given at least 24 hours prior to the press deadline.

(4) For each failure either to place a correction slip in the Playbill or program, as stipulated above, or to correct the Playbill or program cast listing or biography at the next proof printing after proper notice has been given, the Producer shall pay the Actor(s) involved, a sum equal to one-eighth of the Actor's contractual salary for each week or part thereof during which the omission or error continues.

(5) The Producer may carry a sufficient number of program inserts similar in nature to the title, credit page and the "cast in order of appearance" page of a standard theatrical program (Playbill) denoting correct billing and parts played by the cast so that if the programs at the location the company is playing are incorrect or no program is provided, then these inserts shall be provided to the patrons.

(6) Dance Captains shall be billed on the cast page.

19

A-147

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

**(C) Souvenir Programs**

(1) All Actors must have a biography in the Souvenir Program, which may be satisfied by an insert. The Actor shall have the right of approval of biographical material, which approval shall be in writing and which shall not be unreasonably withheld. Failure to seek approval of Actor's biography shall require payment of one-eighth contractual salary. Biographical material not disapproved within 48 hours of its submission to the Actor shall be considered approved. Biographical material once approved must not be edited except where spatial limitations in the program require editing and then only upon mutual consent, which consent will not be unreasonably withheld.

(a) In the event that there are errors or omissions in the biography or billing in the Souvenir Program, the Producer agrees, upon receipt of notice of such an omission or error, to correct biographical material and billing in the next proof printing of the Souvenir Program, provided such notice is given at least two weeks prior to the press deadline.

(b) Program inserts containing cast changes shall be permitted. Changes to the program or inserts as a result of cast changes shall be made at the next press printing. Producer shall make best efforts to provide written notice to the cast, with a copy to Equity, of the date of that printing.

(2) For each failure to correct the Souvenir Program biography and billing at the next proof printing after proper notice has been given, the Producer shall pay the Actor(s) involved a sum equal to one-eighth of the Actor's contractual salary for each week or part thereof during which the omission or error continues.

(3) **Photographs.** Actor shall be properly identified in each photograph of three or fewer Actors in which Actor's likeness appears in the Souvenir Program.

(4) In addition, Producer will make best efforts to identify all Actors pictured in the Souvenir Program.

(5) When the Souvenir Program contains photographs of any other Companies, Producer shall identify which production (e.g., Broadway, Tour, London) is pictured. It is understood that such identification may be listed in an index at the back of the Program. In addition, this rule shall not apply for generic images where individual Actors are not identifiable.

(D) **Websites.** (This rule shall apply to the Producer's "official show" websites only.)

(1) The official Playbill bio of every member of the Equity company shall appear on the website, subject to the approval of the Actor.

(2) Actors shall be properly identified in each photograph of three or fewer Actors appearing on the website. Such identification may be on a separate credit page used for photo identification. The Producer shall make best efforts to identify all Actors pictured on the website.

(3) Whenever there is a cast change, any "current cast list" will be updated as soon as possible.

(4) When the website contains photographs of any other companies of the show, Producer shall identify which production (e.g., "Original Broadway

20

A-148

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Cast", "London Company") is pictured. Such identification may be made on a separate credits page.

**(E) Photographs, Removal of**

(1) When a Principal Actor leaves a cast, Actor's name and/or likeness (in photographs portraying three Actors or fewer) must be removed from all front-of-the-house boards and frames where the show is playing as well as from all frames at other theatres.

(2) No photograph containing the names or likenesses of three or more Principal Actors who are no longer in the company shall be permitted to be displayed. The removal of such photograph shall be made prior to the first performance of the successor of the third Principal Actor so depicted. Should the Producer fail to comply with this Rule within three days after the written notice is given by any of the affected Principal Actors, successors and/or Equity, the Producer shall pay to the Principal Actor(s) currently performing and to the Principal Actor(s) whose name and/or likeness has not been removed, an additional one-eighth of their respective weekly salaries for each day that the Producer has not complied with the Rule. In connection with all other advertising and display media under the Producer's control, Producer shall exercise reasonable diligence in removing the name and/or the likeness of the Principal Actor no longer in the cast.

(3) The Producer shall provide proper identification of each Actor in front-of-the-house photographs which contain the likenesses of three or fewer Actors.

(F) All provisions pertaining to the billing of the Actor not set forth herein shall be specifically set forth as a rider to Actor's employment contract. If billing is contingent on the billing of any other Actor, such contingency shall be clearly and succinctly set forth in the contract.

(1) Whenever a breach of a billing clause contained in an Actor's individual contract is claimed, Equity or the Actor shall notify the Producer by certified letter, e-mail or fax of the breach.

(a) If the breach is not corrected within seven business days excluding Saturday and Sunday of receipt of notification, except as provided below, the Producer shall pay to the Actor a sum equal to one-eighth of the Actor's salary for the first week the breach continues beyond the seventh day. For each week the breach continues thereafter, or if additional breaches occur and the Producer has been properly notified, the Actor shall be paid cumulatively an additional one-eighth per week, or per breach, for as long as the breaches continue (i.e., two-eighths for the second week or second breach, three-eighths for the third week or third breach).

(b) If the breach involves billboards, the time interval for correction shall be extended to two weeks. Exempted from this provision shall be posters on unpaid locations, commonly known as "sniping."

(c) If the breach involves billing in a magazine or similar publication, the time interval shall be seven or more days prior to the press deadline. If the breach involves billing in a newspaper, the time interval shall be 48 or

21

A-149

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

more hours prior to the press deadline and the payment to the Actor shall be per day rather than per week as stipulated in (a) above.

(d) These provisions shall not apply to breaches that are beyond the Producer's control.

(2) In the event of a dispute respecting a breach of the above provisions, the matter shall be resolved by expeditious grievance and arbitration procedures as provided in Rule 4.

## 7. BINDING EFFECT OF AGREEMENT

All contracts of employment signed pursuant to these Rules are binding not only upon the signers on the face thereof, but upon any and all corporations, co-partnerships, enterprises and/or groups which said signers or each of them directs, controls, or is interested in and are hereby agreed to be adopted as their contract by each of them.

## 8. BLACKLISTING

The League and Equity both pledge themselves to use their best efforts to prevent blacklisting in the theatre. The opposition to blacklisting is not a controversial issue between the League and Equity. The term "blacklisting" shall be deemed to mean the submission by a Producer to pressure groups and/or the use of private lists published or unpublished of persons not to be employed in theatrical productions. To that end, Equity and the League shall jointly investigate and deal with all complaints of blacklisting in the theatre and take any and all lawful means to correct, remedy and actively resist each and every instance of blacklisting as and when it arises. If a joint investigation is warranted, representatives of the respective parties will meet and adopt rules and regulations which will govern said investigation.

## 9. BREACHES BY PRODUCER

(A) In addition to any other remedies available herein, each Actor affected herein shall receive up to two weeks' salary as liquidated damages, no present basis of calculation existing, should the Producer:

(1) Breach an individual contract of employment, or any part thereof;

(2) Breach or fail to abide by or conform to any rule which is a part of the employment contract of any Equity member;

(3) Make any false statement in connection with any employment Agreement or regarding security;

(4) Employ or have employed any member of Equity under any form of contract other than a Standard Form;

(5) Be in default as to any employment contract with any member of Equity, or breach any such employment contract, past or present;

(6) In the future, breach any such employment contract;

(7) Fail to give or deposit security at the time and in the form and amount required by Equity;

(8) Otherwise breach or fail to live up to any contract of employment or Equity Rule.

The parties agree and mutually understand that the use of the word "shall" in the first sentence of (A) above is not intended to suggest that a violation of this

22

A-150

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Rule mandates any liquidated damages at all. Depending on all relevant considerations, including the seriousness of a breach and any mitigating circumstances, appropriate liquidated damages may range from zero to two weeks' salary and an arbitrator or other fact finder shall have full discretion to award no liquidated damages where appropriate even though a violation of the Rule has been found.

(B) Should any situation arise where, because of the act of the Producer, or Producer's fault or default, the Actor is released from Actor's obligation to work, then in any of said events, the Actor may, Equity consenting, forthwith terminate Actor's employment and is released from any obligation to render services to the Producer. In addition thereto, the Producer agrees that Producer shall pay the Actor forthwith, in full, for all services rendered, plus any other sums to which the Actor may be entitled by contract or by Equity Rules and also, as liquidated damages, no present basis of calculation existing, up to two weeks' salary for Actors signed to Standard Minimum Contracts and for Actors signed to Term Contracts, a sum equal to the Actor's salary multiplied by the number of weeks remaining under Actor's guarantee of employment, or by the number of weeks during which the production for which the Actor has been engaged runs during the season, calculated from the date when the Actor ceased to be employed, whichever period shall be longer. Against said sums, no offset shall be allowed the Producer for earnings of the Actor in a new or subsequent engagement. These provisions shall apply to each season contracted for.

(C) Disputes as to the applicability of the foregoing paragraphs shall be subject to grievance procedures and arbitration under Rule 4 and neither Equity nor the Actor may finally determine any questions of violation or breach on the part of the Producer, except as to violations of Rule 9(A)(4) and (A)(7). In the event of the Producer's breach of Rule 9(A)(4) or (A)(7), Equity may intervene, without penalty to itself and require the Actor to perform or rehearse or not perform or rehearse under such terms and conditions as Equity may consider just and equitable.

## 10. CHANGES IN CAST:  DUTY OF PRODUCER TO ANNOUNCE

This Rule shall apply to all Actors who play or understudy specifically identifiable characters listed in the program or Playbill. All understudies to Principal parts listed in the program or Playbill shall be listed in the program or Playbill.

(A) When an understudy takes the place of an Actor whose part listed in the program or Playbill is a specifically identifiable character or where such an Actor is replaced by another then:

Either

(1) Announcement of change in cast shall be made at the rise of the curtain, stating the name of the Understudy or replacement Actor and the character portrayed;

Or

(2) Such announcement shall be made in all programs or Playbills by the insertion of a printed slip stating the name of the Understudy or replacement Actor, that Understudy's or replacement Actor's biography (if required by Rule 6(B)(1) or (2)) and the character portrayed;

23

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Or

(3) Such announcement shall be posted conspicuously, prominently and in an unobstructed manner at the entrance to the theatre at the place where tickets of admission are collected, and any other entrances through which the audience might pass to enter the seating areas. Where the producer may want to post cast changes, it must carry additional signage to be used to identify potential cast changes. Such announcement shall be at least eight by 10 inches in size with the name of the part and the Actor in letters of at least one inch.

(B) All further changes in cast made necessary by the absence or replacement of an Actor shall be posted on the board(s) in (3) above or announced (either from the stage or by program insert) in the following manner: "At this performance, the part(s) usually played by (Actor) will be played by (replacement Actor)."

(C) When a Swing is performing in a track with no identifiable characters, the Swing's name shall, at the Producer's option, be posted by means of a slider on the House Board in the lobby, or by means of insert in the daily program.

(D) When an Understudy takes the place of a Principal, either during the first act or at intermission, an announcement of the change in cast shall be made at the rise of the Act II curtain, stating the name of the Understudy and the character portrayed.

(E) If the required announcement(s) are not made or are incorrect as of the rise of the Act I curtain, the appropriate announcement(s) may be made prior to the commencement of the final act.

(F) Except for the notice required in (C) above, for each failure to give the notice of substitution required by this Rule, the Producer agrees to pay the Actor whose part is played by an Understudy or another Actor and also such Understudy or other Actor, an additional sum equal to one-eighth of Actor's own weekly salary

(G) Upon request, Equity will provide a written list of which roles must be announced for a particular production, and both parties will be bound by it.

## 11. CHORUS: PROVISIONS FOR ADDITIONAL COMPENSATION

### (A) Chorus Playing a Part

(1) If a member of the Chorus is required to play a part, speak lines, sing a song, or perform a dance that is individual in its nature, the Chorus shall be paid not less than $15 per week in addition to Chorus' weekly contractual salary for each such assignment or part.

(2) **Payment for.** Such additional assignments, including understudy assignments, shall be reduced to writing no later than one week after such assignment. During previews, should the assignments be deleted or reassigned prior to the Official Opening, the Chorus shall receive payment for an additional assignment only for such weeks or part thereof during which Chorus was responsible for such assignment.

### (B) Chorus as Understudy

(1) **Understudy for Principal Role.** If a Chorus understudies a Principal Role, Chorus shall be paid not less than $33.75 per week for each such role in addition to Chorus' weekly contractual salary.

24

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Chorus shall not be assigned to understudy more than three Principal Roles. (This rule also applies to alternate Understudies. See Rule 67(D) for performance payment.)

Where there are non-enumerated Understudies for a particular role or part and a Principal Actor has given advance notice of a leave for vacation or any other purpose, Producer shall provide, absent extraordinary circumstances, two weeks' notice to said Understudies and post which Understudy will be performing for the Actor on leave.

(a) Understudy roles assigned to Chorus must be so assigned with new contracts or riders and salary adjustments made not later than two weeks after the first paid public performance of the production or at the time of the Official Opening, whichever is earlier.

(b) If the contract of a Chorus is amended to provide for the assignment of an Understudy role and additional compensation therefor, the Producer may, within two weeks of the first paid public performance, withdraw said Understudy assignment and additional compensation therefor and assign said Understudy role to another Chorus. The foregoing shall not apply where the Understudy role and compensation therefor is part of the original contract of employment.

(2) **Understudy for Chorus Playing Parts.** If a Chorus (including Swings) understudies another member of the Chorus who is paid for playing a part, speaking lines, singing a song, performing a dance that is individual in its nature (see 11(A)(1) above), Chorus shall be paid not less than $11.25 per week for each such Understudy assignment or part in addition to weekly contractual salary. (This Rule also applies to second, third, etc., Understudies.) Such assignment must be attached to the contract by rider from the date of assignment.

(3) **Emergency Understudy for Chorus.** If, in an emergency, a Chorus goes on in a part not designated on the contract, as an Understudy to another Chorus playing a part, Chorus thereafter shall be contracted and compensated for such understudy duty at no less than $11.25 in addition to weekly contractual salary, subject to two week termination of such understudy duty only, without regard to the requirements of Rule 63(D).

(C) **Chorus Rider.** An Actor engaged under a Chorus contract may be signed to either of the following Riders in accordance with the following forms. In the event that the Producer requires a Rider to the contract of a Chorus Actor, such Chorus Actor shall have the opportunity to choose the form (either A or B) under which Actor will work. In the event that the Producer does not require a Chorus Rider to the contract of a Chorus Actor as a condition of the offer of employment, the Producer shall have the opportunity to choose the form (either A or B) under which the Chorus Actor may work, and the Producer must offer the Chorus Actor the option to select between: (i) the form of Rider selected by the Producer, and (ii) to work without a Rider. The Producer may restrict the availability of a Rider to one of the two forms only if the option to work without a Rider is also presented to the Chorus actor.

25

A-153

Short Engagement Touring Agreement 2019-2020

(1) "**Six-Month Rider [Form A]**

"Anything in the Standard Equity Contract of employment for Chorus of which this rider is a part to the contrary notwithstanding, it is agreed as follows:

(a) "This rider may be used only if the Chorus is paid at least $54 more weekly than the minimum salary plus required payments for any and all other duties assigned to Chorus for which extra compensation is provided under Equity Rules.

(b) "Neither party hereto may give the other individual notice of termination of this Contract prior to 24 weeks from the date of the first paid public performance of the play. At the conclusion of this 24 week period, all provisions in the Standard Minimum Contract of employment pertaining to individual notice of termination shall apply.

(c) "If, in the 25th and 26th weeks of the Six-Month Rider, the Producer should wish to execute a second or subsequent Six-Month Rider and the Chorus consents thereto, Producer shall pay an additional increment of not less than $27 for a second or subsequent Six-Month Rider. If the Chorus rejects the Producer's offer of a second or subsequent Rider, the Producer need not continue to pay the additional increment provided for in (a) above and this paragraph (c), and if the Actor subsequently tenders a notice of termination, said Actor's notice of termination must include two performance weeks.

(d) "If the Chorus, during the term of this Six-Month Rider [Form A], obtains a contract to play the part of a Principal, the Producer agrees that Chorus may, upon two weeks' notice, terminate employment hereunder.

(e) "This rider shall be valid only if signed and executed by the parties prior to the first day of rehearsal."

(2) "**Six-Month Rider [Form B]**

"Anything in the Standard Equity Contract of employment for Chorus of which this rider is a part to the contrary notwithstanding, it is agreed as follows:

(a) "This rider may be used only if the Chorus is paid at least $27 more weekly than the minimum salary plus required payments for any and all other duties assigned to Chorus for which extra compensation is provided under Equity Rules.

(b) "Neither party hereto may give the other individual notice of termination of this Contract prior to 24 weeks from the date of the first paid public performance of the play. At the conclusion of this 24 week period, all provisions in the Standard Minimum Contract of employment pertaining to individual notice of termination shall apply.

(c) "If, in the 25th and 26th weeks of the Six-Month Rider, the Producer should wish to execute a second or subsequent Six-Month Rider and the Chorus consents thereto, Producer shall pay an additional increment of not less than $13.50 for a second or subsequent Six-Month Rider. If the Chorus rejects the Producer's offer of a second or subsequent Rider, the Producer need not continue to pay the additional increment provided for in

26

A-154

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(a) above and this paragraph (c), and if the Actor subsequently tenders a notice of termination, said Actor's notice of termination must include two performance weeks.

(d) "If the Chorus, during the term of this Six-Month Rider [Form B], obtains a contract to play the part of a Principal, or receives a contract to play the part of a Chorus for a production covered by the Production Contract (including Tiers B, C or D thereof), the Producer agrees that Chorus may, upon two weeks' notice, terminate employment hereunder.

"This rider shall be valid only if signed and executed by the parties prior to the first day of rehearsal."

## (D) Swing

(1) Two full Swings (i.e., a non-performing member of Chorus who Swings all or fewer than all Chorus performing in Chorus numbers in the production), one man and one woman, must be employed not later than the first day of rehearsal. In all instances, the Swing shall be signed to a Swing singer and/or dancer Chorus contract at the time of assignment or employment. Until four weeks after the first paid public performance, Producer reserves the right to reassign full Swing duties to another member of the Chorus who may accept or reject such assignment. Acceptance of such Swing assignment may not be a condition of continued employment in the production.

(2) The need for and employment of additional full Swings shall be subject to negotiation between Equity and the League at Equity's instance. A committee consisting of two representatives of Equity, and two representatives of the League, none affiliated with the production, shall meet within seven (7) days to determine such need. In rendering such determination, Equity representatives and the League representatives shall each cast one vote. Unanimous opinion shall be binding on the League and Equity. Failing unanimity, either party may file for expeditious arbitration within five (5) days of the committee's decision. The arbitrator shall hear and determine such case within twenty-one (21) days of submission. The arbitrator may issue an award in advance of a written decision, however a written decision will be provided to the parties within thirty (30) days of the hearing. Upon mutual agreement, the parties may extend the timelines in this provision.

(3) The Producer and Equity shall be provided with a weekly report from the Stage Manager on the approved form detailing for each performance: the number of performers absent, the reason they were absent, the number of performers who covered for the absent performers, and the number of roles or tracks that were altered or uncovered.

(4) A Swing may be required to attend understudy rehearsals provided that Swing rehearses only those functions for which Swing is contracted.

(5) No Swing shall be permitted to perform for more than three consecutive weeks for any one Chorus, except in the case of sickness, injury, or disability, in which event the period shall be four consecutive weeks.

(6) A full Swing shall be paid not less than 7.5% of Category 1 actor minimum weekly salary per week above applicable minimum salary, in addition to all

27

A-155

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

other increments required by the Agreement.

(7) **Partial Swing.** If a member of the Chorus is designated to Swing a Chorus number in a production and is not hired solely as a full Swing performer (see above), Chorus shall receive not less than $11.25 per week in addition to Chorus' weekly contractual salary for each such number so assigned.

**(8) Vacation/Temporary Replacement by Swings**

(a) A Vacation/Temporary Swing shall be defined as an Actor who swings and/or replaces specific Chorus Actors on a series of temporary contracts for one or more companies of a production and has previously either been contracted as a Swing or has been rehearsed by one company of the production as a Swing for one or more companies of the production.

(b) Each temporary contract for a Vacation/Temporary Swing shall be for no less than one week for each company and shall include a rider listing the swing increment and all pertinent increments applicable to the track(s) being covered.

(c) A Vacation/Temporary Swing shall accrue one performance of sick leave for each four weeks of employment, which need not be consecutive, regardless of how many or which companies employ the Actor. Accrued sick days shall be available for the Actor's use in any company of the show.

## 12. CLAIMS

(A) **Waiver or release not permissible.** Upon any claim of the Actor arising under Actor's agreement through any breach thereof, no receipt, waiver, release, or adjustment by the Actor is of any validity whatsoever unless Equity consents in writing. The Producer, by agreeing to this rule, agrees that Producer will not seek or solicit any such waiver, release, or settlement, nor offer the same in any arbitration or any proceeding in court unless Equity specifically consents thereto in writing.

(B) **Time limit for lodging claims**

(1) During the run of a show the following procedure shall apply:

(a) Claims (i) against a Producer, by either Equity or an Actor, or (ii) by a Producer against either Equity or an Actor, must be filed in writing no later than 30 calendar days after the claim is known or reasonably should have been known by the claimant. Claims not filed within this period shall be waived unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(b) Any claim not resolved in discussions with the Producer and/or Equity must be submitted to grievance within 30 days following the filing of the claim. Claims not submitted to grievance within this period shall be waived unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(c) Claims not resolved in the grievance process must be submitted for arbitration within 30 days following the first grievance meeting at which the claim was discussed. If no demand for arbitration is filed within the period,

28

A-156

Short Engagement Touring Agreement 2019-2020

the claim shall be waived unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(2) Once a show closes, the following procedure shall apply:

(a) Claims (i) against a Producer, by either Equity or an Actor, or (ii) by a Producer against either Equity or an Actor, must be filed as soon as reasonably possible but no later than eight weeks after the closing of a show. Claims not submitted to grievance within this period shall be waived (unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period) and the bond released. If a claim is filed during the eight week period, the bond shall be reduced to the amount necessary to satisfy the claim.

(b) Any claim not resolved in the grievance process must be submitted for arbitration within 30 days following the first grievance meeting at which the claim was discussed. If no demand for arbitration is filed within the period, the claim shall be waived (unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period) and any remaining bond released.

(c) A grievance filed after closing may be treated as expedited and submitted to expedited arbitration at the option of either party.

(C) In no case shall claims of Actors under employment contracts be handled or enforced by agents or attorneys of Actors unless such representation is consented to by Equity in writing.

## 13. CLOTHES AND MAKE-UP

(A) **Costumes, Producer Must Provide.** The Producer shall furnish all Actors engaged hereunder with all costumes and clothes (period or modern), including wigs, hats, beards, hairpieces, tights, hose, stockings and properly fitted footwear. Unless otherwise necessitated by the costume design, tights, hosiery and skin parts shall be appropriate to the Actor's skin color and tone.

(B) **Costumes, Rental of.** Actor shall not rent or lend any wardrobe to a Producer for use in any production unless the terms of the rental or loan are stated in the contract of employment by rider and approved by Equity. If the Actor wishes to wear Actor's own clothes (including shoes) instead of those supplied by the Producer, Actor may do so only with the consent of the Producer and under terms expressed in the employment contract. Any approval required by this paragraph shall not be unreasonably withheld or delayed. Any rental approved by Equity shall be paid by the Producer to the Actor weekly with salary.

(C) **Cleaning and Upkeep of.** Costumes or clothing, including hats, furnished by the Producer shall be freshly cleaned when delivered to the Actor and cleaned thereafter whenever necessary but at least once every three weeks and in any case within one week before the production goes on tour. Spot cleaning, when required, shall be completed in time to allow at least four hours for drying and airing prior to the half-hour call. In order to assure that costumes are cleaned as required, the Stage Manager shall maintain a cleaning schedule. Clean and dry shirts, blouses, stockings and other skin parts shall be furnished for every performance. Skin parts, including undergarments, bodysuits, stockings, dress

29

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

shields, bathing suits, dance trunks and slips, shall be individually assigned and shall not be switched from one Actor to another. After cleaning, every effort shall be made to dry and air costumes prior to their issue to the Actor. All skin parts, including dance belts not provided by the Producer, must be laundered and thoroughly rinsed and dried.

(D) **Kneepads and Protective Clothing.** Prior to any activity that requires knee and elbow pads and protective clothing, the Producer shall furnish new and properly fitted (i.e., small, medium, or large) items for the exclusive use of the Actor for all rehearsals and performances.

(E) **Costumes for Understudies and Swings.** Swings and Understudies must be assigned properly fitted shoes and skin parts for their sole and exclusive use in performance except, however, that special leotards or unitards need not be exclusively assigned, provided that they are washed, thoroughly dried and properly fitted prior to use by each Actor. Producer agrees to make available undergarment liners to any Actor who is not exclusively assigned special leotards or unitards.

A Swing or Understudy shall be provided with a properly fitted costume whenever the Swing or Understudy is required to perform. Absent good and sufficient cause based on the particular circumstances of the production, the Producer shall provide full Swings with their own basic costumes no later than four (4) weeks after the official opening. Any costume worn by another Actor shall be cleaned prior to its use by any Swing or Understudy and again prior to its further use by any other Actor, including the Actor to whom it is regularly assigned. However, if a Swing or Understudy who does not have a full set of costumes is required to appear, costumes worn by said Swing or Understudy must be cleaned not later than the first business day on which no matinee performance occurs following the Swing or Understudy's appearance.

Understudies and Swings shall be advised by contract rider at the time their original employment contracts are executed whether or not the Producer will provide said Actors with their own set of costumes. It is understood that there is no requirement for individual costumes for Understudies.

**(F) Shoes**

(1) All footwear shall be clean, sanitary, properly fitted and in good repair and, if modern and conventional or for dancing, shall be new. No Actor shall be required to perform in shoes which are unsafe, unsanitary, or in poor repair.

(2) The Producer shall provide properly fitted professional dance shoes for all members of the company who are required to dance. Actors and Agents are encouraged to inform the Producer, the General Manager, the Costume Designer and/or the Wardrobe Department as to their preference in shoemaker. Dance shoes may represent the period of a production or nature of a specific character (e.g., sneakers in *WEST SIDE STORY*; athletic shoes in *DAMN YANKEES*) which must conform to the appropriate style of the movement. All footwear shall be of suitable construction for dancing when used for theater dance movement and shall be rubbered and braced when necessary. Professional dance shoes are not required for normal ballroom dancing or where there are minimal choreographed movements. Producer agrees to use best efforts to supply professional dance shoes by the third

30

A-158

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

week of rehearsals, but in no event later than one week prior to dress rehearsal. During rehearsals, the Producer shall furnish at least one pair of pointe shoes for each member of the Chorus called upon to dance in pointe shoes.

(3) Shoes for dancing shall be replaced in accordance with Paragraph (1) above or when the Dance Captain, authorized Producer's representative, Stage Manager and Deputy agree by majority secret ballot vote that the shoes are either in unfit condition for the safety of the performer or are deemed unsafe or unsanitary. Meetings of the committee shall occur at least monthly. If the committee votes that the shoes be replaced immediately, the order for new shoes shall be placed by telephone no later than the next business day.

**(G) Make-up**

(1) The Producer shall furnish all make-up except ordinary and conventional make-up.  If the Actor is required to use body make-up, the Producer shall furnish a regular towel service for the removal of such make-up.  The Producer shall also provide body make-up remover.

(2)  With respect to ordinary and conventional make-up, if the Actor is given a design either orally or in writing by a representative of the Producer or creative team, either:

(a) The design will be generic and any specific brands will be clearly identified as an example, in which case the Producer will not furnish or reimburse the Actor for the make-up; or,

(b) If a specific brand is identified but not labeled as an example or suggestion, the Producer will furnish the make-up or reimburse the Actor for the purchase of such required brand make-up.

**(H) Hairstyle and Hair Color**

(1) The Actor may not be required to change the color of Actor's hair unless Actor agrees in writing at the time of signing the contract to such a change. The Producer shall pay for the original expense of such change, its upkeep during the run of the engagement and its restoration to the original color when the Actor leaves the production.

(2) The Actor may not be required to cut or change the style of Actor's hair in any way or to shave Actor's head unless Actor agrees in writing at the time of signing the contract. The Producer shall pay the original expenses of such change and the expense of the upkeep of said hair or hairstyle during the run of the production.  When the Actor leaves the production, the Producer agrees to restore the length and shape/style of hair when an Actor has been asked to grow Actor's hair out for a role.

**(I) Facial Masks, Hairpieces and Wigs**

(1) Beards and hairpieces furnished by the Producer shall be freshly cleaned when delivered to the Actor and cleaned thereafter whenever necessary but at least once every three weeks.  Lace on all beards, mustaches and hairpieces will be cleaned daily.

(2) No Actor shall be required to use a facial mask, wig or hairpiece including a facial hairpiece (beard or mustache) which has been worn by another Actor

31

A-159

Short Engagement Touring Agreement 2019-2020

until the facial mask, hairpiece or wig has been thoroughly cleaned and properly fitted. After cleaning, facial masks and hairpieces must be dried and aired prior to issue to the Actor.

(3) Protective breathable liners must be inserted into facial masks whenever a replacement or Understudy uses the facial mask of another Actor. Liners shall be issued for the exclusive use of the replacement or Understudy.

(J) No agreement to the contrary between the Producer and the Actor shall relieve the Producer of the obligations under this Rule without the written consent of Equity.

## 14. CONTINUOUS EMPLOYMENT

Continuous employment is of the essence of all employment contracts and all calculations of sums due or benefits accruing to the Actor shall be computed on the basis of consecutive rehearsals and consecutive employment.

## 15. CONTRACT

(A) **Effective Date.** Contracts between the Producer and the Actor must be signed before the Actor shall be permitted to rehearse or perform and shall be signed on the date when the terms of the contract are agreed upon between the parties. If not signed on said date, when issued, they must be signed as of said date.

(B) **Signing of**

(1) Unless contracts are signed concurrently, they must be signed by the Producer first. If the contract is not signed concurrently, the Producer may notify the Actor, or their designated representative, by personal delivery or Certified Mail, that unless the contract is signed and returned to the Producer within a specified time period, which shall not be less than 72 hours after receipt of notice by the Actor or their designated representative, the Contract shall be deemed null and void.

(2) The Producer agrees that all blanks, including opening date, name of part and salary shall be filled in, in writing, before signing or delivery.

(3) **Contract Determination.** As soon as it is available, the Producer shall furnish to Equity the script of any scheduled new musical and/or new adaptation of a musical production with casting breakdowns of Principal roles and number of Chorus to be employed. Equity will then issue its preliminary determination of Principal roles and Chorus parts no later than two weeks after the Producer furnishes such script. Equity Representative(s) shall make best efforts to attend a run-through rehearsal, and within seven business days following such attendance, Equity Representative(s) and the Producer's representative(s) shall meet to review Equity's classifications and determinations in an attempt to create consensus, with the understanding that neither party's position shall be binding. The same Equity Representative(s) or Representative(s) with similar experience shall attend a performance of the production at the mutual agreement of the parties, not to exceed one of the first forty performances of the production, after which they shall again meet with the Producer's representative(s) within ten business days, for the purpose of finalizing the classifications and determinations. If any

32

A-160

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

disagreements remain following this second meeting, the Producer shall have the option to convene a third meeting with Equity within fourteen calendar days in order to provide the Director and/or other creative team member(s) an opportunity to express any creative, artistic, musical, and/or technical grounds to support their positions. Following agreement between Equity and the Producer on the designations of all Principal, Chorus, parts and specialties, the Producer shall notify Equity in advance of any subsequent changes and the parties shall meet to discuss and resolve any disagreements regarding the designations resulting from such changes. If the challenged designations have not been resolved following the third meeting as outlined above, the Producer may proceed to expeditious arbitration in accordance with Rule 4(C), and the Producer shall prevail if Equity's designations are found to be unreasonable.

(4) **Change in Contract Determination.** Producer and Actor may negotiate and include in an Actor's individual contract of employment those terms and conditions that shall apply should the Actor's designation change as a result of the process described in (3) above.

(5) The Producer may designate two numbers in the production, one of which must be either the opening number or the finale, in which Principal Actors may be assigned to perform unidentified on-stage Chorus functions. The two numbers shall be determined by the Producer on or before Official Opening at the first city on the tour, subject to the finalization of the contract determination process pursuant to Rule 15(B)(3).

(C) **Changes and Alterations.** All concessions or waivers granted to the Producer by Equity prior to signing shall be made known to the Actor in writing before signing of the contract. Omission of such notification shall render the concession or waiver invalid at the discretion of Equity. The Actor has no right or power to waive any of the minimum conditions set forth in the employment contract or Equity Rules without the written consent of Equity. Unless any and all riders, changes, alterations, waivers, or substitutions made prior to, when, or after a contract of employment is made shall have been consented to by Equity in writing, such riders, changes, alterations, waivers, or substitutions, or any part thereof, are void at the option of the Actor, Equity consenting. It shall be the duty of the Producer, not the Actor, to submit proposed changes to Equity for its written approval by a duly authorized representative.

(1) At the option of Equity, no such riders, changes, alterations, waivers, or substitutions shall be admitted in evidence in any arbitration or by any tribunal for the disposition of any claim without the written consent of Equity.

(2) If Equity fails to notify the Producer of its disapproval of said riders, changes, alterations, waivers, or substitutions within five business days, excluding Saturday and Sunday, after receipt thereof by Equity at its office, they shall be deemed approved.

(D) **Hiring "As Cast": Obligations to Actor.** If in the contract of a Principal Actor, a part is not specified, then unless Equity shall otherwise order, the Principal Actor shall only be required to appear and perform in the part or parts in which Actor makes Actor's first public appearance.

(1) A Principal Actor may be employed "As Cast" only if Actor is signed to a

33

A-161

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

Standard Minimum Contract and the production is a new work or a new concept of an old work.

(a) When Actor is hired "As Cast," the Producer must designate at least one-half of the parts the Actor may perform on the Actor's contract.

(b) An Actor hired "As Cast" may terminate Actor's employment during the rehearsal period without penalty by giving the appropriate termination notice.

(2) If a Principal Actor is employed to "Understudy-As-Cast," all the provisions of (1) above apply except that Actor shall not be required to appear and perform or understudy in any part (or parts) other than the part or parts Actor was assigned to understudy no later than the day following four weeks after the first paid public performance.  The re-assignment of understudy parts contemplated by this paragraph shall not be applicable in the event the Actor and the Producer have agreed to a specific understudy part (or parts) in the original contract of employment.

(3) The provisions of paragraphs (1) and (2) shall not be applicable to revues.

(4) The Actor shall be permitted to accept assignments other than those originally played or assigned provided that, when assigned, they are designated on a rider to the Actor's contract and additional compensation is negotiated for each assignment.

(E) **Contracts covering employment in outside fields.**  Before any person holding a blanket employment contract covering several employment fields may work in any Equity jurisdiction, the Producer must secure and file with Equity for such person, a duly executed contract on a standard Equity form covering only employment within Equity's jurisdiction, which contract shall be satisfactory to Equity and shall be paramount to any then existing arrangement between said person and the Producer. Said contract shall exclusively govern the employment relationship of said person to said Producer while said person is working in any field over which Equity has jurisdiction.  No Actor shall be required to work with any such person not holding such contract so procured and filed.

(F) **Filing contract.**  Within one week after entering into any employment contract, but in no event more than three days after the Actor has begun to rehearse, the Producer shall file with Equity a signed copy thereof.  Failure to do so shall constitute a breach of contract by the Producer and the Actor may, at any time, Equity consenting, which consent will not be unreasonably granted, terminate the contract without notice and the Producer agrees to pay the Actor as damages for breach a sum or sums to be computed as in the case of breach of Rule 9, BREACHES BY PRODUCER.  If the Producer disagrees with Equity's consent, the Producer may submit the matter forthwith to expeditious arbitration in accordance with Rule 4, ARBITRATION AND GRIEVANCE.

(G) **Attempted breach.**  No Equity member shall agree with a Producer, Employment Agent, Personal Representative, or other Equity member and no Producer shall agree with any Equity member, Employment Agent, or Personal Representative to cause, or attempt to cause, or agree to permit any breach of any term of any employment contract.

(1) Should any Equity member engage in such conduct, such member shall

34

Short Engagement Touring Agreement 2019-2020

be subject to such disciplinary action as the Council of Equity may determine.

Should any Producer be found by the Grievance Committee or Arbitrator to have engaged in such conduct, said Producer agrees that such conduct shall be a breach of Producer's employment agreements with Equity members, entitling any such Equity members to recover from the Producer, Equity consenting, a sum equal to two weeks' salary as liquidated damages, no present basis of calculation existing. The Producer further agrees that upon such breach, Producer's name may be posted on the Defaulting Producers List at Equity.

(2) In the event of a recovery of liquidated damages by or on behalf of the offending Actor, the same shall be paid into the Actors' Equity Foundation, Inc.

**(H) Term Contract**

(1) A Term Contract may be signed only if the salary is at least $160 over the then current applicable Category Actor minimum salary plus required payments for any and all other duties assigned to the Actor for which extra compensation is required under this Agreement. The period of such contract may be for the term or such fixed period as may be agreed by the Producer and the Actor and may include a guarantee of employment in excess of two weeks.

(2) If more than one year is contracted for, the guarantee for the second year shall apply unless the Producer notifies the Actor and Equity by written notice not later than five weeks after the first paid public performance, that Producer will not present the play during any year following the current one and at the same time pays the Actor any and all sums due under Actor's guarantee for each year contracted for beyond the second year. Upon such notice and payment being given and made, neither the Actor nor the Producer shall be bound hereunder beyond the term during the current year.

(I) **Conversion of Standard Minimum Contract to a Term Contract.** A Principal Actor signed to a Standard Minimum Contract expressing a salary of not less than double the applicable Production Contract minimum may agree to convert said contract to a Term Contract by signing a rider at the time of signing Actor's contract, which rider shall read as follows:

"The Actor hereby grants the Producer the right to convert this Contract into a Standard Term Contract for a period not to exceed one year from the date of the first public performance, at a weekly salary of ......................... Dollars ($...............) (this sum shall represent an increase in the weekly salary of not less than 100% of the Actor's original contractual salary), said right to be exercised by the Producer only through written notice delivered to the Actor personally prior to the fifth consecutive performance of the Actor in the play. Promptly upon delivery of such notice, both parties agree to sign and execute a Standard Term Contract under all of the special terms and conditions provided for in this Agreement.

"The Producer guarantees the Actor not less than five weeks' consecutive employment instead of the minimum two weeks."

35

A-163

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 16. COSTUME CALLS

(A) Once a contract has been issued by the Producer, the Actor shall be available prior to the rehearsal period for up to three costume calls at mutually convenient times for purposes of measuring and trying on all items, including but not limited to hats, shoes, wigs and costumes. Such calls scheduled contiguously at a distinct location shall count as one costume call. A call scheduled on the same day as a call at another location shall be counted as a separate call. Any calls beyond three shall be paid at one and one-half times the overtime rate (see Rule 52(D)(3)) for each hour or part thereof, to be paid with the Actor's first paycheck. If given their notice prior to the third week of rehearsal, Actor shall receive one-sixth of Rehearsal Salary, for each such day or part thereof applied to costume measuring in addition to other sums provided for in the Contract of Employment.

**(B) After the First Day of Employment**

(1) Actors may be called for up to five hours of costume calls in addition to the rehearsal period herein prescribed. In no event may a costume call be less than one hour. Should the total time of costume calls exceed five hours, the Actor shall be paid at the overtime rate (see Rule 52(D)(3)) for each hour of part thereof beyond five.

(2) Said costume calls shall be permitted in addition to the rehearsal period herein described, provided they are consecutive with the eight and one half-hour period specified in Rule 52(D)(1)(a).

(3) After the Actor's first paid public performance, costume calls shall be considered part of the rehearsal hours and span of day.

(C) When a costume call under (A) or (B) above occurs locally at a place other than the place of rehearsal, the Producer shall provide, or reimburse the Actor for, transportation to and from such costume call. The manner of transportation shall be determined by the Producer.

(D) When an Actor is required to travel to another city or town for measurement or fitting, the Producer shall pay the cost of airfare and ground transportation and shall pay the Actor full per diem for each night the Actor is away from their current residence or one-half per diem if the Actor can return to their current residence the same day. If the Actor has not yet begun employment, the Producer shall also pay the Actor no less than one-sixth of applicable minimum salary for each day the Actor is required to be away from their current residence. If the Actor is already employed by the Producer, the Actor shall be paid all salary due for the week, including salary for any rehearsals or performances missed because of the travel. If travel or measuring/fitting takes place on the Actor's scheduled day off, Actor shall be paid no less than one-sixth of Actor's current salary in addition to all other salary due or be provided a compensatory day off in the workweek.

## 17. DANCE CAPTAIN

(A) A Dance Captain must be hired where there is movement of such a nature that the maintenance of its artistic quality, as originally staged, does not fall within the normal duties of a Stage Manager. The Stage Manager shall not serve as Dance Captain.

(B) Dance Captains shall be paid not less than 25% of Category 1 actor minimum

36

A-164

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

weekly salary per week in addition to their weekly contractual salary and may, as a condition of employment, upon payment of the additional compensation stated in 11(C) or 15(H), sign a Chorus Rider, or Term Contract which shall begin on the date of the first paid public performance.

(C) The Dance Captain shall be paid from the date of assignment or first day of employment, but in no event later than the first day of rehearsal. The Dance Captain designation may be reassigned and the increment deleted within four weeks of the Dance Captain's first paid public performance unless they are signed to a Term Contract. Following the first four weeks of the Dance Captain's first paid public performance, upon two weeks' advance notice to the Dance Captain, the Dance Captain may be reassigned and the increment deleted, provided that Dance Captain receives one week of the Dance Captain increment for each five weeks' employment as a Dance Captain, up to a maximum payment of 15 weeks of the Dance Captain increment, plus one additional week of the Dance Captain increment for each six months of employment or part thereof as a Dance Captain thereafter.  In no event will the payment be less than two weeks of the applicable Dance Captain increment. There will be no hiatus between Dance Captain assignments.

(D) After the first paid public performance, rehearsal hours for Dance Captain(s) shall be limited to 12 hours per week.

(E) The Producer, at its sole option, may designate an Assistant Dance Captain for an additional payment of not less than 15% of Category 1 actor minimum weekly salary per week in addition to said Assistant's weekly contractual salary.

(F)  If the Dance Captain is absent for any reason for one week or longer, and no replacement Dance Captain has been employed, then:

(1) The Assistant Dance Captain shall be paid the Dance Captain increment in lieu of the Assistant Dance Captain increment; or,

(2) For productions that do not employ an Assistant Dance Captain, a temporary Dance Captain or Assistant Dance Captain shall be assigned from within the company, provided there is an Actor who is willing and able to perform the duties.

Actor shall be paid the applicable increment commencing with the first day of the Dance Captain's absence.

(G) If requested by the Producer, Dance Captains shall provide a copy of choreographic or musical staging notes kept during the course of their employment.  The cost of materials and copying shall be paid by the Producer.

(H) Dance Captains shall be billed on the cast page of the Playbill or program.

## 18. DEFAULTING PRODUCERS

(A) A Producer shall be ineligible to engage Actors unless and until such Producer shall have furnished security in such amount and in such manner and form as may be satisfactory to Equity to insure the payment of the claims of Actors against such Producer.

(B) Any Producer engaging any Actor represents that such Producer is not in default under any agreement with Equity at the time of such engagement and that no contract has been entered into between the said Producer and Equity or

37

A-165

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

any Actor, any breach of which remains unsettled or unliquidated.

(C) No Actor shall work or be required by any Producer to work for any person, partnership, corporation, or enterprise which has failed to abide by any arbitration award or court order (unless such award or order has been successfully challenged in a subsequent court proceeding).

(D) No Actor shall work or be required to work or continue in the employment of any Producer or company, if and when Equity shall be dissatisfied with the quality or amount of any security which may be offered or given or requested by Equity to secure the payment of any claim, present or future, of any Actor.

## 19. DEFINITIONS

(A) **Actor.**   The term "Actor" shall refer to and include all persons who are engaged under Principal, Chorus, and Stage Manager contracts.

(1) **Chorus.**  The terms "Chorus," "Chorus member," "member of the Chorus," "Actor engaged under a Chorus contract" and "Chorus Actor" shall include all persons who are engaged under Chorus contracts and/or actually performing Chorus work, as may be determined by Equity.

(2) **Principal Actor.**  The term "Principal Actor" shall include all persons who are engaged under Equity contracts other than those engaged under Chorus or Stage Manager contracts and/or engaged to perform Chorus or Stage Managerial work.

(3) **Stage Manager.**   The term "Stage Manager" (unless the context otherwise requires) shall refer to and include all persons who are performing the customary duties of "Stage Manager," "First Assistant Stage Manager," and "Second Assistant Stage Manager."

(B) **Disability.**  The term disability shall be defined by the applicable federal laws.

(C) **Employment by Producer.**  Employment by the Producer, or operation of a company or companies by the Producer, as such phrases are used in employment contracts, shall include employment or operation by the Producer alone, or by any corporation or management, corporate or otherwise, which Producer controls or directs.

(D) **Gender.**  All references to "Actor" shall be deemed to refer to both sexes.

(E) **Salary.**  All references in this Agreement to "salary" or "salaries" or "weekly minimum salary" shall be deemed to exclude Per Diem set forth in Rule 29, HOUSING ACCOMMODATIONS AND PER DIEM.

(F) **Work Week and Day.**  A week means from and including Monday through Sunday.  A day means at least 24 hours, in addition to the regular period of rest allowed at the close of each working day.

(G) **Part.**  The term "part" shall mean each character, specialty, or function for which the Actor is responsible.

(H) **Role.**  The term "role" shall mean the sum of the parts, specialties, functions and assignments for which an Actor is responsible.

## 20. DEPUTIES AND MEMBERS:  NOT TO BE DISCRIMINATED AGAINST

(A) It is agreed that deputies may be designated by Equity without let or hindrance.  Whenever a Chorus is employed, there may be Deputies for Chorus

38

A-166

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

singers and Chorus dancers, in addition to a Deputy for Principal Actors. Deputies shall have the duty and obligation to report non-compliance with this Agreement to Actors' Equity Association.

(B) The Producer shall not dismiss or otherwise penalize any Actor for fulfilling the duties or obligations of an Equity Deputy or an Equity member. Any Equity Deputy or member who claims that the Producer has given notice, or otherwise penalized a member for fulfilling such duties either as a Deputy or as an Equity member may present the case to Equity which shall give the Producer an opportunity to be heard if Producer so desires. If Equity is satisfied that such activities are the real cause of dismissal or of any penalty, it shall have the right to submit the matter to the Grievance Committee and, if not decided by the Committee, to demand expeditious arbitration and shall have the power to determine the character and the amount of the claim to be submitted thereto.

(C) It is further agreed that, if upon arbitration, the claim of the Deputy or other Actor is sustained, the Arbitrator shall have the right to impose a penalty, which penalty shall be at the discretion of the Arbitrator, but shall not exceed the sum of five weeks' salary. If the claim is sustained, the Deputy or other Actor shall also be reinstated with back pay from the date of dismissal to date of reinstatement.

## 21. DIVERSE AND INCLUSIVE CASTING

(See also Rule 40, NON-DISCRIMINATION)

The parties recognize the principle of Diverse and Inclusive Casting. The parties further agree, the foregoing notwithstanding, that there can be no interference with the contractual rights or artistic discretion of the playwright, director, or choreographer. Subject to these limitations, the Producer will attempt to achieve Diverse and Inclusive Casting.

(A) Diverse and Inclusive Casting is defined as the casting of Actors with disabilities, Actors of any underrepresented ethnicity (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), Actors over 60, and women in roles where race, gender/gender identity, transgender status, age or the presence or absence of a disability is not germane.

(B) Quarterly meetings will be held between Equity and the League to assure that this Non-traditional Casting policy is being observed and to monitor its implementation.

(C) An analysis of all productions in performance during the previous quarter shall be conducted at these quarterly meetings.

(D) If a dispute under this rule cannot be resolved by the parties at the quarterly meeting, the dispute shall be submitted to grievance and arbitration in accordance with Rule 4.

A-167

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 22. DUES AND INITIATION FEES

The Producer agrees to deduct from the Actor's salary and remit to Equity, union dues, initiation fees and assessments provided that the Producer receives from Equity a proper authorization, agreed to and signed by the Actor.

## 23. DUTIES OF THE ACTOR

The Actor agrees to be prompt at rehearsals and to appear at the theatre no later than one half-hour prior to the performance; to pay strict regard to make-up and dress; to perform Actor's services as reasonably directed to the best of Actor's ability; to properly care for Actor's costume and props; when required by the Producer to wear and use electronic equipment; to respect the physical property of the production and the theatre; and to abide by all reasonable rules and regulations of the Producer not in conflict with Equity Rules.

## 24. EQUITY: SPECIAL PROVISIONS

(A) **Equity Representatives.** Duly authorized representatives of Equity shall have free access to the stage and to all Actors at all times, inclusive of rehearsals and performances. Sufficient time shall be set aside within the first two days of rehearsal at Producer's discretion for an Equity Representative to conduct Equity business. It is understood that: (a) the meeting shall not be scheduled at the end of a full rehearsal day and (b) until the meeting has occurred, the show may not ask the cast to undertake business that would require the presence of an Equity deputy. Such time shall not be considered part of the official rehearsal hours.

(B) Equity may represent Actors in any dispute which may arise with the Producer and Equity may, at all times, represent Actors in relation to any matter arising under any employment agreement and when any act or request or consent of any such Actor is provided for in such agreement, the request, consent, or approval of Equity shall, for all purposes, be deemed the consent, request, approval, or act of the Actors.

(C) **Meetings: privilege of Actors to attend.** The Producer shall neither schedule auditions nor require the services of the Actor for rehearsals (except in cases where dress rehearsals are being held or rehearsals are being held on opening date) at any time when a regularly called meeting of Equity is being held. Time off for this purpose shall not be counted as a part of that day's rehearsal.

**(D) Special power to act for Actor**

(1) Whenever it is provided in any employment contract (a) that any act or thing may be done by an Actor at the option of, with the consent of, or at the request of Equity, or, (b) on the demand of or with the consent of such Actor, Equity, representing the Actor, has and is given the authority to act for and in place of the Actor and to assert the Actor's position or make Actor's request or demand as the case may be, with all of the power and authority of the Actor, without liability to itself.

(2) In all cases where, by virtue of any employment contract, the consent or approval of Equity is required, the Association has and reserves full discretionary power in giving its consent to change, modify, or limit rights of any Actor under Actor's contract, said action to be taken on behalf of the

40

A-168

Short Engagement Touring Agreement 2019-2020

Association in writing by either the President or Executive Director or one of the executives or members of the Legal Department especially authorized by either of said officers to act.

(E) **Oral and written interpretations.** Oral or telephone rulings made by Equity are not binding upon the Association or, except with its consent, upon Actors. Written rulings or interpretations of the employment contract or the Agreement and Rules Governing Employment in Short Engagement Tours must be either approved or given by the President or Executive Director or one of the executives or members of the Legal Department specifically authorized by either of said officers to act and shall be binding upon the Association only when said persons act within the power delegated to them by the Council.

(F) **Council powers.** Should there be any conflict between any Rules or any basis for more than one interpretation as to the meaning of any of them, the Council of Equity has the right to determine the correct interpretation or resolve the conflict and its decision shall be binding upon Equity and its members.

(G) **Determination of classification.** Equity has the sole right to determine whether an individual is correctly classified as an Actor, Chorus, Stage Manager, or Assistant Stage Manager and the Producer agrees that Equity's determination shall be final.

## 25. ESTOPPEL

Reasons given by Equity for requiring Actors to do any act, such as withdrawing from a cast, shall not preclude Equity from giving or relying on other or different valid reasons for its action.

## 26. EXCLUSIVE SERVICE OF THE ACTOR

(A) Except as otherwise provided in the contract of employment, the Actor shall not accept any other engagement in the legitimate and/or musical comedy field from the date of beginning of rehearsal and until said contract is lawfully terminated, without the written consent of the Producer. The Actor shall, however, have the right to accept other employment, not conflicting with the fulfillment of Actor's duties under said contract.

(B) If the Actor is a star or featured player in the production covered by said contract, Actor may enter into a written agreement to be annexed to said contract, agreeing not to accept any other employment and to render Actor's services exclusively to the Producer and not to render services to any other person or corporation, without the written consent of the Producer. The Actor shall recognize that it is Actor's responsibility to perform under Actor's Equity contract in the legitimate theatre. If during the term of Actor's employment under Equity contract, a Principal Actor receiving star or featured billing is also employed in radio or television, Actor shall require as a condition of that employment, where the radio or television program is shown or heard at the same time that the Actor will be appearing in the legitimate production, that any advertisements, written or otherwise, which publicize Actor's appearance on radio or television must expressly mention that Actor is currently appearing in the legitimate production.

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 27. GUARANTEED PERIOD OF EMPLOYMENT

If Actor's contract specifies a guaranteed period of employment or a notice of termination greater than two weeks, said greater period shall be substituted for two weeks where used in these Rules. However, under Rule 63(A)(2), the notice period under Standard Minimum Contract may not exceed four weeks. The guaranteed performance period for temporary replacements may be one week, provided that the engagement under the temporary contract is for one week of performances exclusive of the rehearsal period.

## 28. HEALTH FUND

(A) League members and Coordinated Bargaining Partners ("CBP") of the League who produce under this Agreement shall make a weekly health contribution of $89.50 to the Equity-League Health Trust Fund on behalf of each Actor in their employ. The contribution rates set forth herein are inclusive of a contribution for Supplemental Workers' Compensation Disability benefits administered by the Fund.

(B) Non-League/Non-CBP Producers producing under this Agreement shall make a weekly health contribution to the Equity-League Health Trust Fund at a rate no less than that required under the Production Contract.

(C) This contribution is not refundable in whole or in part. The health benefits afforded shall be determined by the Trustees of the Fund and shall include, but shall not be limited to, medical and hospital benefits.

(D) Contributions are payable and begin to accrue on the first day of employment hereunder.

(E) The Producer further agrees to be bound by the Agreement and Declaration of Trust establishing the aforesaid Health Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto which may be adopted by its Trustees during the term of this Agreement.

## 29. HOUSING ACCOMMODATIONS AND PER DIEM

**(A)** The Producer will provide double or single occupancy housing accommodations, at Actor's option, and at no cost to the Actor, when Actor is more than 50 miles from Actor's Place of Residence (except as provided in (G) below), as outlined herein:

(1) All hotels must be comparable to a AAA double diamond hotel, or better.

(2) The Producer will make best efforts to provide hotels with interior corridors. If a hotel does not have interior corridors, the rooms provided may not be on the ground floor.

(3) Best efforts shall be made to provide hotels with laundry facilities, high speed internet access at no cost to the Actors, and conveniently accessible sources of food. Producer shall reasonably endeavor to provide hotels with gym facilities, microwaves and refrigerators, The Equity Deputy, stage management and company management are encouraged to discuss issues regarding these matters and to work together to try to meet the needs of the traveling company.

(4) For stays in a city of four weeks or more, the Producer shall also offer an

42

A-170

Short Engagement Touring Agreement 2019-2020

unofficial (at the Actor's expense) second housing option that will include a kitchen, unless the official housing option already includes a kitchen.

(B) No less than two weeks prior to the engagement, the advance agent or company manager shall advise the Actor of the hotel (including information regarding grocery and restaurant options within one mile of the hotel, and the Producer's negotiated room rate for single occupancy, not including taxes). In addition, a copy of the information provided to the Actor shall be sent to Actors' Equity Association. Actor shall advise the Producer within one week thereafter of the Actor's acceptance of Producer-provided housing, double or single occupancy, or the Actor's preference to arrange for Actor's own accommodations. Producer, at Producer's sole discretion, may accommodate a change in Actor's preference made after the deadline above for preference notification. Unless the Actor notifies the company manager of acceptance of such accommodations, the Producer shall be relieved of further responsibility. Notwithstanding the foregoing, at any time prior to arrival, the Producer may change offered housing to a comparable hotel. Actors who choose to arrange their own housing may not stay in another Actor's Producer-provided housing.

(1) If the Actor has complied with the requirements of (B) above and does not receive accommodations by half hour, Actor shall not be required to perform until such accommodations are forthcoming. In addition, Actor's overnight rest period shall not commence until accommodations are made available.

(2) If the Actor refuses to accept accommodations that Actor has requested and obtained through the Producer, Actor shall be due Per Diem for one night's accommodation (as applicable based on the prior request) at the rates in (F)(2) or (3) below, and shall thereafter be due Per Diem as per (F)(1) below.

(C) Due regard shall be given to obtaining such accommodations within a reasonable distance of the theatre. Such accommodations shall be clean and sanitary; any violation of this clause shall be grievable. When the theatre is more than one-half mile from the hotel, transportation to the theatre and return after the performance will be furnished at the Producer's expense.

(D) Hotel accommodations must be available for each member of the cast regardless of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status or political persuasion or belief.

(E) **Local Information.** At the commencement of each engagement on the tour (excluding "one-nighters"), Actors shall be advised where to find the following: laundry facilities, drug stores, doctors, local transportation, grocery stores, and restaurants that will be open after performances.

(F) When the Actor is required to be more than 50 miles away from the Actor's Place of Residence, Actor shall receive a Per Diem payment (except as provided in(G), below).

(1) Effective as of July 15, 2016, if the Actor elects not to accept the Producer-provided housing within seven (7) days of the posting of the hotel information pursuant to Rule 29(B), the Per Diem shall be the single occupancy Per Diem rate as defined in Rule 29(F)(2) below plus the

43

Short Engagement Touring Agreement 2019-2020

Producer's negotiated room rate for single occupancy (not including taxes), but in no case greater than the then applicable Per Diem rate for Full Production Tours as defined in the Production Contract, Rule 63(C)(1). If the Actor elects not to accept the Producer-provided housing after the deadline for preference notification in Rule 29(B) and the Producer grants the change to Actor's election, the Per Diem shall be $86.00.

(2) If the Actor elects to accept the Producer-provided single-occupancy housing, the Per Diem shall be $58.00.

(3) If the Actor elects to accept the Producer provided double-occupancy housing, the Per Diem shall be $76.00.

(4) The Per Diem rates in (2) and (3) above shall be capped at the then-current IRS 'high-cost locality' per diem rate.

(G) Where pre-production or rehearsal prior to the first paid public performance takes place in Los Angeles County, New York City, Chicago or San Francisco, Producer shall not be required to pay Per Diem under (F) above, but shall provide, at Actor's option, any Actor who is more than 70 miles away from Actor's Place of Residence, either:

(1) $63 per day, as reimbursement for housing costs; or,

(2) Single occupancy housing within reasonable commuting distance to rehearsal, at no cost to the Actor.

Said housing or per diem shall be provided from the first day of rehearsal up to the time the company leaves the pre-production location or the first paid public performance, whichever is earlier. At that point, Actor shall receive housing and per diem in accordance with (A) through (F) above. Actor shall make their election ((1) or (2) above) in Actor's acceptance of Producer's offer to the Actor. (See also Rule 52(I), **Rehearsal Process in Newark, Purchase or Stamford** .)

(H) Actor shall identify Actor's Place of Residence at the time of audition or interview.

(I) Per Diem shall be paid no later than Thursday of each week for which it is due. Producer shall pay Per Diem in accordance with Federal statutes and regulations regarding withholding and Social Security.

(J) Producer shall, to the extent required by each tax jurisdiction, provide Actor with a separate W-2 form which shall indicate all state and local taxes withheld and the wages and other compensation on which those taxes were levied for each state or locality in which such taxes were withheld. If annual reporting is not required, the Producer shall indicate on each weekly pay stub any amount deducted for tax assessment.

(K) Actors' Equity and the League will establish a Housing Best Practices Committee to consider and attempt to agree on revisions to Rule 29(A) and (C) for all Producer-provided housing. The Committee, comprised of four representatives designated by each party, will meet no later than sixty (60) days of the execution of this Agreement, and finalize their deliberations no later than 120 days of the execution of this Agreement. If the parties are unable to agree on such revisions, the issue shall be submitted to a designated mediator to help resolve the dispute.

44

A-172

Short Engagement Touring Agreement 2019-2020

## 30. ILLNESS AND SICK LEAVE

(A) **Illness: Standard Minimum Contracts.**  Except as provided in (C) below, if the Actor cannot perform on account of illness, injury (other than an injury as specified in Rule 31, INJURY: WORKERS' COMPENSATION INSURANCE), or any other valid reason, then the Actor shall not be entitled to any salary for the time during which said services shall not for such reason or reasons be rendered. Should the foregoing condition continue for a period of 16 performances or more, or for any 24 performances within a period of 48 performances and the Actor has not requested and received Disability Leave under the provisions of paragraph (I) below, the Actor may terminate the contract effective immediately or the Producer may terminate the contract upon one week's notice and in either case, the Producer shall pay for all services to date and transportation back to the Place of Residence or Place of Engagement at the Actor's option.

(B) **Illness: Term Contracts.**  Except as provided in (C) below, if the Actor cannot perform on account of illness, injury (other than an injury as specified in Rule 31, INJURY: WORKERS' COMPENSATION INSURANCE), or any other valid reason, then the Actor shall not be entitled to any salary for the time during which said services shall not for such reason or reasons be rendered.  If during such illness an Actor other than an Understudy plays the part and the original Actor has not requested and received Disability Leave under the provisions of paragraph (I) below, the original Actor shall give two weeks' notice of the date of Actor's return to the cast together with a doctor's certificate certifying Actor's ability to act on that date.

(1) If the Actor must travel to rejoin the company, the Producer shall furnish transportation.

(2) Should the illness of the Actor continue or should it appear that it should necessarily continue for 10 days or more, Equity, at the request of the Producer, shall have full power to modify or terminate the Actor's contract on such terms as it may consider just if it shall be satisfied that it will be necessary for the Producer to employ a successor under a Standard Term Contract.

(C) Actors earning up to $200 more than the applicable Category Stage Manager minimum salary ("Sick/Vacation Leave Cap"), exclusive of Per Diem and Media Fee, shall earn one performance of sick leave for every four weeks of employment.  There shall be no limitation upon the accumulation of such sick leave for Actors who are eligible.  In the event the Actor must use such sick leave, Actor shall suffer no diminution of contractual salary so long as Actor uses no more than the number of performances Actor has accumulated.  Sick leave, however, shall not be added to or be consecutive with Actor's vacation without the written consent of the Producer.

(1) Upon the termination of the Actor's employment and provided that the production has been organized for at least three months or was organized as an announced limited engagement providing less than three months employment, the amount of accumulated sick leave, up to 11 performances per year of employment, shall be paid to Actor on the basis of the applicable minimum salary for the Actor's function from the date of first employment.  At Actor's option, accumulated sick leave may be paid at the end of each Equity

45

A-173

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

contract period/year, respectively, based upon the prevailing salary for that period/year.

(2) Actors who earn in excess of the Sick/Vacation Leave Cap for the Category, but not more than $2,500 (exclusive of Per Diem and Media Fee), shall be entitled to one performance of sick leave for each four weeks of employment, provided that the payment for such sick leave shall not exceed one-eighth of the applicable Category Stage Manager's applicable minimum salary for each performance lost. These Actors shall not be paid for unused sick leave.

(3) Actors earning in excess of $2,500 per week, but not more than $3,500 (exclusive of Per Diem and Media Fee), shall earn one performance of sick leave for each four weeks of employment, up to a cap of four performances of sick leave per year, provided that the payment for such sick leave shall not exceed one-eighth of the applicable Category Stage Manager minimum salary for each performance lost. These Actors shall not be paid for unused sick leave.

(4) Actors earning in excess of $3,500 (exclusive of Per Diem and Media Fee) shall not be entitled to sick leave.

(5) If an Actor's salary increases during the course of an Actor's employment so that Actor no longer accrues sick leave, Actor may still utilize any previously accrued sick leave.

(6) After Actor's first six weeks of employment or first paid public performance, whichever is later, Actor shall be entitled to "borrow" up to six performances of sick leave (up to four performances of sick leave for Actors entitled to such leave pursuant to (3) above). This entitlement expires after Actor accrues six performances of sick leave.

(7) In the event an Actor cannot attend a rehearsal or complete a performance on account of illness or injury (other than an injury as specified in Rule 31, INJURY: WORKERS' COMPENSATION INSURANCE), Actor will utilize one-half of one performance of sick leave for each such rehearsal or performance.

(a) An Actor who is absent as provided above from both a rehearsal and an entire performance on the same day will utilize a maximum of one performance of sick leave for that day.

(b) An Actor who is absent from a rehearsal and two performances on the same day will utilize two performances of sick leave for that day.

(c) An Actor who attends more than half of a rehearsal called on a performance day, and is absent from any performance that same day due to illness or injury (other than an illness or injury as specified in Rule 31, INJURY: WORKERS' COMPENSATION INSURANCE) will utilize one-half of one performance of sick leave for the first performance missed on that day and one and one-half performances of sick leave for two performances missed on that day.

(d) The use of sick leave described in this paragraph (C)(7) will not apply if the Actor's absence has been approved.

46

Short Engagement Touring Agreement 2019-2020

(e) Subject to (C)(6) above, Actors who have no accrued sick leave shall have their salaries reduced by 1/16th of weekly contractual salary for each rehearsal missed or each performance that they fail to complete.

(D) The Producer may require reasonable proof of illness to determine the validity of the Actor's illness as a requisite for sick leave. If the Producer thereafter disallows said sick leave, said decision shall be subject to the grievance and arbitration procedures set forth in Rule 4. If the sick leave claimed is found to be invalid by the Producer subject to grievance procedures and arbitration, the Actor making such claim shall forfeit, in addition to the period in question, up to four future performances of paid sick leave. Any deliberate misrepresentation by an Actor under this rule may subject the Actor to termination.

(E) Any dispute between Equity and the Producer as to whether any of the above sections apply to any given situation may be submitted to grievance and arbitration pursuant to Rule 4.

(F) **Unpaid Absence Only for Compelling Circumstances or Emergency.** Actors shall be entitled to take up to two days of unpaid absence in each year of employment for compelling circumstances or emergency. For purposes of this rule, a compelling circumstance or emergency shall be expressly limited to either a wedding, graduation, family or medical emergency and must involve a member of the Actor's immediate family (spouses and spousal equivalents, domestic partners, parents, children, siblings, in-laws, grandparents and grandchildren). Such absence is subject to the following:

(1) Actor will give one week's written notice when possible;

(2) Producer may limit the number of Actors out at any one time for Unpaid Absence but may not limit it to fewer than one Actor per performance;

(3) Such absence may not be taken during the week between Christmas and New Year's except in extraordinary circumstances;

(4) Such Unpaid Absence may not be used by Actor to accept other work or to attend an audition;

(5) Producer may require Actor to explain the compelling circumstance or emergency;

(6) Any Unpaid Absence for a non-compelling circumstance may be granted at the Producer's sole discretion.

(G) **Bereavement Leave.** Actors shall be entitled to take up to three days of paid leave in each employment year to attend the funeral(s) of a member of Actor's immediate family (spouses and spousal equivalents, domestic partners, parents, legal guardians, children, siblings, in-laws, grandparents and grandchildren). Actors earning a weekly salary in excess of $3,000 shall be paid one-eighth of $3,000 for each performance missed under this rule.

(H) **Personal Days.** Actors shall be entitled to take two unpaid Personal Days in each year of employment for any reason. Personal Days are subject to the following:

(1) Actor will give one week's written notice when possible;

(2) Producer may limit the number of Actors out at any one time for Personal Days but may not limit it to fewer than one Actor per performance, unless a

47

A-175

Short Engagement Touring Agreement 2019-2020

requested Personal Day of a Principal or either of the Understudies for a role overlaps with the previously approved vacation of a corresponding Understudy or Principal;

**(3)** These Personal Days may not be taken during the week between Christmas and New Year's except in extraordinary circumstances.

(4) Replacement Actors need not be granted Personal Days until three weeks following the individual Actor's first performance.

(5) Personal Days need not be granted during the rehearsal period prior to the first paid public performance.

(6) Personal Days need not be granted until after the press opening of the first engagement.  In addition, Personal Days need not be granted on the actual press opening nights of the second and third engagements of the tour and on the press opening night of any engagement of two weeks or longer.

(I) **Disability Leave.**  Any Actor who becomes disabled during the course of Actor's employment in the production shall be eligible for Disability Leave in accordance with the following provisions:

(1) An Actor who is unable to work may request an unpaid leave of absence for a period of up to 12 months.

(2) Such request must be supported by an acceptable medical certificate indicating the time necessary for the leave.

(3) Actors are eligible to request only one such leave for any single medical condition within any collective bargaining period.  However, if a work-related injury is at issue, Actor shall be eligible for one extension of the leave and/or one additional leave if the Actor returns to work prematurely or the same work-related injury recurs.  Producer may, in its discretion, limit total leave(s) for a single work-related injury to a 12 month period, measured from the first day of the first leave.

(4) Producers shall use best efforts to insure that the duration of the leave relates to the nature of the disability. However, in order to accommodate the needs of the production, the Producer may require that the leave be at least three months in length.

(5) Actors on approved leave must notify the Producer at least one month prior to the expiration of the leave of their intention to return to work as scheduled or to resign.

(6) When a disability leave is requested, Equity will advise the Actor about sick leave benefits, health benefits, medical coverage and, if applicable, the procedures for direct payment.

(7) Prior to an Actor's return from a leave, Actor will be required to establish that Actor is able to meet the artistic and physical requirements of the production.  In addition, at Producer's option, Actor may be required to submit to an appropriate examination by Producer's medical representative at Producer's expense.  Actor, at Actor's option, may seek a second opinion at Actor's expense.

(8) Actor's salary on Actor's return to the production will be the same as when the leave began, plus any increases required by this Agreement.

48

A-176

Short Engagement Touring Agreement 2019-2020

(9) Actors on Term contracts will be eligible to request a leave under this provision only if at least nine weeks remain on their contract on the first day of disability.  If the Actor is eligible and elects to take a disability leave, the Actor will complete the remaining term of the contract upon Actor's return to the production.

(10) Temporary replacement Actors may be hired under "Replacement Contracts" for periods up to the full term of the leave. The replacement Actor may be employed for the designated term on a Standard Minimum or Term contract.  Under no circumstances will the Producer be required to employ both Actors simultaneously.  Such replacements will not be eligible for disability leave under the terms of this provision.

(11) During the term of disability, the Actor shall not be entitled to any salary for the time during which services are not rendered.

(12) If the Actor commences a Disability Leave while required to be away from Place of Residence, the Producer shall return Actor to the Place of Engagement or to Place of Residence, at the Actor's option, and will, after the leave, transport Actor to the next place of engagement.

(J)  To the extent otherwise applicable, the parties agree to waive the provisions of the New York State Earned Sick Time Act.

## 31. INJURY:  WORKERS' COMPENSATION INSURANCE

(A) The Producer agrees to obtain and maintain Workers' Compensation Insurance Coverage for all Actors in their employ, and to do so via a single carrier, with the understanding that such carrier may be changed at any time. Failure to obtain Workers' Compensation Insurance shall make the Producer individually liable to the Actor for payments equivalent to any Workers' Compensation lost. This obligation shall survive the termination of the Actor's contract of employment.

(B) **Supplemental Workers' Compensation.**  The Producer agrees to provide supplemental workers' compensation, in addition to Workers' Compensation Disability benefits, through the Equity-League Health Trust Fund.  The Producer's obligation to provide such benefit is met by the contributions made under Rule 28, HEALTH FUND.

## 32. INTIMIDATION

(A) An Actor shall not be compelled to participate in encounter groups, sensitivity sessions, or classes which Actor deems dangerous to Actor's mental health or an infringement upon Actor's mental or physical privacy.

(B) If an Actor makes claim in writing to Equity within seven days that Actor was intimidated into terminating their contract by being compelled to participate in such encounter group, sensitivity session, or class, Equity shall promptly notify the Producer. If such intimidation is acknowledged or established, the Actor shall be reinstated and shall be made whole for any loss.

(C) Neither the Producer, nor any personnel under the Producer's supervision or control, shall intentionally intimidate, harass or humiliate any Actor at any time, including, but not limited to, all communications to Actors in connection with artistic notes.  However, it is understood that there is no intent to interfere with

49

Short Engagement Touring Agreement 2019-2020

the original Director's or original Choreographer's ability to critique Actors in connection with artistic notes.

### 33. JUVENILE ACTORS

(A) The following special provisions shall apply to all Actors who are both under 19 years of age at the time of signing and who have not completed high school:

(1) Juvenile Actor may not be called to understudy or brush-up rehearsals which would intrude on the Actor's normal school day more than once per calendar week.

(2) Producer shall be responsible for providing services of an accredited or licensed tutor while the company is on tour. Tutors shall be required to familiarize themselves with the reasonable and customary schooling requirements of the Juvenile Actors by the first day of rehearsal.

(3) During the rehearsal period, prior to first paid public performance, up to six hours per week of required tutoring must be held during the permitted rehearsal hours. However, when the Juvenile Actors are rehearsing and/or performing on "10 out of 12" hour days, all required tutoring must be held during the permitted rehearsal hours.

(4) If rehearsals for a Juvenile replacement Actor intrude on the Actor's normal school hours for more than 10 school days prior to Actor's first paid public performance or Official Opening, whichever is later, then an accredited or licensed tutor shall be offered.

(5) For Juvenile Actors between 16 and 18 years of age, Producer shall use best efforts to schedule publicity assignments in accordance with Rule 47, PHOTOGRAPHS, PUBLICITY AND PROMOTION, so as not to interfere with Actor's normal school day. For Juvenile Actors under 16 years of age, see (B)(2) below.

(6) **Working Papers.** To the extent working papers may be required by law, a copy of the Juvenile's working papers must be filed with Equity by the Juvenile's first day of rehearsal.

(B) The following special provisions shall apply to Actors under 16 years of age at the time of signing:

(1) Producer shall provide a responsible person to supervise Juvenile Actors during the rehearsal period and, after the first public performance, from half-hour until Juvenile Actor is called for after curtain down. Such person shall not be assigned any other duty under jurisdiction of Equity or another theatrical craft Union which conflicts with the supervision of Juvenile Actors.

(2) Juvenile Actors under 16 years of age shall be permitted to accept publicity assignments in accordance with Rule 47, PHOTOGRAPHS, PUBLICITY AND PROMOTION, provided such activities do not interfere with the Actor's normal school day.

(3) A Juvenile Actor may be signed to a Six-Month Term Contract in accordance with Rule 15(H)(1), CONTRACT.

(4) Whenever Juvenile Actor is required to live away from Actor's permanent residence as provided in Rule 29(H) and further provided the Juvenile Actor is traveling with a parent or legal guardian not regularly employed in the

50

A-178

Short Engagement Touring Agreement 2019-2020

production, in lieu of the Full Per Diem Producer shall provide a double-occupancy room for the Juvenile Actor and guardian to share and shall pay Juvenile Actor not less than twice the remaining amount of Per Diem required for Single Occupancy as set forth in Rule 29(F)(2).

(5) **Dressing Rooms.**  If available, separate dressing rooms for male and female Juveniles will be provided and shall be separate from the adult dressing rooms. If the Producer determines that sufficient dressing room space is available based on the theater and production personnel, then separate dressing room space shall be provided for Juvenile Actors in age-appropriate combinations.  However, in the event Producer determines that such space is not available, screens shall be provided by the Producer to permit age-appropriate separation of dressing space for Juvenile Actors.

## 34. LABOR / MANAGEMENT COMMITTEE

The Parties agree that in order to facilitate an ongoing dialogue and address issues of mutual concern, a Labor/Management Committee consisting of staff and members of Actors' Equity Association, the Broadway League, and Disney Theatrical Productions will convene at least four times per year during the term of the collective bargaining agreement.

## 35. LAWS GOVERNING

(A) All contracts of employment shall be subject to, be construed by and all the rights of the parties thereto shall be determined by the laws of the State of New York, except as otherwise may be provided.

(B) If there are any valid provisions of law applicable to a contract of employment which are in conflict herewith, the provisions of the contract which conflict therewith shall be deemed modified in conformity with the provisions of such applicable laws.

(C) If any provision of this Agreement shall be held invalid or unlawful by any tribunal of competent jurisdiction, the remaining provisions shall not be affected thereby, but shall remain severally valid, binding and in full force and effect.

(D) Rule 40 NON-DISCRIMINATION, and/or Rule 29, HOUSING ACCOMMODATIONS AND PER DIEM, shall be deemed binding and shall remain in full force and effect, notwithstanding any state, local, or municipal ordinance to the contrary.

## 36. LAY-OFFS

(A) Based on an itinerary for the applicable Booking Season provided by Producer to Equity, Producer may lay-off the company for the number of weeks equivalent to 25% of the total number of weeks in that Booking Season (inclusive of all layoff weeks), rounded to the nearest week, where no salary, Per Diem or benefits will be due.  Up to four additional weeks of lay-off may be taken with full Per Diem (per Rule 29(F)) paid to each Actor, a Health contribution made on behalf of each Actor, and the Actor shall accrue sick leave and vacation time for each such week of lay-off.

(1) No single lay-off shall be longer than four weeks.

(2) Four weeks' notice must be given to each Actor prior to a lay-off, and if

51

A-179

Short Engagement Touring Agreement 2019-2020

such notice is not provided, such lay-off weeks shall be part of the four additional lay-off weeks in (A) above for which full Per Diem and applicable benefits shall be due.  If such four additional lay-off weeks have already been used, full salary, per diem and benefits shall be due.

However, in case of a lost booking (which the Producer shall document to Equity upon request), only two weeks notice shall be required, and

(a) when the lay-off is within the permitted 25%, no compensation, Per Diem or benefits shall be due; and

(b) when the lay-off is not within the permitted 25%, Per Diem, Health, sick and vacation leave accrual shall be due.

(3) Up to four times per Booking Season, the Producer may extend a full-week of lay-off  by an additional half-week.

(a) Such additional half-week of lay-off shall count as a half-week towards the lay-off weeks provided in 35(A) above;

(b) In such week, the Actor shall be paid no less than one-eighth of contractual salary per performance, but in no event less than four-eighths of contractual salary for the week;

(c) A Health contribution for the week shall be made on behalf of the Actor; and

(d) Any split-week engagement that follows a half week of layoff in the same week shall not then be followed by a layoff week.

(See also Rule 45(A) PERFORMANCES)

(4) In the event of a lay-off, Producer shall return Actor to Place of Residence or to the Actor's Place of Engagement, at the Actor's option, and will thereafter transport Actor to the next engagement, provided, however, that an Actor may choose to travel independently.  If Actor chooses to travel independently, Producer shall not be required to reimburse Actor's transportation costs.

(5) On the day of return to Place of Residence or Place of Engagement, the Producer will pay Per Diem (per Rule 29(F)(1)) as follows:

(a) If Actor arrives at the destination terminal at or before 4:00 p.m. (local time), Actor will receive 20% of the full daily Per Diem;

(b) If Actor arrives after 4:00 p.m., Actor will receive 45% of the full daily Per Diem.

(6) On the day of reopening following any lay-off of two weeks or more, the Producer may call a run-through or dress rehearsal.  This rehearsal shall be without additional compensation but shall be charged against the regular weekly rehearsal allowance.

(B) **Illness or death of star.**  If after the production has opened, the star shall die or shall be ill and a lay-off shall be taken as a result thereof, the following rules shall govern.

(1) If the lay-off shall be followed by at least one week of employment:

(a) For the first week of the lay-off, or any part thereof, if the Actor is at or is returned to Place of Residence and no rehearsals are held, the Actor's

52

A-180

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

salary may be reduced to one-eighth of minimum for the first day lost and thereafter a per diem payment of one-seventh of the amount deemed to be full Per Diem set forth in Rule 29(F) Rehearsals may, however, be called, in which event the Actor shall receive minimum salary for said day of rehearsal and the balance of the week.

(b) For the second and third weeks of such lay-off, or any part thereof, the applicable minimum weekly salary plus full Per Diem shall be paid to each Actor whether or not the Actor is called to rehearsals. Thereafter, full salary shall be paid up to the time of resuming production.

(c) If the Actor remains away from Place of Residence during the first week of the lay-off, the applicable minimum salary plus Housing and Per Diem shall be provided whether rehearsals are held or not.

(d) In the event that the Producer has secured insurance upon the star or featured player whose illness has prevented the continuation of performances and the Producer becomes entitled to and is paid insurance benefits pursuant thereto, the Producer agrees to assign 40% of any recovery to Equity to the extent necessary for the payment to the Actors of full contractual salary during any weeks for which such benefits may be paid. Any such recovery and payment to Equity shall fulfill all the Producer's obligations to the Actors resulting from such lay-off. It is understood that this paragraph does not require the Producer to secure such insurance.

Producer agrees to send to Equity a copy of the notice of claim filed with the insurer and, in advance of accepting an offer to settle, to advise in writing of any proposed settlement and then to consult with the Executive Director of Actors' Equity Association. This consultation shall not deprive Equity of its right to employ grievance and arbitration as set forth in Rule 4.

(2) If the lay-off shall not be followed immediately by at least one week's employment, each Actor shall receive (except as provided in (3) below) at least one week's contractual salary upon closing in addition to any payments received in accordance with (1) above.

(3) Should the Producer, within 48 hours after the beginning of any lay-off of a company caused by such illness, furnish to Equity a certificate of a physician approved by the Producer and Equity that such illness will prevent the star or Actor playing a starring role from playing for three weeks, or should the Producer notify Equity that said star or Actor playing a starring role has died, the Producer may close the company forthwith without notice, provided that previously two weeks' contractual salary and all other sums due shall have been paid to the Actor.

(4) **Transportation.** When the company is laid off, the Actors shall have the option of receiving a round-trip ticket to the Place of Engagement or Place of Residence and back to the city where the production will re-open or remaining in the city where the lay-off occurs.

(5) In all cases under this Rule, the Actor's guaranteed period of employment must be fulfilled or salary paid in lieu thereof.

A-181

Short Engagement Touring Agreement 2019-2020

## 37. MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS

For purpose of this rule, the term "Recording" shall refer to any taping, filming, digital recording or any other electronic or mechanical reproduction, in whole or in part, of any production (including any element of the production over which the Producer has the right to, or reasonably should have the right to, withhold consent to the use of said element) in which Actors are employed under the terms and conditions of this Agreement.

Televising, broadcasting, and visual or sound Recording may only be done under the following terms and conditions, which shall remain in effect from the beginning of employment until 19 weeks after the production has closed and shall apply to any production licensed, leased or authorized by the Producer, but shall not apply to motion picture filming for theatrical release.

Requests to Record beyond the following provisions must be submitted in writing to Equity at least 30 days in advance unless special circumstances do not permit such notice. Such requests will not be unreasonably declined.

If a dispute between Equity and the Producer arises under this rule, it shall be subject to the Grievance and Expeditious Arbitration procedures set forth in Rule 4.

### (A) Promotion and Publicity

The Producer's goal in any and all promotion and publicity, including use of captured material, is to portray the show, including the Actors, the creative team, and production elements in the most favorable light. The Producer will provide footage and permit its use consistent with that intent

(1) **Capture.** The Producer (or a third-party hired directly by the Producer) may Record material from the production for the purposes of promotion and publicity and as described in (2) Uses. Outside news and media/entertainment companies shall adhere to Rule 37(D) below.

#### (a) Rehearsals

(i) Prior to and including the Official Opening of the first engagement or first paid public performance, whichever is later, the Producer may Record rehearsals at the average of one half-day per week, including all weeks of rehearsal and previews, but in no event more than three days in any one week. For example, a six week rehearsal period with an additional rehearsal/preview period of two weeks permits the capture of four days of rehearsal, three of which could be used in one week.

(ii) After the Official Opening of the first engagement or first paid public performance, whichever is later, the Producer may record up to three full days, or six half-days per year. The applicable date shall serve as the anniversary date for additional Recordings.

A half-day shall constitute up to four contiguous hours. If less than four hours of a call are captured, it shall count as one half-day.

#### (b) Performances

(i) An unlimited number of performances, promotional and publicity events may be Recorded.

54

A-182

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(ii) A performance may be Recorded in its entirety.

**(c) Non-Performance Footage**

(i) Non-performance activities (such as interviews or backstage interaction) in which an Actor is not performing, whether onstage or in rehearsal, may be Recorded on a voluntary basis.

(ii) Costume fittings, costume changes and warm-ups may also be Recorded on a voluntary basis, but shall require a signed consent form at the time of Recording.

(d) All Recording requires 24-hours notice to the cast and Equity.

(2) **Uses.** Recordings done under Section 37(A)(1) above are for promotional and publicity purposes only. They may not be used for purposes of discipline. They may not be used for teaching nor as a replacement for rehearsal. However, these Recordings may be viewed by Producer and creative teams (including Stage Managers and Dance Captains) in perpetuity for use for any Equity production of the Play produced by that original Producer. In no case may they be used to assist in staging a non-Equity production.

(a) Promotional and publicity Recordings may be used in news, current affairs, documentary, informational and entertainment programs, talk shows (including captured material without interview), opening night specials and promoting the Tony Awards. In order to be considered a use for promotion or publicity, the featured production must be currently running, or announced to run, under an Equity-League contract at the time of anticipated initial broadcast. The Producer shall request mention of same in the program.

The above may be delivered through the following platforms and any substantially similar delivery platforms currently available and as they evolve: broadcast and cable television, websites, (including third-party hosting sites and pages on which tickets are sold), podcasts, wallpaper, video e-blasts, presenter displays to promote tours, mobile marketing, movie trailers, "bonus material" on DVDs, video billboards, in-flight videos, in-house hotel videos, educational videos, tour bus videos, sales kiosk videos, in-store videos, lobby loops, group sales videos, corporate videos, and press reels.

(b) For broadcast and cable television (including documentaries for broadcast and cable television) up to 15 minutes of captured footage of rehearsals and performances may be used per program at any one time and Producer can change this footage as often as desired, as long as no single episode contains more than 15 minutes of this captured footage. There is no restriction on the use of other captured material (e.g., non-performance activities and interviews) on broadcast and cable television.

For all other delivery platforms (e.g., websites, mobile phones, non-broadcast uses and other outlets) up to 15 minutes of captured footage of dress rehearsals and performances may be used at any one time (individual website defined as entire site, not page) and Producer can change footage as often as desired as long as no single distribution point contains more than 15 minutes of this captured footage. Other than dress

55

A-183

Short Engagement Touring Agreement 2019-2020

rehearsal and performances, there is no restriction on the use of captured material in any of these platforms.

An entire number or scene may be used for promotional and publicity purposes delivered through the above platforms.

(c) All productions will be identified by cast and date (e.g. "Original Broadway Cast 2010") at the end of any broadcast or exhibition of a documentary or Opening Night Special created hereunder.

(d) The original Producer may use footage in perpetuity for any Equity production of the Play produced by that Producer. If the original Producer licenses the Play for production under an Equity-League agreement by another Producer, that Producer may license the material for promotional and publicity purposes provided that an additional payment to each Actor is negotiated with Equity.

(e) Material may not be used to promote a non-Equity production. Captured material used on presenter websites that promote an entire season and also feature material promoting the non-Equity productions shall indicate which productions employ Actors and Stage Managers represented by Equity.

(f) Equity, the League, and non-profit entities that promote the theatrical industry (e.g., American Theatre Wing, Theatre Development Fund, NYC & Co. and similar travel and tourism bureaus) may obtain and use footage from any production (including closed productions) for purposes of promoting and branding Equity, the League, and the industry. Disney may use footage from its own productions to celebrate its theatrical heritage.

(g) If captured material is used to promote a different production, the material will identify the production from which it was captured (e.g. "Original Broadway Cast.").

(h) Recordings captured under prior agreements may be used in accordance with the provisions of this Agreement and prior specific agreements that permitted additional use are not limited by this Agreement.

**(3) Payment**

(a) A weekly "Media Payment" shall be made to Actors as compensation for the capture and use detailed above. This shall be required in all musical productions. Dramatic productions may opt-in to Rule 37 at any time. If a dramatic production opts in to use the media terms of this Rule, all Actors in the production shall be paid the Media Payment from the first day of Actor's rehearsal. The weekly payment will be not less than 2% of appropriate category actor minimum salary. When a production recoups, the media payment will increase to the appropriate percentage of the post recoupment actor minimum salary for that production. Dramatic productions that do not elect to utilize the provisions of this Rule will be governed by the media provisions as set forth in the Addendum to this Agreement and will not be required to make the payments set forth herein. This payment is in addition to contractual salary and shall be paid for Actor's entire employment period whether or not the Actor appears in any

56

A-184

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

captured material. The payment is subject to pension and dues. This media fee can be incorporated into overscale for Actors earning in excess of $4000 per week.

(b) The Producer may request an Actor to perform new material for webisodes and mobisodes and shall pay Actors rehearsal overtime rates for such performance. All other material from performances, rehearsals, and interviews shall be for promotional use above.

(c) Music videos and infomercials shall be made under the appropriate SAG-AFTRA contract, except no payment shall be required for use of Recordings for the purpose of promotion and publicity.

(d) Performances on reality programs shall be done under the appropriate SAG-AFTRA contract if that program is covered by a collective bargaining agreement. No payment shall be required for promotional use of captured material from a production currently running under an Equity-League contract. See Rule 37(A)(2)(a).

(e) Recording may take place for the purpose of promotion and publicity without additional compensation during a scheduled rehearsal, dress rehearsal or performance. It is understood and agreed, however, that enhanced lighting and multiple takes may occur during such rehearsal, dress rehearsal or performance provided that in the event an excessive number of takes transform the rehearsal into a "session," then the applicable SAG-AFTRA session fee shall be due every Actor at the call. Further, in the event that particular Actors are requested to come in early or stay later for retakes or special shots, or if work additional to Actor's normal duties in rehearsing or performing for the stage production is required of the Actor to accommodate the Recording, the Actor will be paid the appropriate Equity hourly rehearsal overtime rates for such additional work plus any fees which may be required by SAG-AFTRA.

(f) Broadcast of the entire show in any medium shall be subject to a special agreement negotiated with Equity.

(g) A Producer who receives revenue in exchange for allowing captured material to be used shall negotiate with Equity appropriate compensation for Actors.

(h) Live television promotional or publicity performance, e.g. the Tony Awards ceremony, Thanksgiving Day Parade, Today Show, etc. shall continue to be done under the appropriate SAG-AFTRA contract.

(B) **Cast Albums.** Cast albums may be made under the provisions of the Original Cast Album Rider. The Producer agrees that any Actor who sings or verbalizes in the production in any number, plus the Stage Manager, shall be employed on the appropriate SAG-AFTRA Contract for the Recording of said album and shall receive not less than one week's contractual salary or the prevailing weekly Production Contract minimum, whichever is higher, for up to eight hours so employed, which may be scheduled by the Producer over no more than four days. Such cast album shall accord credit to each Actor appearing in the production at the time the Recording is made, whether or not the Actor performs on the Recording.

57

A-185

Short Engagement Touring Agreement 2019-2020

(1) If an Actor works more than eight hours, the Actor shall be paid an additional one-eighth of contractual salary up to a cap of 250% of Production Contract minimum for each hour or part thereof.

(2) Terms for Actor participation in the 15% of monies derived by the Producer are identified in the Cast Album Rider.

(3) Producer shall give Equity not less than 72-hours notice (inclusive of at least two business days) prior to such Recording.

(4) If, during the Recording of a cast album, one or more singers who are not members of the Equity cast are engaged, then Swing singers and Understudies assigned to singing parts who are not engaged to record the cast album shall share equally in an amount equal to the average contractual salary of said Swings and Understudies multiplied by the number of employment days of such supplementary singers.

(5) For cast album Recordings only, there shall be not less than a 10-hour rest period between an evening performance and a morning Recording call. There shall be a break of one and one-half hours (one hour if a meal is provided) between the Recording session and rehearsals or performances scheduled under the Equity Agreement. Recording sessions may not be scheduled on two-performance days. Application of this rule may not reduce breaks or rest periods required by the SAG-AFTRA Contract.

(6) Without additional payment, cast album Recordings may be used for promotional and publicity purposes and for underscoring of television or radio commercials of the production.

(7) If: (a) songs are recorded by Actors before the creation of a cast album; (b) said Actors are paid for those prior recordings under another applicable agreement; and (c) those songs are included on the cast album without further recording work by said Actors, then a credit equal to the amount of the payment in (b) shall be applied against any payments due to those Actors for the Cast Album recording under Rule 37(B). Actors shall also be credited for any hours spent making such recordings against the eight hours set forth in Rule 37(B)(1).

**(C) Commercials: Television and Radio Spot**

(1) **Television Commercials.** If an Actor is called to make a television commercial of three minutes or less duration, the Actor shall sign the applicable SAG-AFTRA Contract and the following terms and conditions shall apply:

    (a) **Session Fees.** Session Fees shall be payable as set forth below:

        (i) **Special Call.** Each Actor, Stage Manager and Dance Captain who is called when the commercial is Recorded shall be paid not less than the then-current session fee for an on-camera principal performer, whether or not the Actor is seen or heard in the commercial. If a Stage Manager or Dance Captain is not called for the session, but is required to render services in connection with the production of the commercial, the Producer shall pay not less than the applicable session fee for an on-camera Principal performer.

58

A-186

Short Engagement Touring Agreement 2019-2020

(ii) **Performance and/or Capture Material.** If a commercial is Recorded at a performance and/or made from capture footage, each Actor, Stage Manager and Dance Captain who was called when the footage was taken shall be paid the applicable session fee for an on-camera Principal performer, whether or not the Actor is seen or heard in the commercial.

(iii) **Hiatus Between Use Cycles.** If there is a hiatus between use cycles, a session fee shall be paid, in accordance with this paragraph 37(C)(1)(a) in addition to the use fee when a new use cycle commences after the hiatus

(b) **Use Fees.** In addition to the session fee set forth above, each Actor seen or heard in the commercial, and each Stage Manager and Dance Captain who performed their function during the Recording shall be paid in accordance with the following:

(i) **One Year Use Fee.** A use fee of not less than the applicable New York Wild Spot on-camera Principal rate, which shall constitute payment in full for up to fifty-two (52) weeks of use of the commercial on broadcast television, cable and the Internet; or,

(ii) **Six-Month Use Fee.** A use fee of $797 which shall constitute payment in full for up to twenty-six (26) weeks of use, of the commercial on broadcast television, cable and the Internet. (Note: This use fee shall increase by the same percentage, and at the same time, that the use payment in (b)(i) above increases.)

(iii) **Re-Use Fees.** The applicable use fee as set forth above in (b)(i) or (b)(ii) shall apply for re-use. If there is a hiatus after a use cycle, a session fee shall also be paid in accordance with paragraph (a)(iii) above.

(c) **Still Photographs.** If a television or other commercial is made from still photographs of persons in the cast, each Actor contained within the photograph, whether recognizable or not, shall be signed to the applicable SAG-AFTRA contract and the terms of this agreement shall apply.

(2) **Radio Commercials.** If an Actor is called to make a radio commercial of three minutes or less duration, the Actor shall sign the applicable SAG-AFTRA Contract and the following terms and conditions shall apply:

(a) **Session Fees.** Session Fees shall be payable as set forth below:

(i) **Special Call.** Each Actor, Stage Manager and Dance Captain who is called when the commercial is Recorded shall be paid not less than the SAG-AFTRA Principal session fee, whether or not the Actor is heard in the commercial. If a Stage Manager or Dance Captain is not called for the session, but is required to render services in connection with the production of the commercial, the Producer shall pay not less than the session fee due to the Actor.

(ii) **Performance and/or Captured Material.** If a commercial is Recorded at a performance and/or from captured material, each Actor, Stage Manager and Dance Captain who was called when the material

59

A-187

Short Engagement Touring Agreement 2019-2020

was captured shall be paid the applicable session fee, whether or not the Actor is heard in the commercial.

(iii) **Hiatus Between Use Cycles.** If there is a hiatus between use cycles, a session fee shall be paid, in accordance with this paragraph (C)(2)(a), in addition to the use fee when a new use cycle commences after the hiatus.

(b) **Use Fees.** In addition to the session fee set forth above, each Actor heard in the commercial and each Stage Manager and Dance Captain who performed their function during the Recording shall be paid in accordance with the following:

(i) **One Year Use Fee.** A use fee of not less than the applicable New York Wild Spot Principal rate, which shall constitute payment in full for up to fifty-two (52) weeks of use of the commercial on radio and the Internet; or,

(ii) **Six-Month Use Fee.** A use fee of $284 which shall constitute payment in full for up to twenty-six (26) weeks of use, of the commercial on radio and the Internet (Note: This use fee shall increase by the same percentage, and at the same time, that the use payment in (b)(i) above increases.)

(iii) **Re-Use Fees.** The applicable use fee as set forth above in (b)(i) or (b)(ii) shall apply for re-use. If there is a hiatus after a use cycle, a session fee shall also be paid in accordance with paragraph (a)(iii) above.

**(3) Provisions applicable to Television and Radio Commercials**

(a) **Holding Fees.** There will be no holding fees.

(b) **Actors Employed Outside of the Production.** Actors who are not in the production and are hired to render services which are in SAG-AFTRA jurisdiction (e.g. voiceovers, testimonials and additional singers) will be engaged in accordance with the standard SAG-AFTRA commercials contract.

(c) **Multi-Show Commercial.** Commercial footage and/or voice tracks from different shows produced under the Agreement, or any 4A's Agreement, may be combined into a single "multi-show" commercial for purposes of promoting a season or series of shows. Actors seen or heard in the spot shall be paid in accordance with the terms set forth below:

(i) If the source commercial is already in cycle for which the Actors are being paid, no additional compensation shall be due; or,

(ii) If the source material is not in cycle, Actors shall be paid in accordance with the term set forth herein.

(d) **Standard SAG-AFTRA Terms Option.** In lieu of the terms set forth herein, the Producer may elect to use standard terms of the applicable SAG-AFTRA Agreement.

(e) **Other Promotional Uses.** Producer may, without payment of additional compensation, use a commercial in cycle for:

(i) video billboards;

60

A-188

Short Engagement Touring Agreement 2019-2020

(ii) taxi videos;

(iii) elevators;

(iv) movie trailers;

(v) group sales video presentations;

(vi) in-flight videos;

(vii) in-house hotel videos;

(viii) tour bus videos;

(ix) lobby loops, kiosks, in-store videos and other such similar uses under 37(A)(2)(a)above.

(f) **Stars.** When using an existing commercial to incorporate new stars, payment shall be due to Actors in the new star commercial only if they have not been paid for the existing commercial.

(g) **Notice.** There must be at least 24-hours' notice to the Actors and Equity prior to any Recording for a commercial. Where practicable, Producer shall give advance notice of use of a commercial created from captured material.

(h) The Producer shall be permitted to make any number of commercials from captured material using the same Actors. In such event, no additional session or use fee shall be due except as indicated here. If the Producer uses an Actor in one commercial in a lesser payment category and then uses the Actor in a subsequent commercial in a higher category, Producer will pay to the Actor the difference in the session fee as well as the adjustment in the use fee as may be required under the Equity or the SAG-AFTRA Agreement.

(i) All other terms of the SAG-AFTRA commercial agreement and Rule 37 in the Equity/League Agreement not otherwise identified or modified herein shall remain in full force and effect.

(D) Provided that the purpose of the recording is promotional in nature and the Producer does not receive revenue in exchange for the capture or use of such material, outside news and media/entertainment companies may Record the production for use on any program only under the following conditions:

**(1) During a Rehearsal**

(a) Recording and interview session shall not exceed one-half hour of the rehearsal.

(b) The Stage Manager shall file a report with Equity giving the time utilized for the Recording and interview session. Said report shall be initialed by a Deputy.

(c) Upon contemplation of Recording during a rehearsal, the Producer shall make every reasonable effort to:

(i) Give the cast 24-hours' notice;

(ii) Schedule only three Recording sessions during which all outlets must do their Recording; and,

(iii) If the time of the Recording is changed, the Producer shall notify the cast of such change and of the re-scheduled time.

61

A-189

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

**(2) At a Performance**

(a) Only one-half hour of footage may be Recorded.

(b) If possible, the cast must be given 24-hours' notice.

(c) When cameras are going to Record, cast must be given notice at the half-hour call.

(d) There shall be no Recording where there is any interference with the Actors such as the requirement for additional lighting or the movement of equipment.

(3) Not more than three minutes of any Recorded portion of the performance or rehearsal shall be shown on the news broadcast. Such three minute Recording may not depict an entire self-contained number or scene.

(4) No payment shall be required hereunder provided no payments are made to any other personnel employed in the production.

(5) An Equity Stage Manager shall be present at every Recording under this paragraph (D)

(6) For any violation of this paragraph (D) other than violations of unauthorized subsequent uses of the Recording, the Producer shall pay one week's contractual salary to each Actor whose rights have been breached hereunder. Such payments shall not preclude any right in law or equity, civil, or criminal, that arise under a breach of this paragraph (D) which the Actor has against the Producer or any third party.

**(E) Documentary**

(1) In addition to providing captured material as provided herein, producer may permit outside news and media/entertainment companies to capture material to make a television documentary, including unlimited exhibition throughout the world on all television and for the period defined in the SAG-AFTRA Agreement. This permission is conditioned on payment of not less than the applicable SAG-AFTRA rates and provided no more than 21 minutes of combined rehearsal/performance footage is used.

(a) "Performance footage" and/or rehearsal shall mean footage acquired from captured material, documentaries (produced after October 1, 1996 provided Actor has given consent to such use) or news footage with no individual clip exceeding three minutes in duration.

(b) "Non-performance footage" involving Actors in non-performance activities (such as interviews, costume fittings and other elements where the performer is not performing whether in rehearsal or on stage) shall not be included in the calculation of running time (the aforementioned 21 minutes).

(c) If work additional to the Actors' (including Stage Managers) normal duties during rehearsal or performance for the stage production is required to accommodate the Recording, the Actor will be paid the appropriate Equity hourly rehearsal overtime rates for such additional work plus any fees which may be required by SAG-AFTRA.

62

A-190

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(d) Producer must obtain Equity's consent to allow Recording of more than a total of three days of rehearsal and/or performance. Equity agrees that it shall not unreasonably withhold its consent to such additional shooting.

(2) **Clip Use in Other Documentaries.** Clips of performers from one or more productions in a different documentary may be used with an aggregate limit of an average of three minutes "performance and/or rehearsal" clips per half-hour provided that the Actors seen are paid no less than the applicable SAG-AFTRA rate in accordance with the formulas identified above.

All Actors (including Stage Managers) shall receive billing at the end of any broadcast of the documentary created hereunder.

(F) **Session Fees.** Whenever session fees are applicable, Producer shall be required to pay a session fee to any Actor who is called to be present at the theater or rehearsal space when Recording is taking place. Stage Managers shall be paid the on-camera Principal rate.

(G) **Payment for Live Television Promotional Appearances.** Whenever an Actor appears in costume on a news, talk or entertainment show, said Actor shall be paid not less than the applicable SAG-AFTRA rate. If the Stage Manager is requested to attend the television appearance, they will be paid not less than the actors.

(H) **Use of Footage After Expiration Date of Contract.** Any footage produced under Rule 37 shall continue to be governed by the terms of this Agreement without regard to the expiration of this Agreement and without regard to the amendment of this Agreement except to the extent that such amendment shall so provide.

(I) **Opening Night Specials.** Opening Night Specials shall be subject to the following terms:

(1) Opening night specials may be either a one or two-hour documentary-style news program, which will combine Recorded portions with live coverage about the creation and opening night of the production;

(2) To include excerpts from the show, the television production may Record portions during regularly scheduled performances and rehearsals, the number to be mutually determined between the needs of the television production and the Producer and director so as not to intrude upon the creative process. In no event shall the television crew Record more than five rehearsals and/or two performances. Up to 45 minutes of each such rehearsal and 30 minutes of each such performance may be Recorded upon 24-hours notice to the cast before each call;

(3) The Producer may include the terms of such Recording by rider to the Actor's contract, including an honorarium of not less than $350 for a two-hour program, and $200 for a one-hour program to be paid to all Actors employed by the production. If any employee of the Producer or Theatre Owner is paid a higher honorarium for this event, the Actors shall be paid the higher amount;

(4) Up to a total of 45 minutes of rehearsal and performance footage may be included in the final edited two-hour program. Up to a total of 20 minutes of rehearsal and performance footage may be included in the final edited one-

63

Short Engagement Touring Agreement 2019-2020

hour program. It is understood that an entire self-contained number or scene may not be broadcast. All Recorded footage shall be used exclusively for the opening night telecast and promotional spots for the telecast. In addition to the permitted minutes of footage, a portion of the curtain call may be broadcast; and,

(5) Producer will ensure that every Actor employed by the production will receive a screen credit on the Opening Night Special program.

(J) **Reference Recordings.** Notwithstanding any Rule in this Agreement to the contrary, Producer may make Reference Recordings during rehearsal and performance under the following conditions:

(1) The cast shall be given at least 24 hours advance notice of the capture of Reference Recordings.

(2) Actors' time spent in such Recordings shall be considered as regular rehearsal or performance time. No additional compensation will be paid to the Actors except when overtime is payable for rehearsal under provisions set forth in this Agreement.

(3) These Recordings may be used solely for the purpose of reviewing design elements, staging, lighting, technical, or choreographic elements. Reference Recordings shall not be used for promotional, publicity, commercial, or disciplinary purposes and shall be held strictly as a record by the Producer and may be viewed by the Producer, designers, director and/or choreographers or their expressly authorized employees.

(4) Producer may make the Reference Recordings available to Actors.

(K) **Benefits.** Contributions on behalf of the Actors shall be made pursuant to the applicable SAG-AFTRA Agreement except for Stage Managers whose benefits shall be paid in accordance with Rule 44, PENSION FUND AND 401(k) PLAN

(L) **Notice to Broadcast Media and Press Agents.** Press Representatives will send to all broadcast media in the major cities and to all ATPAM press agents a letter outlining the provisions of the contract which govern the use and/or reuse of any Recording of productions under this Agreement. This letter will be sent to the broadcast media in these cities and to the ATPAM press agents every year. The League further agrees to advise by letter any other broadcast media who request permission to do such Recording or to use existing Recordings of those contract provisions. Failure to comply with those provisions may subject the Producer to penalties as outlined above. The League will copy Equity on all pro forma letters, indicating the parties contacted, pursuant to this Agreement.

(M)Audio-visual release of the entire production in any medium shall be permitted, provided:

(1) Each Actor (including Swings, Understudies, Dance Captains and Stage Managers) called for the Recording shall be paid pursuant to the terms of the appropriate SAG-AFTRA contract. In no case will Actors be paid less than the rates customarily applied to such releases under a SAG-AFTRA contract, including any residuals due for exploitation in supplemental markets. The work rules under the SAG-AFTRA contract applicable to a comparable release must also be met, as well as the required benefit contributions (made to Equity Funds if no other Funds are applicable) and procedures necessary

64

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

to administer payments. In addition to the payments above, each Actor who is called, and any Actors replaced for the Recording, shall receive a payment of no less than one hundred fifty percent (150%) of applicable Production Contract minimum salary as stated in Rule 63(A), SALARIES. Contributions for Equity pension and 401(k) shall be paid on these monies and Equity Dues shall be deducted on behalf of the Actors.

(2) Stage Managers employed for the Recording will receive the same terms and conditions as the Actors. Stage Managers shall be paid the equivalent of the On-Camera Principal Performer rate for each day of Recording. Contributions for Equity Pension and 401 (k) shall be paid on Stage Managers' salaries in lieu of SAG-AFTRA benefits.

## 38. MILITARY SERVICE OF THE ACTOR

If the Actor is called to report for Military Service, the Actor may cancel Actor's contract by giving the Producer as much notice as the circumstances will permit and the Producer agrees to pay the Actor's transportation to the Place of Residence or to the Actor's Place of Engagement, at Actors' option, and the Actor shall not be obligated for the payment of the fare of Actor's successor.

## 39. NO LOCKOUTS OR STRIKES

(A) Notwithstanding any other provisions contained in this Agreement to the contrary, no Actor shall be subject to discharge, discipline, or replacement by the Producer: (1) for refusal to cross a picket line or enter upon the picketed premises if employees of the Producer other than those covered by this Agreement are on strike or are picketing the Producer; or (2) for refusal to cross a picket line or enter upon the premises of an employer other than the Producer if the employees of such employer are engaged in a strike ratified by a representative of such employees, which such employer is required by law to recognize. Provided, however, that in either instance, such strike or picketing must enjoy the sanction of and be ratified by the relevant parent national or international union and provided further that the Council of Equity endorses and supports the strike or picketing and directs its members to honor such picket line or strike and further provided that the strike or picketing is not in violation of law.

(B) The Producers shall not lock out any of the Actors and neither the Actors nor Equity will call, sanction, or participate in a strike during the period of the Agreement between Equity and the League except as provided above. In no event shall any Actor be required to perform, or to enter the theatre for such purpose, if such performance or entrance would endanger the Actor's safety.

(C) Should a strike by the Actors occur during the period of the Agreement, Equity will be deemed not to have violated the terms of this Rule if Equity refrains from assisting, encouraging, or condoning and in good faith takes every reasonable means to terminate the strike at once and in addition thereto, promptly declares publicly that the strike is unauthorized and directs the Actors to cease such conduct.

(D) The provisions of this Rule shall not be deemed to effect the express rights of Equity or the Actor under Rule 9, BREACHES BY PRODUCER; Rule 18, DEFAULTING PRODUCERS; Rule 38, MILITARY SERVICE OF THE ACTOR; or Rule 49 PRODUCTION PROSECUTED.

65

A-193

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 40. NON-DISCRIMINATION

(See also Rule 21, DIVERSE AND INCLUSIVE CASTING)

(A) The parties hereto affirm their commitment to the policy that employment hereunder shall be without discrimination on the basis of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or belief. Consistent with the foregoing and with the procedure set forth in Rule 5(E)(4), it is the intention of the parties that the casting of productions will be conducted in a manner which provides equal and fair consideration to all Actors including, but not limited to the aforementioned Actors.

Quarterly meetings will be held between representatives of Equity and the League to assure that this fair employment policy is being observed and to monitor its implementation.

This provision is also applicable to applicants for employment.

(B) **Claims.** Any claimed violation of this policy shall promptly be submitted for settlement to the Grievance Committee, pursuant to Rule 4, ARBITRATION AND GRIEVANCE.

(1) The Actor or applicant shall submit to Equity any claimed violation of these provisions within 28 days of the time when the claim arose or when the Actor became aware of the alleged discrimination, whichever is later. Equity shall send written notice of the claim to the League and the Producer, in accordance with Rule 4(A)(2) within five business days thereafter. Any claim for which timely notice is not given shall be barred unless unusual circumstances can be shown for such delay. The Grievance Committee shall meet to consider the claim immediately thereafter.

(2) If the dispute is not decided by the Grievance Committee, the claim may then be submitted directly to arbitration in accordance with Rule 4. The Arbitrator may provide such remedies as in their discretion shall be deemed appropriate.

(C) Notwithstanding Rule 39, NO LOCKOUTS OR STRIKES, the cast shall not be required to perform in any theatre, public or private institution, or other place of performance, where discrimination is permitted or practiced because of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status or political persuasion or belief. As between Equity and the Actor or cast, Equity shall determine whether discrimination exists at the place of performance.

(D) In order to insure equal employment opportunities for all Actors, the Producer shall hold Principal and Chorus Interviews and Auditions pursuant to Rule 5.

(E) The parties hereto agree to continue their joint efforts toward and reaffirm their commitment to the policy of non-discrimination and to an ongoing policy of furthering the principles of equal employment opportunity. It is the desire of the parties that employment opportunities for Actors be improved and that the stage reflect a diverse and inclusive society. In furtherance of this policy, with due regard for the requirements of and suitability for a job and with the understanding that there can be no interference with the contractual rights or artistic discretion of the Playwright, Director, or Choreographer, the Producer shall endeavor to

66

A-194

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

engage Actors of all/any race and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian-American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or belief.

## 41. NOTICES

(A) It is the essence of all employment contracts that all notices hereunder, company and individual, must be in writing. Copies of all notices must be filed with or mailed to Equity forthwith by the party (Actor or Producer) giving notice. Full power is reserved to the Council of Equity to grant relief from this Rule where, in its opinion, the person or persons to whom notice is given has not or have not been misled or injured.

(B) All notices given by the Actor to the Producer may be given in writing to the Producer, the Company Manager, or Stage Manager. Individual notice to the Actor must be given to Actor personally in writing unless the Producer has procured the address of the Actor as registered with Equity, in which case, unless otherwise provided, it may be given by mail or fax. Notice of termination may not be given to the Actor while Actor is on a vacation approved by Producer under terms of Rule 70.

(C) **Week's Notice Defined.** Notices of termination, lay-off, or closing given at or before the end of the performance on Monday night, effective at the end of Saturday night following, shall be deemed one week's notice; and such notice effective at the end of the Saturday week following shall be deemed two weeks' notice. If the playing schedule is Tuesday through Sunday, notice given on Tuesday will be effective at the close of the Sunday performance. Except as provided above, a week's notice shall be seven calendar days and two weeks' notice shall be 14 calendar days. Notice of closing shall remain posted for the entire notice period as specified above unless initialed by each member of the cast. A closing notice posted after the half-hour call shall be promptly called to the attention of the cast.

(D) All communications which refer to the company in general shall be posted upon the Call Board. Actor may designate by means of a Rider Actor's preferred means of receiving communications and notices from management (e.g., cell phone, email).

(E) The posting online of the Agreement and Rules Governing Employment in Short Engagement Tours, herein adopted, shall be full, adequate and final notice to both Producer and Actor of said Rules.

## 42. NUDITY

### (A) Interviews/Auditions

(1) SEX ACTS SHALL NOT BE PERMITTED.

(2) Nudity shall not be permitted at Principal Interviews.

(3) Nudity at Auditions (Principal and/or Chorus Auditions) shall not be permitted except with the express written permission of Actors' Equity and

67

Short Engagement Touring Agreement 2019-2020

shall be subject to the following guidelines:

(a) Actor shall not disrobe, in whole or in part, until after the Actor has been auditioned as a Principal Actor or Chorus Singer and/or Chorus Dancer; and,

(b) A Stage Manager or an official Equity representative must be present; and,

(c) The direct professional and artistic capacity of all persons present must be attested to by the Producer in writing to Equity at the time the written permission is requested (i.e., Producer, Director, Choreographer).

**(B) Rehearsals/Performances**

(1) SEX ACTS DURING REHEARSAL OR PERFORMANCE SHALL NOT BE PERMITTED.

(2) Actor shall not appear nude or perform acts of a sexual nature in the course of a stage presentation unless the Actor has been advised and gives written consent by the time of the Actor's signing the contract. The script shall be submitted for review if the Actor so requests.

(3) Actor shall not pose for nude photographs or appear nude for any motion picture filming, videotaping or other forms of visual recording without the Actor's prior written consent. The applicable consent form will be provided by Equity.

(4) Photographs in which any Actor appears nude or performs an act of a sexual nature shall not be used in any way without the prior written consent of each Actor appearing in the photograph, or copy of the photograph, on a fully executed Equity Nude Photograph/Video Release form. The Actor's written consent must also appear on a copy of the photograph release. Such request to utilize the photograph must specify the specific use for the photograph. The signed, released photograph and release form shall be filed with Equity. The Producer and the Actor shall keep duplicate records.

(a) Prior to release or use of any film or video tape, video cassette, or any electronic or mechanical reproduction in which any Actor appears nude, each Actor appearing in the scene shall be given an opportunity to view the film or tape. Use or release shall not be permitted without the prior written consent of each Actor participating in a scene where any Actor appears nude, or performs acts of a sexual nature, on a fully executed Equity Nude Photograph/Video Release form. The Producer shall file a copy of the fully executed release form for each Actor with Equity.

(b) An authorized Actors' Equity Association representative must be present at all such photographing, filming or videotaping.

(5) Actor shall not, while nude, mix with the audience or leave the stage, backstage or performance area. The Producer shall take all necessary measures to insure that no member of the audience will be permitted to enter the stage, performance area or backstage while any Actor is nude.

(6) Artists renderings of nude Actors shall not be permitted without the Actor's prior written consent.

(C) IF THE PRODUCER BREACHES ANY OF THE ABOVE PROVISIONS THE

68

A-196

Short Engagement Touring Agreement 2019-2020

PRODUCER SHALL BE ASSESSED DAMAGES OF NO LESS THAN ONE WEEK'S CONTRACTUAL SALARY FOR EACH VIOLATION OF ANY OF THE PROVISIONS SET FORTH ABOVE IN PARAGRAPHS (A) OR (B) FOR EACH ACTOR INVOLVED.

(D) All of the above shall not preclude the Actor or Equity from instituting any civil action in addition to the damages set out in this rule.

## 43. NUMBER IN CAST

(A) The number of Actors employed on the first day of rehearsal may not be reduced in number under any circumstances, except if:

(1) A production that tours under the Production Contract (including Tiers B, C and D), and then per Rule 65 transitions to this Agreement in a subsequent Booking Season; and/or,

(2) A production that tours under this Agreement, and then transitions per Rule 65 to tour under a lower Category in a subsequent Booking Season,

the number in cast engaged may be reduced as cast members voluntarily leave the production.

(B) When the cast is reduced in such fashion, if the total cast size, per the Actor qualification requirements of this agreement, modifies the average weekly guarantee calculation such that the production then qualifies for a higher Category (as a result of the Actor adjustment per Qualification for Use of this Agreement Rule 1(B)(3)(e)(i)), the Producer electing to reduce the company must thereafter pay to the Actors remaining with the company no less than the higher Category applicable minimum salary (per Rule 57(A)(2)) and Actors whose contractual salary is $250.00 or less above the new Category minimum shall receive the difference between the two minimums (see Rule 57(A)(5)).

(C) In no event may the total number in Chorus be reduced by more than 20%.

(D) The Producer may employ Stage Managers beyond those required by Rule 62, STAGE MANAGERS, on temporary contracts, without affecting the provisions of Rule 43, NUMBER IN CAST. The additional Stage Managers may be employed until four weeks after the first paid public performance of a tour.

## 44. PENSION FUND AND 401(k) PLAN

(A) The Producer acknowledges that the collective bargaining agreement effective June 1, 1960 between Equity and the League provides for the establishment of a jointly administered Pension Fund. The Producer agrees to abide by all provisions of said agreement with respect to said Pension Fund, including the obligation to make the contributions called for therein and to execute all necessary documents accepting the Agreement and Declaration of Trust establishing said Pension Fund and to be bound by all rules and regulations of said Pension Fund now or hereafter adopted or which may from time to time be adopted by those administering said Fund.

(B) The agreements applicable to the establishment and administration of the Equity-League Pension Fund are renewed and extended for the duration of the collective bargaining agreement between Equity and the League, as amended by the Amendments to the Equity-League Pension Agreement effective June 28, 1971. The terms and conditions contained in the Arbitration Award of Burton

69

A-197

Short Engagement Touring Agreement 2019-2020

Turkus dated April 23, 1963 are continued except as amended and modified in accordance with the recommendations contained in the letter of Morris Tarshis, Chief Labor Mediator for the City of New York, dated February 15, 1965 and as amended by the parties hereto.

(C) The Producer shall pay to the Equity-League Pension Fund 6% of all monies received weekly, exclusive of minimum Per Diem and up to a maximum of $5,500, by all employees hereunder. In lieu of the foregoing, and in addition to the 3% contribution provided for in Rule 44(D) for Canadian Actors whose primary designated fund is the Canadian Actors' Equity Association Registered Retirement Savings Plan, the Producer shall contribute to the Equity-League 401(k) Trust Fund 6% of all monies received weekly, exclusive of the minimum out-of-town expense reimbursement and up to a maximum of $5,500.

(D) The Producer shall contribute 3% of all monies received weekly, exclusive of minimum Per Diem and up to a maximum of $5,500, by all employees hereunder to the Equity-League 401(k) Trust Fund on behalf of each such employee. This contribution for Producers able to utilize tax relief shall be made as follows:

(1) A contribution equal to 1% of all monies received weekly, exclusive of minimum Per Diem and up to a maximum of $5,500, by all employees hereunder shall be made by the Producer; and,

(2) A contribution equal to 2% of all monies received weekly, exclusive of minimum Per Diem and up to a maximum of $5,500, by all employees hereunder shall be made by allocating an equivalent amount of the net tax relief surplus in excess of the Producer's pension obligations under (C) above to the 401(k) Fund.

The specific terms and conditions of the Plan will be made available to all eligible Actors.

(E) The Producer agrees to be bound by the Agreement and Declaration of Trust establishing the Equity-League 401(k) Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto that may be adopted by its Trustees during the term of this Agreement.

## 45. PERFORMANCES

### (A) Number Of

For purposes of determining the performance schedule, the Producer shall demarcate the production's itinerary in periods of four weeks of performances (not including lay-off weeks). The first and last itinerary periods may be up to six weeks of performances.

(1) The producer may schedule up to 32 performances in a four-week performance period, not including lay-off weeks, without additional payment. This schedule may include up to nine performances in a week. At the beginning and end of the tour, there may be a six-week performance period in which the Producer may schedule up to 48 performances. The following shall apply:

(a) No more than nine performances may be held in any work week without the prior consent of Equity;

70

A-198

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(b) There may be no more than two consecutive nine-performance weeks, irrespective of performance period demarcations.  Performance weeks interrupted by a lay-off will not be considered consecutive;

(c) Between two consecutive nine-performance weeks there shall be a 24-hour rest period (see Rule 55(B)(2);

(d) There shall be no more than two nine-performance weeks in a four-week period or three nine-performance weeks in a six-week period;

(e)  If there are fewer than 32 performances in a four-week period (or 48 in a six-week period), a rehearsal may be scheduled in place of a performance without additional compensation as per Rule 52(D)(1)(h), up to 32 (or 48, when applicable) performances/rehearsals ;

(f)  Any number of performances given in a week in which salary is pro-rated due to a partial week of lay-off per by Rule 36(A)(3) shall count as eight performances for such week in the applicable four- or six-week performance period;

(g) The first week of performances shall not be considered part of a performance period unless the first performance of that week is on or before Wednesday matinee; and,

(h) The closing week may be considered part of a performance period if salaries for the week are not pro-rated.

(2) If more than 32 (or 48, when applicable) performances are scheduled in a four- (or six-, when applicable) week period, each Actor shall receive an additional $3/16^{ths}$ of contractual salary for each performance in excess of 32 (or 48, when applicable).

(3) The Producer may alter the performance schedule upon not less than one week's written notice, provided that the scheduled day off is not altered with less than two weeks' notice.

(4) Curtain time may be modified by up to one hour at any time with no notice.

(5) A production may play 10 performances in one week upon Equity's prior consent, which consent will not be unreasonably withheld.  Each Actor shall receive an additional $3/16^{ths}$ of contractual salary for a tenth performance in a work week.

(6) If a production plays a 33rd (or 49th, when applicable) or greater performance in a performance period that is also the tenth performance in a work week, each Actor shall receive an additional $5/16^{ths}$ of contractual salary.

(7) Under no circumstances shall a production play more than 34 performances in a four week period, nor more than 50 performances in a six-week period.

(8) In the week of the first paid public performance, if the first paid public performance is on any night but Monday, payment to the Actors for that part of the week in which the first public performance occurs shall be for such number of performances actually performed.  In no event shall an Actor receive less than the minimum performance salary for the week (inclusive of any rehearsal salary an Actor receives for the period preceding the first public performance) (see Rule 52(C)).

71

A-199

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(9) Except for the week of the first paid public performance, the week of a production's closing, or any week which includes a partial lay-off per Rule 36(A)(3), a week's compensation shall be paid even if fewer than eight performances are given in any week. Also, if more than eight performances are given in any week in a four- (or six-, when applicable) week period in which 32 (or 48, when applicable) performances are scheduled, no additional compensation shall be due for such additional performances, subject to the requirements of (1), (2), (5), (6) and (7) above. In the week of a production's closing, Actor shall be paid no less than one-sixth of contractual salary for each day employed, excluding the day off, but in no event less than one-eighth per performance so long as the proper closing notice has been given. (See Rule 41, NOTICES.)

(10) Six performances may be given in any three consecutive calendar day period without additional payment under the following conditions:

(a) There shall be no travel or rehearsal (except sound check or emergency rehearsal) on any of the three days;

(b) The sixth performance shall be followed by a 12-hour rest period, not a standard 10-hour rest period;

(c) The day following the sixth performance shall be either a one-performance day with no call prior to 6:00 p.m. or a day off on which there may be travel; and,

(d) Not more than seven performances may commence in any four consecutive calendar day period without the express consent of Equity.

(11) Not more than two performances may commence in one calendar day without the consent of Equity, which consent will not be unreasonably withheld.

**(B) Breaks**

(1) There shall be a recess of one and one-half hours after a period of not more than five consecutive hours of rehearsal and/or performance combined. In addition, there shall be a break of five minutes after not more than 55 minutes or 10 minutes after not more than 80 minutes of rehearsal for each Actor. (See also Rule 55, REST PERIODS AND DAYS OFF.)

(2) If the break between performances is less than one and one-half hour (excluding the half-hour call), the Producer shall make a meal available to the Actor at the Producer's expense. If the Actor makes a request in advance for a hot or cold meal and, if practicable, the Producer shall accommodate the Actor's request. If no meal is provided, Producer shall pay to the Actor $15 in lieu thereof. In no event shall said break be less than one hour (excluding the half-hour call). In those cases where Actors are required to report to the theatre earlier than half-hour because of special circumstances such as make-up, costumes and warm-ups, Producer shall provide a meal to Actor at Producer's expense.

(3) On a two performance day, if there are no restaurants within one-half mile from the theatre, Producer will provide, at Producer's option, either round trip transportation for the Actors to a restaurant between performances or will arrange for a meal to be delivered to the theatre between performances.

72

A-200

Short Engagement Touring Agreement 2019-2020

Such meal will be paid for by the Actor.

**(C) Payments to Actor**

(1) All performances or rehearsals for which admission is charged (except bona fide benefits endorsed by the Theatre Authority or Equity) are to be counted and considered as performances for which the Actor is to be paid.

(2) Any performance begun prior to 1:00 p.m. or subsequent to 11:00 p.m. shall be counted as an extra performance within the meaning of this section and the Actor shall be paid an additional $3/16^{ths}$ of the Actor's weekly salary.

Notwithstanding the foregoing, a performance may be scheduled as early as 11:00 a.m. without additional compensation, provided that:

(a) It is not the first performance of the week;

(b) Curtain down of the previous evening's performance is no later than 11:00 p.m.;

(c) The span of day does not exceed 10 hours unless the early curtain is for a student matinee; and,

(d) The show call (inclusive of normal make-up, costume calls, warm-ups, or other pre-show prep) is the first call of the day (i.e., there can be no rehearsal or publicity calls prior to half hour).

(3) On New Year's Day (effective January 1, 2014), July Fourth, Labor Day, Thanksgiving and Christmas, an Actor whose contractual salary is less than $3,000 per week shall receive holiday pay in addition to Actor's weekly contractual salary as follows:

(a) if one performance is scheduled on that holiday, $1/16^{th}$ applicable minimum salary;

(b) if two performances are scheduled on that holiday and Actor performs both, $3/32^{nds}$ of said minimum salary; and

(c) if two performances are scheduled on that holiday and Actor performs only one, $1/32^{nd}$ of said minimum salary.

Actors on paid vacation are entitled to these holiday increments. No rehearsals shall be permitted on the recognized holidays, except for emergency, sound check, and during the final two weeks prior to the first paid public performance. All other rehearsals on the recognized holidays prior to the first paid public performance shall require that all Actors shall receive $1/16^{th}$ of minimum salary for Actor's own category in addition to Actor's weekly salary.

(D) **Curtain Call.** Subject to the Director's artistic discretion, every on-stage performing member of the company shall be entitled to participate in the curtain call at the conclusion of each performance.

(E) **Food and Beverages.** The Producer shall advise the Presenter of Equity's concern that neither food nor beverages will be brought to the ticket holder's seat.

(F) **Lateness.** If Actor is late for "half-hour" more than twice within any six-month period, Actor will be fined 6% of contractual salary for each lateness commencing with Actor's third lateness.

73

A-201

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

All fines will be remitted by the Producer to the Actors' Equity Foundation and will be deducted from Actor's salary on a pre-tax basis. An official and accurate clock will be designated. Written notice of lateness will be given to both Actor and Equity. This rule shall apply uniformly. If it is determined in grievance or arbitration that the rule has not been applied uniformly, Producer must remit all fines assessed within the six months prior to the fine that is challenged.

It is understood that this will not affect Producer's right to send Actor home and reduce salary accordingly. However, if Producer does send Actor home, Producer cannot also fine Actor. The foregoing does not waive or alter the Producer's right to terminate Actor for just cause in the event of chronic lateness, including any lateness for half-hour and rehearsal.

## 46. PERFORMANCES LOST

(A) If the company cannot perform because of fire, accident, strike, riot, Act of God, or the public enemy, which could not be reasonably anticipated or prevented, then the Actor shall not be entitled to any salary for the time during which Actor's services shall not for such reason or reasons be rendered, except the Actor shall receive one-eighth of minimum salary plus housing and per diem for the first day lost and housing and per diem for each day on which performances are not given thereafter.

(1) The company may add a replacement performance in the same week as the canceled performance without any additional compensation provided the Actors receive no less than 24 hours' notice. If a performance is so scheduled, the Actors' salary and Per Diem will not be reduced for the canceled performance.

(2) The company may add a replacement performance within the same or a subsequent four- (or six-, when applicable) week performance period with no less than 72 hours' notice. If the Producer elected not to pay the Actors for the missed performance, the Producer shall pay the Actors for the replacement performance. If the replacement performance is to be the tenth performance in the workweek, Rule 45(A)(5) shall apply.

(3) If a replacement performance is scheduled after the scheduled final performance of the tour, the Producer will reimburse the Actor for any additional travel expenses caused by such scheduling.

(B) Should any of the foregoing conditions continue for a period of 10 days or more, either party may terminate the contract (except on a Term Contract, only the Actor may terminate) and the Producer will pay for all services to date and transportation back to the Place of Residence or the Place of Engagement, at Actor's option. (See Rule 66, TRANSPORTATION AND BAGGAGE.)

(C) If the production closes after 10 days, the six week reopening provision shall not apply provided that all members of the cast at the time the production closed are offered re-employment in the production at not less than the terms prevailing on the date of closing.

(D) Lost performance due to illness or death of star. (See Rule 36(B), LAY-OFFS.)

A-202

Short Engagement Touring Agreement 2019-2020
## 47. PHOTOGRAPHS, PUBLICITY AND PROMOTION

(A) Company picture calls outside regular rehearsal hours shall be limited to four hours prior to the official opening of the first engagement. Thereafter, except as provided in (B) below, picture calls occurring outside of regular rehearsal hours (or outside of performance) must be compensated as overtime hours.

(B) Picture calls may be scheduled for one hour per week outside of regular rehearsal hours to the extent reasonably required to comply with Rule 6(E). This time, if not used, may be accumulated up to a maximum of three hours, from week to week. Such picture calls shall be without additional compensation unless more than three hours are used, in which event overtime shall be payable for each hour or part thereof used in excess of three hours.

(C) Picture calls may be scheduled after a performance on 24 hours' notice. Such calls may be regarded as rehearsal under terms of Rule 52, REHEARSALS. A picture call, once scheduled, may be canceled on 24 hours' notice. Should such picture call be canceled with less than 24 hours' notice, available rehearsal time shall be reduced by two hours.

(D) The Producer may require the Actor to pose not only for customary and usual photographs, but also for photographs to appear in magazines or newspapers for the sole purpose of publicizing and advertising the play, provided said photographing takes place immediately following the matinee or evening performance, during authorized rehearsal hours or dress rehearsals required for replacements. Notice of a picture call must be given at least 24 hours in advance and must be posted before the final half-hour of a performance.

(E) The Actor shall have not less than one hour for supper after matinee or the Producer shall, at Producer's own expense, provide the Actor with a meal. If the call takes place after the evening performance, the photo call shall commence within 30 minutes of curtain down and a meal shall be made available to the Actor at the Producer's expense. If the Actor makes a request in advance for a hot or cold meal and, if practicable, the Producer shall accommodate Actor's request.

(F) If the photographs are taken at a time other than hereinabove specified, or if the limit of hours herein specified is exceeded, or if the limitations in Paragraph (A) or (B) above are exceeded, Actor shall be paid not less than the applicable rehearsal overtime rate (see Rule 52(D)(3)) for each hour or part thereof employed on such photographing.

(G) In the event the Producer requests a picture call for the purpose of replacing a photograph required to be removed under the provisions of Rule 6(E) or for other reasons resulting from the replacement of an Actor and such picture call involves three or fewer performers, the time and place of such picture call shall be mutually arranged between the Producer and the Actors and such a call shall not be considered a Company picture call under this Rule.

(H) In all cases the Actor's name shall be properly credited in the publicity whenever and wherever the photographs are used.

(I) **Rehearsal for Promotional Events.** When Actors are required to rehearse a significant amount of new material for live publicity or promotional events all Actors participating in such rehearsals shall receive not less than the rehearsal overtime rate for each hour or part thereof. This rule shall not apply if the event

75

A-203

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

is being paid under the terms of another union's contract (e.g., SAG-AFTRA).

(J) The Producer shall reimburse the Actor for all reasonable personal expenses incurred in connection with personal and publicity appearances initiated or required by the Producer.

(K) The Producer must obtain the Actor's prior written authorization before the Actor's picture may be used in conjunction with a commercial product and said authorization must specify the commercial product involved.

(1) If the Actor consents to the use of Actor's name, voice, or photographic likeness, as aforesaid, Actor shall be paid not less than $300 for said use. Actors called to a picture call for the purpose described above, whether said call is at the theatre or elsewhere, shall be paid not less than $200 per hour for said call, but shall be paid no additional sums for the use of pictures taken during said call. (See Rule 37(C) where still photos are utilized to make a commercial.)

(2) This requirement shall not apply to the so-called institutional ads similar in type to the department store ads on file at the offices of Equity and the League.

(L) No Actor may be required to pose for nude photographs without Actor's written consent. No nude photographs of an Actor may be used in any way without the written consent of the Actor. (See Rule 42, NUDITY.)

(M) It is understood and agreed that it is part of the Actor's job to participate in reasonable promotional and/or publicity appearances, as requested by Producer.

**(N) Non-Broadcast Publicity/Promotional Appearances by Actors in the Production**

(1) **In Costume.** When Actors participate in live publicity appearances in costume, the Actors shall be paid not less than one-eighth of applicable minimum salary as set forth in Rule 57(A);

(2) **No Costume.** When Actors participate in live publicity appearances without costumes, no payments shall be required. T-shirts, caps and show jackets shall not be considered a costume for purposes of this provision. However, any clothing purchased by the Producer to be worn by Actor(s) in promotional events, other than T-shirts, caps or show jackets, shall be considered a costume for purposes of this provision. Producer may reasonably request that an Actor appear in Actor's own clothing, excluding "black tie," without incurring a payment under this provision;

(3) If the Stage Manager is requested to attend the live event, the Stage Manager will be paid not less than the actors;

(4) See also Rule 37, MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS.

(O) **Publicity Appearances By Actors Not Employed in Any Production of the Show.** An Actor not employed in any production of the show may perform in a publicity appearance promoting said production in accordance with the following:

(1) Actor will be paid not less than one-eighth of applicable minimum salary for each seven out of eight and one-half hour day that the Actor is so

76

A-204

Short Engagement Touring Agreement 2019-2020

engaged.  Overtime shall be at the rehearsal overtime rate;

(2) The Actor shall be provided with single occupancy hotel room at no cost to the Actor plus $40 for food and incidental expenses. Producer shall pay for and arrange all travel.  If the publicity engagement is outside the U.S., in addition to hotel and travel at no cost to the Actor, the Actor shall be reimbursed up to $60 for food and incidental expenses;

(3) The terms of this provision will be applicable as of the first paid public performance of the production.

(4) **Health and Pension.** After three days engaged in such publicity, a Health contribution will be made on the Actor's behalf as of the fourth day employed. Thereafter, a Health contribution will be required after every six days worked. Said Health contributions will be due whether or not the days worked are consecutive.  The Producer will contribute to the Equity-League Pension Fund 8% of all monies (exclusive of Per Diem) paid to the Actor.

(5)  **Use of Photographs.**  See also Rule 6(E).

## 48. PRESS RELEASES

The Producer shall use reasonable care that Producer's press department shall remove the name of the Actor from advertising and publicity matter as soon as is possible after the Actor leaves the company.  The Actor is at liberty to announce an engagement when or after entered into. However, if the Actor is engaged under a Standard Minimum Contract, neither the Producer nor the Actor shall make any public announcement of the engagement until rehearsals have begun. (See also Rule 6, BILLING)

## 49. PRODUCTION PROSECUTED

(A) Should the production in which the Actor is engaged be complained of as being in violation of any statute, ordinance, or law of the United States, or any State or any municipality in any State and should a claim or charge be made against the Actor on account of Actor being engaged in such production, either civil or criminal, the Producer shall defend the Actor at Producer's own expense, or shall pay any and all reasonable charges laid out or incurred by the Actor in Actor's defense and indemnify the Actor against any loss or damage which Actor may suffer on account of being engaged in any such production.

(B) It is specifically agreed and understood between the Actor and the Producer that the language, business and costuming of the play are under the control and direction of the Producer and author, who according to custom, can at any time erase or amend the scenes and lines and that consequently the Actor has no certain method of knowing during rehearsals, whether in its final presentation the play is susceptible of being considered immoral or indecent.  Therefore the Producer represents to the Actor that the play as produced shall not violate any law or give offense which is punishable by any law and expressly agrees that should Producer or the author be arrested or summoned on such charges, that (Equity consenting) the Actor may end and terminate the engagement forthwith. Upon such termination the Producer shall pay to the Actor forthwith all sums due under this Agreement plus one week's salary, as compensation for the termination of the engagement without notice, but in no event shall the Actor receive less than a total of two weeks' contractual salary.

77

A-205

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(C) This rule shall not apply to any case or any set of conditions where its enforcement would be illegal or against public policy. In the case of an arrest on account of the nature of the play or its production, the Producer shall forthwith furnish bail for the Actor; and, in the event of Producer's failure to do so, or for any breach of this rule, the Producer shall pay to the Actor (Equity consenting) the sum of $2,000. After an arrest, the Actor may demand a suspension of performance pending a determination and such suspension shall not terminate or otherwise affect the terms of the agreement unless Equity shall otherwise order.

## 50. PROPERTY; REIMBURSEMENT TO ACTOR FOR LOSS OR DAMAGE

(A) The Producer shall reimburse the Actor for all loss of or damage to: (1) Actor's property used and/or to be used in connection with the play or plays covered by Actor's agreement; (2) the personal clothing worn by the Actor to the theatre and the personal clothing, personal effects, or property worn or carried by the Chorus to Chorus auditions; (3) the personal effects of the Actor, including Actor's baggage, while such property is wholly or partly in the possession, control, or under the supervision of the Producer, or under that of any of Producer's representatives, or when said property is in any theatre, building, or other place in which the play or plays covered by Actor's agreement has been given, is being given, or is to be given; or when said property or personal effects has been in any way shipped, forwarded, or stored by the Producer or any of Producer's representatives, agents, servants, or employees, up to a limit of $10,000 for the Actor's personal effects and/or clothing; up to a limit of $3,000 on the Actor's furs; up to a total limit of $3,000 for the Actor's jewelry. Notwithstanding the aforesaid, however, the Producer shall be liable up to a limit of $3,000 for the Actor's personal effects and/or clothing at auditions and during rehearsals prior to the tour.

(B) The Producer shall be liable as herein above provided whether or not the act, fault, or negligence of the Producer, Producer's agents, servants, or representatives, caused or contributed to such loss or damage. The Producer, however, shall not be liable for any loss of or damage to the property of the Actor while said property is under the sole and exclusive control and supervision of the Actor.

(C) Except as above provided, the Producer shall not be responsible for any loss of or damage to the personal property of the Actor over and above the limitations herein set forth and where, as to such property, it is the duty of the Actor, if Actor desires to protect themselves against loss, to insure the same. The Producer may meet the foregoing obligation by maintaining adequate and sufficient insurance coverage which shall provide the same protection as the Producer hereby assumes. Upon the direct payment of any loss or damage to the Actor by the Producer, the Producer or the Insurer shall be subrogated to all rights of the Actor to the extent of such payment.

## 51. RECORDINGS USED IN PRODUCTION

The Actor shall not be permitted to work in any company where recordings or mechanical or electronic reproductions of voice (e.g., "sweetening") are used to supply dialogue, singing, chanting, or business where living Actors might be employed, unless the Producer shall have first obtained the written consent and permission of Equity,

78

A-206

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

which will not be unreasonably withheld. Should Equity deny the use of such recordings and if Producer believes that such denial is unreasonable, the Producer may file for Expeditious Arbitration in accordance with Rule 4(C). Provided that Equity gives its consent, the Actor will be compensated for participating in such recordings as follows:

(A) **Ensemble Recordings.** An Actor engaged to record material which is ensemble in nature (i.e., unrecognizable) for use in the production may do so provided that Actor is originally contracted for the duty or contracted by rider to participate in such recording and further provided that the Actor is compensated upon leaving the production at no less than one week's minimum salary if the recording is used in the production after Actor's termination provided, however, that an Actor who is unjustly terminated, per Rule 63(D), receives not less than either two weeks' contractual salary as a one-time payment or one week's contractual salary for each 26 weeks' use of the recording, at the Producer's option.

(B) **Individual or Duet Recordings.** An Actor engaged to record material which is individual in nature (i.e., recognizable) for use in the production may do so provided that Actor is originally contracted for the duty or contracted by rider to participate in such recording and further provided that Actor is compensated upon leaving the production at no less than two weeks' contractual salary for each 26 weeks' use of the recording. An Actor engaged solely for a recording who is not engaged to otherwise perform in the production will be signed to a contract and compensated at no less than two weeks' minimum salary for each 26 weeks' use of the recording.

(C) Compensation stipulated herein is for use of said recording(s) in the original production only. Actor will be compensated for use of any such recording(s) in any other production at not less than the minimum terms and conditions stated in the appropriate contract.

## 52. REHEARSALS

(A) **Beginning of.** Rehearsals begin with the date when the Actor is first called. If the Producer chooses to start with a reading to or by the Company or a part thereof, said reading is a part of and shall begin the rehearsal period. If the Producer wishes to employ an Actor for such a reading and the Actor's contracted rehearsal period has not yet commenced, the Producer may offer the Actor the opportunity to participate in the reading provided the Actor is paid not less than two-sixths of minimum rehearsal salary and the Actor's participation is strictly voluntary. It is expressly understood that the Actor's participation in the reading may not be a condition of employment. (For requirement of Stage Managers at rehearsals see Rule 62, STAGE MANAGERS.)

(B) **Rehearsals Continuous.** It is agreed that rehearsals shall be continuous from the date of the first rehearsal to the date of the first public performance of the play as stated on the face of the Contract of Employment.

**(C) Rehearsal Salary, Payment Of**

(1) Beginning with the first day of rehearsal the Producer agrees to pay the Actor rehearsal salary as set forth in Rule 57(A), for a period of up to eight weeks for Principal Actors and Chorus in dramatic productions; up to nine weeks for Principal Actors in musical productions and revues; and up to 10

79

A-207

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

weeks for Chorus in musical productions and revues. For partial weeks, one-sixth of weekly rehearsal salary shall be paid for each day of rehearsal or part thereof except that the last seven days of any rehearsal period (See Rule 55(B)(1)(c)) shall be at the rate of one-seventh for each day or part thereof.

(2) An Actor joining the tour after the first public performance may give no more than four weeks' rehearsal at rehearsal salary except that Swings may give no more than three weeks' rehearsal at rehearsal salary and Understudies no more than two weeks' rehearsal at rehearsal salary. Such rehearsal period shall be deemed to begin on the date the Actor commences rehearsals or on the date of the Actor's arrival out-of-town to be available for rehearsals, whichever is earlier.

(3) In the event that an Actor who has previously performed or understudied a role is on leave from a production for any reason for a period of four (4) consecutive weeks or more, and upon return the appropriate members of the production's creative team (e.g., Director, Choreographer, Dance Captain, and/or Stage Manager) after either a review rehearsal or the Actor's first performance, determine that such Actor requires rehearsals in order adequately to perform Actor's role, then the production shall be permitted to place Actor in rehearsal for up to one week, payable at rehearsal salary, inclusive of the review rehearsal.

(4) Rehearsal salaries are to be paid before noon on the day before the last banking day of the week, but no later than Thursday. (See Rule 57(I) for option to shift payroll week.)

(5) During any week in which there are rehearsals and performances and in which performance salary is paid pro-rata, the Actor shall be paid no less than one week's applicable minimum salary.

(6) Compensation subsequent to permitted rehearsal periods shall be at not less than full contractual salary.

(D) **Rehearsal Hours, Breaks and Overtime.** (See also Rule 55, REST PERIODS AND DAYS OFF.)

**(1) Rehearsal Hours**

(a) **Prior to First Paid Public Performance.** Except as provided in (b) below, rehearsal hours shall not exceed seven out of eight and one-half consecutive hours per day (including breaks required by Rule 52(D)(2)(a) below). However, Producer may elect, at Producer's sole option, to rehearse eight out of nine and one-half consecutive hours per day in lieu of the seven out of eight and one-half hour schedule provided the Actors receive two days off in each week. These days off need not be consecutive. If the Producer elects a five-day schedule, pro-rated calculations shall be made in fifths for partial weeks. The Producer will be entitled to switch schedules only twice during the permitted rehearsal period. The Actors must receive at least one week's notice for any such change in schedule.

(b) **Final Seven Days of Rehearsal Prior to First Paid Public Performance in the Theater.** During the final seven days of rehearsal

80

A-208

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

prior to the day of the first paid public performance, tech/dress rehearsals on stage shall not exceed 10 out of 12 consecutive hours per day (including breaks required by Rule 52(D)(2)(a) below). The Producer may elect to have all or a portion of the cast rehearse part of the day (not to exceed seven out of eight and one half hours) in a rehearsal studio. On the day of the first paid public performance, rehearsals and performance may exceed 10 hours and may encompass more than 12 consecutive hours so long as applicable rest period and breaks requirements are met. On a day of travel, rehearsal and travel time combined shall not exceed 10 hours excluding rest periods.

(c) **After First Paid Public Performance on Tour.** Rehearsals after first paid public performance on Tour shall be limited to eight hours weekly, except that Actors signed to understudy may be called to rehearse their own understudy assignments for an additional four hours per week. Rehearsals shall be limited to two hours on two-performance days; however, absent special circumstances, there shall be no rehearsal between the matinee and evening performances except for understudy rehearsal and/or emergency cast replacements. Notwithstanding the above, during the first engagement of a tour, Actors may be required to rehearse and/or perform seven hours out of an eight and one-half hour day for a maximum of two weeks beginning with the first paid public performance and ending at the Official Opening.

(d) Overtime shall be paid for all rehearsal hours in excess of those permitted for Actors, Stage Managers, and Dance Captains, however, the time such individuals rehearse during performances shall not be charged against regular rehearsal hours. Further, paid rehearsal calls on a day after the day off, as well as any other paid rehearsal hours, shall not be charged against regular rehearsal hours.

(e) **Rehearsals after Performance.** Rehearsals shall not be scheduled after an evening performance. However, notes may be given for a period not to exceed one hour after curtain, such time to be chargeable as rehearsal hours.

(f) Rehearsal hours for each Actor shall be computed from the time of rehearsal call for that Actor. If an Actor appears at a rehearsal call as scheduled, and is released from the call before the full length of time for which the Actor was scheduled, the Actor shall receive credit for all hours for which they were scheduled to attend the call.

(g) Absent special circumstances, rehearsals may be called only upon 24 hours' written notice.

(h) **Rehearsals Substituted for Performance.** After the first paid public performance, rehearsals may be substituted for performance during any week of a performance period in which 32 (or 48, when applicable) or fewer performances are given without additional compensation provided that all rest period and days off requirements have been met.

(i) The length of each such rehearsal shall be limited to the running time of the performance plus half-hour which it replaces and shall be in

81

A-209

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

addition to all rehearsal otherwise permitted and shall be without additional compensation;

(ii) Proper rest breaks per Rule 52(D)(2) must be given; and,

(iii) In no event may the rehearsal day be longer than eight hours, exclusive of rest periods required after five hours of work.

(i) For rehearsal on holidays, see Rule 45(C)(3).

**(2) Breaks**

(a) There shall be a recess of one and one-half hours after a period of not more than five consecutive hours of rehearsal and/or performance combined. In addition, there shall be a break of five minutes after each 55 minutes of rehearsal or 10 minutes after each 80 minutes of rehearsal for each Actor. All Actors rehearsing aerial stunts shall be on the ground and unclipped prior to the commencement of their breaks. These break requirements are also applicable during technical rehearsals except for the last three days prior to the first preview. However, during that period, Producer shall use best efforts to comply with these requirements. (See also Rule 55, REST PERIODS AND DAYS OFF.)

(b) Where rehearsal is consecutive with the half-hour call, the time from the call for rehearsal and the end of the performance shall not exceed five consecutive hours. However, if the rehearsal is on stage, the duration of the call may be extended to not more than five and one-half consecutive hours. All other breaks specified in (a) above shall be observed.

(3) **Overtime.** Should the Actor rehearse more than the hours stipulated in this Rule, the Producer shall pay the applicable rehearsal overtime rates for each hour or any part thereof for each instance of such overtime rehearsal.

| Category 1 | Category 2 | Category 3 | Category 4 | Category 5 | Category 6 |
|---|---|---|---|---|---|
| $30.50 | $26.30 | $24.20 | $22.60 | $20.50 | $19.00 |

Payment for such overtime shall be made no later than the week following the week in which such overtime occurred. The Stage Managers in attendance shall be entitled to overtime payment whenever an Actor receives overtime payment.

(E) **Attendance at Rehearsal.** During engagements of one month or more, the Actor, if Actor has a firm commitment of other employment on a given day under contract within the jurisdiction of the 4 A's, shall not be required to attend a rehearsal on that day, provided that employment must be within the same city as the engagement. Upon request, Actor shall identify said contract employer in the 4 A's jurisdiction.

(F) **Absence Due to Illness.** When the Actor shall have been absent from rehearsal for seven days by reason of illness, the Producer may terminate Actor's contract at the end of said seven days. Equity may, in its discretion, upon appeal by the Producer, reduce this period.

(G) **Rehearsals Lost.** If a Producer is prevented from giving rehearsals because of fire, accident, riot, strike, illness of more than seven consecutive days, or

82

A-210

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

death of star or prominent member of the cast, Act of God or act of public enemy which could not reasonably be anticipated or prevented, then the time so lost shall not be counted as part of the rehearsal period herein provided. During such a lay-off, the Actor shall be provided hotel and Per Diem set forth in Rule 29, HOUSING AND PER DIEM, for a maximum period of two weeks. Should the lay-off continue, the Producer shall pay one-half contractual salary for two further weeks at the end of which time the Actor may terminate Actor's contract, without payment or penalty, unless the Producer continues the services of the Actor by paying full salary therefor.

(H) **Rehearsals Discontinued or Play Abandoned.** If a play for which the Actor is engaged is discontinued or postponed, or if a production is abandoned before or during rehearsals, the Producer shall pay the Actor not less than two weeks' contractual salary plus all rehearsal salary due.

**(I) Rehearsal Process in Newark, Purchase or Stamford**

(1) If company rehearsals before the first paid public performance are held in Newark, New Jersey; Purchase, New York; or Stamford, Connecticut; housing near the rehearsal venue and per diem can be provided, but will not be required, provided that:

(a) Actors will be provided with bus or van transportation from Shubert Alley to the rehearsal. Reasonable additional pick-up points along the most direct route to the rehearsal will be added for the Actors' convenience; and

(b) Travel time will be part of allowed rehearsal hours. Rehearsal time shall commence and will be computed from the time the bus or van is scheduled to depart from Shubert Alley and will end when the bus or van returns to Shubert Alley; and

(c) When rehearsals are in Purchase, New York, the Producer must provide a meal. If the Actor makes a request in advance for a hot meal or a cold meal and, if practicable, the Producer shall accommodate Actor's request.

(2) For those Actors whose Place of Residence is more than 70 miles from New York City, Rule 29(F)(4)and this provision shall apply unless Housing and Per Diem are provided near the rehearsal venue (in which case this provision shall not apply).

**(J) Special Additional Provisions**

(1) The Producer shall provide piano rehearsal for Understudies and replacements (both Principals and Chorus). Replacements shall be afforded at least eight hours of rehearsal with piano. If not conducted on stage, rehearsals shall be conducted in an area or room suitable for rehearsals.

(2) Whenever a troupe or unit rehearsed by a troupe master, subcontractor, or by anyone other than the Producer or any of Producer's employees is used in a production, chorus members of such unit shall be deemed to have rehearsed at least as long as the time elapsing from the first general rehearsal call for the balance of the Chorus to the opening of the production and shall be paid Rehearsal or Contractual Salary accordingly by the Producer.

83

Short Engagement Touring Agreement 2019-2020

(3) The Producer shall use best efforts to conduct understudy rehearsals at least every four weeks.

(K) Adequate technical rehearsal, as shall be deemed necessary, will be provided for all Understudies, Swings and replacements before they are required to perform in front of an audience.  Such technical rehearsal shall include, but not be limited to, rehearsal on the set with such props, lighting effects, mechanical or pyrotechnical devices, weapons, costumes and other cast members as shall be deemed necessary to insure the safety of replacements, Understudies, Swings and the other performing members of the cast.

**(L) Absences and Latenesses**

(1) In the event the Actor is absent from rehearsals without good and sufficient cause, the Actor's salary will be reduced by the applicable portion of the Actor's salary for the time missed.  Should the Actor be absent for rehearsals without good and sufficient cause on more than two occasions within 12 months, in addition to having their salary reduced by the applicable portion of their salary for the time missed, the Actor will lose a Personal Day as defined in Rule 30(H).  The dollar amount of the reduction shall be based on the Actor's rehearsal or contractual salary, as applicable, (up to triple the applicable weekly minimum) and the total number of working hours contracted for the Actor in the week.  The reduction will be assessed in no less than quarter hour increments.

(2) If an Actor is up to 30 minutes late for rehearsal without good and sufficient cause on more than two occasions, or the Actor is more than 30 minutes late without good and sufficient cause to any rehearsal, the Actor's salary will be reduced by the applicable portion of the Actor's salary for the time missed. The above calculation shall be used in determining this amount.

(3) Where lateness is at issue, the Producer may determine, based on the rehearsal requirements of the day, whether the Actor shall be permitted to commence rehearsing immediately, at the next quarter hour, or at the start of the next hour.  If an Actor is more than one hour late to the Actor's rehearsal call, the Producer may determine whether the Actor shall be dismissed for the entire call.  In that event, the Actor's salary will be reduced by the applicable portion of the Actor's salary for the Actor's entire rehearsal call.

(4) In the event a Producer determines that an Actor's salary should be reduced, the Actor must receive written notification, with a copy to Equity, within two business days of the lateness or absence.  The Actor may appeal the determination in writing to the Producer, with a copy to Equity, within two business days of receipt of Producer's notice.  If the matter cannot be satisfactorily resolved informally among the Actor, the Producer, the League and Equity, the matter will be resolved in accordance with the procedures set forth in Rule 4, ARBITRATION AND GRIEVANCE.

(5) If the Actor is absent and/pr late and subject to salary reduction pursuant to Rule 52(L)(1) and (2), respectively, after the fourth occurrence of salary reduction within 12 months under this provision, the Actor may be subject to termination for any subsequent unauthorized absence or lateness from rehearsal.  Absences and lateness shall count collectively for the purposes of this Rule 52(L)(5).

84

A-212

Short Engagement Touring Agreement 2019-2020

(6) It is understood that for purposes of calculating the contractual work week in paragraph (1) above, performances, including half-hour, will be deemed to be three hours.  Notwithstanding the above, however, missed performances shall still be calculated in eighths.  In no event may the Actor's salary be reduced by more than one week's contractual salary in any one week.

(7) A daily record of latenesses and absences, excused or unexcused, shall be part of the Stage Manager's records.  An Actor's daily record will be available to the Actor and Equity upon request.

(8) A half-hour Equity meeting between the cast and an Equity representative will be scheduled during the rehearsal period to discuss this rule.  The entire cast will be required to attend and the meeting will be considered a part of the permitted rehearsal hours for the week.

(9) IT IS THE INTENT OF THIS RULE THAT IT SHALL BE APPLIED UNIFORMLY.

(M) The Company Manager shall be accessible at pre-tour rehearsals.  (See Rule 66(E) for additional provisions relating to Company Managers.)

## 53. REOPENING OF A PLAY

A play, once closed, shall not be reopened for rehearsal or performance within six weeks of its closing under any Equity contract without the consent of Equity except as provided in Rule 46, PERFORMANCES LOST.  Such consent, upon equitable terms and conditions, shall not be unreasonably withheld.

## 54. REPLACEMENT OF ACTOR

(A) Unless Equity shall otherwise order, an Actor may not be required to alternate with an Understudy or successor and if replaced by either, Actor may not thereafter be required (unless Equity otherwise orders) to act again in the role or to report at the theatre for that purpose.  Payments, however, shall continue to be made to Actor according to the terms of Actor's individual employment contract except that the Producer shall receive credit for all monies earned by the Actor under another Equity contract during the balance of the term of Actor's original contract.

(1) If the Actor is late for "half-hour" or appears at the theatre unable to perform due to intoxication or similar cause, the Producer, subject to the provisions of Rule 4, ARBITRATION AND GRIEVANCE, may determine that the Actor should not perform.  If the Actor is temporarily replaced for a single performance for reasons set forth herein, the above provisions shall not apply and the Actor may be required to perform thereafter, provided the Producer notifies Equity in writing of such action and the reasons therefor within 24 hours.  Should such temporary replacement be determined to be without just cause by the Grievance Committee, by an arbitrator or by other mutually agreeable means, the Actor shall be paid full salary for any performance not played as a result of the Producer's action and Actor shall continue to perform under Actor's original contract.

(2) Should the Producer dismiss an Actor for inability to perform due to intoxication or similar cause and so notify the Actor and Equity in writing of such action and the reasons therefor within 24 hours, the provisions of

85

A-213

Short Engagement Touring Agreement 2019-2020

Paragraph (A) above shall not apply. In such event, Equity may institute Expeditious Grievance and Expeditious Arbitration procedures in accordance with Rule 4(A)(1), (C), (E) and (F). If it should be determined by the Grievance Committee, by the Arbitrator, or by other mutually agreeable means that the dismissal was without just cause, the Actor shall be paid full salary for any performances not played as a result of the Producer's action and shall be required to immediately resume Actor's performances when notified to do so by the Producer. Payment for the missed performances must be made prior to the Actor resuming performances under Actor's contract. Pending the determination, the Actor need not report to the theatre.

(B) Subject to the terms of Rule 65(D), should the Term Contract of an Actor initially engaged for the production terminate, according to its terms, within five months of the opening date specified in said contract, the Producer may not reengage the Actor for the same part at a lesser salary than the highest salary in the original contract without the written consent of Equity.

(C) **Role or Part Cut Out.** If the role of an Actor signed to a Term Contract is cut out not later than two weeks after the first paid public performance, the Producer may terminate said contract by the payment of a sum equal to two weeks' contractual salary to the Actor, in addition to all sums due for services rendered, plus eight additional weeks' salary to the extent that the play runs more than two weeks after the Actor's part is cut out or terminated as herein provided. In no event shall the Actor receive less than the guarantee period specified in the Actor's contract of employment.

If such Actor is specifically contracted to play two or more parts and a part is withdrawn or cut out, Actor, immediately upon giving notice, may terminate Actor's contract without penalty.

## 55. REST PERIODS AND DAYS OFF

(A) **Rest Periods** (See also Rule 52(D)(2).)

(1) Except on the final day before the first paid public performance, there shall be a rest period of not less than 12 hours between the end of employment on one day and the beginning of employment on the next day, except for a travel call on the next day, in which case the rest period shall be no less than 10 hours. The rest period preceding the call on the day of the first paid public performance shall be not less than nine hours. (See Rule 62(J) for Stage Managers.)

Time traveled after performance from the theatre to the first hotel in excess of 20 minutes shall be added to the overnight rest period.

(2) If travel the following day will be by bus or other over the road transport, eastward across a time zone boundary, then the rest period between the final curtain (or termination of travel) on the previous day and the bus call on the next day may be reduced one hour without penalty so that the bus call on the following day may be one hour earlier than would otherwise be permitted. Total travel hour limitations and required breaks must be observed.

**(3) Rest Period Upon Arrival in City**

There shall be either:

86

A-214

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(a) A two-hour rest period in any city after the Actor arrives at the hotel or other accommodation prior to the call at the theater or the bus call to the theater. If the rest period is less than two hours, the Producer shall provide the Actor with a meal at the Producer's expense.

(i) If the Actor makes a request in advance for a hot meal or for a cold meal, and if practicable, the Producer shall accommodate Actor's request.

(ii) In the event that no meal is served, the Actor shall be paid $15.00 in lieu thereof. However, the Producer must provide a meal when the Actor is unable to arrange for one;

or

(b) The Producer may take the Actors directly to the theater, where the Producer shall provide a meal at the theater at no cost to the Actor. In the event that the Actors are transported directly to the theater, the Producer shall be responsible for securing the Actor's baggage until the Actor's arrival at the hotel. In that event, the bus shall transport them to their hotels after the performance or rehearsal as the case may be, and shall leave the theatre when all Actors are ready to be transported to the hotels. The time of the bus's departure should not be later than 30 minutes after the final curtain. Should the Producer delay the departure of the bus from the theatre beyond 30 minutes, the actual departure time of the bus shall mark the beginning of the time for the required rest period. Any delay caused by the Actor(s) shall not impact the calculation of the required rest period, and the rest period shall commence at such time the bus was scheduled to depart.

In any event, the rest period upon arrival in town shall be not less than one hour or there must be a rest period of one hour at the theatre between arrival and the half hour call. If the rest period is less than one hour, each Actor shall receive a penalty payment of one hour of double the Category rehearsal overtime rate.

**(B) Days Off**

**(1) Days Off During Rehearsal**

(a) The Actor shall be entitled to one day off in each calendar week of the rehearsal period at rehearsal salary. (See Rule 52(D)(1) which requires two days off each week if Producer elects to rehearse eight out of nine and one-half hours per day each week.)

(b) In the first week of rehearsal, no day off will be required if rehearsals begin on or after Thursday. If rehearsals begin prior to Thursday, a day off in that week will be required.

(c) In the week of first paid public performance, no day off will be required if the first paid public performance is on or after Tuesday.

(d) The tech period may not be followed by more than 12 consecutive days without a day off.

87

A-215

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

**(2) Days Off During Performance**

(a) The Producer agrees that after the first paid public performance there will be one day off in each week free of all performances and rehearsals. Such days off in each week shall be no further apart than 12 consecutive performance days. Travel to the next playing date, if necessary, will not constitute a breach of this paragraph requiring extra payment. For each performance beyond 12 consecutive performance days without a day off, the Actor shall be paid an additional one-eighth weekly contractual salary.

**(b)** In addition there shall be two 24-hour rest periods (free from rehearsal, performance and travel) every 28 days commencing from the first paid public performance of the tour. This shall be defined as any consecutive 24 hours without a call for travel, rehearsal or performance. These two days of 24-hour rest shall not be in the same week.

(i) For any failure to provide such 24-hour rest period due to unforeseen circumstances or circumstances beyond the Producer's control, the Actors shall receive one hour of travel overtime for each hour so invaded, up to a cap of $50 per occurrence.

(ii) Where such travel delays or other unforeseen circumstances cause invasion of a 24-hour rest period, Producer may change the time of the next day's call to provide the Actor with such rest period.

(iii) If the Producer plans travel that results in less than a 24-hour rest period, such that the Producer fails to provide either of the two required 24-hour rest periods in a 28 day period,

(a) For the first such occurrence in a 28 day period, Actors shall receive $50

(b) For the second such occurrence in the same 28 day period, Actors shall receive $150

(iv) For each week of lay-off in any 28-day period, one fewer 24-hour rest period need be provided the Actors (without regard as to whether any payment is due for such lay-off under Rule 36).

(3) After the first paid public performance, the Company may be called to rehearse on the day following the scheduled day off for two hours prior to the first performance of an engagement of less than two weeks. In addition, during an engagement of two weeks or more, the Company may be called to rehearse for up to four hours on the day following the scheduled day off prior to the Official Opening of that engagement. Such rehearsal time shall be without additional compensation but shall be charged against regular rehearsal hours. Rehearsal in excess of these hours shall be paid at one and one-half times the overtime rate for each hour or part thereof, except as provided in (4) below.

(4) A Stage Manager and/or a Dance Captain may be called to audition or rehearse a replacement on the day following their designated day off provided they shall be paid at the rehearsal overtime rate for a minimum call of four hours.

A-216

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 56. SAFE AND SANITARY PLACES OF EMPLOYMENT

(A) The Producer agrees to provide the Actor with safe and sanitary places of employment. The League and Equity agree to meet regularly and share information and to try to address issues in theaters as they arise.

(1) The Producer shall use best efforts to ensure that all facilities to which its productions tour meet the standards outlined herein. All stages shall be clean and properly heated. The Producer shall use best efforts to provide air-conditioning when necessary to insure comfortable healthful temperatures at all times.

(2) Treads on backstage stairways shall be maintained in a safe condition. Stairways shall be provided with adequate lighting and adequate hand-rail supports.

(3) The Producer shall exercise best efforts to keep alleyways leading to stage doors of theatres accessible, properly lighted, free of debris and protected from trash or litter from overhead.

(4) Producer shall post such notices as are required by the regulations of the Occupational Safety and Health Administration.

### (B) Dressing Rooms

(1) Assigned dressing rooms shall be maintained for the exclusive use of the Actors. Where practicable, curtained partitions should be avoided, and shall not be deemed adequate separation to provide exclusive use of the space with respect to other backstage activities. Adequate table space for each Actor shall be allocated to all members of the Company, including Understudies and Swings, for make-up and dressing purposes.

(2) All dressing rooms shall be properly heated and shall have adequate lights, mirrors, shelves and wardrobe hooks for Actor's make-up and dressing equipment.

(a) Use of fluorescent lighting for make-up purposes is prohibited unless the fluorescent lighting is specifically warranted by the manufacturer to be for make-up purposes.

(b) All dressing rooms shall be maintained in a clean and sanitary condition and painted and maintained as necessary. Peeling paint and loose plaster shall be repaired. Floors shall be washed or vacuumed at least once each week and dressing rooms cleaned at least once each working day.

(c) Ventilation of dressing rooms and of all change rooms provided in basement areas, shall meet the standards set by municipal health codes.

(d) If an Actor with a disability is employed, reasonable accommodations, as defined by the ADA, shall be provided.

(3) Where more than three costume changes are required during a performance, a change room shall be maintained within two flights of the stage if space is available. Where adequate or proper space is alleged to be unavailable, such fact must be reported to the Producer and Equity by the Stage Manager and verified by a Deputy. Where Actors are required to make costume changes in areas other than dressing rooms, Producer shall use

89

A-217

Short Engagement Touring Agreement 2019-2020

best efforts to maintain privacy for each gender in separate change areas.

(4) Separate dressing rooms for male and female Actors will be provided.

(5) In theatres where smoking is permitted by law, assignment of dressing room space to Principals shall be made, in part, on the basis of each Actor's smoking habits. Where possible and where space limitations permit, a non-smoking Principal Actor will not be assigned a dressing room in which smoking is permitted. Where possible, Chorus dressing room assignments will be made on the same basis.

**(C) Lavatory and Toilet Facilities**

(1) Each dressing room shall contain at least one washstand which shall provide hot and cold running water for each six Actors assigned therein, within the reasonable requirements of dressing room assignments.  Sink stoppers and paper towels must be provided.

(2) Toilet facilities, sinks and showers shall be thoroughly cleaned at least once each day and shall be kept clean, sanitary and maintained in good working order at all times. Toilet paper must be provided.  In New York City theatres, these facilities shall be on each dressing room floor except that where existing facilities are currently provided on alternate floors, additional facilities will be installed when reasonably feasible.  In all other theatres they shall be on each dressing room floor where reasonably feasible.

(3) All theatres that house musical productions shall provide separate showers for men and women within a reasonable distance from or within the dressing rooms.

(D) **Cots**.  The Producer shall provide at least two cots for every 10 cast members at the theatre and at all places of rehearsal.

**(E) Rehearsal and Performance Surfaces**

(1) Actors shall not be permitted to rehearse dances or to perform on concrete or marble floors or on wood or any other substance which does not provide adequate resilience.

(2) Where a portable stage is used, platforms must be securely fastened and the stage completely covered by a single deck of such material as wood or masonite.  The edges of all decks must be clearly visible or, if not, there must be fastened guard rails in order to preclude the possibility of injury.  Pits not in use shall be completely covered by a non-flexible material.

(F) **First-Aid Kit.**  First-aid kits stocked with adequate supplies shall be available and easily accessible at all times whenever the Actor is required to rehearse, dress, or perform.

(G) **Drinking Water.**  Ample, pure, cool drinking water shall be provided wherever the Actor is required to rehearse or perform.

**(H) Inherently Dangerous Conditions Prohibited**

(1) No Actor shall be required to perform any feat or act which places Actor in imminent danger or is inherently dangerous, nor shall any Actor be required to perform in a costume or upon a set which is inherently dangerous.  It is not the intent of Equity to interfere with proper artistic judgments of the Producer but only to protect the Actor from injury which may jeopardize or terminate a

90

A-218

Short Engagement Touring Agreement 2019-2020

professional career. The Producer shall advise Equity as soon as possible when, in Producer's judgment, there is a potentially dangerous situation. If Equity deems the situation to be one which should be prohibited by this section and the Producer does not agree, the matter shall be submitted for prompt consideration by an industry committee composed of the Executive Director of the Broadway League, or their designee, representing the League and the Executive Director of Equity, or their designee, representing Equity. If the two cannot agree, the matter shall promptly be submitted directly to arbitration.

(2) **Smoke, Haze and Pyrotechnics.** Producer may not use any stage smoke or haze not already approved by Equity and the League. Adequate ventilation and exhaust equipment must be operating and in working order when smoke or haze is used. In addition, the parties agree to implement and monitor the guidelines identified in the Environ/Mt. Sinai study on theatrical smoke, haze and pyrotechnics. All productions shall comply with said guidelines either by adhering to the quantifiable testing limits set forth in the study or by application of the protocol guidelines.

(a) **Notice Requirements.** Prior to the first use, the Producer will send written notification to Equity identifying the specific theatrical smoke, haze and/or pyrotechnic effect products and how they will be used in accordance with the Study.

(b) Smoke and haze machines shall be located so as to minimize Actors' exposure to the concentrated aerosol as it first exits the machine.

(c) The quantity and frequency of use of the various Equity/League approved smoke and haze during a performance must comply with the limits set by the Equity/League Smoke and Haze Study.

(d) An Equity/League smoke and haze committee shall review the use of all stage fogs whenever necessary.

(e) Juvenile Actors' exposure to smoke and haze shall be minimized in accordance with Paragraph (b) above.

(f) Only small amounts of refined, white and additive-free mineral oils may be used.

(g) Actor shall be advised by contract rider if smoke or haze will be utilized in the production.

(h) The foregoing provisions shall not apply to any form of carbon dioxide (e.g., dry ice) or liquid nitrogen. Smoke and haze composed entirely of either substance shall be deemed pre-approved. Any disagreement under Paragraph (2), Smoke, Haze and Pyrotechnics, shall be resolved by expedited arbitration pursuant to Rule 4(C).

(3) **Firearms.** Whenever firearms are used in a production, there shall be a safety demonstration for the entire company, prior to the first paid public performance, or use of firearms on stage, whichever occurs first, and such demonstrations shall be conducted by a qualified individual. Thereafter, safety demonstrations and/or instructions will be required for all affected replacement Actors as well as Swings and Understudies, before their first paid public performance. Brush-up safety demonstrations and/or instructions

91

A-219

Short Engagement Touring Agreement 2019-2020

shall be required at least once each year. Any and all modifications to firearms shall be done by a licensed gunsmith.

(4) **Photography and Recording.** Photography and the use of other recording devices during a performance are prohibited except as expressly provided herein. The Producer shall post the international symbol prohibiting photography and recording prominently in the lobby. In addition, a printed announcement prohibiting photography and all other recording shall be included on either the cast or synopsis page of the Playbill or program. If a chronic pattern of photography or other recording develops, an announcement identifying its prohibition shall be made prior to each performance until the problem is corrected.

(I) **Stage Fighting/Stunts.** The ensuing regulations shall be followed whenever a production requires Actor(s) to engage in stage fighting and/or stunts.

(1) The Producer must notify the Actor by contract rider prior to the rehearsal or performance of all stage fights.

(2) When a Stunt Coordinator is hired to teach a stunt, the Producer must notify the Actor of the stunt by contract rider and Equity prior to the rehearsal or performance of the stunt.

(3) All stage fights will be staged with on-site consultation by a qualified professional (i.e., one who has expertise in first aid, stage combat and, where appropriate, fencing and/or martial arts.)

(4) Equipment used in the performance of any stage fight and/or stunt shall be checked before it is first used in each performance or rehearsal.

(5) A Fight Captain shall be assigned from the company and so designated by rider to the Actor's contract. The Fight Captain shall be paid not less than $56.25 per week in addition to weekly contractual salary. The Fight Captain must be selected no later than the end of the first week of fight rehearsals and be paid the Fight Captain increment from the first day of fight rehearsals.

(6) All Actors who participate in a fight shall run through the routine before each performance. Any exception to this rule shall be at the express discretion of the Fight Captain. Such run-throughs shall not be deducted from regular rehearsal hours.

(7) Except in the case of emergency, performing members of the company shall rehearse fights and/or stunts with Understudies, Swings and replacements during regular rehearsal hours.

(8) First aid information and equipment will be made available to the Fight Captain.

(9) The Fight Director, Choreographer, Stunt Coordinator and/or Fight Captain shall consult with artistic personnel appropriate under the circumstances to reasonably protect the Actors from injury.

(J) **Raked Stage.** Prior to the construction of any raked stage where the incline will be greater than one-half of one inch per foot, the Producer shall promptly notify Equity in writing of such plans and provide such information as Equity may reasonably request. It is understood that when a Producer is utilizing a set from a prior production, said notice may not be possible and the Producer agrees to notify Equity as soon as a determination is made that such set will be utilized.

92

Short Engagement Touring Agreement 2019-2020

When a raked stage is used, a qualified instructor will give instructions to the cast, as to how to perform on the rake in order to avoid the risk of injury. These instructions shall take place prior to any rehearsal or performance on the rake. Thereafter, brush-up instructions will be provided at least once each year. Instructions will also be provided for all replacement actors, as well as Swings and Understudies, before their first rehearsal on the rake.

(K) The safe and sanitary provisions set forth above are intended to bind only the Producer and Theatre Owners who are members of the League. With respect to other theatre owners, however, the League and Equity agree that all booking contracts shall contain a mandatory clause stipulating that the theatre must comply with the standards set forth above.

(L) **Actor's Responsibility.** It is the Actor's obligation to respect the physical property of the theatre. It is agreed that the Actor shall be responsible for any damage to the theatre willfully caused by Actor if the Producer is held responsible to the owner of the theatre for such damage.

(M)**Inspection and Compliance.** Equity shall have the right at reasonable times to inspect all theatres at which Actors are employed to determine whether the theatres are complying with this rule. If alleged violations are found, Equity shall notify the theatre owner and the League immediately and a representative appointed by the League shall have an opportunity to inspect the theater.

(1) If Equity and the League agree that a violation exists, they shall notify the theatre owner that unless the violation is corrected or that satisfactory assurances are given that it will be corrected promptly, the theatre shall be certified as unauthorized for rehearsal and/or performance. If the League fails to avail itself of its right of inspection within 48 hours of receipt of notification, then Equity alone may so inform the theatre owner.

(2) If Equity and the League do not agree, then the matter shall be submitted to arbitration in accordance with Rule 4 and the Arbitrator may, in their discretion, suspend performances until the theatre complies with this rule.

(N) Equity and the League agree it is their mutual intent that the Theatre be a working environment free of hazardous and toxic materials. To this end the parties commit to meet jointly with such experts as are necessary to identify materials and procedures which may be found in the theatrical environment which are hazardous, toxic, or otherwise unsafe and to seek means by which to eliminate them from the Professional Theatre.

(O)**Record Keeping for Illness and Injuries.** A standard protocol will be established for the reporting of all injuries and illnesses.

(P) **Health and Safety Protocol.** The parties agree to implement an innovative safety protocol utilizing the services of a health care practitioner group mutually selected by the parties to provide guidance and assistance to the Producer, the creative team, Equity and the Actors. The mutual goal is to reduce the risk of injury to the Actor.

(Q)For any show with extensive choreography and/or a raked stage, access to physical therapy will be provided to the Equity company either at the theater or at a provider's office at least once per week, for a period of no less than three hours of available treatment time. Requests for physical therapy in other shows will not

A-221

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

be unreasonably denied. In locations where physical therapy is not available, the Producer will discuss with Equity what options will be reasonably available to assist the Actors.

## 57. SALARIES

### (A) Minimum Salary for Performance and Rehearsal

(1) Rehearsal salary is the minimum performance salary unless a higher salary is specifically negotiated. (See Rule 52(I) for rehearsals outside New York City.)

**(2) Performance Salary**

Effective Date:

| Category/Position Minimum Weekly Salary | | 4/29/2019 | 4/27/2020 |
|---|---|---|---|
| **1** | Actor | $1,042 | $1,073 |
| | SM | $1,712 | $1,763 |
| | 1st ASM | $1,352 | $1,393 |
| | 2nd ASM | $1,167 | $1,202 |
| **2** | Actor | $903 | $930 |
| | SM | $1,482 | $1,526 |
| | 1st ASM | $1,173 | $1,208 |
| | 2nd ASM | $1,017 | $1,048 |
| **3** | Actor | $834 | $859 |
| | SM | $1,370 | $1,411 |
| | 1st ASM | $1,083 | $1,115 |
| | 2nd ASM | $939 | $967 |
| **4** | Actor | $770 | $793 |
| | SM | $1,282 | $1,320 |
| | 1st ASM | $1,027 | $1,058 |
| | 2nd ASM | $859 | $885 |
| **5** | Actor | $ 706 | $ 727 |
| | SM | $ 1,220 | $ 1,257 |
| | 1st ASM | $ 962 | $ 991 |
| | 2nd ASM | $ 793 | $ 817 |
| **6** | Actor | $ 643 | $ 662 |
| | SM | $ 1,155 | $ 1,190 |
| | 1st ASM | $ 897 | $ 924 |
| | 2nd ASM | $ 729 | $ 751 |

(3) "Applicable minimum salary" under this Agreement means the minimum weekly salary for the applicable position in the applicable Category.

(4) **Recoupment.** Effective the week following recoupment, applicable minimum salaries will increase by 17%.

(5) Notwithstanding any individual contract of employment to the contrary, if Actor's weekly contractual salary on the effective date of the next scheduled salary increase as specified in (2) above is $250 or less above the Actor's

94

A-222

Short Engagement Touring Agreement 2019-2020

applicable minimum salary exclusive of all required increments, the Actor's salary will be increased by the dollar amount of the increase in minimum salary for the Actor's category as of that effective date.

(6) **Check Cashing on Tour.** Producer will make best efforts to make arrangements for Actors to cash paychecks for no charge.

(7) All Actors shall be given the option of direct deposit of paychecks and per diem checks to the bank of the Actor's choice at no cost to the Actor.

(B) **Second Assistant Stage Managers.** Should an actor be engaged to perform in addition the duties of a Second Assistant Stage Manager, the base salary to which all applicable increments are to be added shall be the minimum salary for a Second Assistant Stage Manager.

(C) **Extraordinary Risk Payments.** An Actor called upon to perform "extraordinary risk" shall receive not less than $15 per week above contractual salary, such payments to begin at the time of such assignment. All "extraordinary risks" must be identified by rider.

(1) "Extraordinary risks" are defined as performing acrobatic feats; suspension from trapezes, wires, or like contrivances; the use of or exposure to weapons, fire, pyrotechnic devices and the taking of dangerous leaps, falls, throws, catches, knee drops, or slides.

(2) An Actor shall also be deemed to be eligible for said additional compensation when the staging or choreography requires the Actor to execute dance movements which depart from the accepted techniques of movement and support as used in contemporary theatre dance, i.e., classical ballet, modern, modern jazz, or ethnic, or where an Actor in a musical dances on a raked stage.

(3) The initial determination as to the eligibility for said additional compensation may be made by Equity in each particular case. Should the Producer not concur in Equity's determination, a committee shall be appointed to see the production and to decide who is eligible for such additional compensation. Said committee shall consist of two representatives appointed by the Broadway League and two representatives appointed by Equity. No committee member shall have an interest in or be an employee of the production in question. In cases involving Actors who dance, all members of the committee shall be familiar with and have a knowledge of dance techniques and dance terminology as it relates to Broadway productions and shall be guided, but not be bound, by the standards previously agreed to by Equity and the League and on file with said organizations.

(4) A majority vote of the committee shall be final and binding on all parties. The committee's determination shall be made no later than the first public performance on tour. If the committee cannot reach a majority determination within said period, the dispute shall be referred to arbitration under the provisions of Rule 4.

(5) Performing on a raked stage in circumstances other than those listed in (1) or (2) above shall be deemed extraordinary risk but the Actor shall not be entitled to the $15 per week payment set forth above.

95

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(D) **Media Payment.** In accordance with Rule 37(A)(3) all Actors in musicals , except Actors earning in excess of $4,000/week, shall receive a Media Payment from the first day of rehearsal. When a Producer of a play has opted to use Rule 37, all Actors in such play, except those whose contractual salary exceeds $4,000/week, will receive a Media Payment from the first day of rehearsal. The weekly payment will be not less than 2% of appropriate category actor minimum salary. When a production recoups, the Media Payment will increase to the appropriate percentage of the post recoupment actor minimum salary for that production. A play that has not opted to use Rule 37 shall not make Media Payments.

(E) **Checks.** No check or draft, either of the Producer or a third party, given to or received by the Actor in payment of any sum due under Actor's contract of employment shall operate to minimize or affect Actor's claim for salary or other compensation under Actor's contract. When paid by check, the Actor must be issued a stub or other record of gross salary which clearly identifies itemized additions (including, but not limited to, overtime payments and Per Diem), itemized deductions (including, but not limited to, all Federal, state and local income taxes withheld and dues deductions) and net salary.

**(F) Contingent Compensation**

(1) Except as provided in (F)(2) below:

(a) No employment contract shall be entered into by the Producer or Actor where, in whole or in part, compensation is contingent upon receipts without the written consent of Equity, which consent will not be unreasonably withheld; and,

(b) In no case shall compensation be contingent upon profits.

(2) **Overage Participation.** Overage participation will begin with the first paid public performance. All Actors earning a contractual salary of less than three times full Production Contract actor minimum salary, exclusive of all required increments, will be entitled to participate in the Producer's share of Overage, as follows:

(a) Overage shall be defined as weekly NAGBOR less the Producer's weekly guarantee (plus up to 10% of NAGBOR) and the local presenter's expenses for that week;

(b) In weeks in which there is "middle money" to the Producer, Overage shall be calculated as if the engagement had been presented at the show's average weekly guarantee as established in determining its Category;

(c) When the production has a four-wall booking, Overage shall be calculated as if the engagement had been presented at the show's average weekly guarantee as established by determining its Category after actual deductions for Presenter expenses.

(d) Overage participation to Actors in weeks that are subject to "Terms Deals" shall be calculated per the following:

NAGBOR, less the agreed upon expenses between the Presenter and Producer in the Settlement (e.g., advertising and labor costs); other actual documented expenses, if any; and the Average Weekly Guarantee as

96

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

established in determining the Category for the tour, plus the average NAGBOR percentage established in the Average Weekly Guarantee (up to 10%). Where a simple percentage of the Producer's Documented Share of the Overage is set forth in the 'Terms Deal', it shall be used in that market as the basis for calculating Overage Participation on such dates to the individual Actor. Where the Producer's Documented Share of the remainder of Overage for that market is not a straight percentage, the figure used for the purpose of calculating Overage Participation to the individual Actor shall be the average Producer Share percentage as is used for Overage on the guaranteed dates.

(e) If a Producer participates or receives payment or shares in monies above the stated flat fee in any flat fee engagement, Actors' share of Overage Participations shall apply to such payments;

(f) Actors on vacation as provided in Rule 70 shall receive Overage. Vacation replacement Actors as provided in Rule 70(C) shall not receive Overage;

(g) **Pre-recoupment.** Each eligible Actor shall receive 0.275% of the Producer's share of Overage, in addition to Actor's contractual salary; and,

(h) **Recoupment.** Effective the week following recoupment, each eligible Actor shall receive 0.400% of the Producer's share of Overage, in addition to Actor's contractual salary.

The Actors shall receive Overage participation, if any, no later than the regular payday in the fourth week following the week for which such Overage may have been due (e.g., Overage due for Week One of the tour shall be paid no later than the regular payday in Week Five; Overage due for Week Three of the tour shall be paid no later than the regular payday in Week Seven).

(G) **Payment in Legal Tender.** All salaries shall refer to and be paid in legal tender of the United States, provided that the Producer may make payment in Canadian currency of equivalent value at the then current rate of exchange for services performed in Canada.

(H) **Actual Salary.** The actual salary of the Actor agreed upon shall be stated in the contract and a lesser or fictitious salary shall not be stated in the contract or rider. A new contract shall be issued and signed whenever the Actor's salary is increased.

(I) The Producer may elect to pay salaries either:

(1) Each week on the day before the last banking day of the week, but no later than Thursday; or,

(2) No later than Thursday of the week following the work week. If this option is elected, Producer shall:

(a) Declare the election no later than the time of bonding;

(b) Notify each Actor at the time of offer of employment that this will be the method of payment;

(c) Pay Per Diem no later than Thursday in each week of employment in which it is due; and,

97

A-225

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(d) In the first week of employment, pay no less than one-half of the week's applicable salary, and in the second week of employment pay the remainder of the previous week's applicable salary, such that in the third week of employment the Producer will be paying the full applicable salary to the Actor for the work performed in the second week, and similarly for each week thereafter. Salary earned in the week prior to a lay-off shall be paid in the week of return from the lay-off, unless the Actor's employment has terminated.

See also Rule 52(C)(2).

(J) **Additional Duties.** The Actor shall not be required to do any additional work without mutual agreement and an additional negotiated compensation therefor. Additional work is defined as playing additional parts, doing additional understudying, or doing additional work as a Stage Manager, not specified in Actor's contract at the time of its original signing. The Actor will be permitted, under conditions described below, to undertake duties which are in addition to the normal duties of the Actor and are therefore in addition to those customarily under the supervision of Actors' Equity Association's bargaining unit, provided that Producer will notify Equity and Actor in advance by rider about such duties, when known. When such duties are added during rehearsal, a rider will be attached to the contract.

**(1) Definition of Work Permitted without Additional Compensation**

(a) Actor shall be permitted, without payment of additional compensation, to set props and small set pieces and to move furniture and set pieces specifically designed to be easily deployed by such Actor, provided that such action is within the scope of the Actor's character in the play and that such movement would customarily be performed by such a character during the action depicted in the play.

(b) Actor shall be permitted, without payment of additional compensation, to set props and small set pieces and to move furniture and set pieces specifically designed to be easily deployed by such Actor, provided that such action coincides with the Actor's entrance into (or exit from) a scene in which the Actor takes part as an integral and necessary participant in the staged plot. Such movement need not be attributed customarily to any character during the action depicted in the play. Resetting of props in a scene by Actors participating in said scene shall be permitted.

**(2) Definition of Work Permitted with Additional Compensation**

(a) Actor shall be permitted, upon payment of additional compensation as set forth below, to make entrances and exits for the primary purpose of setting props and small set pieces and for moving furniture and set pieces specifically designed to be easily deployed by such Actor, provided that such assignments do not prevent or preclude the Actor from fulfilling Actor's customary duties as an Actor.

(b) Actors shall be paid additional compensation as set forth below, if assigned special blocking (staging), the primary purpose of which is to set props, small set pieces, move furniture and set pieces specifically designed to be easily deployed by such Actor. Such assignments shall

98

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

not prevent or preclude the Actor from fulfilling Actor's customary contractual duties as an Actor. Special blocking (staging) shall be defined as blocking (staging) which requires Actor to arbitrarily remove themselves or their character from the action flowing out of and related to the plot of the play in order to accomplish the prop or set move, interrupt the flow of the action on the stage, or any such move accomplished during such interruption of the action of the play, including but not limited to those accomplished during blackouts, dim-outs, or such other conventional interruptions during which scene shifts take place.

**(3) Definition of Work Not Permitted Except with the Permission of and Under Terms Satisfactory to Equity**

(a) Set or prop moves which are inherently hazardous due to location on stage, weight of the set piece or prop, construction, pyrotechnic or electrical effects, proximity to machinery or simultaneous movement of other scenery or effects, shall not be undertaken by the Actor without the express consent of Equity.

(b) Set or prop moves or other assignments not customarily undertaken by the Actor which interfere with the normal work of the Actor or for which the Actor may be engaged to the exclusion of work normally assigned to an Actor shall not be undertaken without the express consent of Equity under terms satisfactory to it.

**(4) Compensation**

(a) An Actor assigned to perform additional duties as defined hereunder shall be paid not less than $5 per week for each move assigned commencing with the first paid public performance of the play. All moves shall be assigned to the Actor by Rider to Actor's employment contract. It is agreed that assignments may be withdrawn or reassigned at the discretion of the Producer and that additional compensation payable hereunder may likewise be adjusted upon execution of a rider to the Actor's employment contract.

(b) An Actor who performs as a Swing, Understudy, or temporary replacement in a part which involves set or prop moves for which additional compensation is required, shall be paid pro-rata for each performance.

(c) Payment hereunder shall be in addition to Actor's contractual salary unless Actor has agreed at the time of signing Actor's original contract of employment that such salary shall cover set and prop moves as set forth herein.

**(5) Initial Determination as to Applicability of this Rule**

(a) If a dispute arises between Equity and the Producer regarding the application of this rule, the matter will be referred to the Grievance Committee for resolution. If the dispute is not decided by the Committee, it may be submitted to arbitration under Rule 4(D).

(b) If a dispute arises between Equity and the Producer regarding the application of this rule to a Production while outside of New York City and if Equity elects not to refer the matter to the Grievance Committee, the

99

Short Engagement Touring Agreement 2019-2020

dispute will be referred to a committee consisting of two representatives appointed by the League and two representatives appointed by Equity. No committee member shall have an interest in or be an employee of the production in question. The parties agree to be bound by the majority opinion of such committee. If the Committee is not able to resolve the dispute, either party may refer the matter to arbitration under the terms of Rule 4.

(c) The appropriate Committee shall view the production and may meet to discuss the facts of the dispute and may suggest solutions to the parties.

## 58. SECRET VOTE

(A) At all meetings of the company called by the Deputy, the Stage Managers shall be included and votes shall be by secret ballot. No Producer or Manager whether under an Equity contract or not may attend such company meetings. A Producer or Manager working under an Equity contract may, however, be informed of the subject of the meeting.

(B) The determination of the Council of Equity as to any issue arising under the above provision shall be final and binding upon the Producer and each member.

## 59. SECURITY AGREEMENTS

The provisions of any and all agreements relating to security deposited or agreed to be deposited with Equity covering any employment under this Agreement and any contracts of employment are hereby adopted and made part of this Agreement and said contracts. This includes agreements on forms now called "Security Agreement" and "Producer's Statement."

It is of the essence of this Agreement and all contracts of employment and a condition precedent to the engagement of the Actor that the Producer shall have filed and maintain with Equity a satisfactory security as required by Equity's existing Security Agreement and Rules.

## 60. SHOWCASE PRODUCTION (NEW YORK AND CHICAGO)/LOS ANGELES 99-SEAT THEATRE PLAN/BAY AREA PROJECT POLICY: CONVERSION FROM

(A) Should an Equity Showcase, Los Angeles 99-Seat Theatre Plan, or Bay Area Project Policy production be produced under this contract within five years of its last performance as a Showcase, Los Angeles 99-Seat Theatre Plan, or Bay Area Project Policy production, all Equity members engaged in such production must receive a bona fide offer to perform the same role or function(s) for which they were engaged in such production. If such bona fide offer is not made, the Actor shall be compensated therefor in the amount of four weeks' applicable Category minimum salary. If more than one such production has been produced within five years, Producer shall be responsible hereunder only to the cast of the first such production.

(B) If a member accepts a role or function in the production different from the one the member performed in the Showcase or other such production, member may agree with the Producer to waive the payment required under this rule.

(C) This provision is not applicable where the subsequent production under this Agreement is not the first standard Equity contract presentation of the play within

100

A-228

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

five years of the Showcase, or other such production, provided the intervening contract presentation has satisfied the applicable conversion rights clause.

## 61. SOCIAL SECURITY AND UNEMPLOYMENT INSURANCE

The Producer shall pay any and all taxes or payments required to be paid by employers in accordance with the following:

(A) The Producer agrees to make contributions to provide Social Security Benefits under the elective provisions of the Social Security Law, if Producer is not required to provide benefits under the law.

(B) In the event the services of the Actor are not subject to the compulsory provisions of an Unemployment Compensation (Insurance) Law of any State, then the Producer hereby agrees that Producer will elect to cover the Actor and pay contributions on the earnings of the Actor under the elective provisions of the Unemployment Insurance Law of the State of New York. In the event, however, the Producer is not eligible to elect to come under the New York State Unemployment Insurance Law, then Producer agrees to elect to come under the Unemployment Compensation (Insurance) Law of the State in which Producer maintains their principal place of business, or of the State of the Actor's residence, or of the State where the contract of employment was entered into. Where possible, the Producer will select the State most favorable to the Actor.

(1) The Producer agrees to elect coverage and to pay contributions within the time required by applicable state law. When such election is made to New York State, the Producer agrees to report the Actor by name, social security number and by Actor's address to the appropriate agency during the first week of the Actor's employment and, in no event, later than the quarter in which the work is performed.

(2) The Producer agrees to execute and file the necessary forms required by the State Unemployment Compensation (Insurance) Law under which the Producer has elected to cover the Actor and shall notify the Actor of Producer's election.

(3) The Producer shall submit proof satisfactory to Equity that Producer has applied for unemployment insurance coverage and deliver a true copy of such application to Equity. The Producer warrants and represents that Producer will not withdraw such application nor modify nor change it without the written consent of Equity.

(C) In the event any Producer fails to apply for Unemployment Insurance Coverage, withdraws or modifies any application for such coverage without the written consent of Equity, fails to elect coverage within the time required by applicable state law, or fails to pay the required insurance contributions to the appropriate state agencies within the time required, the Producer must pay to the Actor the equivalent of any Unemployment Insurance Benefits the Actor may lose as a result thereby. This obligation shall survive the termination of the Actor's contract of employment.

101

A-229

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## 62. STAGE MANAGERS

Stage Managers are covered by all the Rules in this Agreement except where specifically stated otherwise.

(A) There shall be no less than one Stage Manager and one Assistant Stage Manager employed in a dramatic production and no less than one Stage Manager and two Assistant Stage Managers employed in a musical production. A Stage Manager must be in attendance at all rehearsals. (See Rule 52(A).)

(B) Except as provided in paragraph (C) below, no Stage Manager or Assistant Stage Manager shall do work of any nature whatsoever for a Producer without a signed contract (after security has been properly posted with Equity) and the Stage Manager or Assistant Stage Manager has received instructions from the Producer as to the work.

(C) The Stage Manager shall be engaged at least two weeks before the beginning of rehearsals and shall receive at least two weeks' contractual salary for those pre-rehearsal weeks (see Rule 57(I)). However, if rehearsal prior to the first technical rehearsal in the theatre is two weeks or longer, and the Stage Manager has worked under a stage manager contract in the same production under the Production Contract or this contract, the pre-production period may be reduced to one week.

(1) Upon the signing of a contract or a letter of intent between the Stage Manager and the Producer, filed with Equity, signifying Producer's intent to employ the Stage Manager, the Stage Manager shall be obligated to perform all pre-production work. The Producer may require, as part of the aforementioned pre-production work, the Stage Manager's attendance at Principal Interviews/Auditions, Equity Principal and Chorus auditions and open auditions, prior to such two week contractual pre-production period for 12 separate calendar days. All other days of interviews and/or auditions that a Stage Manager attends, as required by (Q) below, shall be paid for at one-sixth of contractual salary.

(2) In the event the Producer fails to offer employment to the Stage Manager for that production, the Producer shall be obligated to pay the Stage Manager two weeks' contractual salary. If the Stage Manager does not accept employment in the production, Stage Manager shall be compensated at the rate of one-sixth of contractual salary for each day worked. (See (Q) below.)

(D) Replacement Stage Managers who are not promoted from the production shall be hired at least one week prior to the date on which they are to take over the production. Replacement Stage Managers (not Assistants from the same show) taking over the duties of Stage Manager during vacation shall be paid on a daily basis when required by the Producer to familiarize themselves with the requirements of the production before assuming duties.

(E) **Short-term Stage Manager.** Stage Managers may be employed on a daily and per-performance basis as follows:

(1) A Stage Manager must be signed to an employment contract for all work performed (including any training) as required by Rule 15, CONTRACT;

(2) Short-term Stage Managers shall be compensated at no less than the rate applicable to the Stage Manager's category as follows:

102

A-230

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(a) One-sixth of minimum salary per day prior to the production's first paid public performance; and/or,

(b) One-eighth of minimum salary per performance after the production's first paid public performance.

(3) After a Short-term Stage Manager has worked for four days or four performances, whichever occurs first, a Health contribution will be made on that Stage Manager's behalf. Thereafter, a Health contribution will be required after every six days or eight performances worked. Said Health contributions will be due whether or not the performances or days worked are consecutive;

(4) The Producer will contribute to the Equity-League Pension Fund 8% of all monies (exclusive of Per Diem) paid to a Short-term Stage Manager;

(5) The employment of Short-term Stage Managers is not intended to replace additional Assistant Stage Managers as may be employed pursuant to (G)(3) below; and,

(6) For "advance work" on tour and/or if any Stage Manager is absent for one week or more, and the production hires a replacement Stage Manager, a Temporary Replacement Contract of at least one week will be used.

(F) No Producer or Manager of a production may be employed as a Stage Manager in that production where the impact of such employment reduces the complement of the Stage Managers herein required. No relative of a Producer or Manager of a production may be employed as a Stage Manager in that production where the impact of such employment reduces the complement of the Stage Managers herein required unless said relative is qualified.

(G) Stage Managers and First Assistant Stage Managers shall not be permitted to act, except in emergency, nor shall they be permitted to understudy provided that in special circumstances the First Assistant Stage Manager in a dramatic play may be permitted to understudy with the consent of Equity which consent will not be unreasonably withheld.

(1) Second Assistant Stage Manager(s) may be required to travel with the company. Should there be more than one official travel option for the Equity Company, the Company Manager shall travel with the Company on the first option, and the Second Assistant Stage Manager may travel with the Company on a different option.

(2) Required Second Assistant Stage Managers shall not be permitted to act in a regularly assigned onstage role, but shall be permitted to be a Dance Captain, understudy or partial swing. Where there are technologically complex productions, if the required Second Assistant Stage Manager is assigned to such responsibilities, Equity reserves the right to object as follows:

(a) Such objection shall be made by the Executive Director of Equity and considered by the Executive Director of the League, or their respective designees. If they reach a joint decision on the matter, their decision shall be final and binding on the Producer and Equity. Absent a joint decision, the matter may be submitted for Expeditious Arbitration.

A-231

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(b) In the event of a joint decision by the parties or a decision by the Arbitrator that the required Second Assistant Stage Manager may not perform such assignments, increments for such assignments may be withdrawn only if the Producer has reserved the right to withdraw such increments in the original contract; such right may be exercised pursuant only to the decision that the Second Assistant Stage Manager may not perform such assignments.

(3) In the case of technologically complex or multi-set productions, Equity may request that additional non-acting/understudying Assistant Stage Managers be employed. Producer shall have the right, after consulting with the Stage Manager, to determine whether any such Assistant Stage Managers are required and Equity agrees that the Producer's determination shall be final.

(4) In musical productions, if the Second Assistant Stage Manager has not been assigned duties under (2) above, the Second Assistant Stage Manager(s) may assist in travel and housing arrangements by developing information regarding venues, travel and accommodations for the company and crew for an additional payment of not less than $33.75 per week. It is understood that these duties cannot invade the required rest periods under this contract without penalty. In all cases in which the Second Assistant Stage Manager is assigned such duties, their Stage Management duties take precedence, and in the case of a dispute, the Stage Manager shall determine priority.

(H) The First Assistant Stage Manager shall be hired not later than one week prior to rehearsals and paid one week's contractual salary, and the Second Assistant Stage Manager on a musical shall be hired not later than one day prior to rehearsals and shall be paid one-sixth of weekly contractual salary for each day prior to the start of rehearsals, except where the Producer certifies to Actors' Equity Association that Producer does not require the First Assistant Stage Manager, or Second Assistant Stage Manager as appropriate, to perform any pre-production work. In no event shall the First or Second Assistant Stage Manager be hired later than the first day of rehearsal. Should the Second Assistant Stage Manager be hired for four or more days prior to the start of rehearsal, a Health contribution shall be made on that Assistant Stage Manager's behalf.

(1) In the event any Assistant Stage Manager is required to perform pre-production work prior to the week before the beginning of rehearsals, a letter of intent shall be signed and the same procedure and arrangement that exists for the Stage Manager shall be applicable to any Assistant Stage Manager. (See (Q) below.)

(2) If any Assistant Stage Manager performs pre-production work prior to rehearsals, the Assistant shall be paid one-sixth of contractual salary for each day worked.

(I) All other Assistant Stage Managers must be hired not later than the first day of rehearsal in which substantially the full complement of the Chorus commences rehearsal, but in no event later than the end of the first week of rehearsal.

(J) There will be a 10-hour rest period between the end of work on one day and

104

A-232

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

the beginning of work on the following day, which can be reduced to eight hours prior to load-ins and travel days.

(K) In the event that for any performance the Stage Manager is not present at the theatre in their capacity as Stage Manager and no replacement Stage Manager is hired, the First Assistant Stage Manager shall receive not less than the applicable minimum salary for Stage Manager and the Second Assistant Stage Manager, if required in (A) above, shall receive not less than the applicable minimum salary for First Assistant Stage Manager for such performance. If for any performance the First Assistant Stage Manager is not present at the theatre in their capacity as First Assistant Stage Manager and no replacement Assistant Stage Manager is hired, the Second Assistant Stage Manager, if required by (A) above, shall receive not less than the applicable minimum salary for First Assistant Stage Manager for that performance. This compensation shall commence with the first day of said absence.

(L) In order to maintain the high level of professionalism in production as well as the necessary backstage safety and discipline for the efficient running of the production, the Producer agrees to hire as the Stage Manager only someone who has been employed previously for at least 20 weeks or in three separate productions as the Stage Manager, or 40 weeks or in six separate productions as an Assistant Stage Manager, or a combination of these (two weeks or two productions as an Assistant Stage Manager equals one week or one production as the Stage Manager) by an employer or employers maintaining professional standards at least equal to those maintained by theatrical employers who are members of *The Broadway League, the League of Resident Theatres, the League of Off-Broadway Producers, The Council of Stock Theatres, the Council of Resident Stock Theatres, the Musical Theatre Association, Producers' League of Theatre for Young Audiences, the Producers' Association of Chicago Area Theatres* and *University/Resident Theatre Association, ANTC, MSUA,* and *WCLO.*

If Producer wishes to engage a Stage Manager who does not meet the above requirements, the parties shall review and discuss it at that time.

(M) Transportation of the Stage Manager's customary work box shall be paid for by the Producer.

(N) **Tech Week Compensation.** Stage Manager(s) will be paid an additional one-sixth of contractual salary in the week immediately prior to the first paid public performance.

(O) Should a Stage Manager and/or Assistant Stage Manager, while providing services hereunder, be called upon to perform services for any other company of the play in which the Producer bears a financial interest, Stage Manager shall be paid not less than one week's contractual salary and; for days in excess of one week, one-sixth of contractual salary for each day worked. A production that moves from one Category to another Category is not considered an "other company of the play" under this provision.

If the Stage Manager or Assistant Stage Manager prepares a script for publication or for use in any other version of the production, the Stage Manager or Assistant shall be paid one week's contractual salary for each version. No

105

A-233

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

payment shall be due any Stage Manager for simply duplicating/copying any script.

(P) The Producer agrees that the duties of and services provided by the Stage Manager require that the Stage Manager must use Stage Manager's home for purposes directly related to the Stage Manager's profession such as storage and use of equipment and production materials and that such use is required not only for the duration of the present production for which the Stage Manager is employed, but is also a continuous service provided for the convenience of the Producer.

(Q) A Stage Manager must be present at all auditions and/or interviews conducted in rehearsal halls, theatres, or studios. Said Stage Manager shall be paid at a daily rate of not less than one-sixth of such Stage Manager's minimum salary for that production. Duplicate payment need not be made if the audition(s) and/or interview(s) fall within or after the one or two week pre-production period as provided for in (C) and (H) above. The Producer shall notify Equity whenever auditions or interviews are held at which the Stage Manager is present.

(R) When the theatre is used for purposes other than the Equity Production and a Stage Manager is requested to be in the theatre to protect or restore the production or to generally oversee the interests of the Production, said Stage Manager(s) shall be compensated at the rehearsal overtime rates in Rule 52(D)(3) for a minimum call of four hours.

However, if such services are rendered on the Stage Manager's day off, Stage Manager shall be compensated for said services at the rate of two-sixths weekly contractual salary in addition to said Stage Manager's usual weekly contractual salary.

(S) If a Stage Manager is called to manage an audition or to rehearse a replacement on the day following Stage Manager's own day off, said Stage Manager shall be compensated at the applicable rehearsal overtime rate for a minimum of four hours.

(T) The Stage Manager shall be consulted in the selection of the Assistant Stage Managers but the Producer shall retain full and final authority in their sole discretion to make all employment decisions.

(U) When necessary, the Stage Managers may be required to travel on a crew bus. Such bus shall have a separate bunk for each Stage Manager and shall be otherwise equipped in accordance with Rule 66(C)(1). Travel time on such bus can be considered as part of the rest period. In no case shall the driver of such vehicle be the Stage Manager or an Assistant Stage Manager. There shall be no reduction in Per Diem for housing costs if Stage Managers are required to travel overnight by crew bus.

(V) In the event of emergency only (such as the breakdown of the crew bus), Stage Managers may be conveyed by safe, alternate means from one stop to the next. Such alternate means of transportation may not be used for more than two moves in any period of 14 days without penalty; the third and each subsequent use for a similar emergency shall be compensated at the rate of $150 per move in addition to any overtime that may be required. The Stage Managers shall be covered by the insurance provisions of Rule 66(C)(8) if such alternate means of

106

A-234

Short Engagement Touring Agreement 2019-2020

transportation is utilized.

(W) When the schedule does not provide, within a calendar week, a day off for any member of the Stage Managerial staff for any reason such as, but not limited to, travel (except as permitted for the entire company), take-out or take-in of a production, performance, rehearsal, audition and/or interview, said Stage Manager shall either (a) be compensated at not less than an additional one-sixth of contractual salary for each such day off not available, or (b) be entitled to a compensatory day off. Company and General Management shall interface with Stage Management to determine whether there is an opportunity to take a compensatory day. If a compensatory day cannot be taken within the 32(or 48, when applicable) performance block in which it is earned, it shall be paid out at one-sixth of contractual salary. It is understood that a day on which no company member is called will be considered a Company day off and may not be assigned as a compensatory day.

(X) On engagements of one week or longer, any Stage Manager who is required to report for a performance call more than two hours prior to curtain (or one and one-half hours before half hour) will receive all applicable overtime and meal penalties.

(Y) After the later of either the end of the fourth week following the official press opening on tour, or the official press opening night in the second city of a tour, rehearsal hours for Stage Managers shall be limited to twelve (12) hours per week of actual rehearsal time, excluding rehearsals conducted during performance calls, as well as rehearsal hours in which Actors are paid. Actual rehearsal hours worked in excess of twelve (12), other than those excluded as per the preceding sentence, shall be paid at the contractual overtime rate. Stage Managers earning more than $250 above minimum scale shall not be so limited.

(Z) During each week in which there is a load-in, all Stage Managers working the load-in shall receive a payment of not less than $75 for the first load-in of each week and $75 for the second load-in in any week. Such payment may be incorporated into overscale arrangements, and will not be required more than twice per week.

## 63. TERMINATION
(See also Rule 41, NOTICES)

### (A) Standard Minimum Contracts

#### (1) Before or During Rehearsal

(a) The Actor and Equity must be notified in writing of the first date of rehearsal.

(b) If there is no beginning rehearsal date fixed in writing, the Actor may terminate without penalty at any time prior to such written notification.

(c) The Actor may terminate without penalty at any time prior to two weeks before rehearsals commence.

(d) The Actor may not give notice of termination within two weeks of the fixed first rehearsal date or during the rehearsal period, except with Equity's consent.

107

A-235

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(e) The Standard Minimum Contract may be terminated by the Producer before the first paid public performance by giving written notice to the Actor and paying Actor forthwith a sum equal to two weeks' contractual salary plus any rehearsal salary due.

(2) **Individual Termination after First Paid Public Performance.** Either party may terminate the contract at any time on or after the date of the first paid public performance of the play by giving the other party two weeks' written notice, except as provided in (D), Just Cause. However, Actor's contract may include a longer notice period of up to four weeks and, if so, the notice period stated in the Actor's contract shall apply. Such longer notice provision in a Standard Minimum Contract shall not require additional payment under Rules 11(C) or 15(H).

(3) **Notice of Termination.** A notice of termination must be in writing and does not take effect until the Actor or Producer is in actual receipt of the notice. Notice must be by certified mail and will be presumed to be received three days after postmarked unless otherwise proven or by hand delivery provided it is not delivered by a Stage Manager.

(4) **Effect of Company Notice.** When a company is closed in accordance with or after notice of closing to the entire company, such notice of closing shall supersede any individual notice then outstanding.

(5) **Company Termination after First Paid Public Performance.** The Producer may close the play and Company upon one week's written notice, or upon payment of one week's contractual salary in lieu thereof, provided Producer has paid the Actor for all services rendered to date and in no event less than two weeks' contractual salary or Actor's individual contractual guarantee, plus rehearsal salary.

(6) **Transportation Payment by Actor.** If, after the first paid public performance, an Actor gives notice of termination and said Actor has been with the production for less than one year, the Producer shall have no responsibility for the return transportation, if any, of the Actor. Producer shall pay for the Actor's transportation back to the Place of Residence or the Actor's Place of Engagement, whichever the Actor chooses, provided Actor has been with the production for at least one year.

(7) **Payment when Actor is Not Allowed to Work Out Notice.** If the Actor is not allowed or required to work out any notice properly given under Actor's contract, Actor shall be paid immediately upon the giving of notice and Actor may forthwith accept other employment.

(8) **Additional Payments.** If individual notice of termination is given by the Producer, Producer agrees to pay the Actor in cash the amount of the cost of transportation of the Actor and their baggage back to the Place of Residence or Place of Engagement, whichever the Actor chooses, whether the Actor chooses to return immediately or not.

(9) **Rights After Giving Notice When Actor Secures New Engagement.** Should either party give the other any notice permitted under the contract, which notice terminates the contract at any future date and should the Actor have or secure a new engagement, Actor shall be permitted to attend

108

A-236

Short Engagement Touring Agreement 2019-2020

rehearsals under the new engagement as may be necessary and as do not conflict with Actor's performance under Actor's then existing contract.

**(B) Term Contracts**

(1) **Notice of closing.** The Producer shall give to all Actors signed to Term Contracts one week's individual notice in writing of the closing of the production and Company or pay one week's salary in lieu thereof.

(2) **Termination.** Term Contracts, except as they may be terminated in accordance with Rule 52(F), (G) and (H), REHEARSALS, Rule 30, ILLNESS AND SICK LEAVE, or paragraph (8) of the Standard Term Contract (see also Rule 54, REPLACEMENT OF ACTOR), and Rule 63(B)(3), Egregious Behavior, terminate on the date stipulated in the individual Contract of Employment, without notice, provided that a Principal Actor engaged under a Term Contract may agree to continue with the Producer after the expiration of the year or period of employment contracted for, without entering into a new contract, but from and after the expiration Actor shall be deemed to be employed under all the terms and conditions of the Standard Minimum Contract. (For Chorus Six-Month Rider, see Rule 11(C).)

(3) **Egregious Behavior.** Actors on a Term Contract or Chorus Six-Month rider may be terminated for egregious behavior.

(C) No individual employment contract may be amended except by a rider signed by the Actor and the Producer in the same manner as required for original execution. No mutual agreement to terminate shall be effective unless it be signed and approved by the Actor and Producer and a copy sent to Equity.

(D) **Just Cause.** No Actor engaged under a Standard Minimum Contract may be terminated except for just cause. (See Rule 54(A)(2) for provisions relating to inability of the Actor to perform.)

(1) Where it is alleged that the Actor is not performing as required, notice of termination may be served only if the following procedures have been observed:

(a) The Actor must have received prior written warning alleging failures to perform as required which warning must also be served upon Equity;

(b) Such written warning may be in the form of "notes" which are reduced to writing;

(c) The written warning (which may be or include "notes") shall be over the signature of the Producer, Director, Choreographer, Musical Director, Company Manager (in the case of touring companies), or other person with authority to terminate employment.

(2) The notice of termination may not be served unless the Producer, Director, Choreographer, Musical Director, Company Manager, or other person with authority to terminate employment has seen the Actor in performance (in the case of understudies, in rehearsal or performance of the part(s) understudied) within one week prior to the date of the notice of termination.

(3) In the case of an understudy, either or both of the above notices may be based upon the Actor's work in understudy rehearsal rather than in actual performance.

109

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(4) Following the service of the notice of termination the Actor, together with Equity, may demand a meeting with the Producer, or Producer's representative, for the purpose of reviewing the matter of the Actor's alleged failure to perform as required. Such meeting shall be held as promptly as possible after the notice of termination is given, but in no event later than one week after demand for such meeting is made. Each party may be accompanied by such other appropriate persons as it desires.

(5) In the event the matter is not satisfactorily resolved, it may be submitted by either party to Grievance and Arbitration in accordance with Rule 4.

(6) Should an arbitrator determine that the termination was without just cause, Arbitrator shall provide a remedy in accordance with the following: Damages limited to one week of actor's minimum salary for each five weeks' employment under a Standard Minimum Contract up to a maximum payment of 15 weeks' minimum salary (based on salary at the time of termination). In no event shall damages be less than two weeks' contractual salary.

(a) In the case of an Actor employed on a Standard Minimum Contract converted from a Term Contract of less than 12 months, or from a Chorus Rider, credit toward the maximum 15-week payment shall be computed as follows:

(i) One week's salary for up to the first seven months' such prior service under the Term Contract or Chorus Rider;

(ii) One week's salary for each four weeks of employment under the Standard Minimum Contract; and,

(iii) If applicable, one week's salary for service in excess of seven months under a Term Contract.

In each case, the one week of salary shall be based on minimum salary at time of termination.

(b) In the case of an Actor employed under a Standard Minimum Contract converted from a Term Contract of 12 months, or more, or from a second or subsequent Chorus Rider, credit toward the maximum 15-week payment shall be computed as follows:

(i) Two weeks' salary for the first 12 months of service under the Term contract or Chorus Riders;

(ii) One week's salary for each three weeks of employment under the Standard Minimum Contract; and,

(iii) If applicable, one week's salary for each six months of additional service under a Term Contract or a third or subsequent Chorus Rider.

In each case, the one week of salary shall be based on minimum salary at time of termination.

To illustrate operation of this clause, if an Actor has been employed under a Standard Minimum Contract for 45 weeks, the maximum damages award would be nine weeks' salary. If an Actor has been employed under a Standard Minimum Contract for 32 weeks after conversion from a Term Contract of six months, the maximum damages award would be nine weeks' salary. If an Actor has been employed under a Standard Minimum Contract

110

A-238

Short Engagement Touring Agreement 2019-2020

for 21 weeks after conversion from a Term Contract of 12 months, the maximum damages award would be nine weeks' salary.

(7) This rule shall be applicable commencing four weeks after the first paid public performance of the play or four weeks after an individual Actor's first paid public performance. The Rule shall be applicable to Understudies and Swings engaged after the first public performance of the play commencing five weeks after date of first employment.

## 64. TRANSFER TO THIS AGREEMENT

It is the intent of the parties that this rule shall apply to situations in which a Producer, who has a financial or controlling interest in a play (see paragraph (C) below), uses the facilities of a LORT theatre (at least in part, in lieu of rehearsal and/or out-of-town tryout under this Agreement) to develop the play in contemplation of producing it under this Agreement. It is not intended to apply to plays produced by a LORT theatre and thereafter transferred by the LORT theatre. (Note: This Rule is applicable to all Equity Contracts as set forth in (F) below.)

### (A) Conversion Payments and Guarantee of Employment

(1) This paragraph shall apply to a production under the League of Resident Theatres ("LORT") Contract in which a Producer has a financial or controlling interest as of the commencement of the rehearsal period under the LORT contract and which is transferred to or produced under this Agreement within three years of the first day of rehearsal under the LORT Contract by the same Producer or by a producing entity in which the Producer has a financial interest. It shall not apply to any production under the LORT contract, in which the Producer did not have a financial or controlling interest as of the date of the commencement of the rehearsal period under the LORT Contract.

(2) In the event that a production covered by this paragraph closes under the LORT Contract and is transferred by the same Producer, or by an entity in which the Producer has a financial interest, so that the production may tour under this Agreement within the time period specified in (A)(1) above, all Actors and Stage Managers in the production engaged under the LORT Contract must receive a bona fide written offer to perform the same role or function that they performed in the LORT production, or an alternate Actor or Stage Manager role or function, respectively.

(a) If such bona fide offer is not made, or if the Actor or Stage Manager does not accept the alternate role or function offered, the Actor shall be compensated in lieu thereof in the amount of four weeks' contractual LORT salary or four weeks' applicable minimum salary stated in this Agreement (as of the date that the role or function performed by the Actor is first offered to another Actor), whichever is greater.

(b) The Producer is obligated to offer employment, or to provide compensation in lieu of such an offer, to each Actor (including Understudies and Stage Managers) engaged in the LORT production, even if the role or function has been eliminated from the Short Engagement Touring Contract production.

(c) However, if the Actor who originally performed the role or function under the LORT Contract is out of the production for a period of one

111

A-239

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

month or more before it goes on tour, (or, if the production is not transferred immediately, one month or more before it closed under the LORT Contract), the Producer may, as an alternative, offer the role to any Actor who has performed or is performing the role or function. Only one of the Actors must be offered employment or compensation in lieu thereof.

(d) In the event a Producer has a financial or controlling interest in a play that is produced at more than one LORT Theatre and more than one Actor has played a given role, the Producer may offer the role to any Actor who originated the role, or any replacement who qualifies per paragraph (c) above, at any of the LORT theatres where the Producer had a financial or controlling interest. If no offer is made, the compensation set forth in (a) above shall be divided equally among the Actors who originated the role at each LORT Theatre.

(e) A Producer shall not be required to make a bona fide offer of employment, or payment in lieu thereof, to a Juvenile Actor if the Juvenile Actor's voice shall change or if the Actor matured or grows more than is consistent with age and maturity of the role they were hired to perform in the LORT production, at the Producer's discretion.

(f) If the Stage Manager in the LORT production does not qualify for the position according to the qualifications set forth in Rule 62(L) of this Agreement, the Producer may offer the Stage Manager the position of Assistant Stage Manager and may consequently "downgrade" the offer made to the LORT Stage Manager's assistant(s).

(g) If the Producer chooses to provide compensation to the LORT Stage Manager(s) in lieu of the offer of employment, the compensation will be at the comparable position under this Agreement. If, however, the Stage Manager does not qualify for the offer of Stage Manager under this Agreement, they may be compensated at the applicable rate for First Assistant Stage Manager.

(h) The payment provided for in this paragraph shall be in lieu of any conversion or similar payment required by this Agreement.

(3) In the event that a production covered by this paragraph closes under the LORT Contract and is transferred to or produced by the same Producer on this Agreement within the time period specified in (A)(1) above, each Actor who is engaged in the Short Engagement Touring production pursuant to an offer made under sub-paragraph (A)(2) above shall be guaranteed a total of five weeks' employment (rehearsal and/or performance) in the Short Engagement Touring production or payment in lieu thereof.

(a) The guarantee of employment provided for in (A)(3) above shall include any guarantee of employment and/or notice period (whether company or individual) provided for elsewhere in this Agreement or in Actor's individual contract and shall not be in addition to any other guarantee of employment or payment in lieu of notice otherwise provided for.

(b) All salary payments received by Actor with respect to the touring production (e.g., whether for rehearsal, performance, in lieu of notice, or

112

A-240

Joint Exhibit 1
Short Engagement Touring Agreement 2019-2020

pursuant to a guarantee provided for elsewhere in this Agreement or in Actor's individual contract) shall be applied to offset and reduce Producer's obligation under (A)(3) above.

(c) For each week fewer than five weeks for which Actor is paid salary for rehearsal or performance, or receives salary under another provision of this Agreement or a term of Actor's individual contract, Actor shall be paid the applicable minimum rehearsal salary for Actor's own position.

**(B) Notice of Financial Interest**

(1) This paragraph shall apply only to a production under the LORT Contract, in which a Producer has a financial or controlling interest as of the commencement of the rehearsal period under the LORT Contract, or obtains a financial interest during the engagement under the LORT Contract and which is transferred to or produced on this Agreement by the same Producer, or a producing entity in which Producer has a financial interest, within the same season (i.e., July 1 through June 30) as the last performance under the LORT Contract or within six months of the last performance under the LORT Contract, whichever is longer. It shall not apply to any production under the LORT Contract in which the Producer did not have a financial or controlling interest.

(2) A Producer who has a financial or controlling interest in a production to be presented under the LORT Contract shall notify Equity in writing of the existence of such interest no later than 10 calendar days before the commencement of the rehearsal period under the LORT Contract. If Producer acquires a financial interest in a production during the course of the engagement under the LORT Contract, Producer shall notify Equity, in writing, within 10 calendar days of acquiring such interest.

(3) If Producer fails to give such notice and if the production is transferred to or produced on this Agreement within the time period specified in (B)(1) above, by the same Producer, or by a producing entity in which the Producer has a financial interest, Producer shall be liable for the following: the difference, if any, between the contractual salary of each Actor in the production under the LORT Contract and the minimum salary stated in this Agreement (as of the commencement of the rehearsal period under the LORT Contract) for each week of rehearsal and for up to a maximum of three weeks of performance under the LORT Contract. In no event however, shall Producer be required to make such payment for any week of rehearsal or performance that occurred before the date on which Producer acquired a financial or controlling interest in the LORT production.

(C) For purposes of this Rule, a "financial interest" in a play produced under the LORT Contract shall be defined as an option to produce a First Class or National Tour production of the same play. A "controlling interest" shall be defined as the exercise of artistic control over a production of the play by a Producer (in a capacity other than author, director, choreographer, musical director, or designer) in contemplation of obtaining an option to produce a First Class production of the play. "Artistic control" shall include, but shall not be limited to, hiring or directing the hiring of the director, choreographer, musical director, designers, or cast. "Financial or controlling interest" shall not include financial contributions, whether

113

A-241

Short Engagement Touring Agreement 2019-2020

for general or specific purposes, made to a LORT Theatre by a Producer. Nor shall it include rights reserved by the author of a play, or the author's exercise of control over a production of their own play.

(D) This rule shall apply only to the first production of a play under this Agreement. It shall not apply to plays, including revivals, previously produced under this Agreement unless the Producer had a financial interest in and an artistic control over the LORT production.

(E) Nothing in this rule is intended to or shall be construed to increase the security or bond that would otherwise be required to be deposited with Equity by a Producer under Rule 65.

(F) **Other Contracts Covered By Transfer Requirements.** This Rule shall also apply to situations in which a Producer who has a financial or controlling interest in a play (see definition in (C) above) uses the facilities of a theater covered by any Equity contract (except the Production Contract) and expressly excluding Staged Readings, Workshops and Showcases (see Rule 60, SHOWCASE PRODUCTION (NEW YORK AND CHICAGO)/LOS ANGELES 99-SEAT THEATRE PLAN/BAY AREA PROJECT POLICY: CONVERSION FROM), except that for productions transferred from a theater other than a LORT or WCLO theater:

(1) The three-year period in (A)(1) above shall be a two-year period; and,

(2) The amount payable under (A)(2)(a) above shall be two weeks' applicable minimum salary under this Agreement or two weeks' minimum salary under the applicable Agreement, whichever is greater.

(3) Any WCLO productions where any contracts were issued prior to the ratification of this Agreement will be subject to (1) and (2) above.

**(G) Payments After Recoupment**

In the event a production covered by this Rule ("transferred production") is produced under this Agreement and is subsequently certified by SDC to have recouped 125% of its capitalization ("recoupment"), the Producer shall pay a one-time bonus of $1,000 to each Actor who was in the closing company of the transferred production, whether or not the Actor signs a contract for the subsequent production. In addition, any Actor who was in the closing company of the transferred production and who either (a) remains with this company until such time as 125% recoupment is achieved, or (b) completes his/her first term (on Principal Term contract or Six-Month Chorus rider) under this Agreement will receive an additional $1,000 at such time as the company recoups 125% of its capitalization under this Agreement.

65. **TRANSITION; AUDIT RIGHTS; MOST FAVORED NATIONS**

**(A) Touring Rider**

A touring rider, including a tentative itinerary, shall be attached to all contracts.

(B) A joint Equity/League committee will review any issues as they arise under this Agreement.

The Committee will meet with any Producer wishing to discuss the application of this Agreement to its current or planned tours. Equity and the League shall encourage all Producers to approach Equity and this Committee to discuss:

114

A-242

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(1) Whether the terms of this Agreement permit a planned tour to qualify for this Agreement;

(2) Whether the Production will be able to "roll down" to use this Agreement in a second or subsequent Booking Season, and what impact such "roll down" may have on the tour and its Actors;

(3) The impact of the economic terms and conditions of this Agreement on Producer's planned tour and the Actors on the tour;

(4) The impact of the work, travel, rest period and/or rehearsal rules of this Agreement on Producer's planned tour and the Actors on the tour; and,

(5) What, if any, modifications to this Agreement would be appropriate to ensure that the Producer/production is able to utilize the terms of this Agreement, that the production will have a successful touring life, and that the Actors may enjoy the benefit of such work under positive working conditions.

In accordance with the terms of the parties' side letter, no concession to this Agreement granted to any League/CBP Producer shall be applicable to any other tour produced by any other League/CBP Producer or production. Equity shall retain the sole right to grant or not grant concessions to this Agreement. Equity's agreement to grant or not grant concessions shall not be subject to Arbitration.

(C) A Production Contract tour, or a tour produced under this Agreement, once closed, may reopen under this Agreement by submitting information for Equity's review no later than 30 days prior to the first rehearsal of the re-opened production.

(1) If a production closes pre-recoupment and the production re-opens within six months, salaries and participation shall be paid at the pre-recoupment levels for the applicable Category. The cost of remounting such production shall be added to the unrecouped capitalization of the closed show to determine when recoupment occurs.

(2) If a production closes post-recoupment and the production re-opens within six months, salaries and participation shall be paid at the post-recoupment levels for its applicable Category.

(D) If a Production Contract tour or a tour produced under this Agreement continues for a subsequent Booking Season (i.e., without closing and re-opening), the production may utilize this Agreement by providing information at least 30 days prior to the subsequent Booking Season that demonstrates its qualification for a Category under this Agreement. The Producer shall give Equity and the Actors no less than 30 days notice of its intent to continue to or to utilize this Agreement, and notice of any change in Category.

(1) Should a production qualify for a higher Category for its subsequent Booking Season, the salary of each Actor whose contractual salary is less than three times Production Contract minimum shall be increased by the difference in the applicable position weekly minimum salary between the two Categories for each job function (e.g., actor, stage manager).

(2) Should a production qualify for a lower Category, or transition from the Production Contract to this Short Engagement Touring Agreement, for its subsequent Booking Season, no current Actor's salary shall be reduced, except:

115

Short Engagement Touring Agreement 2019-2020

(a) If the Producer gives the Actors at least 45 days' notice of the change in Category or Contract, Producer and any Actor(s) not on a Six-Month Chorus Rider or Term Contract may negotiate terms for continued employment in such Booking Season, including a reduction in weekly salary, provided such terms satisfy the minimum conditions of this Agreement for the new Category/Contract. The Actor must notify the Producer within 15 days of the notice whether Actor wishes to remain with the company after the new Category/Contract terms go into effect.

(b) If the Producer gives the Actors at least 45 days' notice of the change in Category or Contract, Producer and Actor(s) on a Six-Month Chorus Rider or Term Contract shall be free to negotiate terms for continued employment in such Booking Season, including a reduction in weekly salary, effective upon the expiration of such individual employment contracts, provided such terms satisfy the minimum conditions of this Agreement for the new Category or Contract. The Actor must notify the Producer within 15 days of the notice whether Actor wishes to remain with the company after the new Category or Contract terms go into effect.

(3) If the original itinerary or subsequent Booking Season's itinerary is less than 52 weeks, the itinerary may be extended to up to 52 weeks so long as the Producer demonstrates that the full itinerary for such Booking Season, including the extension, would have qualified for the same or lower Category. If the itinerary within the full Booking Season would have qualified for a higher Category, the Production shall change to the higher Category at the time of the extension beyond the original qualifying itinerary. The Production will not be allowed to drop to a lower Category until after the first full 52-week Booking Season as provided in the previous paragraph.

(4) Should a production transfer from the Production Contract to this contract under this rule, any Actor on a Term Contract or Six-Month Rider shall have the right to terminate their individual employment contract with no penalty, prior to the first engagement under this contract, by giving Producer notice no later than 15 days following notice by the Producer of intent to transfer to this contract.

(5) Replacement Actor(s) engaged to rehearse prior to the beginning of the new Booking Season may be contracted at the new Category or Contract level.

(6) Producer and Actor(s) who joins the production after the change in Category or Contract may negotiate terms, provided such terms satisfy the minimum conditions of this Agreement for the new Category.

(7) If a production qualifies for this Agreement or a lower Category, and an Actor gives notice as required in D(3) above of Actor's intent to leave the tour, the Producer will transport the Actor and baggage allowed pursuant to Rule 66 back to the Place of Residence or Place of Engagement, whichever the Actor chooses.

(8) All other terms of each Actor's individual employment contract not inconsistent with the terms of this Agreement will remain in effect.

(9) A tour cannot move from a Category to the full Production Contract

116

A-244

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

without the written consent of Equity.

(E) All productions using this Agreement shall provide the following information to Equity:

(1) Weekly Box Office Statements/Settlements, signed by the Producer's representative and the Presenter's representative, to the extent available

(a) When the show plays a city on a "Terms Deal", in addition to the Box Office Settlement signed by the Producer's representative and the Presenter's representative, Equity shall receive a statement outlining the following:

(i) NAGBOR

(ii) The Average Guarantee for the Tour

(iii) Actual Expenses;

(2) Unaudited Profit and Loss Statements;

(3) Audited Profit and Loss Statements, if produced; and,

(4) Status Reports of progress towards recoupment, submitted quarterly or whenever delivered to others.

Weekly Box Office Statements/Settlements will be due no later than seven calendar days after the end of each fourth week of performances. Unaudited Profit and Loss Statements will be provided to Equity at the same time as when provided to the investors, but in no case later than 45 calendar days after the end of each eighth week of performances. Audited Profit and Loss Statements, if any, will be provided to Equity at the same time as when provided to the investors.

(F) Equity has the right to audit, at its expense, any production using this Agreement, in accordance with standard business practices.

(G) **Most Favored Nations.** Equity has agreed to grant the League/CBP most favored nations status with regard to touring arrangements, the details of which are set forth in a side letter.

## 66. TRANSPORTATION AND BAGGAGE

### (A) Actor's Transportation

(1) The Actor shall travel with the company by the most comfortable and expedient form of transportation as reasonably determined by the Producer. Travel time is deemed to be consecutive and all lay-overs, except in the case of bus travel, shall be a part of travel time. The Producer shall, at Producer's own expense, transport the Actor when the Actor is required to travel, including initial transportation from Place of Residence or Place of Engagement to place of rehearsal or Point of Opening and from Point of Closing to Place of Residence or Place of Engagement, at Actor's option.

(2) Upon the production's closing, it shall be the Actor's option to be transported to the Place of Residence or Place of Engagement. Actor will be entitled to Per Diem as provided below if Actor chooses to travel on the Company transportation:

(a) If Actor arrives at the destination terminal at or before 4:00 p.m. (local time), Actor will receive 20% of the full daily Per Diem;

117

A-245

Short Engagement Touring Agreement 2019-2020

(b) If Actor arrives after 4:00 p.m., Actor will receive 45% of the full daily Per Diem.

(3) **Night Travel.** Night travel shall be deemed to be travel between the hours of 10:00 p.m. and 6:00 a.m. and shall only be permitted with the written consent of Equity, which shall not be unreasonably withheld. (See Rule 66(D) for special regulation regarding railroad transportation.) Application may be by letter, telephone, e-mail or FAX, and after consultation with the Company. Confirmation from Equity, if permission is granted, shall be in writing.

(4) **Travel Hours.** The Producer shall submit to Actors' Equity Association a detailed routing of any proposed tour based on the following schedule of maximum hours and mileage per each day of travel:

| Double performance days | 3 hours |
|---|---|
| Single performance days | 7 hours |
| Non-performance days | 10 hours * |

*Note: for every 13 performance weeks (or part thereof) of itinerary, one 12 hour travel day may be scheduled on non-performance days; these 12-hour travel days may occur at any time during the itinerary (not just one per 13-performance week segment). The Producer shall give 48 hours' notice of a travel day in excess of 10 hours except in the case of circumstances outside the Producer's control, such as a lost booking.

Travel time shall be limited to 40 hours per week. Thereafter, overtime travel shall be in accordance with paragraph (5) of this Rule.

(5) **Travel Time; Calculation of**. Travel time shall commence and be computed from the time the Actors are scheduled to depart from the first Actor's hotel until the time the last Actor's hotel is reached at the city of destination, such hotels being referred to in the plural to recognize Producer's option to provide more than one hotel choice, which is not required. The Actor shall be prompt for all bus calls and shall make Actor's baggage available for loading at least 15 minutes prior to the scheduled departure time. If an Actor is responsible for a delay at any time, such delay shall not be counted as part of the travel time of the Company. If Actors are lodged at more than one hotel, the Producer, for the convenience of the Acting Company, shall schedule a pick-up at each hotel. However, upon arrival in town or at the destination, the time traveled from the last Actor's hotel to the theatre in excess of 30 minutes shall be counted as part of travel time of the Company. When a trip is made to a restaurant after arrival at the hotel and before arrival at the theatre, then the total time traveled returning from the theatre to the last hotel shall be used to compute this excess.

(a) Travel time shall not include time lost due to accident or other circumstances not within the control of the Producer or time spent going through customs/security when traveling internationally.

(b) Time required to deal with traffic violations of the bus driver or bus, refueling, or altering equipment on the bus to comply with comfort and safety regulations of (1) above shall be computed as travel time.

(6) For Alaska and Hawaii, restrictions on travel hours, per (A)(4) above shall

118

A-246

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

be waived.  It is agreed that Actor, upon arrival, will be immediately transported to their lodging.  The Actor's 12-hour rest period upon arrival shall be extended by no less than two times the amount of time traveled in excess of the hours provided in (A)(4) above, if any.

(7) Actors shall execute an Equity/League Short Engagement Touring Agreement Overseas Rider prior to traveling outside North America.

(8) **Overtime Travel.**  If the applicable travel time set forth in (4) above is exceeded, the Producer shall pay each Actor involved $21.00/hour or part thereof.  Travel overtime may be calculated in half-hour segments (and paid at one half the hourly rate per half hour or part thereof).

Overtime travel on a two performance day shall be paid at double overtime which may be calculated in half-hour segments.  Payment of any overtime due shall be included with the salary payment of the week following the week during which the overtime travel occurs.

(9) After closing, all provisions of this section will be in full force and effect while returning to Place of Engagement or Place of Residence.

**(B) Air Transportation**

(1) Air travel must be on FAA certified and scheduled first-class airlines, including chartered flights on such airlines and not on non-scheduled or private airlines.  The cost of baggage checked on the airline, not to exceed 50 pounds, will be borne by the Producer.  See (F) below regarding other baggage provided for Actors.

(2) The Producer agrees to reimburse the Actor for the premium cost of air travel insurance purchased by the Actor up to the amount of $150,000.  If the itinerary includes more than four stops by air, the Producer shall provide each member of the company with a recognized air travel insurance policy effective from commencement of the first flight of the tour through the final flight at the conclusion of the tour.

(3) When air travel is required, the Producer shall assume ground transportation costs between the airline bus terminal (or normal pick-up station in the city) and the airport. The Producer may designate the means of ground transportation.

(4) Coast to coast flights will be non-stop if Actor is traveling on Actor's day off and will otherwise be limited to not more than two stops.  If there are no scheduled non-stop coast to coast flights on Actor's day off, one stop will be permitted.

(5) Travel time shall not include time lost due to accident or other circumstances not within the control of the Producer, or time spent going through customs/security when traveling internationally.

(6) When air travel is required, no less than two weeks prior to the engagement, the advance agency or company manager shall advise the Actor of the flight information, including the Producer's negotiated rate for the flight.  Within five (5) days of receiving notification of the flight information and cost, Actor shall advise the Producer of the Actor's acceptance of the Producer-provided flight, or the Actor's preference to arrange for Actor's own travel.  Notwithstanding the foregoing, at any time prior to travel, the Producer

119

A-247

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

may change the offered flight to a comparable flight.

If the Actor does not accept the Producer-provided flight within five (5) days of notification to the Actor of the flight information pursuant to the above, the Producer shall be relieved of responsibility for arranging travel for the Actor. If the Actor elects to arrange their own travel, Producer shall reimburse the Actor for the costs of their travel, up to the cost of the Producer-provided flight, including taxes.

**(C) Bus Transportation**

(1) **Comfort and Safety.** The Producer agrees that the bus shall be equal in comfort, condition, and safety to those used by first-class long distance bus companies, except where the bus is used for airport and local transportation. The bus driver shall obey traffic regulations, and speed and safety rules of cities and states. The driver of such vehicle must conform to the applicable federal regulations. The bus shall be in good mechanical condition and shall provide the following accommodations and safety devices which shall be in good working order:

(a) Air-conditioning and heating;

(b) 34 inches between seats (back-to-back in upright position), reclining seats and foot rests which shall be adjustable. In buses where wheel-wells protrude into foot space, Producer shall not assign the affected seat to Actors on a single seat basis;

(c) Toilet facilities;

(d) Cold drinking water and paper cups;

(e) Separate luggage quarters;

(f) A speedometer and odometer which must be operative at all times. If immediate attention is not given to the repair of a speedometer or odometer malfunction, Equity may require a change of bus; and,

(g) Clean windshield and windows.

Should there be more than two mechanical breakdowns in a one month period, Equity shall have the right to require the Producer to furnish a different bus.

(2) **Comfort Stops.** There shall be no smoking on the bus. On trips lasting longer than two hours, there shall be a 15-minute rest stop after the first two-hour period and every two hours thereafter. The 15-minute rest stop shall not be charged as travel time, but any time over that, if used by management, will be charged as travel time. The time taken up by these rest stops cannot create a penalty situation.

(3) **Meal Stops.** Within the first four hour travel period, there shall be a meal stop of not less than one hour. However, if arrival at the hotel can be reasonably made within the first five hours, no meal stop will be required. After this first stop, meal stops shall occur at intervals not to exceed five hours. If, however, the trip does not commence until after 12:00 noon, the first meal stop need not occur for five hours. The actual time utilized for such meal stops shall not be considered part of the travel time.

(4) The following services shall be provided at no additional cost to the Actor:

120

A-248

Short Engagement Touring Agreement 2019-2020

(a) Loading and unloading baggage onto or from the bus;

(b) Sweeping the bus at least once a day;

(c) Delivering the bus at least one-half hour prior to departure times for luggage loading.

(5) The conditions of (1) and (3) above shall be set forth as a rider to the Producer's contract with the bus company.

(6) The Company Manager or other representative of the Producer shall travel with the Company on the bus at all times.

(7) Scenery and physical props of the company shall not be transported by the same vehicle(s) transporting Actors. Permission to travel scenery and props on the company bus in small companies shall not be unreasonably withheld by Equity. An automatic exception to this rule may be made should there be a truck breakdown. However, such exception shall not be automatically granted if breakdowns exceed three per year.

(8) Producer shall obtain and pay for Travel Accident Insurance of at least $150,000 to cover each Actor engaged hereunder.

(9) **Routing.** The Producer shall submit to Equity and the Actor a route sheet which shall specify places of performance, mileage between cities, and estimated hours. Said route sheet shall be submitted prior to the commencement of the tour. Subsequent route sheets shall be submitted to Equity and the Actor as bookings are arranged.

(10) **Bus Log.** The Producer shall cause to be kept an accurate and complete bus log which shall not be prepared by a member of the Equity Company. The Deputy will initial the log daily indicating only that the Deputy is aware of the figures entered. At the end of each week, the Company Manager shall provide the Deputy with two copies of said log. The Deputy shall file one copy with Equity together with any comments deemed appropriate.

(11) If there are two or more consecutive days of travel by bus in which any of the consecutive days are expected to require eight or more hours of travel, then on each such day for which it is expected that there will be eight or more hours of bus travel each Actor will be provided two exclusive seats on the bus.

**(D) Rail Transportation**

(1) Day coach transportation for the Company is limited to 10 hours. If the train schedule requires transportation in excess of 10 hours or after 10:00 p.m., a roomette single occupancy sleeping accommodation shall be furnished each Actor.

(2) Should the Producer present proof satisfactory to Equity that roomette single occupancy sleeping accommodations could not be obtained, Producer will negotiate with Equity accommodations or compensation in lieu thereof for the Actor.

(3) Travel time shall not include time lost due to accident or other circumstances not within the control of the Producer, or time spent going through customs/security when traveling internationally.

121

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(E) **Company Traveling as a Unit.** When the Company travels as a unit, the Company Manager or other representative of the Producer shall travel with the Company at all times, shall be at the hotel used by the majority of the Acting Company at check-in and check-out (the Second Assistant Stage Manager may also be asked to assist with these functions), and shall be accessible to the Acting Company at all reasonable times while the Company is on tour.

**(F) Baggage**

(1) The cost of baggage transportation not to exceed 200 pounds shall be borne by the Producer.

(2) The Producer may limit the amount of baggage the Actor may transport on the plane as checked baggage to one bag of up to 50 pounds. Any cost resulting from baggage being greater than 50 pounds for one bag shall be borne by the Actor.

(3) The Producer may provide one or more containers with a capacity of at least 150 pounds for each Actor's additional belongings, to be transported separately. These containers will be delivered to the theatre at each location, if possible. Otherwise, the Actors will be provided safe and unimpeded access to these containers no less frequently than at the beginning and again at the end of each engagement, and in no event shall Actor be without access to containers for more than 21 days. For new tours that commence after September 2019 under this Agreement, if the Producer provides one or more containers, at least one such container must be at least 75 linear inches (e.g. Contico ProTuff or similar container) for each Actor's additional belongings, to be transported separately.

(4) The Producer will reimburse the Actor for actual expenses incurred up to $40 each way in the transportation of personal luggage from the Actor's apartment to the pick-up point and, at the conclusion of Actor's engagement, from the drop-off point to Actor's residence.

(5) The Producer agrees to transport at least one full-sized suitcase, plus carry-on luggage which fits in overhead luggage racks (subject to airline restrictions on carry-on hand luggage). Make-up kits and rehearsal clothes shall not be included in this limitation and may be transported separately by the Producer. In addition, the Producer agrees to arrange for shipment to and from the Actor's residence, reasonable wardrobe changes necessitated by change of seasons during a tour. The Producer shall facilitate such wardrobe exchanges up to two times per year, up to $100 per exchange (subject to receipts). For tours that commenced prior to April 29, 2019, that are providing containers pursuant to Rule 66(F)(3) but those containers are not at least 75 linear inches, Producer shall facilitate such wardrobe exchanges up to four times per year, up to $100 per exchange (subject to receipts).

(6) If the Actor elects not to accept the Producer-provided flight within five (5) days of posting of the flight information pursuant to Rule 66(B)(6) above, and instead elects to arrange their own flight, Producer shall reimburse the Actor for the costs of their checked baggage up to the amount paid per Actor electing to accept the Producer-provided flight.

(G) **Mail.** Producer agrees to forward first-class mail to Actor on tour if Actor's

122

A-250

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

mail is brought or sent to Producer's office.

## 67. UNDERSTUDIES

Except as provided in paragraph (K) below, the Actor shall not be permitted to understudy unless Actor's Contract so provides.

(A) All parts for which contracts are issued, except parts of stars and "bit" players, shall be covered by Understudies. Nothing contained herein shall require Chorus to be understudied.

(B) A performing Actor shall be compensated for each Principal role understudied at the rate of not less than $33.75 per week:

A General Understudy shall be compensated at the rate of not less than $33.75 per week for each Principal role understudied over three.

In no event shall a performing Actor be permitted to understudy more than three Principal roles. A General Understudy may understudy not more than five Principal roles.

(C) Where there are non-enumerated Understudies, the Producer must indicate by contract rider, at the time the original contract is executed, that there may be more than one Understudy for the Understudy part contracted and that the Understudy will perform at the Producer's discretion. When a Principal Actor has given advance notice of a leave for vacation or any other purpose, Producer shall provide, absent extraordinary circumstances, two weeks' notice to said Understudies and post which Understudy will be performing for the Actor on leave.

**(D) Payment for Performance**

(1) No Understudy shall perform in a Principal part to which said Understudy is assigned without additional compensation.

(a) Payment of one-eighth of an Actor's own contractual salary shall be made to the Understudy for any performance in which the Actor appears in the capacity of an Understudy to a Principal.

(b) A cast member understudying a Star billed over the title, if receiving less than $200 over minimum, shall be paid at least $175 for each performance given in place of the Star.

(E) Understudies shall be present at each performance unless the Producer otherwise consents.

(F) Understudies must be hired not later than one week before the first paid public performance.

(1) Understudy of Principal parts assigned to Chorus must be so assigned on new contracts or riders and salary adjustments made no later than two weeks after the first paid public performance of the production or at the time of the Official Opening, whichever is earlier.

(2) Where the contract of a Chorus is amended so that additional compensation is agreed upon based on the assignment of understudy work, the Producer may, within two weeks of the first paid public performance, withdraw said understudy work and additional compensation and assign said understudy work to another Chorus. The foregoing shall not apply where

123

A-251

Short Engagement Touring Agreement 2019-2020

understudy work and compensation therefor is part of the original contract of employment.

(3) For Principal Actors, see Rule 15(D)(2), Hiring "As Cast".

(G) The Producer shall provide Understudies with script and music. No Understudy shall be required to perform a part until one week after Understudy has received this material and until Understudy has had at least one rehearsal in the part assigned. However, Understudy may read the part or may perform it if able and willing. (See also Rule 52(K))

(H) If a Chorus understudies a Principal Actor, the Chorus' name and the part understudied shall be listed in the program. (This shall also apply to alternate Understudies.) (See Rule 7, BILLING.)

(I) Understudies shall be in only one company at a time.

(J) If a Principal Actor's employment is terminated, a contract for replacement must be negotiated and signed between the Producer and the Understudy or other replacement no later than two weeks after the Principal's last performance in the production.

(K) If in an emergency the Actor goes on as an Understudy in a Principal part not specified in the Actor's contract, the Actor shall be compensated for such performance at not less than two-eighths of Actor's own contractual salary and shall thereafter be contracted and compensated for such Understudy duty at no less than the usual minimum rate, subject to two week termination of the Understudy assignment only without regard to requirements of Rule 63(D), TERMINATION.

(L) The Producer shall use best efforts to conduct understudy rehearsals at least every four weeks.

(M) If, after 18 months, an Actor has not performed a Principal understudy assignment despite there having been more than one opportunity to perform said assignment, the Actor shall be released from that assignment upon written request from the Actor.

## 68. UNION EMBLEM

The Producer agrees to include the Actors' Equity Association emblem in the program or Playbill and to insert the following caption beneath it: "The Actors and Stage Managers employed in this production are members of Actors' Equity Association, the Union of Professional Actors and Stage Managers in the United States."

At any theatre where the Playbill includes full information about both Equity and non-Equity productions in the same program, the Equity emblem and caption shall be on the cast page for each Equity production.

## 69. UNION SECURITY

(A) All Actors who are members of Actors' Equity Association shall, as a condition of employment, continue to be members of the Union in good standing for the life of this Agreement. All employees who are not now members of Equity shall, as a condition of employment, become members within 31 days following the signing of this Agreement and shall thereafter remain members of the Union in good standing as a condition of continued employment. All new employees shall, as a

124

A-252

Short Engagement Touring Agreement 2019-2020

condition of employment, become members of the Union within 31 days from the date of the commencement of their employment and shall thereafter continue to be members of the Union in good standing as a condition of continued employment. As defined and applied in this rule, the phrase "member of the Union in good standing" means a person who pays initiation fees and dues (or the monetary equivalents thereof) to the Union as financial obligations in accordance with the requirements of the National Labor Relations Act.

(B) Equity shall provide the Producer two weeks' written notice to discharge any Actor for non-payment of union dues or initiation fee (or the monetary equivalents thereof). Upon the Actor's failure to make such payment within the aforesaid period, the Producer agrees immediately to discharge the Actor, provided however, that Equity shall withhold its demand for discharge if the Producer undertakes, with the consent of the Actor, to withhold from the Actor's salary a sum sufficient to correct the Actor's delinquency.

## 70. VACATIONS

### (A) Vacation

(1) Beginning with the first day of employment, Actor shall accrue vacation pay at the rate of 4% of contractual salary (including any Overage participation) received up to a maximum of the Sick/Vacation Leave Cap (as defined in Rule 30, ILLNESS AND SICK LEAVE) per week. When accrued vacation is paid, it shall be paid by separate check.

(2) For each six months of the Actor's employment, Actor shall be entitled to a one week vacation at Actor's option in multiples of one week increments and provided that vacations may not be taken within 12 weeks of the official opening at the first engagement, without the Producer's consent. If Actor chooses to take the vacation, Actor shall receive, in lieu of contractual salary, the accrued vacation pay specified in (1) above, and any Overage participation due Actors in such week (see Rule 57(F)(2)(f)). If Actor chooses not to take the vacation, Actor shall receive, in addition to contractual salary, the accrued vacation pay specified in (1) above.

(3) When the Actor's contract terminates, Actor shall receive all accrued vacation pay which has not been previously paid.

(B) **Notice of Vacation.** The Actor shall give the Producer no less than five weeks' notice of the date of Actor's intended vacation, which date shall be approved or disapproved in writing by the Producer within one week thereafter.

(C) **Replacement.** An Actor engaged to replace another on one week's vacation may be engaged for one week on condition that Actor shall not be called upon to rehearse more than one week. The contract shall clearly set forth that the engagement is limited to one week only. The replacement Actor shall not be entitled to receive Overage.

## 71. VOLUNTARY CLASSES

The Actor is prohibited from attending so-called "voluntary" acting, dance and music classes prior to or during the rehearsal period and prior to the opening. The Producer agrees not to request that the Actor attend such classes.

125

A-253

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## DURATION

This Agreement shall commence on April 29, 2019, and expire on November 1, 2020. Any new rules, when adopted, shall be retroactive to April 29, 2019, unless otherwise stated.

All individual contracts of employment existing or signed on or subsequent to said date shall be modified in accordance with the new rules. Equity may advise its members that no Actor shall work for the Producer unless an Agreement and Rules Governing Employment in Short Engagement Touring Contract is in effect.

ACTORS' EQUITY ASSOCIATION
by Mary McColl
Executive Director

8/29/19
Date

THE BROADWAY LEAGUE INC.
by Alison Corinotis
Associate Director, Labor Relations

8/30/19
Date

A-254

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## ADDENDUM

### ALTERNATIVE MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS FOR DRAMATIC PRODUCTIONS

Dramatic productions may opt-in to Rule 37 Media Promotion and Publicity and Other Recording and Broadcast Provisions. Absent such opt-in, the terms as set forth below apply. Once they opt-in, Rule 37 applies from the first day of rehearsal for employment under this Agreement.

For purpose of this rule, the term "Recording" shall refer to any taping, filming, digital recording or any other electronic or mechanical reproduction, in whole or in part, of any production (including any element of the production over which the Producer has the right to, or reasonably should have the right to, withhold consent to the use of said element) in which Actors are employed under the terms and conditions of this Agreement.

Televising, broadcasting, and visual or sound Recording may be done under the following terms and conditions, which shall remain in effect from the beginning of employment until 19 weeks after the production has closed and shall apply to any production licensed, leased or authorized by the Producer, but shall not apply to motion picture filming for theatrical release.

Requests to Record beyond the following provisions must be submitted in writing to Equity at least 30 days in advance unless special circumstances do not permit such notice. Such requests will not be unreasonably declined.

If a dispute between Equity and the Producer arises under this Rule, it shall be subject to the Grievance and Expeditious Arbitration procedures set forth in Rule 4.

(A) **Reference Recordings**. Notwithstanding any Rule in this Agreement to the contrary, Producer may make Reference Recordings during rehearsal and performance under the following conditions:

(1) The cast shall be given at least 24 hours advance notice of the capture of Reference Recordings.

(2) Actors' time spent in such recordings shall be considered as regular rehearsal or performance time. No additional compensation will be paid to the Actors except when overtime is payable for rehearsal under provisions set forth in this Agreement.

(3) These recordings may be used solely for the purpose of reviewing design elements, staging, lighting, technical, or choreographic elements. Reference Recordings shall not be used for promotional, publicity, commercial, or disciplinary purposes and shall be held strictly as a record by the Producer and may be viewed by the Producer, designers, director and/or choreographers or their expressly authorized employees.

(4) Producer may make the Reference Recordings available to Actors.

127

A-255

Short Engagement Touring Agreement 2019-2020

(B) **Recording and/or Broadcast of the Entire Production**. Visual and/or sound Recording and/or Broadcast of the entire production in any medium shall be permitted, provided:

(1) Each Actor (including Swings, Understudies, Dance Captains and Stage Managers) called for the Recording shall be paid pursuant to the terms of the appropriate SAG-AFTRA contract. In no case will Actors be paid less than the rates customarily applied to such releases under a SAG-AFTRA contract, including any residuals due for exploitation in supplemental markets. The work rules under the SAG-AFTRA contract applicable to a comparable release must also be met, as well as the required benefit contributions (made to Equity Funds if no other Funds are applicable) and procedures necessary to administer payments. In addition to the payments above, each Actor who is called, and any Actors replaced for the Recording, shall receive a payment of no less than one hundred fifty percent (150%) of applicable Production Contract minimum salary as stated in Rule 63(A),SALARIES. Contributions for Equity Pension and 401(k) shall be paid on these monies and Equity Dues shall be deducted on behalf of the Actors.

(2) Stage Managers employed for the Recording will receive the same terms and conditions as the Actors. Stage Managers shall be paid the equivalent of the On-Camera Principal Performer rate for each day of Recording. Contributions for Equity Pension and 401(k) shall be paid on Stage Managers' salaries in lieu of SAG-AFTRA benefits.

(C) **Cast Albums.** Cast albums may be made under the provisions of the Original Cast Album Rider. The Producer agrees that any Actor who sings or verbalizes in the production in any number, plus the Stage Manager, shall be employed on the appropriate SAG-AFTRA Contract for the Recording of said album and shall receive not less than one week's contractual salary for up to eight hours so employed, which may be scheduled by the Producer over no more than four days. Such cast album shall accord credit to each Actor appearing in the production at the time the Recording is made, whether or not the Actor performs on the Recording.

(1) If an Actor works more than eight hours, the Actor shall be paid an additional one-eighth of contractual salary up to a cap of 250% of Production Contract minimum for each hour or part thereof.

(2) Terms for Actor participation in the 15% of monies derived by the Producer are identified in the Original Cast Album Rider.

(3) Producer shall give Equity not less than 72-hours' notice (inclusive of at least two business days) prior to such Recording.

(4) If, during the Recording of a cast album, one or more singers who are not members of the Equity cast are engaged, then Swing singers and Understudies assigned to singing parts who are not engaged to record the cast album shall share equally in an amount equal to the average contractual salary of said Swings and Understudies multiplied by the number of employment days of such supplementary singers.

(5) For cast album Recordings only, there shall be not less than a 10-hour rest period between an evening performance and a morning Recording call.

128

A-256

Short Engagement Touring Agreement 2019-2020

There shall be a break of one and one-half hours (one hour if a meal is provided) between the Recording session and rehearsals or performances scheduled under the Equity Agreement. Recording sessions may not be scheduled on two-performance days. Application of this rule may not reduce breaks or rest periods required by the SAG-AFTRA Contract.

(6) If: (a) songs are recorded by Actors before the creation of a cast album; (b) said Actors are paid for those prior recordings under another applicable agreement; and (c) those songs are included on the cast album without further recording work by said Actors, then a credit equal to the amount of the payments in (b) shall be applied against any payments due to those Actors for the Cast Album recording under Addendum (C). Actors shall also be credited for any hours spent making such recordings against the eight hours set forth in Addendum (C).

**(D) Commercials: Television and Radio Spot**

(1) **Television Commercials.** An Actor may be called to make a television commercial of three minutes or less duration. The Actor shall sign the applicable SAG-AFTRA Contract and the following terms and conditions shall apply:

(a) **Session Fees.** Session Fees shall be payable as set forth below:

(i) **Special Call.** Each Actor, Stage Manager and Dance Captain who is called when the commercial is Recorded shall be paid not less than the then-current session fee for an on-camera principal performer, whether or not the Actor is seen or heard in the commercial. If a Stage Manager or Dance Captain is not called for the session, but is required to render services in connection with the production of the commercial, the Producer shall pay not less than the applicable session fee for an on-camera Principal performer.

(ii) **Performance.** If a commercial is Recorded at a performance, each Actor (including Stage Managers) who is performing his/her function for that performance, will be paid the applicable session fee for an on-camera Principal performer.

(iii) **B-Roll Advance News Footage-Footage of the production shot in accordance with the rules in (E).** If a commercial is made from the B-Roll footage, each Actor, Stage Manager and Dance Captain who was called when the footage was taken shall be paid the applicable session fee for an on-camera Principal performer, whether or not the Actor is seen or heard in the commercial.

(iv) **Hiatus Between Use Cycles.** If there is a hiatus between use cycles, a session fee shall be paid, in accordance with this paragraph (B)(1)(a), in addition to the use fee when a new use cycle commences after the hiatus.

(b) **Use Fees.** In addition to the session fee set forth above, each Actor seen or heard in the commercial, and each Stage Manager and Dance Captain who performed their function during the Recording shall be paid in accordance with the following:

129

A-257

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

(i) **One Year Use Fee.** A use fee of not less than the applicable New York Wild Spot on-camera Principal rate, which shall constitute payment in full for up to fifty-two (52) weeks of use of the commercial on broadcast TV, cable and the Internet; or,

(ii) **Six-Month Use Fee**. A use fee of $703, which shall constitute payment in full for up to twenty-six (26) weeks of use, of the commercial on broadcast TV, cable and the Internet. (Note: This use fee shall increase by the same percentage, and at the same time, that the use payment in (b)(i) above increases.)

(iii) **Re-Use Fees.** The applicable use fee as set forth above in (b)(i) or (b)(ii) shall apply for re-use. If there is a hiatus after a use cycle, a session fee shall also be paid in accordance with paragraph (a)(iv) above.

(iv) **Standard SAG-AFTRA Option.** In lieu of the terms set forth herein, the Producer may elect to use standard terms of the applicable AFTRA or SAG Agreement.

(c) **Holding Fees**. There will be no holding fees.

(d) **Actors Employed Outside of the Production.** Actors who are not in the production and are hired to render services which are in SAG-AFTRA jurisdiction (e.g., voiceovers, testimonials and additional singers) will be engaged in accordance with the standard SAG-AFTRA commercials contract.

(e) **Still Photographs.** If a television or other commercial is made from still photographs of persons in the cast, each Actor contained within the photograph, whether recognizable or not, shall be signed to the applicable AFTRA or SAG contract and the terms of this agreement shall apply.

(f) **Multi-Show Commercial.** Commercial footage and/or voice tracks from different shows produced under this Agreement, or any 4A's Agreement, may be combined into a single "multi-show" commercial for purposes of promoting a season or series of shows. Actors seen or heard in the spot shall be paid in accordance with the terms set forth below:

(i) If the source commercial is already in cycle for which the Actors are being paid, no additional compensation shall be due; or,

(ii) If the source material is not in cycle, Actors shall be paid in accordance with the terms set forth herein.

(g) **Other Promotional Uses.** Producer may, without payment of additional compensation, use a commercial in cycle for:

(i) video billboards;

(ii) taxi videos;

(iii) elevators;

(iv) movie trailers;

(v) group sales video presentations;

(vi) in-flight videos;

(vii) in-house hotel videos;

130

A-258

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

      (viii) tour bus videos;

      (ix) lobby loops, kiosks, in-store videos and other such similar uses.

(2) **Radio Commercials.** Equity will permit the Actor to make a radio spot commercial of three minutes or less duration promoting the theatre or production provided the Actor is signed to the applicable SAG-AFTRA Contract. When a Stage Manager, Dance Captain, or other Actor is required to do any work other than performance in connection with a radio commercial, the Producer shall pay said Actor not less than the applicable SAG-AFTRA Principal minimum in addition to payments required if Actor also performs. If the commercial is Recorded during a performance, those Actors performing during that performance, including Stage Managers and Dance Captains who are performing their functions for this performance, will be paid the SAG-AFTRA session fee in addition to any use fees which may be applicable, pursuant to the SAG-AFTRA contract.

(3) **Stars.** Producer may create new footage at a regularly scheduled performance for the exclusive purpose of incorporating new stars into a pre-existing commercial provided all Actors seen in the newly incorporated footage are paid pursuant to the terms and conditions contained herein. Payment shall be due Actors in the new star commercial only if they have not been paid for the pre-existing commercial.

(4) **Notice.** There must be at least 24-hours' notice to the Actors and Equity prior to any Recording for a commercial. Where practicable, Producer shall give advance notice of use of a commercial created from B-Roll.

(5) The Producer shall be permitted to make any number of commercials from captured material using the same Actors.  In such event, no additional session or use fee shall be due except as indicated here.  If the Producer uses an Actor in one commercial in a lesser payment category and then uses the Actor in a subsequent commercial in a higher category, Producer will pay to the Actor the difference in the session fee as well as the adjustment in the use fee as may be required under the Equity or the SAG-AFTRA Agreements.

(6) All other terms of the SAG-AFTRA commercial agreement and this Addendum to the Equity/League Agreement not otherwise identified or modified herein shall remain in full force and effect.

(E) Provided that the purpose of the recording is promotional in nature and the Producer does not receive revenue in exchange for the capture or use of such material, outside news and media/entertainment companies may Record the production for use on any program under the following conditions:

    **(1) During a Rehearsal**

      (a) Recording and interview session shall not exceed one-half hour of the rehearsal.

      (b) The Stage Manager shall file a report with Equity giving the time utilized for the Recording and interview session. Said report shall be initialed by a Deputy.

      (c) Upon contemplation of Recording during a rehearsal, the Producer shall make every reasonable effort to:

         (i) Give the cast 24-hours' notice;

131

A-259

Short Engagement Touring Agreement 2019-2020

(ii) Schedule only three Recording sessions during which all outlets must do their Recording; and,

(iii) If the time of the Recording is changed, the Producer shall notify the cast of such change and of the re-scheduled time.

**(2) At a Performance**

(a) Recording may be for only one-half hour of footage.

(b) If possible, the cast must be given 24-hours' notice.

(c) When cameras are going to Record, cast must be given notice at the half-hour call.

(d) There shall be no Recording where there is any interference with the Actors such as the requirement for additional lighting or the movement of equipment.

(3) Not more than three minutes of any Recorded portion of the performance or rehearsal shall be shown on the news broadcast. Such three minute Recording may not depict an entire self-contained number or scene.

(4) No payment shall be required hereunder provided no payments are made to any other personnel employed in the production.

(5) An Equity Stage Manager shall be present at every Recording under this paragraph (E).

(6) For any violation of this paragraph (E), other than violations of unauthorized subsequent uses of the Recording, the Producer shall pay one week's contractual salary to each Actor whose rights have been breached hereunder. Such payments shall not preclude any right in law or equity, civil, or criminal, that arise under a breach of this paragraph (E) which the Actor has against the Producer or any third party.

(F) **B-Roll Advance News Recording ("B-Roll").** In order to be able to supply publicity footage to outlets which cannot, for whatever reason, supply their own crews to take such footage, the Producer may shoot B-Roll, provided that Producer adheres strictly to all the terms and conditions of (E) above.

(1) The Producer will advise all media to whom the footage is supplied of the terms and conditions outlined in this Agreement under which the airing of such footage is governed.

(2) The Producer will be limited to one such Recording per year and remains liable for any claims resulting from any misuse of such footage.

(3) The Recording of B-Roll may take place in accordance with this paragraph without additional compensation, during a scheduled rehearsal, dress rehearsal or performance. It is understood and agreed, however, that enhanced lighting and multiple takes may occur during such rehearsal, dress rehearsal or performance provided that in the event an excessive number of takes transform the rehearsal into a "session," then the applicable SAG-AFTRA session fee shall be due every Actor and Stage Manager at the call. Further, in the event that particular Actors are requested to come in early or stay later for retakes or special shots, such Actors shall likewise be paid the applicable SAG-AFTRA session fee(s) that may be due.

(G) **Other Promotional Uses.** The League and Equity acknowledge that

132

A-260

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

consistent and varied promotion and advertising of theatrical productions will promote long term employment for all performers employed in legitimate theater productions and that the Recording of the material and uses contemplated by this provision are intended to achieve this objective.

(1) **B-Roll -No Payment Required.** Additional allowances for other promotional uses of B-Roll in accordance with (F) above and without additional compensation are identified below.

(a) **Press Reels.** Producer can use clips of up to three minutes of performance and/or rehearsal footage (of which no continuous sequence shall exceed 30 seconds) for each production included on the Press Reel.

(b) **Web Sites.** Up to a total of five minutes of rehearsal and/or performance footage (of which no continuous sequence shall exceed 30 seconds) may be used either in a directory or multiple Broadway show format (e.g., Broadwayworld.com) or by an individual Producer on behalf of a particular show or group of shows.

(i) Neither merchandise promotion nor ticket sale information shall be presented on the same "page" as the foregoing, but may provide a link to a separate page which does contain such content.

(ii) It is also understood that there may be no promotion of any other product(s) on the "page" where the B-Roll will be seen without Equity's prior written consent.

(iii) If voiceover or other live Actor work performance is required in addition to the permitted performance footage, the applicable SAG-AFTRA Agreements shall apply to such voice-over or other work.

(c) **News and Current Affairs Programs.** Producer can use clips of up to three minutes in total time on each such program.

(d) **Entertainment Talk Shows**

(i) Producer may provide clips (no more than two on any one program) as part of a bona fide interview in which the production is being promoted.

(ii) Total amount of B-Roll may not exceed two minutes per program, and may not contain all or substantially all of a musical number.

(iii) All performers seen and/or heard on the clip must have given written consent prior to use.

(iv) Clip usage is restricted to currently running productions only.

(e) **Clip Use of Other Productions on TV News Shows**. Producer can use clips of performers in other productions on news specials not to exceed three minutes in length.

(2) **Use of B-Roll Including Documentary and News Footage--Payment Required.** The Producer may use footage from any B-Roll, documentaries (produced after October 1, 1996 provided Actor has given consent to such use) or news footage for purposes of promoting the theatrical production for a single SAG-AFTRA fee to each Actor appearing in such footage in the following venues:

133

A-261

Short Engagement Touring Agreement 2019-2020

(a) **Educational Videos.** Up to a total of 15 minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety;

(b) **Tour Bus Videos.** Up to a total of 15 minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety;

(c) **Sales Kiosk Videos,** In-Store Videos or Lobby Loops. Up to a total of six minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety. For the creation and use of loops from commercial footage see (J) below;

(d) **Group Sales Video.** Up to a total of eight minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety;

(e) **Corporate Videos.** Up to a total of eight minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety;

(f) **Movie Trailers and Video Billboards.** Up to a total of three minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety;

(g) **In-flight Video and In-house Hotel Video.** Up to a total of eight minutes of rehearsal and/or performance footage from a show provided no number or scene is shown in its entirety. In-flight video or in-house hotel video may either be presented as a multiple show directory or on an individual show or multiple show basis so long as it is presented along with either soft news, cultural or tourist information; and.

(h) **Music Video and Infomercial**. With respect to infomercials, up to a total of 15 minutes of rehearsal and/or performance footage from a show.

Footage from commercials may be used for any or all of the above upon payment of the applicable SAG-AFTRA fee for such use.

Actors' Equity shall not apply any additional fees for the above uses provided the Producer fully complies with all of the terms and conditions set forth herein.

The above permitted uses shall not include the sale of videos or the endorsement of any commercial products.

**(H) Documentary**

(1) The Producer shall have the right to make a television documentary, including unlimited exhibition throughout the world on all television and for the period defined in the SAG-AFTRA Agreement. This permission is conditioned on payment of not less than the applicable SAG-AFTRA rates and provided no more than 21 minutes of combined rehearsal/performance footage is used.

(a) "Performance footage" and/or rehearsal shall mean footage acquired from Advance News Footage, documentaries (produced after October 1, 1996 provided Actor has given consent to such use) or news footage with no individual clip exceeding three minutes in duration.

(b) "Non-performance footage" involving Actors in non-performance activities (such as interviews, costume fittings and other elements where

134

A-262

Short Engagement Touring Agreement 2019-2020

the performer is not performing whether in rehearsal or on stage) shall not be included in the calculation of running time (the aforementioned 21 minutes).

(c) If work additional to the Actors' normal duties rehearsing or performing for the stage production is required to accommodate the Recording, the Actor will be paid the appropriate Equity hourly rehearsal overtime rates for such additional work plus any fees which may be required by SAG-AFTRA.

(d) Producer must obtain Equity's consent to shoot more than a total of three days of rehearsal and/or performance. Equity agrees that it shall not unreasonably withhold its consent to such additional shooting.

(2) **Clip Use in Other Documentaries.** The Producer can use clips of performers from one or more productions in a different documentary with an aggregate limit of an average of three minutes "performance and/or rehearsal" clips per half-hour provided that the Actors seen are paid no less than the applicable SAG-AFTRA rate in accordance with the formulas identified above.

All Actors (including Stage Managers) shall receive billing at the end of any broadcast of the documentary created hereunder.

(I) **Session Fees.** Whenever session fees are applicable, Producer shall be required to pay a session fee to any Actor who is called to be present at the theater or rehearsal space when Recording is taking place. Stage Managers shall be paid the on-camera Principal rate.

(J) **Payment for Live Television Promotional Appearances.** Whenever an Actor appears in costume on a news, talk or entertainment show, said Actor shall be paid not less than the applicable SAG-AFTRA rate. If the Stage Manager is requested to attend the television appearance, they will be paid not less than the actors.

(K) **Use of Footage After Expiration Date of Contract.** Any footage produced under this Addendum shall continue to be governed by the terms of this Agreement without regard to the expiration of this Agreement and without regard to the amendment of this Agreement except to the extent that such amendment shall so provide.

(L) **Loops Using Commercial Footage.** Footage from a television commercial created to promote the production on television may be edited to create a non-broadcast "loop" for unlimited promotional use subject to the following conditions:

(1) If the commercial is in a cycle for which the Actors are being paid the applicable SAG-AFTRA rate, no additional compensation to Actors is required;

(2) If the commercial is not in cycle, Actors will receive the applicable SAG-AFTRA non-broadcast B-roll payment;

(3) The Actors' Equity logo will appear in every frame of performance footage;

(4) In no event may any Equity loop footage be used to promote a non-Equity production.

(M) **Opening Night Specials**. Opening Night Specials shall be subject to the

135

A-263

Short Engagement Touring Agreement 2019-2020

following terms:

(1) Opening night specials may be either a one or two-hour documentary-style news program, which will combine Recorded portions with live coverage about the creation and opening night of the production;

(2) To include excerpts from the show, the television production may Record portions during regularly scheduled performances and rehearsals, the number to be mutually determined between the needs of the television production and the Producer and director so as not to intrude upon the creative process. In no event shall the television crew Record more than five rehearsals and/or two performances. Up to 45 minutes of each such rehearsal and 30 minutes of each such performance may be Recorded upon 24-hours' notice to the cast before each call;

(3) The Producer may include the terms of such Recording by rider to the Actor's contract, including an honorarium of not less than $350 for a two-hour program and $200 for a one-hour program to be paid to all Actors employed by the production. If any employee of the Producer or Theatre Owner is paid a higher honorarium for this event, the Actors shall be paid the higher amount;

(4) Up to a total of 45 minutes of rehearsal and performance footage may be included in the final edited two-hour program. Up to a total of 20 minutes of rehearsal and performance footage may be included in the final edited one-hour program. It is understood that an entire self-contained number or scene may not be broadcast. All Recorded footage shall be used exclusively for the opening night telecast and promotional spots for the telecast. In addition to the permitted minutes of footage, a portion of the curtain call may be broadcast; and,

(5) Producer will ensure that every Actor employed by the production will receive a screen credit on the Opening Night Special program.

(N) **Benefits.** Contributions on behalf of the Actors shall be made pursuant to the applicable SAG-AFTRA Agreement except for Stage Managers whose benefits shall be paid in accordance with Rule 44, PENSION FUND AND 401(K) PLAN.

(O) **Notice to Broadcast Media and Press Agents.** Press Representatives will send to all broadcast media in the major cities and to all ATPAM press agents a letter outlining the provisions of the contract which govern the use and/or reuse of any Recording of productions under this Agreement. This letter will be sent to the broadcast media in these cities and to the ATPAM press agents every year. The League further agrees to advise by letter any other broadcast media who request permission to do such Recording or to use existing Recordings of those contract provisions. Failure to comply with those provisions may subject the Producer to penalties as outlined above. The League will copy Equity on all pro forma letters, indicating the parties contacted, pursuant to this Agreement.

A-264

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

## APPENDIX A

| | 4/29/19 | 4/27/20 |
|---|---|---|
| **Category 1 - Weekly Salary Pre-Recoupment** | | |
| Category 1 Actor | $1,042 | $1,073 |
| Category 1 SM | $1,712 | $1,763 |
| Category 1 1st ASM | $1,352 | $1,393 |
| Category 1 2nd ASM | $1,167 | $1,202 |
| | | |
| **Category 2 - Weekly Salary Pre-Recoupment** | | |
| Category 2 Actor | $903 | $930 |
| Category 2 SM | $1,482 | $1,526 |
| Category 2 1st ASM | $1,173 | $1,208 |
| Category 2 2nd ASM | $1,017 | $1,048 |
| | | |
| **Category 3 - Weekly Salary Pre-Recoupment** | | |
| Category 3 Actor | $834 | $859 |
| Category 3 SM | $1,370 | $1,411 |
| Category 3 1st ASM | $1,083 | $1,115 |
| Category 3 2nd ASM | $939 | $967 |
| | | |
| **Category 4 - Weekly Salary Pre-Recoupment** | | |
| Category 4 Actor | $770 | $793 |
| Category 4 SM | $1,282 | $1,320 |
| Category 4 1st ASM | $1,027 | $1,058 |
| Category 4 2nd ASM | $859 | $885 |
| | | |
| **Category 5 - Weekly Salary Pre-Recoupment** | | |
| Category 5 Actor | $706 | $727 |
| Category 5 SM | $1,220 | $1,257 |
| Category 5 1st ASM | $962 | $991 |
| Category 5 2nd ASM | $793 | $817 |
| | | |
| **Category 6 - Weekly Salary Pre-Recoupment** | | |
| Category 6 Actor | $643 | $662 |
| Category 6 SM | $1,155 | $1,190 |
| Category 6 1st ASM | $897 | $924 |
| Category 6 2nd ASM | $729 | $751 |
| | | |
| **Category 1 - Weekly Salary Post-Recoupment** | | |
| Category 1 Actor | $1,219 | $1,255 |
| Category 1 SM | $2,003 | $2,063 |
| Category 1 1st ASM | $1,582 | $1,630 |
| Category 1 2nd ASM | $1,365 | $1,406 |

137

A-265

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

| | 4/29/19 | 4/27/20 |
|---|---|---|
| **Category 2 - Weekly Salary Post-Recoupment** | | |
| Category 2 Actor | $1,057 | $1,088 |
| Category 2 SM | $1,734 | $1,785 |
| Category 2 1st ASM | $1,372 | $1,413 |
| Category 2 2nd ASM | $1,190 | $1,226 |
| | | |
| **Category 3 - Weekly Salary Post-Recoupment** | | |
| Category 3 Actor | $976 | $1,005 |
| Category 3 SM | $1,603 | $1,651 |
| Category 3 1st ASM | $1,267 | $1,305 |
| Category 3 2nd ASM | $1,099 | $1,131 |
| | | |
| **Category 4 - Weekly Salary Post-Recoupment** | | |
| Category 4 Actor | $901 | $928 |
| Category 4 SM | $1,500 | $1,544 |
| Category 4 1st ASM | $1,202 | $1,238 |
| Category 4 2nd ASM | $1,005 | $1,035 |
| | | |
| **Category 5 - Weekly Salary Post-Recoupment** | | |
| Category 5 Actor | $826 | $851 |
| Category 5 SM | $1,427 | $1,471 |
| Category 5 1st ASM | $1,126 | $1,159 |
| Category 5 2nd ASM | $928 | $956 |
| | | |
| **Category 6 - Weekly Salary Post-Recoupment** | | |
| Category 6 Actor | $752 | $775 |
| Category 6 SM | $1,351 | $1,392 |
| Category 6 1st ASM | $1,049 | $1,081 |
| Category 6 2nd ASM | $853 | $879 |
| | | |
| Chorus Part | $15.00 | $15.00 |
| Understudy | $33.75 | $33.75 |
| Understudy for Chorus Parts | $11.25 | $11.25 |
| Chorus Rider A - Initial | $54.00 | $54.00 |
| Chorus Rider B - Initial | $27.00 | $27.00 |
| Chorus Rider A - Subsequent | $27.00 | $27.00 |
| Chorus Rider B - Subsequent | $13.50 | $13.50 |
| Term Contract (amount over applicable minimum) | $160.00 | $160.00 |
| Swing | $78.15 | $80.48 |
| Partial Swing | $11.25 | $11.25 |
| Dance Captain | $260.50 | $268.25 |
| Assistant Dance Captain | $156.30 | $160.95 |

138

A-266

Joint Exhibit 1

Short Engagement Touring Agreement 2019-2020

| | 4/29/19 | 4/27/20 |
|---|---|---|
| Fight Captain | $56.25 | $56.25 |
| Extraordinary Risk | $15.00 | $15.00 |
| Set Moves | $5.00 | $5.00 |
| OT Travel | $21.00 | $21.00 |
| | | |
| Media Fee (Cat 1) | $20.84 | $21.46 |
| Media Fee (Cat 2) | $18.06 | $18.60 |
| Media Fee (Cat 3) | $16.68 | $17.18 |
| Media Fee (Cat 4) | $15.40 | $15.86 |
| Media Fee (Cat 5) | $14.12 | $14.54 |
| Media Fee (Cat 6) | $12.86 | $13.24 |
| | | |
| Rehearsal OT (Cat 1) | $30.50 | $30.50 |
| Rehearsal OT (Cat 2) | $26.30 | $26.30 |
| Rehearsal OT (Cat 3) | $24.20 | $24.20 |
| Rehearsal OT (Cat 4) | $22.60 | $22.60 |
| Rehearsal OT (Cat 5) | $20.50 | $20.50 |
| Rehearsal OT (Cat 6) | $19.00 | $19.00 |
| | | |
| Per Diem - pre-production/rehearsal in NY, LA, Chicago or SF | $63.00 | $63.00 |
| Per Diem - Single Occ. | $58.00 | $58.00 |
| Per Diem - Double Occ. | $76.00 | $76.00 |
| Per Diem - Opt Out within 7 days of posting | Posted Single Occ. Hotel Rate plus Single Occ. per diem to cap | Posted Single Occ. Hotel Rate plus Single Occ. per diem to cap |
| Per Diem - Opt Out approved after 7 days | $86.00 | $86.00 |
| | | |
| Category 1 Guarantee | $319,000.00 | $329,000.00 |
| Category 2 Guarantee | $297,000.00 | $306,000.00 |
| Category 3 Guarantee | $275,000.00 | $283,000.00 |
| Category 4 Guarantee | $254,000.00 | $262,000.00 |
| Category 5 Guarantee | $229,000.00 | $236,000.00 |
| Category 6 Guarantee | $208,000.00 | $214,000.00 |

A-267

Joint Exhibit 1

HEADING AND RULE NUMBER                                           PAGE NUMBER

INDEX

Abandonment of Play (52(H))................................................................. 83
Absences or Lateness for Rehearsal (52(L))................................................ 84
ACCESSIBILTY IN AUDITIONING:
          For Actors with a Mobility Impairment (5(A)(2)(a)(iv))...................... 12
          For d/Deaf Actors (5(A)(2)(b)(v)) ......................................... 13
          For Blind or Visually Impaired Actors (5(A)(2)(b)(vi))..................... 13
Accident, Insurance (31) .................................................................. 49
Accident, Performance Lost (46)........................................................... 74
Act of God (46)............................................................................ 74
          and (52(G))............................................................... 82
ACTOR:
          Definition (19(A)) ........................................................ 38
          Duties (23)................................................................ 40
          Salary (57(A)(2))......................................................... 94
          Actors' Fund Benefits (45(C)(1)) .......................................... 73
Actor's Obligation to Equity (1) .......................................................... 6
Actual Salary (57(H))...................................................................... 97
Additional Duties (57(J))................................................................. 98
AFL-CIO (1(B)(1)).......................................................................... 7
AFTRA (37) ............................................................................... 54
Agents (2)     ............................................................................ 7
Agreement, Posting of (41(E))............................................................. 67
Air-Conditioning, Dressing Rooms (56(A)(1))............................................... 89
Air-Conditioning, Stage (56(A)(1))........................................................ 89
Air Travel Insurance (66(B)(2))........................................................... 119
Air Transportation (66(B))................................................................ 119
ALIENS (3)     ............................................................................ 7
Alterations of Contract (15(C)) .......................................................... 33
Announcement of Cast Changes (10) ........................................................ 23
Arbitration and Grievance (4) ............................................................. 8
Arbitration Procedures (4(D)) ............................................................ 10
Arbitration, Expeditious (4(C)) ........................................................... 9
"As Cast" Hiring (15(D)) ................................................................. 33
Assistant Dance Captain (17(E),17(F)) .................................................... 37
Assistant Stage Managers, Salary (57(A)(2))............................................... 94
Assistant Stage Managers (62) ............................................................ 102
Audition, Chorus (5(C)) .................................................................. 14
Audition Code (5(E)(1)) .................................................................. 16
Auditions, Replacement, Principal (5(B)).................................................. 14
Auditions/Interviews, Principal (5(A))..................................................... 11

Baggage (66(F))........................................................................... 122
Bereavement Leave (30(G))................................................................. 47

i

A-268

Joint Exhibit 1

HEADING AND RULE NUMBER                                                              PAGE NUMBER

BILLING (6) ............................................................................................. 18
    Bios for Principals, Chorus Actors, and Stage Managers (6(B)(1))..................... 19
    Bios for Understudies to Stars and Featured Principals (6(B)(2))...................... 19
    Breaches (6(F)) ................................................................................ 21
    House Boards (6(A))........................................................................... 18
    Photographs, Removal of (6(E)) ............................................................ 21
    Program/Playbill (6(B)) ....................................................................... 18
    Souvenir Program (6(C)) ..................................................................... 20
Binding Effect of Agreement (7) ................................................................. 22
Biography, Program (6(B)(1)).................................................................... 19
Biography, Souvenir Program (6(C)) ........................................................... 20
Blacklisting (8) ...................................................................................... 22
Bond (59) ............................................................................................ 100
Breach, Attempted (15(G)) ...................................................................... 34
Breach, Billing (6(F)) .............................................................................. 21
Breaches by Producer (9) ....................................................................... 22
Breaks, Rehearsal (52(D)(1)(i)) ................................................................ 81
Breaks, Performance (45(B)) ................................................................... 72
Bus Log (66(C)(10)) ............................................................................... 121
Bus Transportation (66(C))...................................................................... 120

Call Board (41(D)) ................................................................................. 67
Canadian Currency (57(G))...................................................................... 97
Cast Album (37(B))................................................................................ 57
Cast Changes (10) ................................................................................ 23
Cast Listing, Programs (6(B)).................................................................. 18
Cast Meetings (58) ............................................................................... 100
Change Rooms (56(B)(3))........................................................................ 89
Changes in Contract (15(C)) .................................................................... 33
Check Cashing on Tour (57(A)(6)) ............................................................. 95
Checks (57(E)) ..................................................................................... 96
Children (See Juvenile Actors)(33)
CHORUS (11) ....................................................................................... 24
    Agents (2(C)) .................................................................................. 7
    As Second Assistant Stage Manager (57(B)) ...................................... 95
    Auditions (5(C)) .............................................................................. 14
    Costumes (13).............................................................................. 29
    Dance Captains (17)....................................................................... 36
    Definition (19(A)(1)) ........................................................................ 38
    Deputies (20(A)) ............................................................................ 38
    Determinations, Contract (15(B)(3)) ................................................... 32
    Dramatic Plays (52(C)(1))................................................................. 79
    Emergency Understudy (11(B)(3))...................................................... 25
    Equity's Right to Determine (24(G))..................................................... 41
    Extraordinary Risk Payment (57(C))..................................................... 95

ii

Joint Exhibit 1

HEADING AND RULE NUMBER　　　　　　　　　　　　PAGE NUMBER

Number of (43) .................................................................................. 69
Partial Swing (11(D)(7)) .................................................................... 28
Playing a Part (11(A)) ....................................................................... 24
Reduction of (43(C)) ......................................................................... 69
Six-Month Rider (11(C)) .................................................................... 25
Swing (11(D)) ................................................................................... 27
Troupe (or Unit) (52(J)(2)) ................................................................ 83
Understudy Chorus (11(B)(2)) .......................................................... 25
Understudy, Notice of Performance (11(B)(1), 67(C)) ............... 24, 123
Understudy Principal (11(B)(1)) ........................................................ 24
Understudy Star (67(D)(1)(b)) ......................................................... 123
Christmas, Holiday Pay (45(C)(3)) ............................................................ 73
CLAIMS (12) ............................................................................................ 28
Non-Discrimination (40) .................................................................... 66
Release, Not Permitted (12(A)) ......................................................... 28
Time Limit in Lodging (12(B)) ............................................................ 28
Waiver, Not Permitted (12(A)) ........................................................... 28
Classes, Voluntary (71) .......................................................................... 125
Cleaning Costumes (13(C)) ..................................................................... 29
Closing Company (63(A)(4),63(A)(5)) ..................................................... 108
Closing Notice (41(C)) ............................................................................. 67
Term Contracts (63(B)) ................................................................... 109
CLOTHES AND MAKE-UP (13) ............................................................... 29
Cleaning of Costumes (13(C)) .......................................................... 29
Cleaning of Hair Pieces (13(I)) ......................................................... 31
Hair Style and Hair Color (13(H)) ...................................................... 31
Knee Pads (13(D)) ............................................................................ 30
Rental (13(B)) ................................................................................... 29
Shoes (13(F)) .................................................................................... 30
Skin Parts, Exclusive use of (13(C), 13(E)) ................................ 29, 30
Towels (13(G), 13(I)) ......................................................................... 31
Understudy and Swing Costumes (13(E)) .......................................... 30
Clothing Personal, Loss or Damage (50) .................................................. 78
Commercial Photographs (47(K)) ............................................................. 76
Commercial, Radio (37(C)(2)) .................................................................. 59
Commercial, Television (37(C)(1)) ............................................................ 58
Commissions, Agent (2(B)) ........................................................................ 7
Company Closing (63(A)(4), 63(A)(5)) .................................................... 108
Company Manager, Tour (66(E)) ............................................................. 122
Compelling Circumstances, Unpaid Leave (30(F)) .................................... 47
Compensation (57) ................................................................................... 94
Contingent Compensation (57(F)) ............................................................ 96
Continuous Employment (14) ................................................................... 32
CONTRACT (15) ....................................................................................... 32
Alterations (15(C)) ............................................................................ 33

A-270

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

As Cast (15(D))………………………………………………………….. 33
Attempted Breach (15(G)) ............................................................ 34
Breach (9)....................................................................................... 22
Changes (15(C))............................................................................ 33
Conversion to Term (15(I)) .......................................................... 35
Effective Date (15(A)) ................................................................. 32
File with Equity (15(F)) ............................................................... 34
Outside Fields (15(E)) ................................................................. 34
Riders (15(C))............................................................................... 33
Term (15(H))................................................................................. 35
Signing (15(B)) ............................................................................ 32
Termination (63) .......................................................................... 107
        Before or During Rehearsals (63(A)(1)) ............................ 107
        Just Cause (63(D)) ............................................................. 109
        Term Contract (63(B))........................................................ 109
        Standard Minimum Contract (63(A)) ................................. 107
Conversion from LORT and Other Contracts (64) ....................... 111
Conversion from Production (65) ................................................. 114
Conversion from Showcase, Los Angeles 99-Seat Theatre Plan
        or Bay Area Project Policy (60) ....................................... 100
Costume Calls (16)......................................................................... 36
Costume Measuring (16(A)) .......................................................... 36
Costumes, Swings and Understudies (13(E)) ............................... 30
Cots (56(D))  .................................................................................. 90
Council Powers (24(F)) ................................................................. 41
Curtain Call (45(D)) ...................................................................... 73
Curtain Time Change (45(A)(4))................................................... 71

Damaged Property of Actor (50) ................................................... 78
Dance Captains (17) ...................................................................... 36
Dance Costumes, Unsafe (56(H)(1))............................................. 90
Dancers, Auditions (5(C))............................................................. 14
Dancing Surfaces (56(E), 5(C)(2)(e)) ..................................... 90, 15
Dangerous Conditions (56(H)) ..................................................... 90
Day, Definition of (19(F)) ............................................................ 38
DAY OFF:
        After first paid public performance (55(B)(2))................... 88
        Day after Day Off after first paid public performance (55(B)(3)) ......... 88
        Day Off (55(B)) ................................................................. 87
        "Golden Day" Off, See 24 hour rest period (55(B)(2)(b)) ................. 88
        Rehearsal, during (55(B)(1))............................................. 87
        Rehearsal prior to first paid public performance (52(D)(1)) ............... 80
        Schedule Change (45(A)(3)) ............................................. 71
        Stage Managers (55(B)(4))................................................ 88
                and (62(W))............................................................. 107

A-271

Joint Exhibit 1

HEADING AND RULE NUMBER                        PAGE NUMBER

Death of Star, Layoff (36(B), 52(G)) ........................................................ 52, 82
Defaulting Producers (18) ............................................................................. 37
DEFINITIONS (19) ........................................................................................ 38
    Actor (19(A)) ........................................................................................ 38
    Booking Season (Qualification for use of this Agreement (1(A)) ......................... 3
    Chorus (19(A)(1)) ................................................................................. 38
    Compelling Circumstances (30(F)) ...................................................... 47
    Day (19(F)) ........................................................................................... 38
    Disability (19(B)) .................................................................................. 38
    Part (19(G)) .......................................................................................... 38
    Performance (45(C)(1)) ........................................................................ 73
    Principal Actor (19(A)(2)) ..................................................................... 38
    Role (19(H)) .......................................................................................... 38
    Stage Manager (19(A)(3)) .................................................................... 38
    Week (19(F)) ........................................................................................ 38
Deputies and Members (20) .......................................................................... 38
Determination of Classification (24(G)) ........................................................ 41
Direct Deposit (57(A)(7)) ............................................................................... 95
Disability Leave (30(I)) .................................................................................. 48
DIVERSE AND INCLUSIVE CASTING (21)……………………………………………………38
Docking of Salary (52(L), 45(F)) .............................................................. 84, 73
Documentary (37(E)) ...................................................................................... 62
Dressing Rooms, Safe and Sanitary (56(B), 56(C)) ................................. 89, 90
Drinking Water (56(G)) ................................................................................... 90
Dues and Initiation Fees (21) ........................................................................ 39
    and (69) ............................................................................................. 124
Duration of Agreement  ............................................................................... 155
Duties of the Actor (23) ................................................................................. 40
    and (54(A)(1)) ...................................................................................... 85

Employment, Continuous (14) ....................................................................... 32
Equal Opportunity, Auditions (5(E)(4),40) ............................................... 17, 66
Equity Meetings (24(A), 24(C), 58(A)) ................................................... 40, 100
    Chorus Auditions (5(C)(2)(b)) ............................................................. 15
Equity Representatives (24(A)) ..................................................................... 40
Equity, Special Provisions (24) ..................................................................... 40
Errors in Program (6(B)(1)(a), 6(B)(3),6(B)(4)6(B)(5)) ............................ 19, 19
Estoppel (25) ................................................................................................. 41
Exclusive Service of the Actor (26) ............................................................... 41
Expeditious Arbitration (4(C)) .......................................................................... 9
Expeditious Grievance (4(A)(1)) ...................................................................... 8
Expense Money (29(E),29(F)(4)) ................................................................... 43
Extra Performances (45(A)(1), 45(A)(2), 45(A)(5), 45(A)(6),45(A)(7),45(A)(9)) ....... 70, 71
Extraordinary Risk Payment (57(C)) .............................................................. 95

Joint Exhibit 1

HEADING AND RULE NUMBER ............................................. PAGE NUMBER

Facial Masks (13(I)) ..................................................................................... 31
Fight Captain (56(I)(5)) ................................................................................ 92
Filming (See MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND
BROADCAST PROVISIONS) ......................................................................... 54
Fines, Lateness for "half hour" (45(F)) ......................................................... 73
Fire, Performance Lost (46(A)) ..................................................................... 74
Firearms (56(H)(3)) ...................................................................................... 91
First Aid Kits (56(F)) ..................................................................................... 90
First Assistant Stage Manager (62) ............................................................ 102
First Assistant Stage Manager, Salary (57(A)(2)) ........................................ 94
First Rehearsal Meeting (24(A)) ................................................................... 40
Flash photography prohibited (56(H)(4)) ....................................................... 92
Floors for Dancing (56(E)) ............................................................................ 90
    and (5(C)(2)(e)) ...................................................................................... 15
Food and Beverage (45(E)) .......................................................................... 73
Four A's (1(B)) ............................................................................................... 7
401(k) Plan (44) ........................................................................................... 69
Furs, Lost or Stolen (50(A)) .......................................................................... 78

"Golden Day" (See Twenty-four Hour Rest Period) ...................................... 86
Grievance Committee (4(A)) ........................................................................... 8
Guaranteed Period of Employment (27) ........................................................ 42

Hair Color and Style (13(H)) ......................................................................... 31
Hairpieces (13(I)) .......................................................................................... 31
"Half-Hour":
    Actor's duty to appear (23) ...................................................................... 40
    Change of Due to Delays (55(B)(2)(b)(ii)) ............................................... 88
    Lateness (45(F), (54(A)(1)) ............................................................... 73, 85
Harassment (32) ........................................................................................... 49
Hazard Pay (see Extraordinary Risk) (57(C)) ............................................... 95
Health Insurance (28) ................................................................................... 42
Heat, Dressing Rooms (56(B)(2)) .................................................................. 89
Hiring "As Cast" (15(D)) ................................................................................ 33
Holiday Pay (45(C)(3)) .................................................................................. 73
Hospitalization, Medical Coverage (28) ........................................................ 42
Hotel, Reservations (29(B)) ........................................................................... 43
Hours, Rehearsals (52(D)) ............................................................................ 80
House Boards (6(A)) ...................................................................................... 18

Illegal Rules (34) .......................................................................................... 51
Illness and Sick Leave (30) ........................................................................... 45
Illness of Star, Lay-Off (36(B), 52(G)) .................................................... 52, 82
Illness, Termination:

A-273

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

Rehearsal (52(F)) .................................................................. 82
Standard Minimum Contracts (30(A)) ................................. 45
Term Contracts (30(B)) ......................................................... 45
Initiation Fees and Dues (21) ...................................................... 39
Injury and Supplemental Workers' Compensation (31) ............... 49
Inspection, Safe and Sanitary (56(M)) ........................................ 93
INSURANCE:
Air Travel (66(B)(2)) ........................................................... 119
Bus Travel (66(C)(8)) ........................................................... 121
Hospitalization and Medical (28) ........................................ 42
Liability (5(E)(2)) ................................................................ 16
Personal Property (50) ........................................................ 78
Social Security (61) ............................................................. 101
Supplemental Workers Compensation (31(B)) ................... 49
Unemployment (61) ............................................................. 101
Workers' Compensation (31(A)) .......................................... 49
Internet (See Web Usage)
Interpretations, Oral and Written (24(E)) ................................... 41
Interviews/Auditions, Principal (5(A)) ......................................... 11
Interviews, Publicity, Expense Reimbursement (47(J)) ............... 76
Intimidation (32) .......................................................................... 49
Intoxication (54(A)) ...................................................................... 85
Itinerary (66(C)(9)) ....................................................................... 121

Jewelry, Lost or Stolen (50) ........................................................ 78
Joining Company on Tour (52(C)(2)) ........................................... 80
Holiday Pay (45(C)(3)) ................................................................. 73
Just Cause 63(D) ......................................................................... 109
Juvenile Actors (33) ..................................................................... 50
Per diem (33(B)(4)) ............................................................. 50
Tutor (33(A)(2), 33(A)(4)) ................................................... 50
Working Papers (33(A)(6)) .................................................. 50

Knee Pads (13(D)) ........................................................................ 30

Lateness (23) ............................................................................... 40
for "half-hour" (45(F), 54(A)(1)) ......................................... 73, 85
for Rehearsal (52(L)) ........................................................... 84
Lavatories (56(C)) ........................................................................ 90
Laws Governing (34) ................................................................... 51
LAY-OFF (36) ............................................................................... 51
Illness or Death of Star (36(B), 52(G)) ................................ 52, 82
Leave, Unpaid (30(F), 30(H)) ...................................................... 47, 47
Legal Tender, Salaries (57(G)) .................................................... 97
Liability Insurance (5(E)(2)) ........................................................ 16

A-274

Joint Exhibit 1

HEADING AND RULE NUMBER           PAGE NUMBER

Local Information (29(A)(3)) ................................................................................ 42
Local Transportation (29(C)) ............................................................................. 43
Lock-outs or Strikes (39) ................................................................................... 65
LORT, Transfer from (64) ................................................................................. 111
Lost Performances (46) ...................................................................................... 74
Lost Property (50) ............................................................................................... 78
Lost Rehearsals (52(G)) ..................................................................................... 82
Luggage (see Baggage)

Mail, Forwarding on Tour (66(G)) ................................................................... 122
Make-Up (13(G)) ................................................................................................. 31
Maternity Leave (see Disability Leave)
Meal Stops (66(C)(3)) ....................................................................................... 120
Meals between Performances (45(B)(2), 45(B)(3)) .................................... 72, 72
MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST
PROVISIONS (37) .............................................................................................. 54
     B-Roll Footage (See Capture (37(A)(1)) ................................................. 54
     Cast Album (37(B)) ................................................................................. 57
     Commercials:  TV, Radio Spot, In-Flight or Theatrical (37(C)) .............. 58
     Documentary (37(E)) ............................................................................. 62
     Dramatic Production Opt-Out (See Addendum)
     Media Payment (37(A)(3)(a), 57(D)) ................................................ 56, 96
     Newscast (37(D)) .................................................................................... 61
     Notice to Broadcast Media and Press Agents (37(L)) ........................... 64
     Opening Night Specials (37(I)) ............................................................... 63
     Payment for Live Television Promotional Appearances (37(G)) ............ 63
     Session Fees (37(C)(1)(a), 37(C)(2)(a)) ........................................... 58, 59
     Use of Footage After Expiration Date of Contract (37(H)) ..................... 63
     Webisodes and Mobisodes (37(A)(3)(b)) ............................................... 57
Medical Insurance (28) ....................................................................................... 42
Meeting, First Rehearsal (24(A)) ....................................................................... 40
Meetings, Cast (58) .......................................................................................... 100
Membership Meeting, Equity (24(C)) .................................................................. 40
Military Service (38) ............................................................................................ 65
Minimum Salary (57(A)) ...................................................................................... 94
Most Favored Nations (Experimental Touring Program 65(G)) ....................... 117
Motion Picture of Production (37) ....................................................................... 54

Newscast (37(D)) ................................................................................................ 61
Night Travel (66(A)(3), 66(D)(1)) ............................................................. 118, 121
No Lockouts or Strikes (39) ................................................................................ 65
NON-DISCRIMINATION (40) ............................................................................. 66
     Against Deputy (20) ............................................................................... 38
     Age (40) .................................................................................................. 66
     Casting (40) ............................................................................................ 66

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

and (5(E)(4)) ................................................................. 17
Claims (40(B)) ............................................................... 66
Disability (40) ................................................................ 66
Hotels (29(D)) ............................................................... 43
National Origin (40) ....................................................... 66
Political Persuasion or Belief (see also 8, BLACKLISTING) (40)...................... 66
Race, Color, Creed (40) ................................................ 66
Sex (Sexual Harassment) (40) ...................................... 66
Sexual Orientation (40).................................................. 66
Union Activity (20) ........................................................ 38

Non-Resident Aliens (3) ............................................................. 7
Non-Traditional Casting (40 DIVERSE AND INCLUSIVE CASTING (21)) ................... 66
Note Sessions (52(D)(1)(e)) ...................................................... 81
NOTICES (41).............................................................................. 67
Closing (63(A)(4), 63(A)(5), 63(B)(1)).............................. 108, 109
Weeks Notice Defined (41(C))....................................... 67
In Writing (41(A), 41(B)) ............................................... 67
Posting of (41(C), 41(D), 41(E))..................................... 67
Termination (63) ........................................................... 107
To Actor (41(B))............................................................. 67
Picture Call (47(C),47(D)) ................................. 75
To Producer (41(B))....................................................... 67
To Understudy (11(B)(1), 67(C))............................... 24, 123
Nudity (42)  ................................................................................. 67
Number in Cast (43) .................................................................... 69
Number of Chorus (43(C)) ............................................ 69
Number of Stage Managers (43(D)) .............................. 69
Number of Performances (45(A)) ............................................... 70

Obligation of Actor to Equity (1) ................................................. 6
Offset, Salary (9(B)) .................................................................... 23
Omission in Program (6(B)(3), 6(C)(1)(a))............................... 19, 20
Oral Rulings (24(E)) .................................................................... 41
Overage Participation (57(F)(2)) ................................................ 96
Overseas Rider (66(A)(7)).......................................................... 119
OVERTIME….... ........................................................................... 82
Picture Calls (47(A), 47(B), 47(F)) ............................ 75, 75
Overtime, Rehearsal (52(D)(3))................................................. 82
Overtime Travel (66(A)(8)) .......................................................... 119

Part Cut Out (54(C)) .................................................................... 86
Partial Swing (11(D)(7))............................................................... 28
Pension Fund (44)........................................................................ 69
Per Diem (29(E)) .......................................................................... 43

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

    After Closing (66(A)(2)) ................................................................. 117
    Juveniles (33(B)(4)) ........................................................................ 50
Per Diem, Rehearsal (29(F)(4)) ................................................................ 44
PERFORMANCES (45) ............................................................................. 70
    Breaks (45(B)) ................................................................................ 72
    Curtain Time Change (45(A)(4)) ..................................................... 71
    Definition (45(C)(1)) ....................................................................... 73
    Holiday Pay (45(C)(3)) ................................................................... 73
    Lost (46) ......................................................................................... 74
    Number of (45(A)) .......................................................................... 70
    Payment for Additional (45(A)(2)45(A)(5), 45(A)(6), 45(C)(2)) ..................... 71, 73
Personal Appearances, Expense Reimbursement (47(J)) ........................... 76
Personal Days (30(H)) .............................................................................. 47
PHOTOGRAPHS (47) ............................................................................... 75
    Calls (47(A),47(B),47(C),47(D),47(E),47(F),47(G)) ....................... 75
    Commercial Use (47(K)) ................................................................. 76
    Identification (6(C)(3), 6(C)(4), 6(C)(5), 6(D)(2), 6(E)(3)) ............................. 20, 21
    Nude Photographs (47(L)) .............................................................. 76
    Publicity (47(D), 47(H)) .................................................................. 75
    Removal of (6(E)) ........................................................................... 21
    Replacement Call (47(G)) ............................................................... 75
    Websites (6(D)(2),6(D)(4)) .............................................................. 20
Photography Prohibited (56(H)(4)) ............................................................ 92
Place of Engagement, Transportation to/from
    (66(A)(1), 66(A)(2), 36(A)(4), 36(B)(4)) ............................... 117, 52, 53
Posting of Agreement (41(E)) ................................................................... 67
Postponement (52(H)) .............................................................................. 83
Press Release (48) ................................................................................... 77
Principal Actor, Definition (19(A)(2)) ........................................................ 38
Principal Auditions and Interviews (5(A)) .................................................. 11
Principal Auditions, Replacement (5(B)) ................................................... 14
Pro-Ration of Salary
    Performance (45(A)(8),45(A)(9),52(C)(5)) ................................. 71, 80
    Rehearsal (52(C)(1),52(C)(5)) ....................................................... 79
Producer's Statement (59) ....................................................................... 100
Production Prosecuted (49) ...................................................................... 77
Program/Playbill (6(B)) ............................................................................. 18
Program, Errors or Omissions (6(B)(1)(a), 6(B)(3), 6(B)(4), 6(B)(5)) ................ 19, 19
Property, Loss or Damage (50) ................................................................. 78
Props and Set Moves (57(J)) .................................................................... 98
Protective Clothing (13(D)) ....................................................................... 30
Publicity and Photographs (47) ................................................................. 75
    By Actors Not Employed in Any Production (47(O)) ........................ 76

Radio Broadcasting (37(A)(3)(f)) ............................................................... 57

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

Radio Spot Commercial (37(C)(2)) ........................................................ 59
Rail Transportation (66(D)) .................................................................. 121
Raked Stage (56(J)) ........................................................................... 92
Reading of the Play (52(A)) ................................................................. 79
Recognition ...................................................................................... 1
Recording of Production (37) ............................................................... 54
Recording Used in Production (51) ........................................................ 78
Reduction of Chorus (43) .................................................................... 69
Reduction of Principals and Stage Managers (43) ..................................... 69
REHEARSALS (52) ............................................................................. 79
        Abandonment of Play (52(H)) ...................................................... 83
        Absence from (52(F), 52(L)) ................................................. 82, 84
        Attendance at (52(E)) ................................................................ 82
        After Performance (52(D)(1)(e)) ................................................. 81
        After Illness, Injury or Disability (30(B), 30(I)(11)) ..................... 45, 49
        Beginning of (52(A)) ................................................................. 79
        Breaks (52(D)(1)(i)) .................................................................. 81
        Calls (52(D)(1)) ....................................................................... 80
        Continuous (52(B)) .................................................................. 79
        Day after Day Off (55(A), 55(B)(3)) ....................................... 86, 88
        Days Off (55(B)) ...................................................................... 87
        Discontinued (52(H)) ................................................................ 83
        Holidays (45(C)(3)) .................................................................. 73
        Hours after Opening (52(D)(1)(c)) ............................................... 81
        Hours during Rehearsal Period (52(D)(1)(a), 52(D)(1)(b)) ................. 80
        Hours on Two Performance Day (52(D)(1)(c)) ................................. 81
        Latenesses (52(L)) ................................................................... 84
        Length of Rehearsal Period (52(C)(1), 52(C)(2)) ............................. 79
        Lost (52(G)) ............................................................................ 82
        Note Sessions (52(D)(1)(e)) ....................................................... 81
        Out-of-Town; Newark, Purchase or Stamford (52(I)) ........................ 83
        Overtime (52(D)(3)) .................................................................. 82
        Per Diem (29(E), 52(I)) ........................................................ 43, 83
        Reading of the Play (52(A)) ....................................................... 79
        Salary (52(C)) ......................................................................... 79
                and (57(A)(1)) ................................................................ 94
        Special Provisions (52(J)) .......................................................... 83
        Stage Fighting (56(I)(6), 56(I)(7)) ............................................... 92
        Substituted for Performance (52(D)(1)(h)) ..................................... 81
        Swings (11(D)(3)) ..................................................................... 27
        Technical Rehearsal for Swings/Understudies/Replacements (52(K)) ...... 84
        Understudies (52(J)(1), 52(J)(3), 52(K)) ...................................... 83
        Weeks permitted (52(C)(1), 52(C)(2)) .......................................... 79
Rental of Clothing (13(B)) ................................................................... 29
Re-Opening of a Play (53) ................................................................... 85

A-278

Joint Exhibit 1

HEADING AND RULE NUMBER                                                    PAGE NUMBER

Replacement of an Actor (54) ....................................................................... 85
REPLACEMENTS
    Chorus, Vacations/Temporary Swings (11(D)(8))................................................ 28
    Emergency, Principal (67(K))................................................................ 124
    Emergency, Chorus (11(B)(3)) ............................................................. 25
    Understudy (67(J))............................................................................ 124
    Vacation (70(C)) ............................................................................... 125
Representatives (24(A), 24(B)) .................................................................. 40
Reservations, Hotel (29(B)).......................................................................... 43
REST PERIODS (55) ....................................................................................... 86
    After Arrival (55(A)(3)) ....................................................................... 86
    After Day Off (55(A), 55(B)(3))......................................................... 86, 88
    Between Days (55(A)(1), 55(A)(2))................................................... 86, 86
    Between Performances (45(B)(2))......................................................... 72
    Stage Managers (62(J))...................................................................... 104
    Twenty-four Hour Rest Period (55(B)(2)(b)) ......................................... 88
    Travel Day (52(D)(1)(b), 55(A)(1), 55(A)(2), 66(A)(6)) ................... 80, 86, 86, 118
RIDER:
    Additional Duties (57(J)) ..................................................................... 98
    Cast Album 37(B)  .............................................................................. 57
    Chorus Six-Month (11(C)) ................................................................... 25
    Contracts (15(C))................................................................................ 33
    Costumes, Understudies and Swings (13(E))....................................... 30
    Exclusive Service (26) ........................................................................ 41
    Extraordinary Risk (57(C))................................................................... 95
    Nudity (42(B)(2))................................................................................. 68
    Overseas (66(A)(7))............................................................................ 119
    Smoke and Haze (56(H)(2)(a)) ........................................................... 91
    Stage Fighting (56(I)(1)) ..................................................................... 92
    Stunts (56(I)(2)) ................................................................................. 92
    Touring (65(A))  .................................................................................. 114
    Understudies (67(C))........................................................................... 123
Riot, Performance Lost (46(A)) ................................................................... 74
Risk Insurance (31(B)) ................................................................................ 49
Risk Payments (57(C)).................................................................................. 95
Role/Part Cut Out (54(C)).............................................................................. 86
Rulings, Oral and Written (24(E)) ................................................................. 41
Run-of-the-Play (see Term Contract)

SAFE AND SANITARY PLACES OF EMPLOYMENT (56) ........................................ 89
    Actor's Responsibility (56(L)).............................................................. 93
    Air Conditioning (56(A)(1))................................................................... 89
    Auditions (5(C)(2)(e)), 5(E)(1)) ...................................................... 15, 16
    Backstage (56(A))............................................................................... 89
    Bus Transportation (66(C)(1)).............................................................. 120

xii

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

Change Rooms (56(B)(3)) ................................................................. 89
Compliance (56(M)) ......................................................................... 93
Costumes (56(H)(1)) ....................................................................... 90
Cots (56(D)) .................................................................................... 90
Dancing Surfaces (56(E)) ............................................................... 90
        for Auditions (5(C)(2)(e)) ..................................................... 15
Dangerous Conditions Prohibited (56(H)) ....................................... 90
Dressing Rooms (56(B), 56(C)) ................................................ 89, 90
Drinking Water (56(G)) .................................................................... 90
Firearms (56(H)(3)) ......................................................................... 91
First Aid Kits (56(F)) ....................................................................... 90
Hazardous and Toxic Materials (56(N)) .......................................... 93
Heat (56(A)(1), 56(B)(2)) ................................................................ 89
Inspection (56(M)) ........................................................................... 93
Lavatories (56(C)) ........................................................................... 90
Photography and Recording Prohibited (56(H)(4)) .......................... 92
Raked Stage (56(J)) ........................................................................ 92
Showers (56(C)(3)) ......................................................................... 90
Smoke, Haze and Pyrotechnics (56(H)(2)) ..................................... 91
Smoking Prohibited (56(B)(5)) ........................................................ 90
Stage (56(A), 56(J)) ................................................................... 89, 92
Stage Fighting/Stunts (56(I)) .......................................................... 92
Toilets (56(C)(2)) ............................................................................ 90
Ventilation (56(B)(2)(c)) .................................................................. 89
SAG (37) ......................................................................................... 54
SALARIES (57) ............................................................................... 94
Actor (57(A)(2)) ............................................................................... 94
Actual Salary (57(H)) ...................................................................... 97
Additional Duties (57(J)) ................................................................. 98
Assistant Stage Manager (57(A)(2)) ............................................... 94
Checks (57(E)) ................................................................................ 96
Chorus (57(A)(2)) ............................................................................ 94
Chorus Increments (11) ................................................................... 24
Contingent Compensation (57(F)) ................................................... 96
Dance Captain (17(B), 17(E)) ......................................................... 36
Direct Deposit (63(A)(8)) ............................................................... 108
Expense Money (See Per Diem) ...................................................... 43
Extraordinary Risk (57(C)) .............................................................. 95
Extra Performances (45(A)(1), 45(A)(2), 45(A)(5), 45(A)(6), 45(A)(9)) ......... 70, 71
Holiday Pay (45(C)(3)) ..................................................................... 73
Legal Tender (57(G)) ....................................................................... 97
Media Payment
Payday, Rehearsal (52(C)(4)) .......................................................... 80
Payment Due (57(I)) ........................................................................ 97
Pro-Ration, Performance (45(A)(8), 45(A)(9), 52(C)(5)) ........... 71, 80

A-280

Joint Exhibit 1

HEADING AND RULE NUMBER                                          PAGE NUMBER

Pro-Ration, Rehearsal (52(C)(1), 52(C)(5)) ................................................. 79, 80
Rehearsal (52(C)) ......................................................................................... 79
    and (57(A)(1)) ......................................................................................... 94
Second Assistant Stage Managers (57(A)(2), 57(B)) ................................ 94, 95
Stage Managers (56(A)(2)) ............................................................................ 89
Swing (11(D)(6)) ........................................................................................... 27
Schedule Change (45(A)(3), 52(D)(1)(g)) ................................................... 71, 81
Screen Actors Guild (37) ................................................................................ 54
Script Preparation (62(O)) ............................................................................ 105
Script Required (15(B)(3)) .............................................................................. 32
Script Review (5(E)(4)) ................................................................................... 17
Secret Vote (58) ........................................................................................... 100
Security Agreements (59) ............................................................................. 100
Set and Prop Moves (57(J)) ........................................................................... 98
Showcase Production, Conversion from (60) ............................................... 100
Showers (56(C)(3)) ........................................................................................ 90
Sick Leave (30) .............................................................................................. 45
Sick/Vacation Leave Cap (30(C)) .................................................................. 45
Singers, Chorus Auditions (5(C)) ................................................................... 14
Six-Month Rider, Chorus (11(C)) .................................................................... 25
Size of Chorus (43(C)) ................................................................................... 69
Smoke, Haze and Pyrotechnics (56(H)(2)) ..................................................... 91
Social Security and Unemployment Insurance (61) ...................................... 101
Sound Checks (55(B)(3)) ................................................................................ 88
Souvenir Program (6(C)) ................................................................................ 20
Stage Fighting (56(I)) ..................................................................................... 92
STAGE MANAGERS (62 ............................................................................... 102
    Acting Not Permitted (62(G)) ................................................................ 103
    Assistants (62) ...................................................................................... 102
    Absent from Production (62(K)) ............................................................. 105
    Additional Services Other Company (62(O)) ......................................... 105
    Cast Albums (37(B)) ................................................................................ 57
    Commercials (37(C)) ............................................................................... 58
    Contract required (62(B)) ...................................................................... 102
    Day Off, Compensatory (62(W)) ........................................................... 107
    First Assistant (62(H)) ........................................................................... 104
    Media Benefit Contributions (37(K)) ....................................................... 64
    Newscast (37(D) ..................................................................................... 61
    Number of (62(A)) .................................................................................. 102
    Overtime (52(D)(3)) ................................................................................. 82
    and (62(R), 62(S)) ................................................................................. 106
    Pre-Production (62(C),62(D),62(H)) ............................................... 102, 104
    Qualifications of Stage Manager (62(L)) ............................................... 105
    Replacements (62(D),62(E)) .................................................................. 102
    Required (62(A)) .................................................................................... 102

Joint Exhibit 1

HEADING AND RULE NUMBER                                  PAGE NUMBER

Required Attendance (62(A),62(Q))........................................................ 102, 106
Required Second ASM in a Musical (62(A)) ................................................. 102
Rest Period (62(J)) ..................................................................................... 104
Salary (57(A)(2)) ........................................................................................... 94
Script Preparation (62(O)) .......................................................................... 105
Second Assistant (57(B)) .............................................................................. 95
       and (62(A)) .......................................................................................... 102
Selection of Assistant Stage Manager (62(T)) ............................................ 106
Short-term Stage Manager (62(E)) ............................................................. 102
Tech Week Compensation (62(N)) .............................................................. 105
Transportation of Work Box (62(M)) ........................................................... 105
Weekly Report of Performers Absent 11(D)(3) .............................................. 27
Stage, Safe and Sanitary (56(A)) .................................................................... 89
Standard Minimum Contract, Conversion (15(I)) ............................................. 35
Standard Minimum Contract, Termination (63(A)) ......................................... 107
Star, Illness or Death (36(B)) ........................................................................... 52
Strikes or Lock-Outs (39) ................................................................................ 65
Stunts (56(I)) .................................................................................................... 92
Supplemental Workers' Compensation Plan (31(B)) ........................................ 49
Sweetening (51) ............................................................................................... 78
Swing (11(D)) ................................................................................................... 27

TELEVISION, RECORDING AND MOTION PICTURE FILMING (See MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS)
Term Contract, Conversion to (15(I)) ............................................................... 35
Term Contract, Minimum (15(H)) ..................................................................... 35
TERMINATION (63) ....................................................................................... 107
    After First Paid Public Performance (63(A)(2)) ......................................... 108
    Company Closing (63(A)(4), 63(A)(5)) ...................................................... 108
       and (41(C)) ...................................................................................... 67
    Illness (30(A), 30(B)) .................................................................................. 45
       and (52(F)) ....................................................................................... 82
    Just Cause (63(D)) ................................................................................... 109
    Military Service (38) .................................................................................. 65
    Notice (63(A)(3)) ...................................................................................... 108
    Replacement of Actor (54) ........................................................................ 85
    Rights After Giving Notice (63(A)(9)) ...................................................... 108
    Role or Part Cut Out (54(C)) ..................................................................... 86
    Six-Month Rider (Chorus) (11(C)) .............................................................. 25
    Standard Minimum, Before Rehearsal (63(A)(1)) .................................... 107
    Standard Minimum, During Rehearsal (63(A)(1)) .................................... 107
    Term (63(B)) ............................................................................................ 109
Thanksgiving, Holiday Pay (45(C)(3)) .............................................................. 73
Time Limit, Claims (12(B)) ............................................................................... 28

A-282

Joint Exhibit 1

HEADING AND RULE NUMBER                                    PAGE NUMBER

Toilets (56(C)) ................................................................................. 90
Transfer from LORT and Other Contracts (64)................................ 111
Transfer to Short Engagement Touring Agreement (64) .................. 111
    Conversion Payments and Guarantee of Employment (64(A))........ 111
    Definition of Financial Interest (64(C)) ...................................... 113
    From Production Contract Tour (65(C), 65(D)) ............................ 115
    Notice of Financial Interest (64(B)) ........................................... 113
    Payments After Recoupment (64(G)) ........................................ 114
TRANSPORTATION (66).................................................................. 117
    Air (66(B)) ................................................................................ 119
    Air Travel Insurance (66(B)(2)) ................................................. 119
    Baggage (66(F)) ....................................................................... 122
    Bus Transportation (66(C)) ....................................................... 120
        Breakdowns, Time Lost (66) ............................................. 117
        Bus Log (66(C)(10)) ......................................................... 121
        Comfort Stops (66(C)(2)) .................................................. 120
    Company Manager (66(C)(6),66(E)).................................... 121, 122
    Delays:
        Air Travel (66(B)(5)) ......................................................... 119
        Bus Travel (66(A)(5)) ........................................................ 118
        Rail Travel (66(D)(3)) ........................................................ 121
    Meal Stops (66(C)(3)).............................................................. 120
    Night Travel (66(A)(3),66(D)(1)) ......................................... 118, 121
    Overtime (66(A)(8)) .................................................................. 119
    Per Diem After Closing (66(A)(2))............................................. 117
        and (63(B)(2)) .................................................................. 113
    Place of Residence or Engagement, to and from (66(A)(1),66(A)(2))............... 117
    Rail (66(D)).............................................................................. 121
    Route Sheet (66(C)(9)) ............................................................ 121
    Travel Time (66(A)) .................................................................. 117
Tutors (33(A)(2),33(A)(4)) .............................................................. 50
Twenty-four Hour Rest Period (55(B)(2)(b)) .................................... 88

UNDERSTUDIES (67).................................................................... 123
    "As Cast" (15(D)(2))................................................................. 34
    Attendance at Performance (67(E)).......................................... 123
    Billing (6(A)(1), 6(B)(1), 6(B)(2)) ......................................... 18, 19
    Changes in Cast (Billing and Bio) (10)...................................... 23
    Chorus for Chorus (11(B)(2))................................................... 25
    Chorus for Principal (11(B)(1))................................................. 24
        and (67(F)(1),67(F)(2))..................................................... 123
    Costumes (13(E)) .................................................................... 30
    Emergency, Chorus Part (11(B)(3)).......................................... 25
    Emergency, Principal Part (67(K)) ............................................ 124
    For Star (67(D)(1)(b)) .............................................................. 123

A-283

Joint Exhibit 1

HEADING AND RULE NUMBER

PAGE NUMBER

General Understudy (67(B)) ................................................................ 123
Notice (67(C)) .................................................................................. 123
Number of Roles Permitted (67(B)) .................................................. 123
One Company at a Time (67(I)) ........................................................ 124
Payments (67(D)) ............................................................................ 123
Principal Role (67(B)) ...................................................................... 123
Program Listing (6(B)(1),6(B)(2)) ............................................... 19, 19
    and (67(H)) ............................................................................ 124
Provided with Script, Music (67(G)) ................................................ 124
Rehearsal (67(G),67(L),52(J),52(K)) ...................................... 124, 83
Replacements (67(J)) ...................................................................... 124
Required (67(A)) .............................................................................. 123
Time Limit in Hiring (67(F)) .............................................................. 123
Unemployment Insurance (61) ........................................................ 101
Union Emblem (68) .......................................................................... 124
Unpaid Leave for Compelling Circumstances (30(F)) ...................... 47
Union Security (69) .......................................................................... 124

Vacations (70) ................................................................................. 125
Accrual (70(A)(1)) ........................................................................... 125
Actor's Right to Take (70(A)(2)) ...................................................... 125
Sick Leave not Consecutive with Vacation (30(C)) .......................... 45
Vacation Replacement Contracts (11(D)(8), 70(C)) ................. 28, 125
Voluntary Classes (71) .................................................................... 125
Vote, Secret (58) ............................................................................. 100

Water, Drinking (56(G)) ..................................................................... 90
Water, Hot (56(C)(1)) ........................................................................ 90
Webisodes and Mobisodes (37(A)(3)(b)) .......................................... 57
Web Usage (37(A)(2)(b)) ................................................................... 55
Week, Definition of (19(F)) ................................................................ 38
Wigs (13(I)) ....................................................................................... 31
Worker's Compensation (31) ............................................................. 49
Work Week (19(F)) ............................................................................ 38