# 23-7087

## United States Court of Appeals

*for the*

## Second Circuit

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

– v. –

JOHN GORE THEATRICAL GROUP, INC.,

*Respondent.*

ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD
IN CASE NO. 02-CA-286802

## REVISED JOINT APPENDIX
### Volume 2 of 2 (Pages A-284 to A-417)

<table>
<tr>
<td>

RUTH E. BURDICK
BRADY FRANCISCO-FITZMAURICE
MILAKSHMI V. RAJAPAKSE
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

*Attorneys for Petitioner*

</td>
<td>

MARK THEODORE
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

HENRIQUE N. CARNEIRO
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Respondent*

</td>
</tr>
</table>

CP COUNSEL PRESS    (800) 4-APPEAL • (326572)

i

# TABLE OF CONTENTS

**Page**

*Volume 1*

Certified List of the National Labor Relations
  Board, dated October 2, 2023 ............................... A-1

Transcript of Hearing Before the ALJ, dated
  August 30, 2022 ...................................................... A-4

  GC Exhibits 1A-F ................................................. A-94

  Respondent Exhibit 1 ............................................ A-121

  Respondent Exhibit 2 ............................................ A-123

  Respondent Exhibit 4 ............................................ A-125

  Joint Exhibit 1 ...................................................... A-126

*Volume 2*

  Joint Exhibit 2 ...................................................... A-284

  Joint Exhibit 3 ...................................................... A-299

  Joint Exhibit 4 ...................................................... A-300

  Joint Exhibit 5 ...................................................... A-301

  Joint Exhibit 6 ...................................................... A-302

  Joint Exhibit 7 ...................................................... A-303

  Joint Exhibit 8 ...................................................... A-304

  Joint Exhibit 9 ...................................................... A-313

  Joint Exhibit 10 .................................................... A-314

  Joint Exhibit 11 .................................................... A-317

  Joint Exhibit 12 .................................................... A-318

ii

|  | Page |
|---|---|
| Joint Exhibit 13 | A-331 |
| Administrative Law Judge's Order, dated December 6, 2022 | A-335 |
| Order Transferring Proceeding to the Board, dated December 6, 2022 | A-347 |
| Respondent's Exceptions to the Administrative Law Judge's Order, dated January 3, 2023 | A-349 |
| General Counsel's Answering Brief to Respondent's Exceptions, dated January 31, 2023 | A-360 |
| Charging Party Actors Equity's Association's Answering Brief to Respondent's Exceptions Brief, dated January 31, 2023 | A-372 |
| Respondent's Reply Brief, dated February 14, 2023 | A-403 |
| National Labor Relations Board Application for Enforcement, dated August 23, 2023 | A-413 |

A-284



Joint Exhibit 2
**Hanan B. Kolko, Of Counsel**
Tel:  212.356.0214
Fax:  646.473.8214
hkolko@cwsny.com
www.cwsny.com

900 Third Avenue, Suite 2100 • New York, NY 10022-4869

July 6, 2021

<u>**Via Email: bplum@proskauer.com**</u>
Bernard Plum
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299

Re: <u>Information Request regarding John Gore Organization/Networks</u>

Dear Mr. Plum:

We write to you on behalf of Actors' Equity Association ("Equity"), in your capacity as counsel for The Broadway League, and in connection with the upcoming unified touring negotiations and Equity's evaluation of a possible grievance. Equity is concerned that one of the League's members, the John Gore Organization ("JGO") has been and is diverting productions covered by the Short Engagement Touring Agreement (the "SETA") to Networks Presentations, LLC, a Texas Limited Liability Company and/or its affiliates (collectively, "Networks). Equity's investigation has revealed that JGO and/or an affiliate has an interest in Networks. Specifically, and for example, Equity's investigation has revealed:

a) a 2018 public filing with the Texas Secretary of State showing that Key Brand Family Holdings is a "member" of Networks Presentations, LLC, a Texas Limited Liability Company;

b) a 2018 public filing in Georgia showing that Key Brand Family Holdings, Inc. changed its name to John Gore Family Holdings, Inc. as of March 27, 2018;

c) 2019 and 2020 public filings with the North Carolina Secretary of State showing that John Gore Family Holdings, Inc. is a "Manager" of Networks Presentations, LLC a Texas Limited Liability Company; and

d) both the 2018 Texas filing and the 2019 North Carolina filing show an address of 1619 Broadway, 9th Floor New York, New York for Key Brand Family Holdings, (Texas) and John Gore Family Holdings Inc., (North Carolina), an address which is identical to the address shown for JGO on its web page.

In view of this, and pursuant to your obligations under Sections 8(a)(1) and (5) of the National Labor Relations Act, please produce the following information:

3018416.5

A-285

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 2

      1.     For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had an equity interest and describe that equity interest. For purpose of this letter, "theatrical production" is defined as any live musical and/or dramatic production.

      2.     For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings has or had an equity interest and describe that equity interest.

      3.     For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings, Inc. has or had an equity interest and describe that equity interest.

      4.     For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Holdings has or had an equity interest and describe that equity interest.

      5.     For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings, Inc. has or had an equity interest and describe that equity interest.

      6.     For the period January 1, 2018 through the present identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had an equity interest and describe that equity interest.

      7.     For the period January 1, 2018 through the present identify each theatrical production in which Networks Presentations, LLC, a Texas Limited Liability Company has or had an equity interest and describe that equity interest.

      8.     For the period January 1, 2018 through the present identify each theatrical production in which Networks has or had an equity interest and describe that equity interest.

      9.     For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

      10.     For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

A-286

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 3

11.     For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings, Inc. has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

12.     For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

13.     For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings, Inc. has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

14.     For the period January 1, 2018 through the present, identify each theatrical production in which JGO affiliate and/or subsidiary has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

15.     For the period January 1, 2018 through the present identify each theatrical production in which Networks has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

16.     For the period January 1, 2018 through the present identify each theatrical production in which Networks Presentations, LLC, a Texas Limited Liability Company has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

17.     Identify all employees, officers, shareholders, directors, partners, or members of any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary who are also employees, officers, shareholders, directors, partners, or members of Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company.  For each such officer, shareholder, director, partner, and member, state their position at each such entity, and, if the individual had any equity interest in the entity, sate the percentage of such interest.

18.     Identify all individuals identified in response to request number 17 who are or were at any time in the period from January 1, 2018 to the present officers, , shareholders, directors, partners, or members of Networks.  For each such officer, shareholder, director,

A-287

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 4

partner, and member, state (a) the individual's position at Networks; (b) the individual's ownership interest in the Networks and any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary; and (c) the periods of time in which they had those ownership interests.

19.    Identify each partnership and/or corporation affiliated with each of the following: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and Key Brand Family Holdings, Inc and describe each affiliation.

20.    Identify each partnership or corporation affiliated with Networks and Networks Presentations, LLC a Texas Limited Liability Company and describe each affiliation.

21.    For the period January 1, 2018 to the present, identify by production all theatrical productions in which any of the following - JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc, and any JGO affiliate and/or subsidiary - had a, equity, financial or managerial interest which subsequently were produced by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company and, for each such play or musical, describe the equity, financial or managerial interest.

22.    For the period January 1, 2018 to the present, identify all press agents employed by any of the following, and state which employs or employed the press agent identified: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, and any JGO affiliate and/or subsidiary.

23.    For the period January 1, 2018 and the present, identify all press agents employed by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company, and state which employs or employed each press agent identified.

24.    Please describe each business relationship that existed between January 1, 2018 and the present between each of the following and Networks and Networks Presentations, LLC, a Texas Limited Liability Company: John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc, and any JGO affiliate and/or subsidiary. If that relationship has materially changed since on or after January 1, [year], please describe the change, and describe the business relationship as it was immediately prior to the change.

25.    Was any shareholder or member of JGO a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or

A-288

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 5

members, identify their ownership interest in JGO and Networks, and state the periods in which they had those ownership interests.

26.     Was any shareholder or member of John Gore Family Holdings a shareholder or member of Networks between January 1, 2018 and the present?  If so, please identify such shareholders or members, identify their ownership interest in John Gore Family Holdings and Networks, and state the periods in which they had those ownership interests.

27.     Was any shareholder or member of John Gore Family Holdings, Inc. a shareholder or member of Networks between January 1, 2018 and the present?  If so, please identify such shareholders or members, identify their ownership interest in John Gore Family Holdings, Inc. and Networks, and state the periods in which they had those ownership interests.

28.     Was any shareholder or member of Key Brand Family Holdings, Inc. a shareholder or member of Networks between January 1, 2018 and the present?  If so, please identify such shareholders or members, identify their ownership interest in Key Brand Family Holdings, Inc. and Networks, and state the periods in which they had those ownership interests.

29.     Was any shareholder or member of any other JGO affiliate and/or subsidiary a shareholder or member of Networks between January 1, 2018 and the present?  If so, please identify such shareholders or members, identify their ownership interest in the JGO affiliate and/or subsidiary and Networks, and state the periods in which they had those ownership interests.

30.     Was any shareholder or member of Key Brand Family Holdings, a shareholder or member of Networks between January 1, 2018 and the present?  If so, please identify such shareholders or members, identify their ownership interest in Key Brand Family Holdings and Networks, and state the periods in which they had those ownership interests.

31.     *I attach as Exhibits A and B photocopies of the 2018 Texas Secretary of State and Georgia filings referred to above.  The Texas filing identifies Key Brand Family Holdings as a member of Networks LLC.*  Please describe the relationship between Key Brand Family Holdings and The John Gore Organization.  Please describe the relationship between Key Brand Family Holdings, *the entity listed in the Texas filing,* and Key Brand Family Holdings, Inc., *the entity listed in the Georgia filing.*  Please describe the relationship between Key Brand Family Holdings, Inc. and the John Gore Organization.

32.      Please describe the relationship between John Gore Family Holdings and John Gore Family Holdings, Inc.

33.     Please describe the relationship between John Gore Family Holdings, Inc. and the John Gore Organization.

A-289

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 6

34.     *I attach as Exhibit C the 2019 North Carolina Secretary of State filing referred to above.*  It identifies "John Gore Family Holdings" as a "Manager" of Networks Presentations, LLC.  Please describe the duties which John Gore Family Holdings has in its capacity as a "Manager" of Networks Presentations, LLC.

35.     Please identify all shareholders, owners, and/or members of JGO between January 1, 2018 and the present and state the percentage of their ownership.

36.     Please identify all shareholders, owners, and/or members of John Gore Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

37.     Please identify all shareholders, owners, and/or members of John Gore Family Holdings between January 1, 2018 and the present and state the percentage of shares their ownership.

38.     Please identify all shareholders, owners, and/or members of Key Brand Family Holdings Inc. between January 1, 2018 and the present and state the percentage of their ownership.

39.     Please identify all shareholders, owners, and/or members of Key Brand Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

40.     Please identify all shareholders, owners, or members of Networks between January 1, 2018 and the present and state the percentage of their ownership.

41.     Please identify all shareholders or members of Networks Presentations, LLC, a Texas Limited Liability Company, between January 1, 2018 and the present and state the percentage of their ownership.

42.     Please identify all corporate parents, affiliates, and subsidiaries of the following: JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, and John Gore Family Holdings, Inc.

43.     Please identify all corporate parents, affiliates, and subsidiaries of Networks Presentations, LLC, a Texas Limited Liability Company.

44.     Was any senior executive of JGO also a senior executive of Networks between January 1, 2018 and the present?  If so, please identify the senior executive and his/her job title in each company between January 1, 2018 and the present.

A-290

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 7

45.	Was any officer, director, member or managing member of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings, Inc. also an officer, director, member or managing member of Networks or Networks Presentations, LLC between January 1, 2018 and the present?  If so, please identify the officer/director/member/ managing member and his/her role in each company between January 1, 2018 and the present.

46.	Was any supervisor and/or manager of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings Inc. also a supervisor or manager of Networks and/or Networks Presentations, LLC between January 1, 2018 and the present?  If so, please identity the supervisor and/or manager and his/her role at each company between January 1, 2018 and the present.

47.	Did Networks and/or Networks Presentations, LLC and JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings Inc. share any equipment between January 1, 2018 and the present? If so, please identify each such piece of equipment.  As used in this question, "equipment" includes sets, costumes, props, and any other physical item used to produce, stage, present, or otherwise put on a play, show, theatrical production, concert, or any other type of live entertainment.

48.	Identify all plays produced by Networks or Networks Presentations, LLC with the services or assistance of any of the following -  JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and Key Brand Family Holdings Inc. - between January 1, 2018 and the present.

49.	Identify all plays produced by any of the following - JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and/or Key Brand Family Holdings Inc. - with the services or assistance of Networks and/or Networks Presentations, LLC between January 1, 2018 and the present.

Please provide the requested information and documents by July 31, 2021.  Equity is willing to discuss the terms of an appropriate confidentiality agreement should you believe that any information or documents responsive to these requests are confidential.  Failure to comply with this request is an unfair labor practice and may result in the filing by Equity of an unfair labor practice charge.  Finally, if you do not represent the entities regarding which information is sought, please forward this letter to the appropriate persons and please let us know to whom you have forwarded this letter so that we may follow up with that person or persons.

.

A-291

Joint Exhibit 2



Bernard Plum
July 6, 2021
Page 8

Thank you in advance for your anticipated cooperation.

Very truly yours,

Hanan B. Kolko

HBK:nam
Enclosures

cc:   (Via email)
      Mary McColl, Executive Director
      Susan Davis, Esq.

A-292

Joint Exhibit 2

# Exhibit A

A-293

Joint Exhibit 2

# Public Information Report

**Public Information Report**
**NETWORKS PRESENTATIONS, LLC**
Report Year :2018

Information on this site is obtained from the most recent Public Information Report (PIR) processed by the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.texas.gov or Comptroller of Public Accounts, Open Records Section, PO Box 13528, Austin, Texas 78711.

| Title | Name and Address |
|---|---|
| MEMBER | **GENTRY AND ASSOCIATES INC.**<br>7135 MINSTREL WAY-STE 105 COLUMBIA, MD 21045 |
| DIRECTOR | **GENTRY AND ASSOCIATES INC.**<br>7135 MINSTREL WAY-STE 105 COLUMBIA, MD 21045 |
| MEMBER | **KEY BRAND FAMILY HOLDINGS**<br>1619 BROADWAY. 9TH FLOOR NEW YORK, NY 10019 |
| DIRECTOR | **KEY BRAND FAMILY HOLDINGS**<br>1619 BROADWAY. 9TH FLOOR NEW YORK, NY 10019 |

A-294

Joint Exhibit 2

# Exhibit B

A-295

Joint Exhibit 2

Control Number : 09078214

# STATE OF GEORGIA
### Secretary of State
**Corporations Division**
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

## AMENDED CERTIFICATE OF AUTHORITY
### NAME CHANGE

I, **Brian P. Kemp**, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

**KEY BRAND FAMILY HOLDINGS, INC.**
**a Foreign Profit Corporation**

formed under the laws of the State of **Delaware** and authorized to transact business in Georgia on **11/09/2009**, has amended its application to transact business in this state by the filing of an amendment changing its name to

**John Gore Family Holdings, Inc.**
**a Foreign Profit Corporation**

and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said application.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on **05/17/2018**.



Brian P. Kemp
Secretary of State

A-296

Joint Exhibit 2



**Brian P. Kemp**
Secretary of State

OFFICE OF SECRETARY OF STATE
CORPORATIONS DIVISION
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, GA 30334
(404) 656-2817
sos.georgia.gov/corporations

RECEIVED
SECRETARY OF STATE
CORPORATE DIVISION
2018 MAR 27 PM 3:44

## APPLICATION FOR AMENDED
## CERTIFICATE OF AUTHORITY
## OF A FOREIGN ENTITY

An amended certificate of authority must be obtained by filing an application for amended certificate of authority if a foreign entity changes its name or its jurisdiction of organization. If any other information required in the original application has changed, please use this form, attaching additional pages if necessary, to inform the Secretary of State of said changes. Complete (where applicable) and return this form with a check payable to "Secretary of State" in the amount of $20.00.

1. **Entity Name:** Key Brand Family Holdings, Inc.

2. **Entity Control Number:** 09078214

3. **Entity Type** (check one only):

   ☑ Corporation (Corporation must provide certificate of existence from home state with new name, if applicable.)
   ☐ Limited Liability Company
   ☐ Limited Partnership/Limited Liability Limited Partnership
   ☐ Limited Liability Partnership

4. **State/Country of Home Jurisdiction:** Delaware

5. **Date of Authorization in Georgia:** 11/09/2009

6. **New Entity Type** (if applicable):

   ☑ Corporation (Corporation must provide certificate of existence from home state with new name, if applicable.)
   ☐ Limited Liability Company
   ☐ Limited Partnership/Limited Liability Limited Partnership
   ☐ Limited Liability Partnership

7. **New Name of Entity** (if applicable): John Gore Family Holdings, Inc.

8. **New Home Jurisdiction** (if applicable): _____

9. _____  **Date** 3/14/2018
   **Signature**

   Robert A. Brandon
   **Print Name**

   **Signer's Capacity** (check one only):

   | Corporation: | ☑ Officer ☐ Chairperson of Board of Directors ☐ Court-Appointed Fiduciary ☐ Attorney-in-fact |
   | LLC: | ☐ Member ☐ Manager ☐ Court-Appointed Fiduciary ☐ Attorney-in-fact |
   | LP/LLLP: | ☐ General Partner ☐ Attorney-in-fact |
   | LLP: | ☐ Authorized Person |

**Email Address:** tbellos@broadway.com

Form CD 518
(Rev. 6/2017)

A-297

Joint Exhibit 2

# Exhibit C

A-298

# LIMITED LIABILITY COMPANY ANNUAL REPORT <span style="color:red">Joint Exhibit 2</span>

10/2017

NAME OF LIMITED LIABILITY COMPANY: Networks Presentations, LLC

SECRETARY OF STATE ID NUMBER: 0505527     STATE OF FORMATION: TX

REPORT FOR THE CALENDAR YEAR: 2019

| Filing Office Use Only |
| --- |
| E - Filed Annual Report |
| 0505527 |
| CA201910518567 |
| 4/15/2019 04:26 |
| ☐ Changes |

## SECTION A: REGISTERED AGENT'S INFORMATION

**1.** NAME OF REGISTERED AGENT: Corporation Service Company

**2.** SIGNATURE OF THE NEW REGISTERED AGENT:

SIGNATURE CONSTITUTES CONSENT TO THE APPOINTMENT

**3.** REGISTERED AGENT OFFICE STREET ADDRESS **& COUNTY**    **4.** REGISTERED AGENT OFFICE MAILING ADDRESS

2626 Glenwood Avenue,     2626 Glenwood Avenue,, Suite 550

Raleigh, NC 27608 Wake County     Raleigh, NC 27608

## SECTION B: PRINCIPAL OFFICE INFORMATION

**1. DESCRIPTION OF NATURE OF BUSINESS:** Promotion of Theatrical Entertainment

**2. PRINCIPAL OFFICE PHONE NUMBER:** (301) 926-3401    **3. PRINCIPAL OFFICE EMAIL:** Privacy Redaction

**4.** PRINCIPAL OFFICE STREET ADDRESS     **5.** PRINCIPAL OFFICE MAILING ADDRESS

7135 Minstrel Way, Suite 105     7135 Minstrel Way, Suite 105

Columbia, MD 21045-5293     Columbia, MD 21045-5293

**6. Select one of the following if applicable. (Optional see instructions)**

☐ The company is a veteran-owned small business

☐ The company is a service-disabled veteran-owned small business

## SECTION C: COMPANY OFFICIALS (Enter additional company officials in Section E.)

| NAME: Gentry Associates, Inc. | NAME: John Gore Family Holdings, Inc. | NAME: |
| --- | --- | --- |
| TITLE: Manager | TITLE: Manager | TITLE: |
| ADDRESS: | ADDRESS: | ADDRESS: |
| 7135 Minstrel Way Suite 105 | 1619 Broadway, 9th Floor | |
| Columbia, MD 21045 | New York, NY 10019-7412 | |

## SECTION D: CERTIFICATION OF ANNUAL REPORT. Section D must be completed in its entirety by a person/business entity.

| Gentry Associates, Inc., by Patricia Ann Guerieri Tax Director | 4/15/2019 |
| --- | --- |
| SIGNATURE | DATE |

Form must be signed by a Company Official listed under Section C of This form.

| Gentry Associates, Inc., by Patricia Ann Guerieri Tax Director | Manager |
| --- | --- |
| Print or Type Name of Company Official | Print or Type Title of Company Official |

This Annual Report has been filed electronically.

MAIL TO: Secretary of State, Business Registration Division, Post Office Box 29525, Raleigh, NC 27626-0525

A-299

Joint Exhibit 3



From: Plum, Bernard M. <BPlum@proskauer.com>
Sent: Friday, July 30, 2021 3:01 PM
To: Hanan B. Kolko <HKolko@cwsny.com>
Cc: Susan Davis <sdavis@cwsny.com>
Subject: The John Gore Organization

Dear Hanan:

Please be advised that I have been engaged by The John Gore Organization in connection with the matters raised by your email sent to me on July 7,2021. I will be in touch next week to discuss.

Thanks, and have a nice weekend.

Bernie

**Bernard M. Plum**
Member of the Firm

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3070
f 212.969.2900
bplum@proskauer.com

**green**spaces
Please consider the environment before printing this email.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message and its attachments are sent from a law firm and may contain information that is confidential and

A-300

Joint Exhibit 4



**From:** Hanan B. Kolko
**Sent:** Tuesday, August 24, 2021 12:12 PM
**To:** 'Plum, Bernard M.' <BPlum@proskauer.com>
**Cc:** Susan Davis <sdavis@cwsny.com>
**Subject:** RE: The Nederlander Producing Company of America/ The John Gore Organization

Bernie:

On July 7, 2021, we sent you two information requests directed at (1) the John Gore Organization and (2) the Nederlander Organization. Both requests set a July 31, 2021 deadline for a response. In two July 30, 2021 emails to me, you stated:

*Dear Hanan:*

*Please be advised that I have been engaged by The John Gore Organization/ the Nederlander Producing Company of America in connection with the matters raised by your email sent to me on July 7,2021. I will be in touch next week to discuss.*

*Thanks, and have a nice weekend.*

*Bernie*

Your July 30, 2021 email to me on behalf of the Nederlander Producing Company of America is below. I attach your July 30, 2021 email on behalf of the John Gore Organization.

We have not heard from you since then. As a courtesy, and without prejudice to Equity's rights, we will extend the due date for a responses to these two information requests to September 3, 2021.
Please let us know if you have questions or want to discuss.
Thanks,
Hanan

1

A-301

Joint Exhibit 5



**From:** Plum, Bernard M. <BPlum@proskauer.com>
**Sent:** Thursday, August 26, 2021 2:01 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Susan Davis <sdavis@cwsny.com>
**Subject:** The John Gore Organization

Hanan - my apologies for the delay. With the industry opening more shows simultaneously than ever, on Broadway and the road, it's difficult to engage now on how best to thoughtfully respond to a bulky request. I doubt we will accomplish that during the last week of August just before Labor Day and Rosh Hashanah.

We will, however, begin work on it and will send a response as soon as possible, hopefully no later the middle of next month. If you need to proceed more quickly with whatever process you plan to invoke I certainly understand, although I see no point to that given how long and complex a process this will likely be.

Bernie


**Bernard M. Plum**
Member of the Firm

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3070
f 212.969.2900
bplum@proskauer.com


greenspaces
Please consider the environment before printing this email.

---

**From:** Hanan B. Kolko <HKolko@cwsny.com>
**Sent:** Tuesday, August 24, 2021 12:12 PM
**To:** Plum, Bernard M. <BPlum@proskauer.com>

A-302

Joint Exhibit 6



**From:** Hanan B. Kolko
**Sent:** Monday, August 30, 2021 3:23 PM
**To:** 'Plum, Bernard M.' <BPlum@proskauer.com>
**Cc:** Susan Davis <sdavis@cwsny.com>
**Subject:** RE: The John Gore Organization

Bernie - Without prejudice to AEA's rights, and on a non-precedential basis, we'll extend the deadline to 9/17.
Thanks.
Hanan



**Hanan B. Kolko**
900 Third Ave, Suite 2100
New York, NY 10022-4869
Tel:   212.356.0214
Fax:  646.473.8214
Cell: 516-241-6674

HKolko@cwsny.com  |  www.cwsny.com | Bio
*Subscribe to the Cohen, Weiss and Simon LLP Bankruptcy Labor Law Blog
at* www.cwsny.com/bankruptcy-blog

**From:** Plum, Bernard M. <BPlum@proskauer.com>
**Sent:** Thursday, August 26, 2021 2:01 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Susan Davis <sdavis@cwsny.com>
**Subject:** The John Gore Organization

Hanan - my apologies for the delay.  With the industry opening more shows simultaneously than ever, on Broadway and the road, it's difficult to engage now on how best to thoughtfully respond to a bulky request.  I doubt we will accomplish that during the last week of August just before Labor Day and Rosh Hashanah.

We will, however, begin work on it and will send a response as soon as possible, hopefully no later the middle of next month. If you need to proceed more quickly with whatever process you plan to invoke I certainly understand, although I see no point to that given how long and complex a process this will likely be.

1

A-303

Joint Exhibit 7



-----Original Message-----
From: Plum, Bernard M. <BPlum@proskauer.com>
Sent: Friday, September 17, 2021 1:57 PM
To: Hanan B. Kolko <HKolko@cwsny.com>
Cc: Susan Davis <sdavis@cwsny.com>; Theodore, Mark <MTheodore@proskauer.com>
Subject: John Gore Organization

Hanan - we are finalizing a response to the Equity information request and plan to get it to you by end of day Monday. Apologies for the delay.

Bernie

Sent from my iPhone

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A-304

Joint Exhibit 8



**From:** Theodore, Mark <MTheodore@proskauer.com>
**Sent:** Thursday, September 23, 2021 3:28 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** John Gore Theatrical Group, Inc. - Information Request

Hanan,

I work with Bernie Plum and we are compiling response's to your client's information request. We appreciate your patience and are about finished pulling together the responses.

It appears a good deal of the information requested is confidential, in that it is considered proprietary. Most of it is non-public, of course. John Gore as a regular practice requests recipients of such information to sign a non-disclosure agreement, which is attached. The agreement will not interfere with your client's ability to use the information to bring claims pursuant to the relevant collective bargaining agreement.

If you could execute the agreement and send it back to us, we'll be ready to provide the responses to your information request.

Of course, please feel free to contact me should you wish to discuss this issue. Again, thanks very much for your patience and we apologize for any delay.

Mark

A-305

Joint Exhibit 8

**Mark Theodore**
Member of the Firm

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.5640
c:310.880.5346
f 310.557.2193
mtheodore@proskauer.com


greenspaces
Please consider the environment before printing this email.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message and its attachments are sent from a law firm and may contain information that is confidential and
protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender
immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A-306

Joint Exhibit 8

## CONFIDENTIALITY AGREEMENT

This **CONFIDENTIALITY AGREEMENT** (the "Agreement"), dated as of September __, 2021 is entered into by and between Actors' Equity Association, a labor union with offices at 165 West 46th Street, New York, NY 10036 ("Recipient") and The John Gore Theatrical Group, Inc., a Texas corporation with offices at 1619 Broadway, 9th Floor, New York, NY 10019 (together with its parent, subsidiaries and affiliates, as applicable, "Disclosing Party" or "Company"). Recipient and Disclosing Party are each referred to herein as a "Party" and collectively as the "Parties."

**WHEREAS** Recipient has requested certain information from the Company pursuant to an Information Request sent to Bernard Plum by Cohen, Weiss & Simon LLP on July 6, 2021 and in furtherance of Company's and Recipient's bargaining obligations, including the pursuit of grievances under the Short Engagement Touring Agreement signed by John Gore Theatrical Group, Inc. as a member of The Broadway League and Recipient (the "Transaction"); and

**WHEREAS**, subject to the terms of this Agreement, Disclosing Party intends to disclose to Recipient Confidential Information (as defined below) for the sole purpose of responding to the Transaction; and

**WHEREAS**, Recipient wishes to receive Confidential Information and is willing to agree to keep such information confidential as more fully set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. Confidential Information. Except as provided in Paragraph 2, "Confidential Information" means all non-public, confidential and/or proprietary information (whether oral, written, electronic or otherwise) relating to the Disclosing Party or the Transaction (including, without limitation, software, data, design plans, drawings, operational or financial information or other business and/or technical information) that, whether before, on, or after the date hereof, is disclosed to Recipient or any of Recipient's Representatives (as defined below) by Disclosing Party or any Disclosing Party Representatives (as defined below), together with all notes, memoranda, summaries, analyses, compilations, forecasts, studies, data and other documents and materials (in whatever form maintained) that are prepared by Recipient or Recipient's Representatives to the extent that they, whether in whole or part, use, contain, reflect or are derived from any such information or data. For purposes of this Agreement, references to "Recipient's Representatives" shall mean Recipient's outside attorneys and officers of Recipient. "Disclosing Party Representatives" in this Agreement shall mean, Disclosing Party and its affiliates, together with the respective officers, directors, employees, partners, agents, consultants and advisors (including, without limitation, financial advisors, counsel and accountants) of such Party. All information provided by or on behalf of the Disclosing

A-307

Joint Exhibit 8

Party Representatives will be considered Confidential Information unless otherwise provided in this Confidentiality Agreement.

2.  Exceptions. "Confidential Information" does not include information that:

    (a) is now in the public domain, or later enters the public domain through no action by Recipient or Recipient's Representatives in violation of this Agreement;

    (b) Recipient can demonstrate was already in its or Recipient's Representatives' possession on a non-confidential basis at the time of its disclosure to Recipient pursuant to this Agreement; provided, that the source of such information was not bound by an obligation of confidentiality to Disclosing Party;

    (c) is independently developed by Recipient or Recipient's Representatives without reference to, or the use of, any Confidential Information;

    (d) becomes available to Recipient or Recipient's Representatives on a non-confidential basis from a source other than Disclosing Party or Disclosing Party Representatives; provided, that such source was not bound by an obligation of confidentiality to Disclosing Party; or

    (e) is approved for disclosure or release by written authorization from Disclosing Party.

3.  Non-Disclosure.

    (a) Except as set forth in Paragraph 4, for the term of this Agreement, Recipient and Recipient's Representatives shall keep the Confidential Information confidential, shall use it solely for the purpose of the Transaction and for no other purpose, and shall not disclose or reveal it to any person other than to Recipient's Representatives who are involved in the Transaction and who are directed by Recipient to maintain the Confidential Information as confidential in accordance with the terms and conditions of this Agreement. Recipient agrees to so direct all of Recipient's Representatives who receive Confidential Information to maintain it as confidential in accordance with this Agreement and Recipient shall be responsible for any breach of this Agreement by any of Recipient's Representatives. For purposes of this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any corporation, company, partnership, other entity or individual.

    (b) Except as set forth in Paragraph 4, Recipient and Recipient's Representatives shall not: (x) make any disclosure to any other Person of (i) the fact that discussions, negotiations or investigations are taking or

2

A-308

Joint Exhibit 8

have taken place concerning the Transaction, (ii) the existence or contents of this Agreement, (iii) the fact that Recipient or Recipient's Representatives have requested or received Confidential Information, or (iv) any of the terms, conditions or facts relating to the Transaction, including the status thereof, or either Party's consideration of the Transaction; or (y) make any public statement concerning the Transaction (any disclosure or statement described in clauses (x) or (y) being a "Public Statement"). If Recipient or Recipient's Representatives are required to make any Public Statement for such Person not to be in violation of any applicable Law (as defined below), then, in addition to complying with Paragraph 4, Recipient shall (x) provide the Company with the text of such Public Statement as far in advance of its disclosure as is practicable and (y) consider in good faith the Company's suggestions concerning the nature and scope of the information to be contained therein.

4.    Permitted Disclosure.  Recipient and Recipient's Representatives may disclose Confidential Information solely to the extent required, in the written opinion of its outside counsel, by any of the following (collectively, a "Required Disclosure"): applicable law, governmental regulation or rule or requirement of a self-regulatory agency (having jurisdiction over Recipient or Recipient's Representatives and during the course of any audit, examination or investigation of the books and records of Recipient or Recipient's Representatives that is of a general nature and not specifically targeting Disclosing Party or its affiliates or their respective employees), court order, governmental decree or demand, interrogatories, subpoena, civil investigative demand or other legal process (collectively, "Law").  If Recipient or Recipient's Representatives are required to disclose Confidential Information pursuant to a Required Disclosure, Recipient shall provide advance notice (to the extent not prohibited by Law) to Disclosing Party of any such requirement so that Disclosing Party may seek a protective order or other appropriate remedy.  Recipient agrees to cooperate (and shall cause Recipient's Representatives to do so) with Disclosing Party in any such proceeding, provided that, the foregoing shall not be construed to require Recipient or any such Representative to undertake litigation or other legal proceedings on its own behalf. Regardless of whether or not such protective order or other appropriate remedy is obtained, Recipient and such Representative will only furnish that portion of the Confidential Information that, in the written opinion of its outside counsel, Recipient or such Representative is required by Law to disclose or furnish, and Recipient and such Representative will do so in accordance with any such protective order.  Any information disclosed pursuant to such Required Disclosure shall be designated as the highest available level of confidentiality under any governing protective order.

5.    Ownership, Return or Destruction of Confidential Information.  Disclosing Party does not grant to Recipient or any of Recipient's Representatives any right, title or interest of any kind in the Confidential Information (including, without limitation, in any intellectual property contained in or relating to the Confidential Information).  At any time upon the written request of Disclosing Party, Recipient and Recipient's

3

A-309

Joint Exhibit 8

Representatives shall return to Disclosing Party or, at Recipient's option, destroy all Confidential Information in the possession of Recipient or any of Recipient's Representatives (including expunging all such Confidential Information from any computer or other device containing such information) within five business days (and provide to the Company a certificate addressed to the Company and signed by a duly authorized representative confirming such destruction or erasure). The Recipient and Recipient's Representatives shall remain subject to this Agreement after the destruction or return of Confidential Information, including, without limitation, with respect to any oral Confidential Information. Notwithstanding the foregoing, Recipient and Recipient's Representatives (i) may retain the Confidential Information to comply with applicable Law or *bona fide* internal document retention or compliance policy and (ii) shall not be required to erase or expunge any Confidential Information residing on its or their automatic electronic backup or archival systems for the period it normally archives backed up computer records (but shall not access any such Confidential Information); *provided*, that Recipient and Recipient's Representatives shall continue to be bound by all obligations contained herein with respect to such Confidential Information, including, without limitation, obligations of confidentiality and use hereunder, until the earlier of (x) if all of the Confidential Information has been destroyed or erased, the date that is three (3) years from the date of this Agreement and (y) if all of the Confidential Information has not been destroyed or erased, the date that is five (5) years from the date of this Agreement.

6. <u>No Representations or Warranties Concerning Confidential Information</u>. Recipient acknowledges that neither Disclosing Party nor any of Disclosing Party's Representatives is making any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information. Recipient also agrees that neither it nor any of Recipient's Representatives is entitled to rely on the accuracy or completeness of any Confidential Information and that it and they shall be entitled to rely solely on such representations and warranties regarding Confidential Information as may be made to Recipient in any definitive agreement relating to the Transaction, subject to the terms and conditions of such agreement. Recipient further agrees that neither Disclosing Party nor any Disclosing Party Representatives shall have any liability to Recipient or any of Recipient's Representatives relating to or resulting from Recipient's or any of Recipient's Representatives' use of the Confidential Information or any errors therein or omissions therefrom.

7. <u>No Obligation to Proceed</u>. The Parties agree that unless and until a definitive agreement with respect to the Transaction has been executed and delivered by the Parties, neither Party shall be under any obligation with respect to the Transaction. Either Party may, at any time and in its sole discretion, elect to terminate discussions or any negotiations regarding the Transaction, and neither Party is under any obligation to continue discussions or to consummate any agreement with the other Party with respect to the Transaction.

4

A-310

Joint Exhibit 8

8. <u>Remedies</u>.  In the event of any breach or threatened breach hereof, and in addition to any and all other remedies available to Disclosing Party at law or in equity, Disclosing Party shall be entitled to injunctive and other equitable relief without the posting or securing of a bond or other security as a remedy for any such breach or threatened breach, and Recipient agrees that Disclosing Party's remedy at law would not be adequate.  The protections offered to Confidential Information hereunder are in addition to, and not in lieu of, the protections offered under any applicable trade secrets or other Laws.  If any legal action is brought forth to enforce this Agreement, the prevailing party will be entitled to receive its reasonable and documented attorney's fees, court costs, and other collection expenses, in addition to any other relief it may receive.

9. <u>No Waiver of Privilege</u>.  To the extent that any Confidential Information includes materials subject to the attorney-client privilege, the Company is not waiving or diminishing, and shall not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Confidential Information (including any Confidential Information related to pending or threatened litigation) to Recipient or Recipient's Representatives.

10. <u>Miscellaneous</u>.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The Parties agree that all electronic, .pdf, telecopied or telefaxed copies of this Agreement and signatures hereto shall be deemed to be originals.  This Agreement sets out the Parties' entire understanding with respect to the subject matter hereof as of this date.  This Agreement may only be amended by a written document signed by both Parties.  It is not the purpose or intention of the Parties to create, and this Agreement shall never be construed as creating, a joint venture, partnership or other relationship whereby any Party shall be held liable for the acts, either of omission or commission, of any other Party hereto.  This Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective successors and assigns, provided that no person other than the Parties hereto may enforce the provisions of this Agreement.  No waiver of any provision of this Agreement, or of a breach hereof, shall be effective unless it is in writing and signed by the Party waiving such provision or breach.  No waiver of a breach of this Agreement (whether express or implied) shall constitute a waiver of a subsequent breach hereof, and no delay on the part of either Party in exercising any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any waiver on the part of either Party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The terms of this Agreement shall control over any additional purported confidentiality requirements imposed by any offering memorandum, web-based database or similar repository of Confidential Information to which Recipient or any of Recipient's Representatives is granted access in connection with the evaluation, negotiation or consummation of the Transaction, notwithstanding acceptance of such an offering memorandum or submission of an electronic signature, "clicking" on an "I Agree" icon or other indication of assent to such additional confidentiality conditions, it being understood and agreed that Recipient's and Recipient's Representatives' confidentiality

5

A-311

Joint Exhibit 8

obligations with respect to the Confidential Information are exclusively governed by this Agreement and may not be amended except by an agreement executed by the parties hereto in writing.

11. <u>Headings and Severability</u>.  The headings used in this Agreement are for convenience only and shall have no significance in the interpretation of this Agreement. All provisions of this Agreement are severable, and the unenforceability, invalidity or illegality of any of the provisions of this Agreement shall not affect the validity, enforceability or legality of the remaining provisions of this Agreement.

12. <u>Governing Law; Consent to Jurisdiction; Jury Trial Waiver</u>.  This Agreement shall be governed by and construed in accordance with the Law of the State of New York without regard to principles of conflicts of Law, except as set forth in Section 5-1401 of the New York General Obligations Law.  Each Party hereto hereby consents and submits to the jurisdiction of the federal and state courts located in the County and City of New York, State of New York in any action or proceeding arising out of or related to this Agreement or the subject matter hereof and each Party hereby waives (to the extent permitted by applicable Law) any objection which it may now or in the future have to the laying of venue for any such action or proceeding in any such court.  As a material inducement to the other Party hereto to enter into this Agreement, each Party hereby waives, to the fullest extent permitted by applicable Law, the right to demand a jury trial.

13. <u>Term</u>. Except for (a) Paragraph 5, which shall terminate in accordance with the terms thereof, and (b) Paragraphs 6-12 and this Paragraph 13, which shall be binding in perpetuity or until the latest date permitted by applicable Law, the terms and conditions set forth in this Agreement shall automatically terminate on the date that is three (3) years from the date of this Agreement.

6

A-312

Joint Exhibit 8

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**Actors' Equity Association**_____

_____
By: _____
Name:
Title:

**John Gore Theatrical Group, Inc.**

By: _____
Name:
Title:

7

A-313



**From:** Theodore, Mark <MTheodore@proskauer.com>
**Sent:** Thursday, September 23, 2021 3:43 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

Hanan

This was really the client's NDA. I'll find out what Nederlander would like to do. Thanks.

Mark

**Mark Theodore**
Member of the Firm

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.5640
c:310.880.5346
f 310.557.2193
mtheodore@proskauer.com

greenspaces
Please consider the environment before printing this email.

**From:** Hanan B. Kolko <HKolko@cwsny.com>
**Sent:** Thursday, September 23, 2021 12:30 PM
**To:** Theodore, Mark <MTheodore@proskauer.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

*This email originated from outside the Firm.*

Mark - Thank you. We will review. Will you be sending us a similar - or identical - proposed NDA for the Nederlander information request?

A-314

Joint Exhibit 10



**From:** Hanan B. Kolko
**Sent:** Tuesday, October 5, 2021 12:01 PM
**To:** 'Theodore, Mark' <MTheodore@proskauer.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

Duly noted. You've had the document requests for three months. We think that, given this length of time, you should be able to promptly explain why your clients believe all of the documents must be treated as confidential. In setting our timeframe, we took those factors into account. From our point of view our deadline stands.

Thanks,

Hanan



**Hanan B. Kolko**
900 Third Ave, Suite 2100
New York, NY 10022-4869
Tel: 212.356.0214
Fax: 646.473.8214
Cell: 516-241-6674

HKolko@cwsny.com | www.cwsny.com | Bio
*Subscribe to the Cohen, Weiss and Simon LLP Bankruptcy Labor Law Blog
at* www.cwsny.com/bankruptcy-blog

**From:** Theodore, Mark <MTheodore@proskauer.com>
**Sent:** Tuesday, October 5, 2021 11:09 AM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

Hanan

A-315

Joint Exhibit 10

We do appreciate your patience. The parties discussed a September deadline. We raised the issue of confidentiality on 9/23 and proposed an NDA for John Gore at that time. We were awaiting comments on the NDA to move forward. Now, for the first time, we understand your client is taking the position none of the information is confidential. Under the circumstances, we don't believe an arbitrary time deadline is productive. Regardless, we will keep moving forward to resolve these outstanding requests.

Thanks.

**Mark Theodore**
Member of the Firm

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.5640
c:310.880.5346
f 310.557.2193
mtheodore@proskauer.com

greenspaces
Please consider the environment before printing this email.

**From:** Hanan B. Kolko <HKolko@cwsny.com>
**Sent:** Tuesday, October 5, 2021 6:43 AM
**To:** Theodore, Mark <MTheodore@proskauer.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

*This email originated from outside the Firm.*

Got it.

First, we do not agree that any of the material responsive to the information request is confidential.

Given that you received these information on 7/6/21, nearly three months ago. In light of this, we expect your rationales as to why the responsive documents are confidential by close of business on 10/7/1.

Thanks.

Hanan



**Hanan B. Kolko**
900 Third Ave, Suite 2100
New York, NY 10022-4869
Tel: 212.356.0214

2

A-316

Joint Exhibit 10

Fax: 646.473.8214
Cell: 516-241-6674

HKolko@cwsny.com | www.cwsny.com | Bio
*Subscribe to the Cohen, Weiss and Simon LLP Bankruptcy Labor Law Blog*
*at* www.cwsny.com/bankruptcy-blog

**From:** Theodore, Mark <MTheodore@proskauer.com>
**Sent:** Monday, October 4, 2021 11:00 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

Hanan
We will respond as to our rationale(s) as soon as possible. I'm in a hearing the next few days but will be back to you when I free up.

Mark

**Mark Theodore**
Member of the Firm

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.5640
c:310.880.5346
f 310.557.2193
mtheodore@proskauer.com

greenspaces
Please consider the environment before printing this email.

**From:** Hanan B. Kolko <HKolko@cwsny.com>
**Sent:** Monday, October 4, 2021 8:38 AM
**To:** Theodore, Mark <MTheodore@proskauer.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

**This email originated from outside the Firm.**

Mark: We do not understand why any of the requested information should be subject to an NDA. Please explain to us your clients' rationales for seeking confidential treatment for each specific category of information responsive to our July 6, 2021 information requests.

Thanks,

Hanan

3

A-317

Joint Exhibit 11



**From:** Hanan B. Kolko
**Sent:** Wednesday, October 13, 2021 9:23 AM
**To:** 'Theodore, Mark' <MTheodore@proskauer.com>
**Cc:** 'Plum, Bernard M.' <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

If, by 4:00 p.m. this afternoon, you have not provided us with (a) any documents that you deem non-confidential, and (b) an explanation of why your client believes the remaining responsive documents are confidential, we will file a ULP. To be clear, this applies to the information requests for Gore and Nederlander.

Thanks,

Hanan



**Hanan B. Kolko**
900 Third Ave, Suite 2100
New York, NY 10022-4869
Tel: 212.356.0214
Fax: 646.473.8214
Cell: 516-241-6674

HKolko@cwsny.com | www.cwsny.com | Bio
*Subscribe to the Cohen, Weiss and Simon LLP Bankruptcy Labor Law Blog
at* www.cwsny.com/bankruptcy-blog

**From:** Hanan B. Kolko
**Sent:** Tuesday, October 5, 2021 12:01 PM
**To:** 'Theodore, Mark' <MTheodore@proskauer.com>
**Cc:** Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** RE: John Gore Theatrical Group, Inc. - Information Request

Duly noted. You've had the document requests for three months. We think that, given this length of time, you should be able to promptly explain why your clients believe all of the documents must be treated as confidential. In setting our timeframe, we took those factors into account. From our point of view our deadline stands.

A-318

Joint Exhibit 12



**From:** Kwon, Jennifer H. <jkwon@proskauer.com>
**Sent:** Wednesday, October 13, 2021 3:38 PM
**To:** Hanan B. Kolko <HKolko@cwsny.com>
**Cc:** Theodore, Mark <MTheodore@proskauer.com>; Plum, Bernard M. <BPlum@proskauer.com>
**Subject:** Response of John Gore Theatrical Group to AEA Information request

Mr. Kolko,

Please see the attached.

**Jenny H. Kwon**
Assistant to Anthony J. Oncidi | Kate Gold | Mark Theodore

Proskauer
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
d 310.284.4502
f 310.557.2193
jkwon@proskauer.com

greenspaces
Please consider the environment before printing this email.

*******************************************************************************************************
****************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and
protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender

1

A-319

Joint Exhibit 12

immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A-320

Joint Exhibit 12



Proskauer Rose LLP   2029 Century Park East   Suite 2400   Los Angeles   CA 90067-3010

Mark Theodore
Member of the Firm
d +1.310.284.5640
f 310.557.2193
mtheodore@proskauer.com
www.proskauer.com

October 13, 2021

**VIA EMAIL**
(hkolko@cwsny.com)

Hanan B. Kolko, Esq.
Cohen Weiss and Simon, LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4849

Re:     **Response to Information Request regarding John Gore Theatrical Group, Inc./Networks**

Dear Mr. Kolko:

We write on behalf of John Gore Theatrical Group, Inc. (hereinafter, "JGTG") in response to your letter dated July 6, 2021 ("Request"), to Bernard Plum in his "capacity as counsel for The Broadway League."  In the Request, you requested information on behalf of Actor's Equity Association ("AEA") pursuant to the National Labor Relations Act, as amended ("Act"). Specifically, the information request broadly seeks information with respect to the relationship between John Gore Organization and Network Presentations LLC.  In the letter you claim that "the John Gore Organization has been and is diverting productions covered by the Short Engagement, Touring Agreement (the 'SETA') to Networks Presentation, LLC. . ."  No such evidence of diversions of productions was provided in the Request.  We ask now that AEA provide-- for each instance it believes that a production was diverted in violation of SETA-- the following information:

- The identity of the production that was diverted, including the name of the production, its location or locations.
- A description of how "John Gore Organization" diverted a production, including the date of event, the date upon which AEA became aware of the event, and describe how AEA became aware of the event.
- The identity of all witnesses relied upon by AEA to make the claim that "productions have been" and are "being diverted" to Network Presentations, LLC.  For each witness identified by AEA, include any witness statements given to AEA, including descriptions provided in emails and other documents.
- The exact provisions of SETA which were violated by productions allegedly being diverted.

Beijing   Boca Raton   Boston   Chicago   Hong Kong   London   Los Angeles   New Orleans   New York   Paris   São Paulo   Washington DC

A-321

Joint Exhibit 12

Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 2

AEA is obligated to provide this information consistent with Sections 8(b)(3) of the Act, as well as Board case law. *See, e.g., California Nurses Association (Alta Bates Medical Center),* 326 NLRB 1362 (1998).

With respect to the Request, it should be noted that JGTG is signatory to SETA; there are no other John Gore Organization affiliates signatory to that agreement. Therefore, the obligation to provide information flows from the actual signatory, not "John Gore Organization." While JGTG maintains no such diversion of "productions" occurred in violation of SETA, JGTG will respond accordingly consistent with its obligations under the Act. JGTG does not respond on behalf of any other corporate affiliate of The John Gore Organization.

Moreover, inasmuch as the Request was not sent directly to JGTG, the parties agreed that a response would be provided in September 2021. I contacted you on September 23, 2021, forwarding you a Non-Disclosure Agreement, concerning the treatment of confidentiality information. This is consistent with p. 7 of the Request which states "Equity is willing to discuss the terms of an appropriate confidentiality agreement. . ." We heard nothing substantively about the matter until October 4, 2021, when you simultaneously claimed *none* of the information sought was confidential and issued a deadline of October 7, 2021 to provide a basis for the confidentiality agreement. This arbitrary deadline was made despite the fact you knew I was in a hearing. When I suggested that such deadlines are not productive, you disregarded that and maintained that the deadline will stand.

As you are aware, there is nothing in the Act or the case law of the National Labor Relations Board that suggests one party may set an arbitrary deadline to receipt of information. Rather, the law requires response within a reasonable time period. Given that the Request was not sent to an actual employer and the parties agreed to a September response time, no such unreasonable delay has occurred. The AEA did not object to the request for a non-disclosure agreement; indeed, it did nothing for 15 days. Setting an arbitrary deadline after letting several days pass without any response is unreasonable.

We have no interest in fighting over these issues. Instead, we will provide information on behalf of JGTG to the items of the Request which are not confidential. As to the items that request confidential information, the item number notes it is confidential and articulates the basis for it. Once the parties reach an understanding about how such confidential information will be treated, JGTG will supply the information.

1.      For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had an equity interest and describe that equity interest. For purpose of this letter, "theatrical production" is defined as any live musical and/or dramatic production.

        *This item requests information as to equity interests of "JGO" in productions. The obligation to provide information would be limited to equity interests in productions held by JGTG. The information is confidential because the equity arrangements are covered*

A-322

Joint Exhibit 12

Proskauer》

Hanan B. Kolko, Esq.
October 13, 2021
Page 3

> *by confidentiality agreements with other entities. JGTG will provide this information once a satisfactory confidentiality agreement has been reached by the parties.*

2.  For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings has or had an equity interest and describe that equity interest.

    *None.*

3.  For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings, Inc. has or had an equity interest and describe that equity interest.

    *None.*

4.  For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Holdings has or had an equity interest and describe that equity interest.

    *None.*

5.  For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings, Inc. has or had an equity interest and describe that equity interest.

    *None.*

6.  For the period January 1, 2018 through the present identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had an equity interest and describe that equity interest.

    *The response to this item is confidential for the reasons described in Item 1.*

7.  For the period January 1, 2018 through the present identify each theatrical production in which Networks Presentations, LLC, a Texas Limited Liability Company has or had an equity interest and describe that equity interest.

    *JGTG is not in possession of any information responsive to this request.*

8.  For the period January 1, 2018 through the present identify each theatrical production in which Networks has or had an equity interest and describe that equity interest.

    *JGTG is not in possession of any information responsive to this request.*

9.  For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had a financial interest (by virtue, without limitation, of debt, revenue

A-323

Joint Exhibit 12

## Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 4

sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

*JGTG considers this information to be confidential for the reason set forth in item 1.*

10. For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

    *None.*

11. For the period January 1, 2018 through the present identify each theatrical production in which John Gore Family Holdings, Inc. has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

    *None.*

12. For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

    *None.*

13. For the period January 1, 2018 through the present identify each theatrical production in which Key Brand Family Holdings, Inc. has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

    *None.*

14. For the period January 1, 2018 through the present, identify each theatrical production in which JGO affiliate and/or subsidiary has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

    *Responding on behalf of JGTG, JGTG considers this information confidential. Please see the response to item 1, above, for basis.*

15. For the period January 1, 2018 through the present identify each theatrical production in which Networks has or had a financial interest (by virtue, without limitation, of debt,

A-324

Joint Exhibit 12

Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 5

revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

*JGTG is not in possession of any information responsive to this request.*

16.     For the period January 1, 2018 through the present identify each theatrical production in which Networks Presentations, LLC, a Texas Limited Liability Company has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

*JGTG is not in possession of any information responsive to this request.*

17.     Identify all employees, officers, shareholders, directors, partners, or members of any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary who are also employees, officers, shareholders, directors, partners, or members of Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company. For each such officer, shareholder, director, partner, and member, state their position at each such entity, and, if the individual had any equity interest in the entity, state the percentage of such interest.

*JGTG considers this information confidential. The identities of officers, shareholders, directors, partners of The John Gore Organization, Inc. and other entities is not within the public domain and is held confidential by JGTG. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

18.     Identify all individuals identified in response to request number 17 who are or were at any time in the period from January 1, 2018 to the present officers, shareholders, directors, partners, or members of Networks. For each such officer, shareholder, director, partner, and member, state (a) the individual's position at Networks; (b) the individual's ownership interest in Networks and any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary; and (c) the periods of time in which they had those ownership interests.

*This information is confidential. See response to item 17, above, for basis.*

19.     Identify each partnership and/or corporation affiliated with each of the following: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and Key Brand Family Holdings, Inc. and describe each affiliation.

*The information in this request is considered confidential. The identity of each partnership and/or corporation affiliated with The John Gore Organization, Inc. and other entities is not within the public domain and is held confidential by JGTG. JGTG*

A-325

Joint Exhibit 12

Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 6

*will provide this information once a confidentiality agreement has been reached by the parties.*

20. Identify each partnership or corporation affiliated with Networks and Networks Presentations, LLC a Texas Limited Liability Company and describe each affiliation.

   *Gentry & Associates, Inc. and John Gore Family Holdings, Inc. are each 50% members of Networks Presentations, LLC. We do not have knowledge of other partnerships or corporations affiliated with Networks.*

21. For the period January 1, 2018 to the present, identify by production all theatrical productions in which any of the following - JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary - had a, equity, financial or managerial interest which subsequently were produced by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company and, for each such play or musical, describe the equity, financial or managerial interest

   *Answering on behalf of JGTG, this information is confidential. See response in item 1, above, for basis.*

22. For the period January 1, 2018 to the present, identify all press agents employed by any of the following, and state which employs or employed the press agent identified: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, and any JGO affiliate and/or subsidiary.

   *We do not understand the relevance of this request. Please state the basis for the relevance of the request.*

23. For the period January 1, 2018 and the present, identify all press agents employed by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company, and state which employs or employed each press agent identified.

   *We do not understand the relevance of this request. Please state the basis for the relevance of the request.*

24. Please describe each business relationship that existed between January 1, 2018 and the present between each of the following and Networks and Networks Presentations, LLC, a Texas Limited Liability Company: John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary. If that relationship has materially changed since on or

A-326

Joint Exhibit 12

Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 7

after January 1, [year] (sic), please describe the change, and describe the business relationship as it was immediately prior to the change.

*We note that the year was left out of the item. Given that all other items set the timeframe from January 1, 2018, we have used that date for response. JGFH has been a member of Networks Presentations, LLC between January 1, 2018 and the present with 50% ownership.*

25.   Was any shareholder or member of JGO a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in JGO and Networks, and state the periods in which they had those ownership interests.

*The information is confidential. Please see the response to number 19, above.*

26.   Was any shareholder or member of John Gore Family Holdings a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in John Gore Family Holdings and Networks, and state the periods in which they had those ownership interests.

*No shareholder or member of John Gore Family Holdings was a shareholder or member of Networks for the period between January 1, 2018 and the present.*

27.   Was any shareholder or member of John Gore Family Holdings, Inc. a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in John Gore Family Holdings, Inc. and Networks, and state the periods in which they had those ownership interests.

*No.*

28.   Was any shareholder or member of Key Brand Family Holdings, Inc. a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in Key Brand Family Holdings, Inc. and Networks, and state the periods in which they had those ownership interests.

*No.*

29.   Was any shareholder or member of any other JGO affiliate and/or subsidiary a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in the

A-327

Joint Exhibit 12

**Proskauer»**

Hanan B. Kolko, Esq.
October 13, 2021
Page 8

JGO affiliate and/or subsidiary and Networks, and state the periods in which they had those ownership interests.

*Answering on behalf of JGTG, the answer is "no."*

30.  Was any shareholder or member of Key Brand Family Holdings, a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in Key Brand Family Holdings and Networks, and state the periods in which they had those ownership interests.

*No.*

31.  *I attach as Exhibits A and B photocopies of the 2018 Texas Secretary of State and Georgia filings referred to above. The Texas filing identifies Key Brand Family Holdings as a member of Networks LLC.* Please describe the relationship between Key Brand Family Holdings and The John Gore Organization. Please describe the relationship between Key Brand Family Holdings, *the entity listed in the Texas filing*, and Key Brand Family Holdings, Inc., *the entity listed in the Georgia filing*. Please describe the relationship between Key Brand Family Holdings, Inc. and the John Gore Organization.

*JGTG considers this information to be confidential. Please see Item 17, above, for basis.*

32.  Please describe the relationship between John Gore Family Holdings and John Gore Family Holdings, Inc.

*John Gore Family Holdings, Inc. is the full name of John Gore Family Holdings.*

33.  Please describe the relationship between John Gore Family Holdings, Inc. and the John Gore Organization.

*JGTG considers this information to be confidential. Please see item 17, above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

34.  *I attach as Exhibit C the 2019 North Carolina Secretary of State filing referred to above.* It identifies "John Gore Family Holdings" as a "Manager" of Networks Presentations, LLC. Please describe the duties which John Gore Family Holdings has in its capacity as a "Manager" of Networks Presentations, LLC.

*John Gore Family Holdings, Inc. is a member of Networks Presentations, LLC, owning 50% of its membership interests. In denoting John Gore Family Holdings as a "Manager" of Networks Presentations, LLC, the intent was to denote its 50% ownership of Networks Presentations, LLC's membership interests. John Gore Family Holdings, Inc. does not have any managerial duties and is not an active manager of Networks Presentations, .*

A-328

Joint Exhibit 12

Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 9

35.    Please identify all shareholders, owners, and/or members of JGO between January 1, 2018 and the present and state the percentage of their ownership.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

36.    Please identify all shareholders, owners, and/or members of John Gore Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

37.    Please identify all shareholders, owners, and/or members of John Gore Family Holdings between January 1, 2018 and the present and state the percentage of shares their ownership.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

38.    Please identify all shareholders, owners, and/or members of Key Brand Family Holdings Inc. between January 1, 2018 and the present and state the percentage of their ownership.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

39.    Please identify all shareholders, owners, and/or members of Key Brand Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

40.    Please identify all shareholders, owners, or members of Networks between January 1, 2018 and the present and state the percentage of their ownership.

*John Gore Family Holdings, Inc. is a member of Networks Presentations, LLC holding a 50% membership interest between January 1, 2018 and the present.*

*Gentry & Associates, Inc. is a member of Networks Presentations, LLC holding a 50% membership interest between January 1, 2018 and the present.*

A-329

Joint Exhibit 12

## Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 10

41.  Please identify all shareholders or members of Networks Presentations, LLC, a Texas Limited Liability Company, between January 1, 2018 and the present and state the percentage of their ownership.

*John Gore Family Holdings, Inc. is a member of Networks Presentations, LLC holding a 50% membership interest between January 1, 2018 and the present.*

*Gentry & Associates, Inc. is a member of Networks Presentations, LLC holding a 50% membership interest between January 1, 2018 and the present.*

42.  Please identify all corporate parents, affiliates, and subsidiaries of the following: JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, and John Gore Family Holdings, Inc.

*JGTG considers this information to be confidential. Please see item 17 above, for basis. JGTG will provide this information once a confidentiality agreement has been reached by the parties.*

43.  Please identify all corporate parents, affiliates, and subsidiaries of Networks Presentations, LLC, a Texas Limited Liability Company.

*JGTG responds, see response to 41, above.*

44.  Was any senior executive of JGO also a senior executive of Networks between January 1, 2018 and the present? If so, please identify the senior executive and his/her job title in each company between January 1, 2018 and the present.

*No.*

45.  Was any officer, director, member or managing member of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings, Inc. also an officer, director, member or managing member of Networks or Networks Presentations, LLC between January 1, 2018 and the present? If so, please identify the officer/director/member/ managing member and his/her role in each company between January 1, 2018 and the present.

*JGTG considers this information confidential. See item 17, above, for basis.*

46.  Was any supervisor and/or manager of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings Inc. also a supervisor or manager of Networks and/or Networks Presentations, LLC between January 1, 2018 and the present? If so, please identity the supervisor and/or manager and his/her role at each company between January 1, 2018 and the present.

*No.*

A-330

Joint Exhibit 12

# Proskauer»

Hanan B. Kolko, Esq.
October 13, 2021
Page 11

47.  Did Networks and/or Networks Presentations, LLC and JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, or Key Brand Family Holdings Inc. share any equipment between January 1, 2018 and the present? If so, please identify each such piece of equipment. As used in this question, "equipment" includes sets, costumes, props, and any other physical item used to produce, stage, present, or otherwise put on a play, show, theatrical production, concert, or any other type of live entertainment.

*No.*

48.  Identify all plays produced by Networks or Networks Presentations, LLC with the services or assistance of any of the following - JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and Key Brand Family Holdings Inc. - between January 1, 2018 and the present.

*None.*

49.  Identify all plays produced by any of the following - JGO, John Gore Organization, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, and/or Key Brand Family Holdings Inc. - with the services or assistance of Networks and/or Networks Presentations, LLC between January 1, 2018 and the present.

*None.*

Please execute or return with comments the non-disclosure agreement provided on September 23, 2021. We look forward to receiving the information requested on page 1 of this letter within a reasonable period of time.

Please feel free to call with any questions or if you would like to discuss this matter.

Very truly yours,

Mark Theodore

A-331

Joint Exhibit 13



Proskauer Rose LLP   2029 Century Park East, Suite 2400   Los Angeles, CA 90067-3010

January 25, 2022

**VIA EMAIL**

Hannan B. Kolko, Esq.
Cohen Weiss and Simon, LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4849

Mark Theodore
Member of the Firm
d +1.310.284.5640
f 310.557.2193
mtheodore@proskauer.com
www.proskauer.com

Re:   **Actor's Equity Association -and-John Gore Theatrical Group, Inc. Grievance**

Dear Mr. Kolko:

As you are aware, we represent John Gore Theatrical Group, Inc. (hereinafter, "JGTG"). The December 10, 2021, grievance filed by Actor's Equity Association ("AEA") directly with The Broadway League has been forwarded to us for response. We note you received a copy of the grievance. The grievance asserts a violation of the Short Engagement, Touring Agreement ("SETA") based on an alleged relationship between JGTG and other John Gore related entities which may have an interest in "NETworks Presentations." It is asserted that these relationships with NETworks Presentations violate Rule 7 of SETA and "Rule 8 of the Production Contract in that JGTG has an interest in John Gore Family Holdings ("JGFH"), which has an interest in NETworks Presentations, Inc. It is obvious this grievance relates to the July 6, 2021 information request made by you on behalf of AEA. JGTG, as the only entity with an obligation to AEA, responded to the request on October 13 providing most of the information. The information that was not provided is considered confidential. JGTG has offered to provide the information if an accommodation can be reached, which is an obligation of the parties. So far, AEA has offered no accommodation.

In an effort to move this matter along--and as a sign of good faith-- JGTG provides additional information responsive to AEA's information request. The attached spreadsheet identifies the shows in which JGTG has invested since January 1, 2018. We also have included the production type, whether the investment was ever recouped, and whether JGTG was acting as General Partner or Lead Producer. As explained during our telephone calls, JGTG does not own any membership interest in NETworks Presentations, and simply does not control the shows which NETworks Presentations decides to produce—or have any decision making responsibility related thereto. Further, JGTG has not had the title of General Partner or Lead Producer of a new production since 2012 and does not have lead or decision-making authority for any of the productions listed on the attached spreadsheet.

JGTG is willing to provide the outstanding information subject to an adequate non-disclosure agreement. We ask AEA to accept this proposal so we can move on with the grievance in a timely manner, which given the current state of the industry would be best.

A-332

Joint Exhibit 13

## Proskauer»

Hannan B. Kolko, Esq.
January 25, 2022
Page 2

JGTG's October response formally requested information related to the claims in the July 6 information request and the December 10 grievance. To date, AEA has not acknowledged this information request, let alone provided any responsive information. Such information is needed for JGTG to defend itself, and it is clearly relevant to the grievance. Please provide the information by February 4, 2022. For ease of reference, we are setting forth the information request made on October 13, 2021—to which AEA has failed to respond-- here:

"We ask now that AEA provide-- for each instance it believes that a production was diverted in violation of SETA-- the following information:

- The identity of the production that was diverted, including the name of the production, its location or locations.
- A description of how 'John Gore Organization' diverted a production, including the date of event, the date upon which AEA became aware of the event, and describe how AEA became aware of the event.
- The identity of all witnesses relied upon by AEA to make the claim that "productions have been" and are "being diverted" to Network Presentations, LLC. For each witness identified by AEA, include any witness statements given to AEA, including descriptions provided in emails and other documents.
- The exact provisions of SETA which were violated by productions allegedly being diverted.

AEA is obligated to provide this information consistent with Sections 8(b)(3) of the Act, as well as Board case law. *See, e.g., California Nurses Association (Alta Bates Medical Center),* 326 NLRB 1362 (1998)."

Assuming AEA provides the information requested no later than February 4, the parties should be able to have this matter heard by a Grievance Committee shortly thereafter.

Let's find some time to discuss this matter soon and get it moving forward.

Very truly yours,

Mark Theodore

Enclosure

6335/15622-018 CURRENT/128258100v2

A-333

Joint Exhibit 13

LIST OF ALL SHOWS IN WHICH JOHN GORE THEATRICAL GROUP, INC. INVESTED
Funded as of January 1, 2018
Recoupment Status as of January 2022
Note: A typical Broadway season has on average 40 touring shows

| Season | Title | Production Type | General Partner (Y/N) | Lead Producer (Y/N) | Recoupment Achieved (Y/N) | Produced by NETworks |
|---|---|---|---|---|---|---|
| 2021 | | | | | | |
| | The Prom | Tour | No | No | No | Yes |
| | Ain't Too Proud | Tour | No | No | No | No |
| | Bedwetter | Off-Broadway - ENHANCEMENT | No | No | No | No |
| | Black No More | Regional - ENHANCEMENT | No | No | No | No |
| | Cats | Tour | No | No | No | No |
| | Hadestown | Tour | No | No | No | No |
| | Hamilton | Australia | No | No | No | No |
| | Jagged Little Pill | Australia | No | No | No | No |
| | Moulin Rouge | Australia | No | No | No | No |
| | Moulin Rouge | Tour | No | No | No | No |
| | Moulin Rouge | UK | No | No | No | No |
| | MJ | Broadway | No | No | No | No |
| | Mr. Saturday Night | Broadway | No | No | No | No |
| | Pretty Woman | Tour | No | No | No | No |
| 2020 | | | | | | |
| | Between the Lines | Off-Broadway | No | No | No | No |
| | Company | Broadway | No | No | No | No |
| | Cyrano | Off-Broadway - ENHANCEMENT | No | No | No | No |
| | Dear Evan Hansen | UK | No | No | No | No |
| | Derren Brown: Secret | Broadway | No | No | No | No |
| | Diana | Regional/Broadway | No | No | No | No |
| | Escape to Margaritaville | Tour | No | No | Yes | No |
| | Frankie and Johnny in the Clair de Lune | Broadway | No | No | No | No |
| | Girl from the North Country | Off-Broadway/Broadway | No | No | No | No |
| | Hangmen | Broadway | No | No | No | No |
| | Jagged Little Pill | Regional/Broadway | No | No | No | No |
| | Mean Girls | Tour | No | No | No | No |
| | Moulin Rouge | Regional/Broadway | No | No | No | No |
| | My Fair Lady | Tour | No | No | No | No |
| | Pretty Woman | UK | No | No | No | No |
| | Sing Street | Off-Broadway/Broadway | No | No | No | No |
| | Six | Broadway | No | No | No | No |
| | Summer | Tour | No | No | No | No |
| | The Band's Visit | Tour | No | No | No | Yes |
| | The Lehman Trilogy | Broadway | No | No | No | No |
| | Tina: The Musical | Broadway | No | No | No | No |
| 2019 | | | | | | |
| | A Bronx Tale | Tour | No | No | Yes | Yes |
| | A Christmas Story | Tour | No | No | Yes | No |

A-334

Joint Exhibit 13

| Production | Type | | | | | |
|---|---|---|---|---|---|---|
| Ain't Too Proud | Broadway | No | No | No | No | No |
| Almost Famous | Regional - ENHANCEMENT | No | No | No | No | No |
| Anastasia | Tour | No | No | No | Yes | Yes |
| Beetlejuice | Broadway | No | No | No | Yes | No |
| Dear Evan Hansen | Tour | No | No | No | Yes | Yes |
| Fiddler on the Roof | Tour | No | No | No | No | No |
| Gary: A Sequel to Adronicus | Broadway | No | No | No | No | No |
| Gettin' the Band Back Together | Broadway | No | No | No | Yes | No |
| Hadestown | Broadway | No | No | No | No | No |
| Hamilton | Exhibition | No | No | No | Yes | Yes |
| Hamilton | And Peggy Tour | No | No | No | No | No |
| Head Over Heels | Regional/Broadway | No | No | No | No | No |
| Hello Dolly | Tour | No | No | No | No | No |
| Hillary and Clinton | Broadway | No | No | No | No | No |
| Jesus Christ Superstar | Tour | No | No | No | No | No |
| King Kong | Broadway | No | No | No | No | No |
| King Lear | Broadway | No | No | No | No | No |
| Muriel's Wedding The Musical | Australian Tour | No | No | No | Yes | No |
| My Very Own British Invasion | Regional - ENHANCEMENT | No | No | No | No | No |
| Network | Broadway | No | No | No | Yes | No |
| Oklahoma! | Off-Broadway/Broadway | No | No | No | No | No |
| Pretty Woman | Regional/Broadway | No | No | No | No | No |
| Superhero | Off-Broadway - ENHANCEMENT | No | No | No | Yes | No |
| The Boys in the Band | Broadway | No | No | No | No | No |
| The Cher Show | Regional/Broadway | No | No | No | No | No |
| The Waverly Gallery | Broadway | No | No | No | No | No |
| To Kill a Mockingbird | Broadway | No | No | No | Yes | Yes |
| Tootsie | Broadway | No | No | No | No | No |
| Waitress | UK | No | No | No | No | No |
| Waitress | 2nd National Tour | No | No | No | No | Yes |
| **2018** | | | | | | |
| Carousel | Broadway | No | No | No | No | No |
| Chicago | UK 2018 | No | No | No | Yes | No |
| Kinky Boots | UK Tour | No | No | No | Yes | No |
| My Fair Lady | Broadway | No | No | No | Yes | No |
| The Iceman Cometh | Broadway | No | No | No | No | No |
| Three Tall Women | Broadway | No | No | No | Yes | No |

A-335

JD(NY)-13-22<br>
New York, NY

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**JOHN GORE THEATRICAL GROUP, INC.**

    **And**                                **Case 02-CA-286802**

**ACTORS EQUITY ASSOCIATION**

*Tanya Khan, Esq.*, for the General Counsel.
*Mark Theodore, Esq.* and *Ariel Brotman, Esq.*, for the Respondent.
*Eyad Asad, Esq.*, for the Charging Party.

**DECISION**

**STATEMENT OF THE CASE**

JEFFREY P. GARDNER, Administrative Law Judge. The charge was filed on November 24, 2021, and the complaint was issued on June 16, 2022. The complaint alleges Respondent violated Sections 8(a)(5) and (1) by failing and/or refusing to provide information requested by the Charging Party Union.[1]

On August 30, 2022, pursuant to the Board's decision in *William Beaumont Hospital*, 370 NLRB No. 9 (2020), I conducted a trial via Zoom Government during which all parties were afforded the opportunity to present their evidence. At trial, the parties stipulated to certain jurisdictional facts, and submitted a series of Joint Exhibits (Jt. Exhs. 1 through 13).[2] After the trial, the parties filed timely briefs, which I have read and considered. Upon consideration of the briefs, and the entire record, including the testimony of witnesses and my observation of their demeanor, I make the following

**FINDINGS OF FACT**

**I. JURISDICTION**

Respondent admits, and I find, that it is a domestic corporation with headquarters located in New York, New York and facilities located throughout the United States, including a facility located at 1619 Broadway, New York, New York. Respondent further admits, and I find, that it has been engaged in the business of presentation of, and investment in, theatrical plays and musicals, that in conducting its business operations it annually derives gross revenue in

---

[1] The complaint was subsequently amended at trial to stipulate to Respondent's description of its business operations as "presentation of and investment in" rather than "production of" theatrical plays and musicals.

[2] Abbreviations used in this decision are as follows: "Tr." for the Transcript, "GC Exh." for the General Counsel's exhibits and "R. Exh." for Respondent's Exhibits. Specific citations to the transcript and exhibits are included only where appropriate to aid review, and are not necessarily exclusive or exhaustive.

A-336

JD(NY)-13-22

excess of $500,000 and purchases and receives goods and services valued in excess of $5,000 from points outside the state of New York.

Therefore, I find that Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. In addition, Respondent admits, and I further find, that the Union, Actors' Equity Association is a labor organization within the meaning of Section 2(5) of the Act.

## II. ALLEGED UNFAIR LABOR PRACTICES

### Background

Pursuant to a Short Engagement Touring Agreement (SET Agreement) between Actors' Equity Association (the Union) and the Broadway League, a multiemployer member organization of theater producers of which Respondent is a member, Respondent has recognized the Union as the exclusive bargaining representative of all the Actors (Principals, Chorus, Stage Managers and Assistant Stage Managers) employed by them, for the purpose of collective bargaining and the administration of matters within the scope of the SET Agreement, the most recent of which has been in effect since April 29, 2019, and ran through November 1, 2020. (Jt. Exh. 1).[3]

Based on public filings that came to the Union's attention, a question arose as to whether Respondent was diverting productions covered by the SET Agreement to an entity called Networks Presentations and/or its affiliates, prompting the Union to investigate a potential grievance. That investigation led to the Union making a series of information requests on the subject of Respondent's business relationships that are at issue herein.

### The Union's Information Requests

On July 7, 2021, the Union sent a letter[4] by email requesting that Respondent furnish the Union with a series of information. That letter was addressed to Bernard Plum,[5] an attorney with Mr. Theodore's firm which represented the Broadway League. The information requested by the Union included the following:

1. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had an equity interest and describe that equity interest. For purpose of this letter, "theatrical production" is defined as any live musical and/or dramatic production....

6. For the period January 1, 2018 through the present, identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had an equity interest and describe that equity interest.

---

[3] Although Respondent denied in its Answer that it employs any actors, it stipulates that it is bound by the SET Agreement, and by Board law with regard to the Union's requests for information herein.

[4] The email was sent on July 7, 2021, though the letter attached to it was dated July 6, 2021.

[5] All of the Union's requests and correspondence relevant to this matter were made through counsel, specifically Hanan Kolko, Esq. All of Respondent's correspondence and production were likewise made through counsel, specifically Mark Theodore, Esq.

2

A-337

JD(NY)-13-22

9. For the period January 1, 2018 through the present, identify each theatrical production in which JGO has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

14. For the period January 1, 2018 through the present, identify each theatrical production in which any other JGO affiliate and/or subsidiary has or had a financial interest (by virtue, without limitation, of debt, revenue sharing, enhancement money arrangement, etc.) other than an equity interest and describe that financial interest.

17. Identify all employees, officers, shareholders, directors, partners, or members of any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary who are also employees, officers, shareholders, directors, partners, or members of Networks and/or Networks Presentationns, LLC, a Texas Limited Liability Company. For each such officer, shareholder, director, partner, and member, state their position at each such entity, and, if the individual had any equity interest in the entity, state the percentage of such interest.

18. Identify all individuals identified in response to request number 17 who are or were at any time in the period from January 1, 2018 to the present officers, shareholders, directors, partners, or members of Networks. For each such officer, shareholder, director, partner, and member, state (a) the individual's position at Networks; (b) the individual's ownership interest in the Networks and any of JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary; and (c) the periods of time in which they had those ownership interests.

19. Identify each partnership and/or corporation affiliated with each of the following: JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc. and describe each affiliation.

21. For the period January 1, 2018 to the present, identify by production all theatrical productions in which any of the following - JGO, John Gore Family Holdings, John Gore Family Holdings, Inc., Key Brand Family Holdings, Key Brand Family Holdings, Inc., and any JGO affiliate and/or subsidiary – had an equity, financial or managerial interest which subsequently were produced by Networks and/or Networks Presentations, LLC, a Texas Limited Liability Company and, for each such play or musical, describe the equity, financial or managerial interest.

25. Was any shareholder or member of JGO a shareholder or member of Networks between January 1, 2018 and the present? If so, please identify such shareholders or members, identify their ownership interest in JGO and Networks, and state the periods in which they had those ownership interests.

3

A-338

JD(NY)-13-22

31. Please describe the relationship between Key Brand Family Holdings and The John Gore Organization. Please describe the relationship between Key Brand Family Holdings, *the entity listed in the Texas filing*, and Key Brand Family Holdings, Inc., *the entity listed in the Georgia filing*. Please describe the relationship between Key Brand Family Holdings, Inc. and the John Gore Organization.

33. Please describe the relationship between John Gore Family Holdings, Inc. and the John Gore Organization.

35. Please identify all shareholders, owners and/or members of JGO between January 1, 2018 and the present and state the percentage of their ownership.

36. Please identify all shareholders, owners, and/or members of John Gore Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

37. Please identify all shareholders, owners, and/or members of John Gore Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

38. Please identify all shareholders, owners, and/or members of Key Brand Family Holdings, Inc. between January 1, 2018 and the present and state the percentage of their ownership.

39. Please identify all shareholders, owners, and/or members of Key Brand Family Holdings between January 1, 2018 and the present and state the percentage of their ownership.

42. Please identify all corporate parents, affiliates, and subsidiaries of the following: JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, and John Gore Family Holdings, Inc.

45. Was any officer, director, member or managing member of JGO, Key Brand Family Holdings, Key Brand Family Holdings, Inc., John Gore Family Holdings, or John Gore Family Holdings, Inc. also an officer, director, member or managing member of Networks or Networks Presentations, LLC between January 1, 2018 and the present? If so, please identify the officer/director/member/managing member and his/her role in each company between January 1, 2018 and the present.

(Jt. Exh. 2).[6]

---

[6] The complaint lists only the numbered paragraphs that appear here: 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45 are requests which Respondent is alleged to have unlawfully failed to respond. The omitted paragraphs between 1 and 49 that appeared in the Union's July 7, 2021 information request are not at issue in this matter.

4

A-339

JD(NY)-13-22

The information request specifically stated that the Union was "willing to discuss the terms of an appropriate confidentiality agreement" and set a deadline of July 31, 2021, for receipt of the requested information. (Jt. Exh. 2).

On or about July 30, 2021, Respondent replied by email to the Union's information request, acknowledged receipt, and indicated that it would be in touch the following week. (Jt. Exh. 3). When Respondent did not get in touch by August 24, 2021, the Union sent a follow-up email, noting that no additional response had been forthcoming, and "as a courtesy" extending the due date to September 3, 2021. (Jt. Exh. 4).

On August 26, 2021, Respondent sent an email apologizing for its delay, and advising that it would not be able to meet the new September 3, 2021 requested deadline. Respondent did state, however, that it would begin work on it and would send a response as soon as possible, hopefully no later than the middle of September 2021. (Jt. Exh. 5). The Union wrote back on August 30, 2021, to indicate that it would extend the deadline again, "on a non-precedential basis," to September 17, 2021. (Jt. Exh. 6).

Respondent wrote to the Union on September 17, 2021, to report that it was finalizing its response, and would get it to the Union by the end of day Monday, September 20, 2021. (Jt. Exh. 7). On September 23, Respondent wrote to advise that it was compiling responses to the information request, but asserted for the first time that:

"It appears a good deal of the information requested is confidential, in that it is considered proprietary. Most of it is non-public, of course. John Gore as a regular practice requests recipients of such information to sign a non-disclosure agreement, which is attached. The agreement will not interfere with your client's ability to use the information to bring claims pursuant to the relevant collective bargaining agreement." (Jt. Exh. 8).

Respondent requested that the Union execute and return the agreement, and Respondent would be ready to provide the responses to the Union's information request.

The Union acknowledged receipt of Respondent's email the same day, and indicated it would review. However, on October 4, 2021, the Union wrote to Respondent indicating that it did not understand why any of the requested information should be subject to a non-disclosure agreement (NDA). The Union requested that Respondent explain its rationale for seeking confidential treatment for each category of information responsive to its request. (Jt. Exh. 10).

Thereafter, the parties exchanged emails over the following days as to when Respondent should be expected to provide the rationales and/or responsive documents, and on October 13, 2021, the Union advised Respondent that if it did not provide the Union by the end of the day with any responsive documents that were non-confidential and an explanation for

5

A-340

JD(NY)-13-22

why it considered other documents confidential, it would file an unfair labor practice charge. (Jt. Exh. 11).

Respondent provided its response that day, identifying various of the Union's requests as not being relevant or indicating that it was not in possession of responsive documents. For purposes of the information requests at issue in this case, Respondent stated that those information requests sought confidential information, and would be provided once a confidentiality agreement was reached by the parties.

With regard to request nos. 1, 6, 9, 14 and 21, Respondent advised that the information being sought was its equity interests in productions and was confidential because "the equity arrangements are covered by confidentiality agreements with other entities. For the remainder of the Union's requests." (Jt. Exh. 12). With regard to request nos.17–19, 25, 31, 33, 35–39, 42 and 45, Respondent maintained the information was confidential because it "is not within the public domain and is held confidential" by Respondent. (Jt. Exh. 12).

It is undisputed that Respondent did not provide any documents responsive to any of the Union's July 7, 2021 information requests that are included in the complaint. The complaint alleges Respondent's unlawful failure to respond as of October 13, 2021, the date of Respondent's written response seeking confidentiality protections.

### III. CREDIBILITY DETERMINATIONS

Union Attorney Hanan Kolko testified at the hearing about his communications with Respondent's counsel. I found his testimony to be consistent with documentary evidence in the parties' Joint Exhibits, and found his demeanor to be forthright and honest. He was extremely well-prepared with knowledge of the information requests that were made, and had a clear recollection of the substance of conversations he had with Mr. Theodore on the subject over the course of two-plus months beginning in November 2021. Mr. Theodore did not testify at the hearing.

Respondent's General Counsel, Sheila Lavu, testified at the hearing about Respondent's position regarding confidentiality. I also found her testimony to be honest, though hesitating at times. Her knowledge was not as comprehensive as that of Mr. Kolko, and she struggled at times to recall specifics. In particular, when testifying as to a YouTube video which Respondent offered as justification for withholding information, she seemed uncertain of specifics, and unable to explain why that video justified withholding the information sought here.

### ANALYSIS

1. All of the information sought by the Union is relevant.

The Supreme Court has long held that an employer must provide a union, on request, with relevant information that is necessary for the proper performance of its duties as the exclusive bargaining representative. *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 153 (1956). Indeed, the Supreme Court has held that an employer's duty to bargain collectively extends beyond periodic contract negotiations and includes its obligation to furnish information that allows a

6

A-341

JD(NY)-13-22

union to decide whether to process a grievance under an existing contract. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436 (1967).[7]

"A labor organization's right to information exists not only for the purpose of negotiating a collective-bargaining agreement, but also for the proper administration of an existing contract, including the bargaining required to resolve employee grievances." *Southern California Gas Co.*, 344 NLRB 231, 235 (2005) (*citing Hobelmann Port Services*, 317 NLRB 279 (1995); *Westinghouse Electric Corp.*, 239 NLRB 106, 107 (1978).

Accordingly, the Board has long held that Section 8(a)(5) of the Act obligates an employer to furnish requested information which is potentially relevant to the processing of grievances. "An actual grievance need not be pending nor must the requested information clearly dispose of the grievance." *United Technologies Corp.*, 274 NLRB 504 (1985). However, if there does exist a pending grievance, "an employer's duty to furnish information relevant to the processing of a grievance does not terminate when the grievance is taken to arbitration." *Lansing Automakers Federal Credit Union*, 355 NLRB 1345, 1353 (2010).

Information requests regarding bargaining unit employees' terms and conditions of employment are "presumptively relevant" and must be provided. *Whitesell Corp.*, 352 NLRB 1196, 1197 (2008), adopted by a three-member Board, 355 NLRB 649 (2010), enfd. 638 F.3d 883 (8th Cir. 2011). There is no burden on the part of the Union to prove the relevance of or explain the need for this type of presumptively relevant information.

By contrast, where the requested information is not directly related to the bargaining unit, the information is not presumptively relevant, and the requesting party does have the burden of establishing the relevance of the requested material. *Disneyland Park*, 350 NLRB 1256, 1257 (2007); *Earthgrains Co.*, 349 NLRB 389 (2007). Even in those situations where a showing of relevance is required, whether because the presumption has been rebutted or because the information requested concerns non-unit matters, the standard for establishing relevancy is the liberal, "discovery-type standard." *Alcan Rolled Products*, 358 NLRB 37, 40 (2012). *Caldwell Mfg. Co.*, 346 NLRB 1159, 1160 (2006).

While none of the information sought by the Union in this case would appear to fall under the presumptively relevant category, it is undisputed that all of the requests at issue seek relevant information.[8] The parties are in agreement that apart from the issue as to whether there is a need for specific confidentiality arrangements for any of the requested information, the Union is otherwise entitled to the information it sought.

2. Respondent failed and refused to furnish the Union with relevant information

The General Counsel alleges, and I find, that Respondent violated Section 8(a)(5) and (1) of the Act when, since October 13, 2021, Respondent failed or refused to provide the Union with relevant information, which it requested and is entitled to as the exclusive collective-bargaining representative of the unit.

---

[7] This is often referred to as "policing the contract." See, e.g., *United Graphics, Inc.*, 281 NLRB 463, 465 (1986).
[8] As to certain of the Union's original requests, Respondent took the position that those requests did not seek relevant information. However, none of those requests are at issue here.

7

JD(NY)-13-22

Respondent's argument to the contrary relies solely on its position that the information the Union sought was confidential, requiring the Union to engage in "accommodative bargaining." The obligation to engage in accommodative bargaining arises in circumstances where a union requests otherwise relevant information for which an employer has "legitimate and substantial" confidentiality interests." *Pennsylvania Power & Light Co.*, 301 NLRB 1104 (1991). "The party asserting confidentiality has the burden of proof. Legitimate and substantial confidentiality and privacy claims will be upheld, but blanket claims of confidentiality will not." *Id.* at 1105. And, significantly, "[t]he appropriate accommodation necessarily depends on the particular circumstances of each case." *Id.*

Here, Respondent's position regarding confidentiality can be broken down into two categories of requests. For the first category, request nos. 17–19, 25, 31, 33, 35–39, 42 and 45, Respondent nominally asserted during the parties' communications that it "considers this information confidential" because the information "was not in the public domain." Nevertheless, at all times, including at trial and in its posttrial brief, Respondent has maintained that it would turn over this information if the confidentiality concerns involving the second category of requests were resolved. To date, it still has not turned over any of these documents.

The second category of requests, found in request nos. 1, 6, 9, 14 and 21, seek information that Respondent asserts is covered by third-party confidentiality agreements it has with other entities. Respondent maintains that information is therefore not permitted, let alone required, to be turned over without having a separate confidentiality agreement with the Union. It is this second category of request that is at the heart of the parties' dispute.

With regard to this second category of requests, other than the fact that it has a third-party confidentiality agreement concerning them, Respondent has not articulated specifically why the Union is not entitled to them. But, a third-party confidentiality agreement alone is insufficient to create a legitimate and substantial confidentiality interest. *Delaware County Mem. Hosp.*, 366 NLRB No. 28 (2018), *enf'd. in relevant part*, *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3rd Cir. 2020). Respondent also has not provided the Union with a copy of the third party agreements themselves.

Given these circumstances, I find that Respondent has not met its burden of proof in establishing that any of the requested information comes with the "legitimate and substantial" confidentiality interests required to withhold it from the Union pending accommodative bargaining. Indeed, Respondent has effectively held hostage information in the first category in order to pressure the Union to sign a confidentiality agreement Respondent proposed and which the Union had no reasonable opportunity to bargain over.

Accordingly, I find Respondent's failure to provide the Union with any of the requested information violates Section 8(a)(5) and (1) of the Act.

## CONCLUSIONS OF LAW

1. Respondent, John Gore Theatrical Group, Inc., is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, Actors' Equity Association, is a labor organization within the meaning of Section 2(5) of the Act and represents a bargaining unit comprised of workers employed by the Respondent.

8

A-343

3. Since on or about October 13, 2021, Respondent has committed unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act by refusing to bargain collectively with the Union by failing and refusing to furnish it with certain information it requested on July 7, 2021, that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of Respondent's unit employees.

4. The Respondent's above-described unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

## REMEDY

Having found that the Respondent has engaged in conduct in violation of Section 8(a)(5) and (1) of the Act, I shall recommend that it cease and desist from engaging in such conduct and take certain affirmative action designed to effectuate the policies of the Act.

In particular, I shall recommend that, to the extent it has not already done so, Respondent shall timely furnish the following information to the Union: all of the information in the Union's July 7, 2021 information request nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45.

I shall also recommend that Respondent be required to notify its employees that the Union is entitled to request and receive information related to its role as collective-bargaining representative, and Respondent will not withhold from the Union information which the Union is lawfully entitled to request and receive.

Therefore, Respondent will be ordered to post and communicate by electronic post to employees the attached Appendix and Notice. On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[9]

## ORDER

Respondent, John Gore Theatrical Group, Inc., its officers, agents, and representatives, shall

1. Cease and desist from

(a) Refusing to bargain collectively with the Union, Actors' Equity Association, by failing and refusing to and/or unreasonably delaying in providing the Union information requested that is necessary and relevant to its role as the exclusive representative of the Respondent's unit employees at its 1619 Broadway, New York, New York facility.

(b) In any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

---

[9] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

A-344

JD(NY)-13-22

2. Take the following affirmative action necessary to effectuate the purposes and policies of the Act.

(a) Furnish to the Union, in a timely manner, all of the information requested in the Union's July 7, 2021 correspondence paragraph nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45.

(b) Within 14 days after service by the Region, post at its 1619 Broadway, New York, New York location copies of the attached notice marked "Appendix."[10] Copies of the notice, on forms provided by the Regional Director for Region 2 after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to the physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since October 13, 2021.

(c) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C.  December 6, 2022.

Jeffrey P. Gardner
Administrative Law Judge

---

[10] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

10

A-345

JD(NY)-13-22

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT refuse to bargain collectively and in good faith with the Union, Actors' Equity Association, by failing and refusing to furnish it with requested information in a timely manner that is relevant and necessary to the Union's performance of its duties as the collective-bargaining representative of our unit employees at our 1619 Broadway facility.

WE WILL NOT in any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of our employees in the Unit.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.

WE WILL furnish to the Union in a timely manner the information it requested in its July 7, 2021 information requests nos. 1, 6, 9, 14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45.

JOHN GORE THEATRICAL GROUP, INC.
(Employer)

Dated _____ By _____
                                      (Representative)                (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation, and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below:

26 Federal Plaza, Room 3614, New York, NY 10278-0104
(212) 264-0300, Hours: 9 a.m. to 5:30 p.m.

A-346

JD(NY)-13-22

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/2-CA-286802 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, (212) 264-0344.

A-347

# UNITED STATES OF AMERICA
# BEFORE THE NATIONAL LABOR RELATIONS BOARD

JOHN GORE THEATRICAL GROUP, INC.

and

ACTORS EQUITY ASSOCIATION

Case 02-CA-286802

## ORDER TRANSFERRING PROCEEDING TO
## THE NATIONAL LABOR RELATIONS BOARD

A hearing in the above-entitled proceeding having been held before a duly designated Administrative Law Judge, and the decision of that judge, a copy of which is attached, having been filed with the Board in Washington, D.C.,

**IT IS ORDERED,** pursuant to Section 102.45 of the National Labor Relations Board's Rules and Regulations, that the above-entitled matter be transferred to and continued before the Board.

Dated, Washington, D.C., December 6, 2022.

By direction of the Board:

/s/ Roxanne L. Rothschild
Executive Secretary

NOTE: Communications concerning compliance with the Administrative Law Judge's decision should be with the Regional Director of the Regional Office that issued the complaint.

Exceptions to the decision of the Administrative Law Judge must be received by the Board's Office of the Executive Secretary, 1015 Half Street SE, Washington, DC 20570, on or before **January 3, 2023**

Please refer to Section 102 of the Board's Rules and Regulations ("Rules") with regard to the procedure for filing exceptions to the Administrative Law Judge's decision, or any responsive documents. Attention is specifically directed to the Rules concerning requests for extension of time to file documents (Rule 102.2(c)); the style and format of documents (Rule 102.5(a)); limitations on the length of briefs (Rules 102.5(a), 102.46(a)(1)(i)(D), & 102.46(h)); methods of filing with the Board's Office of the

A-348

Executive Secretary (Rules 102.5(c)-(e)); and service on the other parties (Rules 102.5(c), 102.5(f)-(i), & 102.46(h)).

A-349

## UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD

JOHN GORE THEATRICAL GROUP, INC.,

        **Respondent,**

and

ACTORS' EQUITY ASSOCIATION,

        **Charging Party.**

**Case No.   02-CA-286802**

## JOHN GORE THEATRICAL GROUP, INC.'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

Pursuant to Section 102.46 of the Rules and Regulations of the National Labor Relations Board, Respondent John Gore Theatrical Group, Inc. ("JGTG") files the following exceptions to Administrative Law Judge Jeffrey P. Gardner's ("ALJ") December 6, 2022 Decision and Order ("ALJD") in the above-captioned case:

1.      Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "Respondent is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act." (ALJD 2:4-5).

2.      Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "Respondent has recognized the Union as the exclusive bargaining representative of all Actors (Principals, Chorus, Stage Managers, and Assistant Stage Managers) employed by them for the purpose of collective bargaining and the administration of matters within the scope of the SET Agreement" (ALJD 2:15-18).

A-350

3. Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that Respondent "stipulates that it is bound by the SET Agreement, and by Board law with regard to the Union's requests for information herein." (ALJD 2, n. 3).

4. Exception is taken to the ALJ's inaccurate recitation of the facts, which is contrary to the record, that Respondent identified "various of the Union's requests as not being relevant." (ALJD 6:4-5).

5. Exception is taken to the ALJ's inaccurate quotation, which is contrary to the record, that Respondent stated "the equity arrangements are covered by confidentiality agreements with other entities. For the remainder of the Union's requests." (ALJD 6:11-13).

6. Exception is taken to the ALJ's incomplete quotation, which is contrary to the record, that Respondent stated that the information "is not within the public domain and is held confidential." (ALJD 6:14-15)

7. Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "it is undisputed that Respondent did not provide any documents responsive to any of the Union's July 7, 2021 information requests that are included in the complaint." (ALJD 6:17-18).

8. Exception is taken to the ALJ's failure, which is contrary to Board precedent and the record, to consider Equity's refusal to respond to JGTG's information requests in Joint Exhibits 12 and 13. (ALJD 6:4-20).

9. Exception is taken to the ALJ's failure, which is contrary to Board precedent and the record, to consider Joint Exhibit 13. (ALJD 2:10-6:20).

2

10.     Exception is taken to the ALJ's credibility determinations, which are contrary to the record, that Union Attorney Hanan Kolko's testimony was "consistent with documentary evidence in the parties' Joint Exhibits." (ALJD 6:24-25).

11.     Exception is taken to the ALJ's credibility determinations, which are contrary to the record, that Kolko's demeanor was "forthright and honest." (ALJD 6:24-26).

12.     Exception is taken to the ALJ's credibility determinations, which are contrary to the record, that Respondent's General Counsel Sheila Lavu's testimony was "hesitating at times." (ALJD 6:32-34).

13.     Exception is taken to the ALJ's credibility determinations, which are contrary to the record, that Lavu's "knowledge was not as comprehensive that of Mr. Kolko, and she struggled at times to recall specifics." (ALJD 6:34-35).

14.     Exception is taken to the ALJ's credibility determinations, which are contrary to the record, that Lavu "seemed uncertain of specifics, and unable to explain why that video justified withholding the information sought here. (ALJD 6:35-37).

15.     Exception is taken to the ALJ's entire analysis of relevancy, which is irrelevant and undisputed according to the record. (ALJD 6:41-7:37).

16.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "[t]he parties are in agreement that apart from the issue as to whether there is a need for specific confidentiality arrangements for any of the requested information, the Union is otherwise entitled to the information sought." (ALJD 7:35-37).

17.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "[a]s to certain of the Union's original requests, Respondent took the position that those requests did not seek relevant information." (ALJD 7, n. 8).

A-352

18.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record and Board precedent, that "Respondent failed and refused to furnish the Union with relevant information." (ALJD 7:39).

19.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record and Board precedent, that "Respondent violated Section 8(a)(5) and (1) of the Act when, since October 13, 2021, Respondent failed or refused to provide the Union with relevant information, which it requested and is entitled to as the exclusive collective-bargaining representative of the unit." (ALJD 7:41-44).

20.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record and Board precedent, that Respondent "relies solely on its position that the information the Union sought was confidential, requiring the Union to engage in 'accommodative bargaining.'" (ALJD 8:1-3).

21.     Exception is taken to the ALJ's incomplete finding and conclusion, which is contrary to the record, that "Respondent nominally asserted during the parties' communication that [Respondent] 'considers this information confidential' because the information 'was not in the public domain.'" (ALJD 8:13-15)

22.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "[t]o date, [Respondent] still has not turned over any of these documents." (ALJD 8:17).

23.     Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "other than the fact that it has a third-party confidentiality agreement concerning them, Respondent has not articulated specifically why the Union is not entitled to them." (ALJD 8:25-27).

4

A-353

24. Exception is taken to the ALJ's misplaced reliance on *Delaware County Mem. Hosp.*, 366 NLRB No. 28 (2018)*, enf'd in relevant part, Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3rd Cir. 2020), which misinterprets and misapplies precedent and is contrary to the record, that "a third-party confidentiality agreement alone is insufficient to create a legitimate and substantial confidentiality interest." (ALJD 8:25-27).

25. Exception is taken to the ALJ's finding and conclusion, which is contrary to the record, that "Respondent also has not provided the Union with a copy of the third party agreements themselves." (ALJD 8:30-31).

26. Exception is taken to the ALJ's finding and conclusion, which is contrary to Board precedent and the record, that "Respondent has not met its burden of proof in establishing that any of the requested information comes with the 'legitimate and substantial' confidentiality interests required to withhold it from the Union pending accommodative bargaining." (ALJD 8:33-36).

27. Exception is taken to the ALJ's finding and conclusion, which is contrary to Board precedent and the record, that "Respondent has effectively held hostage information in the first category in order pressure the Union to sign a confidentiality agreement Respondent proposed and which the Union had no reasonable opportunity to bargain over." (ALJD 8:36-38).

28. Exception is taken to the ALJ's finding and conclusion, which is contrary to Board precedent and the record, that "Respondent's failure to provide the Union with any of the requested information violates Sections 8(a)(5) and (1) of the Act." (ALJD 8:40-41).

29. Exception is taken to the ALJ's failure, which is contrary to Board precedent, to balance JGTG's legitimate and substantial confidentiality concerns with the Union's need for the information. (ALJD 7:39-8:41).

5

30.  Exception is taken to the ALJ's conclusion of law, which is contrary to Board precedent and the record, that "[s]ince on or about October 13, 2021, Respondent has committed unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act by refusing to bargain collectively with the Union by failing and refusing to furnish it with certain information it requested on July 7, 2021, that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of Respondent's unit employees." (ALJD 9:1-6).

31.  Exception is taken to the ALJ's conclusion of law, which is contrary to Board precedent and the record, that "[t]he Respondent's above-described unfair labor practices affect commerce within the meaning of Section 2(6) and 2(7) of the Act." (ALJD 9:8-9).

32.  Exception is taken to the ALJ's conclusion of law, which is which is contrary to Board precedent and the record, that "Respondent, John Gore Theatrical Group, Inc., is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act." (ALJD 8:45-46).

33.  Exception is taken to the ALJ's conclusion of law, which is which is contrary to Board precedent and the record, that "[t]he Union, Actors' Equity Association, is a labor organization within the meaning of Section 2(5) of the Act and represents a bargaining unit comprised of workers employed by the Respondent." (ALJD 8:48-50).

34.  Exception is taken to the ALJ's proposed remedy, which is contrary to Board precedent, that "Respondent shall timely furnish all of the information in the Union's July 7, 2021 information requests nos. 1, 6, 9, 14, 17-19, 21, 25, 31, 33, 35-39, 42, and 45." (ALJD 9:17-20).

35.  Exception is taken to the ALJ's proposed remedy, which is contrary to Board

6

precedent, that "Respondent be required to notify its employees that the Union is entitled to request and receive information related to its role as collective-bargaining representative, and Respondent will not withhold from the Union information which the Union is lawfully entitled to request and receive." (ALJD 9:22-25).

36.      Exception is taken to the ALJ's proposed remedy, which is contrary to Board precedent, that "Respondent will be ordered to post and communicate by electronic post to employees the attached Appendix and Notice." (ALJD 9:27-28; APPENDIX).

37.      Exception is taken to the ALJ's proposed ORDER, which is contrary to Board precedent, that Respondent shall cease and desist from "[r]efusing to bargain collectively with the Union, Actors' Equity Association, by failing and refusing to and/or unreasonably delaying in providing the Union information requested that is necessary and relevant to its role as the exclusive representative of the Respondent's unit employees at its 1619 Broadway, New York, New York Facility." (ALJD 9:33-42).

38.      Exception is taken to the ALJ's proposed ORDER, which is contrary to Board precedent, that Respondent shall cease and desist from "[i]n any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by Section 7 of the Act." (ALJD 9:33-36, 9:44-45).

39.      Exception is taken to the ALJ's proposed ORDER, which is contrary to Board precedent, that Respondent shall "[t]ake the following affirmative action necessary to effectuate the purposes and policies of the Act": "[f]urnish to the Union, in a timely manner, all of the information requested in the Union's July 7, 2021 correspondence paragraphs nos 1, 6, 9, 14, 17-19, 21, 25, 31, 33, 35-39, 42 and 45." (ALJD 10:1-6).

40.      Exception is taken to the ALJ's proposed ORDER, which is contrary to Board

7

A-356

precedent, that Respondent shall "[t]ake the following affirmative action necessary to effectuate the purposes and policies of the Act": "[w]ithin 14 days after service by the Region, post at its 1619 Broadway, New York, New York location copies of the attached notice marked 'Appendix.' Copies of the notice, on forms provided by the Regional Director for Region 2 after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to the physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or by other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced or covered by another material. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since October 13, 2021." (ALJD 10:1-2, 10:8-22).

41.     Exception is taken to the ALJ's proposed ORDER, which is contrary to Board precedent, that Respondent shall "[t]ake the following affirmative action necessary to effectuate the purposes and policies of the Act": "[w]ithin 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps the Respondent has taken to comply." (ALJD 10:1-2, 10:24-26).

42.     Exception is taken to the APPENDIX to the ALJD, which is contrary to Board precedent, which contains a proposed NOTICE TO EMPLOYEES, which states "WE WILL NOT refuse to bargain collectively and in good faith with the Union, Actors' Equity Association, by

8

A-357

failing and refusing to furnish it with the requested information in a timely manner that is relevant and necessary to the Union's performance of its duties as the collective bargaining representative of our unit employees at our 1619 Broadway facility." (ALJD APPENDIX).

43. Exception is taken to the APPENDIX to the ALJD, which is contrary to Board precedent, which contains a proposed NOTICE TO EMPLOYEES, which states "WE WILL NOT in any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of our employees in the Unit." (ALJD APPENDIX).

44. Exception is taken to the APPENDIX to the ALJD, which is contrary to Board precedent, which contains a proposed NOTICE TO EMPLOYEES, which states "WE WILL furnish to the Union in a timely manner the information it requested in its July 7, 2021 information requests no. 1, 6, 9, 14, 17-19, 21, 25, 31, 33, 35-39, 42 and 45." (ALJD APPENDIX).

45. Exception is taken to the APPENDIX to the ALJD, which is contrary to Board precedent, which contains a proposed NOTICE TO EMPLOYEES, which lists below Respondent's name "(Employer)" (ALJD APPENDIX).

46. Exception is taken to the ALJ's exclusion, which is contrary to Board precedent and the Federal Rules of Evidence, of Respondent's Exhibit 3. (Tr. 77:18-78:6).

47. Exception is taken to the ALJ's partial exclusion, which is contrary to Board precedent and the Federal Rules of Evidence, of Respondent's Exhibit 4. (Tr. 84:4-10).

WHEREFORE, based on the foregoing exceptions and brief in support thereof, Respondent JGTG hereby requests that the decision of the ALJ be reversed and the complaint filed herein be dismissed in its entirety.

A-358

Respectfully submitted,

PROSKAUER ROSE LLP

Dated:  January 3, 2023

By:_____
Mark Theodore
Ariel Brotman
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel. No.: (310) 557-2900
Fax No.: (310) 557-2193
Attorneys for Respondent,
John Gore Theatrical Group, Inc.

10

A-359

# UNITED STATES OF AMERICA
# BEFORE THE NATIONAL LABOR RELATIONS BOARD

**JOHN GORE THEATRICAL GROUP, INC.,**

        **Respondent,**

**and**

**ACTORS' EQUITY ASSOCIATION,**

        **Charging Party.**

**Case No.   02-CA-286802**

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **John Gore Theatrical Group, Inc.'s Exceptions to the Decision of the Administrative Law Judge** has been served on January 3, 2023 as indicated below upon:

*By email*
Tanya Khan, Esq.
Counsel for General Counsel
NLRB - Region 2
26 Federal Plaza, Suite 3614
New York, NY 10278-3699
Tanya.Khan@nlrb.gov

*By email*
Eyad Asad, Esq.
COHEN, WEISS, AND SIMON
900 Third Avenue, Suite 2100
New York, NY 10022-4869
EAsad@cwsny.com

Dated: January 3, 2023

_____
Robert Linton

A-360

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

JOHN GORE THEATRICAL GROUP, INC.,

        Respondent

                              Case No. 02-CA-286802

    and

ACTORS EQUITY ASSOCIATION

        Charging Party

**COUNSEL FOR THE GENERAL COUNSEL'S**
**ANSWERING BRIEF TO RESPONDENT'S EXCEPTIONS TO THE**
**ADMINISTRATIVE LAW JUDGE'S DECISION**

Tanya W. Khan
Counsel for the General Counsel
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, NY 10278

Dated at New York, NY
January 31, 2023

A-361

## I.    STATEMENT OF THE CASE

On December 6, 2022, Administrative Law Judge Jeffrey P. Gardner issued a Decision correctly finding that John Gore Theatrical Group, Inc., herein "Respondent" violated Sections 8(a)(1) and (5) of the Act by failing and refusing to provide Actors' Equity Association, herein "the Union", with information requested on July 7, 2021.

On January 3, 2023, Respondent filed Exceptions ("Respondent's Exceptions") and a brief in support of Respondent's Exceptions. Respondent has excepted to all unfair labor practice findings found by the Judge. Specifically, Respondent excepted to the Judge's conclusion that Respondent failed to meet its burden that it has "legitimate and substantial" confidentiality interests to the Union's information request, and instead argues that the Union waived its entitlement to the requested information by refusing to bargain over the information request.

Pursuant to Section 102.46(b)(1) of the Rules and Regulations of the National Labor Relations Board (the "Board"), the Union requested an extension of time to file the answering brief from January 17, 2023, to January 31, 2023. The General Counsel joined in on the Union's request for an extension of time. The Board granted the request for an extension to January 31, 2023.

## II.    STATEMENT OF FACTS

Counsel for the General Counsel asserts that the facts found by the Judge have been accurately set forth in the Decision,

## III.    ARGUMENT

### A.    *The ALJ Properly Concluded to Findings that were Previously Admitted by Respondent in its Answer [Exceptions 1-3)*

In Respondent's Exceptions, it raises Exceptions number 1 through 3, without a corresponding argument in its brief. The Board should disregard these raised Exceptions, as

1

A-362

Respondent has failed to comply with Section 102.46 of the Board' Rules and Regulations. Section 102.46(a)(1) requires that each exception "set forth specifically the questions of procedure, fact, law, or policy to which exception is taken," and that if a supporting brief is filed, it should present "argument … in support of the exceptions."

Additionally, in its Answer to the Complaint, herein the "Answer", Respondent admits to the allegations set forth in paragraphs 3, 5 and 7(a) of the Complaint. Specifically, Respondent, in paragraph 3 of its Answer admitted Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. (G.C. Ex. 1(f)) Likewise, in paragraph 5 its Answer, Respondent admits it recognized the Union as the exclusive bargaining representative of all Actors (Principals, Chorus, Stage Managers and Assistant Stage Managers) employed by them for the purpose of collective bargaining and the administration of matters within the scope of the Short Engagement Touring Agreement, hereafter, "SET Agreement". (G.C. Ex. 1(f)) Finally, Respondent, in paragraph 7(a) its Answer, admitted that the information requested by the Union is necessary for, and relevant to, the Union's performance of its duties, as the exclusive bargaining representative. This admission by Respondent confirms that it is bound by the SET Agreement, and by Board law with regard to the Union's requests for information.

**B.** ***The ALJ Properly Concluded that Respondent Did Not Meet Its Burden of Proof To Establish That It Has "Legitimate And Substantial" Confidentiality Interests [Exceptions 4, 6, 7, 9-15, 17-31, 46, 47]***

Respondent argues the ALJ did not properly analyze its asserted confidentiality concerns and that the ALJ failed to address how Respondent's confidentiality concerns are insufficient. Additionally, Respondent argues that the Decision did not discuss the Union's failure to engage in accommodative bargaining after conceding some of the information sought is legitimately confidential.

2

A-363

The record reflects that Respondent raised a confidentiality defense to information request nos. 1, 6, 9, 14 and 21, which Respondent asserts is covered by third-party confidentiality agreements it has with other entities. (ALJD 8:19-20). With respect to information request nos. 17, 18, 19, 25, 31, 33, 35 through 39, 42 and 45, Respondent asserts the information is confidential as the information is non-public. (ALJD 8:11-14).

Under Board law, a party may refuse to furnish confidential information to the other party in a collective-bargaining relationship only under certain conditions. Initially, the party must show that it has a legitimate and substantial confidentiality interest in the information sought. *Pennsylvania Power Co.,* 301 NLRB 1104, 1105 (1991). Information which would give rise to such an interest may include that which would reveal, contrary to promises or reasonable expectations, highly personal information, such as individual medical records or psychological test results; that which would reveal substantial proprietary information, such as trade secrets; that which could reasonably be expected to lead to harassment or retaliation, such as the identity of witnesses; and that which is traditionally privileged, such as memoranda prepared for pending lawsuits. *Detroit Newspaper Agency,* 317 NLRB 1071, 1073 (1995). If this showing is made, the Board must weigh the party's interest in confidentiality against the requester's need for the information, and the balance must favor the party asserting confidentiality. *Detroit Edison Co. v. NLRB,* 440 U.S. 301 (1979); *Detroit Newspaper Agency,* supra at 1074; *Pennsylvania Power,* supra at 1105.

With regard to claims of confidentiality, the party asserting a claim of confidentiality bears the burden of proving it. *Washington Gas Light Co.*, 273 NLRB 116 (1984). Further, an employer asserting a confidentiality interest must affirmatively propose an accommodation such as redactions or a confidentiality agreement. *Postal Service*, 364 NLRB at 231 (2016). By failing to

3

propose such accommodations, the employer waives and forgoes its opportunity to do so. *Del. Cty. Mem. Hosp.,* 366 NLRB No. 28, at 32 (March 7, 2018).

Here, the Union established the relevancy for its information request from the outset by notifying Respondent that the information sought was to investigate whether Respondent has violated Rule 7 of the SET Agreement. Respondent asserts that paragraphs 17, 18, 19, 25, 31, 33, 35 through 39, 42 and 45 were deemed confidential since the information is non-public. Respondent admits that the information is not confidential under Board law, but that it was not comfortable releasing the information as it may be exposed in some public forum. Respondent's concerns do not eliminate its obligation to provide the Union with information it is entitled to statutorily. *Detroit Newspaper Agency,* supra at 1074 (a blanket claim that information is confidential or proprietary, without more, does not satisfy the employer's burden.)

Respondent argues the Union has not bargained in good faith over the release of the confidential information and has demanded the Union agree to a non-disclosure agreement to the possibly legitimate confidentiality concerns regarding request nos. 1, 6, 9, 14 and 21, while refusing to release the remaining information as leverage. Respondent has not bargained in good faith by holding information hostage. As provided in *Del. Cty. Mem. Hosp.*, supra, Respondent has not met its burden to establish that all of the information requested by the Union is subject to its confidentiality request and is therefore unlawfully refusing to provide the information not subject to its putative confidentiality defense. Notably, the Board in *Del. Cty. Mem. Hosp.*, *infra,* required the employer to produce the entire information request, both the asserted confidential and non-confidential parts since the Board found the respondents were in possession of requested information it knew to be at least partially relevant and failed to (1) produce those portions that were relevant, (2) identify portions that were not being produced, and (3) explain why portions

4

A-365

were being withheld. *Del. Cty. Mem. Hosp.*, supra at 43. Likewise, here, the ALJ correctly found that the Respondent was not entitled to a second chance to assert objections to production that should have been raised in a timely manner when the request was initially made over a year ago. To do so would place the Respondent in a more advantageous position than it is now. *Postal Service*, 364 NLRB No. 27 (2016) (Board will not reward respondents by ordering confidentiality accommodations that were not proposed with regard to a pilot production that was already complete); *West Penn Power Co.*, 339 NLRB 585, 586 (2003) (remedy is to provide the information, rather than to bargain over providing the information, because employer should have bargained over the burden of production at the time the information was requested). Therefore, the ALJ properly applied *Del. Cty. Mem. Hosp.*

Respondent cites to *Good Life Beverage Co.* (*Silver Brothers Co.*), 312 NLRB 1060, 1060-62 (1993), for support of its position and argues that the Board's findings are similar to this case. In *Silver Brothers Co.*, the union requested certain financial information from the employer when the employer filed for bankruptcy. Immediately after receiving that information, the union business agent had made statements in a newspaper article regarding the employer's financials. The employer then requested a confidentiality provision for any additional financial information provided to the union and furthermore and wanted to discuss whether the union's need for the information was legitimate. The Board found that the employer demonstrated the need for confidentiality. However, the instant case is wholly inapposite to the fact pattern in *Silver Bros*. Significantly, here, there was no record evidence to indicate that the Union had released confidential information about Respondent at any time.

A-366

### 1. The ALJ Properly Ordered Respondent Provide the Union with Third Party Agreements

Respondent argues that the law requires parties to seek an accommodation to third party agreements. The Union has made clear to Respondent that it would enter into a non-disclosure agreement over the information covered by third-party confidentiality, but that the negotiation of a non-disclosure agreement on the third-party confidentiality issue should not preclude Respondent from providing the information not subject to such agreements. (Tr. 35) Respondent's attempts to have the Union sign a non-disclosure agreement on any non-publicly available information rather than solely on information subject to third-party agreements reveals Respondent has failed to propose appropriate accommodations. (Tr. 73). Since Respondent has failed to propose appropriate accommodations related to information subject to third-party agreements, by conditioning its release on reaching a non-disclosure agreement regarding non-confidential information, Respondent has waived its opportunity to do so now. *Del. Cty. Mem. Hosp.*, supra at 32.

### 2. Respondent's Organizational Structure is Not a Legitimate Confidentiality Concern

Respondent has failed to demonstrate that its organizational structure is a legitimate confidentiality concern, as it does not fall under any category of what would be deemed confidential under Board law. See *Detroit Newspaper Agency,* supra at 1071. Respondent argues that its fear that the Union's request for non-public information would be leaked to the public supports the need for additional safeguards prior to the release of information. Respondent again attempts to point to *Silver Brothers Co.*, 312 NLRB at 1060-62, to support its contention that the Union has a propensity to disclose confidential information, but as discussed herein, the facts do not show that the Union has released information related to Respondent which would raise

A-367

confidentiality concerns. Respondent's argument is wholly without merit and the record does not support its contention.

### 3. *ALJ Properly Limited Admission of Respondent's Exhibit 4*

During the hearing, Respondent attempted to show that it had a legitimate confidentiality concern by seeking to enter a three-hour YouTube video which purported to show Union members discussing confidential information related to the SET Agreement[1]. (R. Ex. 4). Respondent's witness, Sheila Lavu conceded that the information discussed in the video was not related to Respondent, but another production. (Tr. 79:18-20). Respondent did not produce any evidence to show that at the time of the information request, the Union would leak information related to Respondent's business. Accordingly, Respondent failed to demonstrate justification for withholding the information from the Union.

Contrary to Respondent's argument, the ALJ properly limited the YouTube video into evidence by limiting it to just its screenshot as a reference to Lavu's testimony. The video in question is three-hours long and does not involve Respondent or information pertaining to Respondent whatsoever. The only link between the instant case and the YouTube video is that the individuals featured in the video were members of the Charging Party Union. Lavu attempted to explain that the video demonstrated that the Union had a propensity to disseminate potentially private information to its members which they would then share with the public. However, Respondent failed to establish what information was confidential, who provided the information that was being discussed or how it was provided to the individuals in the YouTube video.

---

[1] The ALJ correctly limited the admission of the YouTube video as a screenshot to reference the testimony of Lavu. (Tr. 84:4-9).

A-368

C.    **ALJ's Credibility Determinations Were Correct**

Contrary to Respondent's position, the ALJ's credibility determinations were correct. Respondent excepted to the ALJ's credibility findings regarding the testimony of General Counsel's witness Hanan Kolko and Respondent's witness Lavu. The Board's established policy is to not overrule an administrative law judge's credibility resolution unless the clear preponderance of all the relevant evidence convinces the Board that they are incorrect. *Standard Dry Wall Products,* 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). Further, as the demeanor of witnesses is a factor of consequence in resolving issues of credibility, and as the Administrative Law Judge, not the Board, has had the advantage of observing the witnesses while they testified, it is the Board's policy to attach great weight to an Administrative Law Judge's credibility findings insofar as they are based on demeanor. *Id.*

Here, there is no evidence whatsoever to support a reversal of the ALJ's credibility findings with respect to the testimony of Kolko or Lavu. The ALJ properly noted that credibility determinations rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, and the weight of the respective evidence, and established or admitted facts. (ALJD 6:24-37).

D.    **The Union Did Not Refuse to Bargain [Exceptions 7-11, 16, 19]**

The record evidence shows that throughout the parties' discussions concerning the information request, the Union made clear to Respondent that it would enter into a non-disclosure agreement over the information covered by third-party confidentiality, but that the negotiation of a non-disclosure agreement on the third-party confidentiality should not preclude Respondent from providing the information not subject to such agreements. Tr. 40-41. Respondent argues that there

8

A-369

are tradeoffs in negotiations, and it is not uncommon for a party to hold onto something in order to get something else. (Tr. 53:6-12, 54:12- 19). However, by refusing to provide information that Respondent knew the Union was entitled to and was not subject to any confidentiality claims, it is Respondent, not the Union that is engaged in bad faith. Indeed, at no time during the parties protracted negotiations regarding the information, did Respondent file a charge against the Union alleging a violation of Section 8(b)(3). Additionally, Respondent incorrectly argues that since the Union never requested to see a copy of the third-party confidentiality agreements, Respondent was not required to produce the agreements to the Union to support its claim of confidentiality. However, a union is not required to accept a summary or representation of information that may be confirmed and verified by other materials. *Pet Dairy*, 345 NLRB 1222, 1223 (2005); *Wallace Metal Products, Inc.*, 244 NLRB 41 fn. 2 (1979). Rather, Respondent has the burden to produce the third-party agreements to the Union in response to the information request, rather than wait for the Union to request them. The record indicates that the Union was more than willing to engage in bargaining over the information which could feasibly be considered confidential. (Tr. 41:1-2, 43:5-7). Respondent is not entitled to withhold information it already had an obligation to provide as leverage in asking the Union to accept less than it may otherwise be entitled to receive. See *Sonat Marine, Inc.*, 279 NLRB 100, fn. 4 (1986) (Board found unlawful refusal to produce information where production was effectively conditioned on union waiving its right to negotiate over the underlying issue). It is without question that Respondent unlawfully withheld information the Union was lawfully entitled to receive.

**E.      The Remedy Ordered by the ALJ is Just and Proper Under the Act**

The remedy ordered by the ALJ is appropriate. The ALJ found and concluded Respondent failed and refused to provide the Union with the relevant information requested and properly

9

A-370

ordered that Respondent provide the Union with the requested information. Respondent contends that the proper remedy was to order bargaining over the release of confidential information, not access, and cites to *Borgess Med. Ctr. & Michigan Nurses Ass'n*, 342 NLRB 1105 (2004) as support. However, Respondent's reliance on *Borgess* is misguided as it relates to the instant case. While the Board in *Borgess* found that the respondent did not provide accommodations to confidential information, yet did not order release of the information, the Board found that the information was now moot to the union. That is not the case here. It is established where Respondent has not set forth a proper confidentiality interest, it will be ordered to do so unencumbered by restrictions on the information. The Board in *Watkins Contracting, Inc.,* 335 NLRB 222, 226 (2001) affirmed the ALJ's order rejecting the employer's assertion of confidentiality where the employer "only stated that the information should be held confidential and then asked if the Union would agree to sign a confidentiality agreement". It was ordered the respondent provide the information to the union and not require the parties to bargain over the confidential information, as respondent did not establish a sufficient confidentiality interest.

Furthermore, Respondent excepts to the ALJ's proposed Order which requires Respondent to post a Notice to Employees at its facility and electronically. Respondent failed to address this exception in its supporting brief and therefore did not comply with Section 102.46(a)(1). In any event, this remedy is standard in ALJ and Board Orders and is no way extraordinary relief.

## IV. CONCLUSION AND REMEDY

For the foregoing reasons, the General Counsel urges the Board to find Respondent's Exceptions to be without merit. The ALJ properly found Respondent violated Sections 8(a)(1) and (5) of the Act by failing and refusing to provide the Union with information request nos. 1, 6, 9,

10

A-371

14, 17–19, 21, 25, 31, 33, 35–39, 42 and 45. Accordingly, the ALJ's decision, findings and

conclusions of law and recommended remedy should be adopted.

_____
Tanya Khan
Counsel for the General Counsel
NLRB, Region 2
26 Federal Plaza, Room 3614
New York, NY  10278

Dated: January 31, 2023
New York, NY

A-372

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 2

-------------------------------------------------------------- x
                        :
JOHN GORE THEATRICAL GROUP, INC.,     :
                        :
         Respondent,        :    Case No. 02-CA-286802
                        :
      and              :
                        :
ACTORS' EQUITY ASSOCIATION,       :
                        :
         Charging Party.     :
                        :
                        :
-------------------------------------------------------------- x

**CHARGING PARTY ACTORS EQUITY'S ASSOCIATION'S**
**ANSWERING BRIEF TO RESPONDENT'S EXCEPTIONS BRIEF**

*/s/ Eyad Asad*
Eyad Asad
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 563-4100
Facsimile: (646) 473-8249
easad@cwsny.com

*Attorneys for Actors' Equity Association*

Dated: January 31, 2023

9888199.6

A-373

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

PROCEDURAL HISTORY..................................................................................... 11

ARGUMENT....................................................................................................... 11

I.      The ALJD Correctly Found that the Respondent Lacked a Legitimate and Substantial Confidentiality Interest in the Information it Withheld. ................................ 11

      A.      Respondent Bears the Burden of Proving it Had Legitimate and Substantial Confidentiality Interests that Justified its Refusal to Provide the Requested Information. .................................................................... 13

      B.      The ALJ Correctly Held that Respondent Failed to Prove that it had Legitimate and Substantial Confidentiality Interests in the First Category of Information, Pertaining to Information it Claims is Not Normally in the Public Domain. ....................................................................... 15

      C.      The ALJD Concluded Correctly that Respondent's Third-Party Confidentiality Provisions do not Provide Blanket Protection from Disclosure to the Union without a Confidentiality Agreement. ........................... 19

      D.      Respondent's Argument that the Union's Members Might "Misuse" Information Provided to it is Based on Mere Speculation, and, in any Event, not a Proper Basis to Withhold the Information....................................... 21

II.      The ALJD's Order Requiring Respondent to Produce the Disputed Information is Appropriate. ...................................................................................... 25

CONCLUSION.................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................... 28

i

A-374

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beverly Health & Rehab. Servs., Inc.*,
  328 NLRB 959 (1999) ..................................................................................22

*Borgess Med. Ctr.*,
  342 NLRB 1105 (2004) ................................................................................25

*Delaware County Mem. Hosp.*, 366 NLRB No. 28 (2018), *enf'd in relevant part,*
  *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3d Cir. 2020). *Crozer*...................... *passim*

*Detroit Newspaper Agency*,
  317 NLRB 1071 (1995) ....................................................................1, 13, 14, 17

*Good Life Beverage Co. (Silver Bros. Co.)*,
  312 NLRB 1060 (1993) ..............................................................................17, 18

*Lasher Service Corp.*,
  332 NLRB 834 (2000) ................................................................................14, 17

*Minnesota Mining & Mfg. Co.*,
  261 NLRB No. 2 (1982) ..............................................................................25, 26

*Nat'l Grid USA Service Co., Inc.*,
  348 NLRB No. 88 (2006) ..............................................................................15

*Nexstar Broad., Inc.*,
  370 NLRB No. 72 (2021) ..............................................................................15

*Strategic Resources, Inc.*,
  364 NLRB No. 42 (2016) ..............................................................................13

*Washington Hosp. Ctr. Corp.*,
  360 NLRB 846 (2014) ..................................................................................14

**Statutes**

Section 8(a)(5) and 8(a)(1), National Labor Relations Act ...........................................2, 11, 19, 26

**PRELIMINARY STATEMENT**

The Charging Party, the Actors' Equity Association (the "Union"), filed the charge in this case because the Respondent John Gore Theatrical Group (the "Respondent") refused to provide information requested by the Union, which the Respondent admits is relevant, unless the Union executed a nondisclosure agreement. For nearly four months after the Union made its July 7, 2021 information request, the Respondent delayed in responding, then sought to have the Union sign an onerous confidentiality agreement covering many of the requests. The Union then filed the charge in this case, but the Respondent persisted, again for months, in demanding a confidentiality agreement. When questioned by the Union as to why it thought that any of the disputed information should be subject to a confidentiality agreement, the Respondent repeatedly stated its concern was that the Union's members would post the information on social media. What it never did, and did not do at the hearing in this case, is establish that the information it sought to withhold fell within any of the narrow categories of confidential information recognized by the Board. In failing to do so, it failed to meet its burden under *Detroit Newspaper Agency*, 317 NLRB 1071, 1074 (1995), to prove that it had "legitimate and substantial" confidentiality concerns.

Administrative Law Judge ("ALJ") Jeffrey P. Gardner issued the Decision (the "ALJD") in this case on December 6, 2022. The ALJ found that Respondent failed to bear its burden of proving that it had "legitimate and substantial" confidentiality concerns over the information it had refused to disclose. (ALJD 8:33-36). Instead, the ALJD found that the Respondent had held one set of information responsive to the Union's information request "hostage" in order to leverage a confidentiality agreement with the Union for the other set of responsive information. (ALJD 8:36). As to the information Respondent held hostage— information concerning the Respondent's organizational structure and relationships with various

1

affiliated entities—the ALJD determined that the Respondent had repeatedly maintained, both before and during the hearing, that it would produce the information without a confidentiality agreement *if and only if* the Union gave it a confidentiality agreement for the other set of disputed information. (ALJD 8:14-17). Accordingly, the ALJD concluded that the Respondent lacked legitimate and substantial confidentiality concerns over that first set of information. (ALJD 8:33-36). In essence, the Respondent's demand for a confidentiality agreement was just a negotiating position, not a reflection of a legitimate and substantial confidentiality concern.

The other category of information which the Respondent refused to disclose without a confidentiality agreement was covered by nondisclosure agreements (NDAs) the Respondent had with third-parties. The ALJD also rejected the Respondent's contention that it had established legitimate and substantial confidentiality concerns over that information. Instead, the ALJD concluded that the Respondent relied exclusively on the mere existence of those third-party confidentiality agreements to justify its refusal to produce information. The Board rejected that same argument in *Delaware County Mem. Hosp.*, 366 NLRB No. 28 (2018), *enf'd in relevant part, Crozer-Chester Med. Ctr. v. NLRB ("Crozer")*, 976 F.3d 276 (3d Cir. 2020). *Crozer* held that an employer's third-party confidentiality agreement does not, by itself, establish an employer's "legitimate and substantial confidentiality interest" in information. *Id.* at 294. The ALJD properly followed *Crozer* and held that Respondent had not met its burden of proof as to the information it refused to provide based on third party NDAs.

As we explain here, the ALJD correctly found that the Respondent had failed to meet its burden of proof and so violated Section 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the "Act").

2

A-377

In its Brief in Support of Exceptions to the Decision of the Administrative Law Judge ("Resp. Br.") and its Exceptions to the Decision of the Administrative Law Judge ("Resp. Exc."), Respondent contends that the ALJD erred in not finding that the Union failed to engage in accommodative bargaining over the terms of the Respondent's proposed nondisclosure agreement with the Union.  But, under Board precedent, and as correctly decided in the ALJD, the party seeking the information has no obligation to engage in accommodative bargaining *unless* and *until* the party raising confidentiality asserts a legitimate and substantial basis for it. Throughout the Union's communications with Respondent, the Union repeatedly asked Respondent why it asserted that the material at issue was confidential, in an effort to determine whether the Union had an obligation to bargain.  The Respondent failed to offer an explanation other than that it viewed the information as confidential and did not want the Union's members to publicize the information on social media.  The ALJD determined that the Respondent's failure to establish a legitimate and substantial confidentiality interest in the disputed information meant that the Union had no duty to engage in accommodative bargaining.

For the reasons stated in the ALJD and as explained below, the ALJD should be affirmed in its entirety, and the remedies ordered in the ALJD should be upheld.

## STATEMENT OF FACTS

*Actors' Equity Association, the Broadway League and the John Gore Theatrical Group*

The Union represents approximately 40,000 actors, stage managers and others in the performing arts throughout the United States.  (Transcript of August 30, 2022 proceedings ("Tr.") 52); (Joint ("Jt.") Exhibit ("Exh.") 1 at 3).  The Union and The Broadway League (the "League"), a multiemployer association representing producers, are parties to a collective bargaining agreement known as the Short Engagement Touring Agreement (the "SETA").  (Tr. 24-25).  The SETA covers touring musical and dramatic productions where most engagements

3

A-378

are of less than one week.  (Jt. Exh. 1 at 3).  No engagement under the SETA may last more than four weeks, except under certain specified circumstances.  (*Id.*).  The Respondent is a signatory to the SETA (Jt. Exh. 12 (page 2 of letter dated October 13, 2021 from Mark Theodore to Hanan Kolko)) (Answer ¶5(b)[1]) (ALJD 2:13-20), and involved in business of presenting Broadway touring shows.  (Tr. 65).

*The Union Asks for Information on July 7, 2021*

On July 7, 2021, Hanan B. Kolko, counsel for the Union, sent an information request[2] on the Union's behalf to Bernard Plum, counsel for the League, seeking information regarding potential double breasting by the Respondent.  (Jt. Exh. 2); (Tr. 25).  In the letter, Kolko explained that the Union was concerned that the Respondent "has been and is diverting productions covered by the . . . [SETA] to Network Presentations. . . ."  (Jt. Exh. 2 at 1).[3]  Kolko explained that the Union's investigation revealed public filings showing that the Respondent and various affiliated entities had connections to NETworks Presentations, LLC. ("NETworks"), a non-union producer and manager of musical and dramatic touring productions.  (Jt. Exh. 2);

---

[1]  Respondent takes exception to the ALJD's finding and conclusion that it has recognized the Union as the exclusive bargaining representative of Actors, as defined in the SETA. (Respondent's Exceptions ("Resp. Exc. ¶2).  But in its Answer, it specifically admitted to that allegation.  (General Counsel ("GC") Ex. 1-f (Respondent's Answer to Complaint ("Answer" or "Ans.") ¶5(a)-(b)).

[2] The information request was dated July 6, 2021 but Kolko sent it to Plum on July 7.  (Tr. 25).

[3] When the Respondent ultimately responded to the Union's information request, it stated that the proper name of the signatory to the SETA was the "John Gore Theatrical Group," and that its response applied only to that entity.  There is no dispute in this case that the correct name of the Respondent is as identified by the Respondent.  (Jt. Exh. 12 at 2.)

4

A-379

(ALJD 2:21-26). Kolko further explained that the Union sought the information in connection with upcoming collective bargaining negotiations and to investigate a possible grievance. (*Id.*).[4]

The Union's request sought information relevant to determining the Respondent's interests in NETworks, as well as various other entities that the Union's investigation found were affiliated with the Respondent. (Jt. Exh. 2). Thus, the Union's request sought disclosure of Respondent's interests (financial or otherwise) in theatrical productions; its relationship with potential affiliates; its investments or other interests in NETworks's productions and NETworks's investments or interests in Respondent's productions; and information on common ownership, management, directors, shareholders and employees of Respondent, its affiliates, and NETworks. (Jt. Exh. 2).

The Union also offered to "discuss the terms of an appropriate confidentiality agreement" covering responsive information that might be confidential. (Jt. Exh. 2 at 7).

*The Respondent Provided no Information until October 13, 2021*

The Respondent then delayed for over three months before it even responded on the substance of the Union's request. Plum did not acknowledge the receipt of the request until July 30, 2021; then, he said only that he would be in touch the following week to discuss the request. (Jt. Exh. 3); (ALJD 5:6-8). Plum failed to follow up with Kolko the following week. (Tr. 26); (ALJD 5:8).

On August 24, 2021, Kolko again emailed Plum and asked for a response to the information request by September 3. (Tr. 27); (Jt. Exh. 4); (ALJD 5:8-10). Plum responded by email dated August 26, stating that the Respondent could not meet the September 3 deadline and

---

[4] The Union ultimately filed a grievance over the Respondent's and its affiliated entities' interests in NETworks. (Jt. Exh. 13).

5

A-380

requested until mid-September to respond; Kolko agreed to September 17 as the new deadline. (Tr. 27); (Jt. Exhs. 5-6); (ALJD 5:11-17).  The Respondent did not respond on September 17; instead, that day, Plum told Kolko that he would provide a response to the request by the end of the day on Monday, September 20 (Tr. 28); (Jt. Exh. 7); (ALJD 5:19-20).  Despite Plum's commitment, and despite the fact that over two months had passed since Kolko sent the information request, the Respondent provided nothing on September 20.  (Tr. 28:12-14).

On September 23, 2021, Mark Theodore, Plum's partner, emailed Kolko to advise him that the Respondent thought much of the information sought by the Union was proprietary, confidential information.  (Tr. 28); (Jt. Exh. 8); (ALJD 5:21-32).  Theodore provided a nondisclosure agreement to Kolko for the Union to execute.  (Tr. 28-29); (Jt. Exh. 9); (ALJD 5:31-32).  Notably, Theodore provided no responsive information.  Theodore's September 23 email provided no rationale for the Respondent's request for a nondisclosure agreement, and did not even identify which of the information sought it thought was confidential.  (Jt. Exh. 8). Thus, eleven weeks after the Union requested information, the Respondent provided its first "response": In that "response," it provided nothing, only claiming —with no detail or explanation —that much of the requested information was confidential.  (*Id.*)

In response, on October 4, Kolko stated that the Union did not think any of the information sought was confidential and asked the Respondent to provide its rationale for its confidentiality claims for each category of information sought by the Union.  (Tr. 30); (Jt. Exh. 10); (ALJD 5:35-38).  In a follow up email, Kolko asked for the Respondent's explanation by October 7, noting that the Respondent had by that point nearly three-months to consider the Union's requests.  (Tr. 30-31); (Jt. Exh. 10); (ALJD 5:35-39).  The Respondent did not provide an explanation for its assertion of confidentiality by October 7.  (Tr. 31).  Thus, despite asserting

6

A-381

confidentiality on September 23, two weeks later, as of October 7, the Respondent made no effort—despite the Union's request—to explain why it was asserting confidentiality, or what pieces of the information sought were in fact entitled to treatment as confidential. And October 7 was three months from the day the Union demanded the information. On October 13, Kolko again emailed Theodore to demand production of responsive information that the Respondent did not deem confidential and an explanation as to why the Respondent believed any remaining information was confidential. (Tr. 31-32); (Jt. Exh. 11); (ALJD 5:42-43; 6:1-2).

*The Respondent's October 13, 2021 Response to the Information Request*

By letter dated October 13, the Respondent provided a written response to the Union's information request, but no responsive information. (Jt. Exh. 12); (ALJD 4-5). In it, the Respondent identified the requests it claimed were subject to confidentiality. (Jt. Exh. 12); (ALJD 6:10-15). In total, of the 49 separate requests made by the Union, the Respondent claimed confidentiality as to 18 of the requests. (Jt. Exh. 12); (GC Ex. 1-d (Complaint) ¶6 (identifying requests to which the Respondent objected on confidentiality grounds); (GC Ex. 1-f (Answer) ¶6); (ALJD 6:10-15). The Respondent stated two different confidentiality objections, quoted in full as follows:

- This item requests information as to equity interests of "JGO" in productions. …. The information is confidential because the equity arrangements are covered by confidentiality agreements with other entities. JGTG will provide this information once a satisfactory confidentiality agreement has been reached by the parties.

- JGTG considers this information confidential. The identities of officers, shareholders, directors, partners of The John Gore Organization, Inc. and other entities is not within the public domain and is held confidential by JGTG. JGTG will provide this information once a confidentiality agreement has been reached by the parties.

(Jt. Exh. 12).

7

A-382

It asserted the first objection—based on its third-party confidentiality agreements—in response to the Union requests numbers 1, 6, 9, 14 and 21 (collectively, the "Investment Requests"). (Jt. Exh. 12); (ALJD 6:10-12). Those requests sought information on theatrical productions in which Respondent or its affiliated entities had an equity or other financial interest, and information on common owners, management or employees between JGTG, its affiliates and NETworks. (Jt. Exh. 12). The Respondent's second objection pertained to requests 17-19, 25, 31, 33, 35-39, 42 and 45 (collectively, the "Ownership Requests"). (Jt. Exh. 12); (ALJD 6:13-15). Those requests sought information on various ownership, management and employee relationships between and among the Respondent, its affiliates and/or NETworks. (Jt. Exh. 12).

In a November 3, 2021 telephone conversation, Theodore explained to Kolko that the Respondent's confidentiality claims essentially fell into two categories: (1) those concerning ownership interests that, the Respondent claimed, were not publicly available and which the Respondent has not historically publicized; and (2) those covered by third-party confidentiality agreements, which consisted primarily of information related to the Respondent's financial interests. (Tr. 33-34). He also told Kolko that the Respondent's overarching concern was that union members would disseminate that information on social media. (Tr. 34).

In that same conversation, Kolko laid out the Union's understanding of the types of information the Board considers confidential. (Tr. 33). He described confidentiality objections recognized by the Board as consisting of three "buckets" of information: attorney-client material; personal information such as social security numbers and personal medical information; and trade secrets or confidential proprietary information. (Tr. 33). He noted that the Union did not seek either attorney-client information or any personal information, leaving

8

A-383

only confidential, proprietary information as a possible basis for the Respondent's objection. (Tr. 33). Kolko explained that confidential, proprietary information would include information like the recipe for Reese's Pieces, or information on the Respondent's plans to open a new theater, which would cause the Respondent competitive harm if made public. (Tr. 34-35). Kolko asked Theodore which "buckets" the claimed confidential information fell into. (Tr. 35). Kolko gave unrebutted testimony that Theodore responded by telling him that the claimed confidential information did not fall into any of them. (Tr. 35).

Kolko and Theodore spoke by telephone again on November 11, 2021. (Tr. 35). Kolko again asked Theodore for "the rationale for the requests for which [the Respondent] sought confidentiality that weren't the ones covered by the third-party agreements," identifying the Ownership Requests. (Tr. 36). Theodore had no response to Kolko's inquiry other than stating, at the beginning of the conversation, that the Respondent had no specific rationale. (Tr. 36).

Kolko and Theodore spoke again on December 9. (Tr. 37). Theodore told Kolko that the Respondent did not need an onerous NDA, and that if the parties were able to resolve the dispute as to information covered by third-party agreements, then the rest of the issues—that is, the Respondent's refusal to disclose other information that it did not claim was subject to third-party confidentiality agreements—could be resolved. (Tr. 38). Thus, in this conversation, the Respondent made clear that it would only provide the information about ownership and connections between the Respondent and NETworks if the Union agreed to a nondisclosure agreement as to the material subject to third party nondisclosure agreements. Again, Theodore told Kolko that the Respondent was worried that Equity members would post on social media the

9

A-384

information it provided. (Tr. 38). Theodore made no effort to otherwise explain the Respondent's rationale for treating the information at issue as confidential.

On December 22, they spoke again. (Tr. 38). Kolko proposed that the Respondent at a minimum produce the information not subject to third-party confidentiality agreements. (Tr. 39). Kolko contacted Theodore again on January 6 and either January 13 or 14, 2022, but Theodore did not provide a substantive response to Kolko's December 22 proposal. (Tr. 39-40). On January 20, Kolko reiterated the December 22 proposal. (Tr. 40-1). In that conversation, he said that the Union did not want its receipt of material not covered by the third-party agreements held up by the Respondent's refusal to turn over material covered by those agreements. (Tr. 41).

Notably, although Theodore was present at the hearing in this case, the Respondent presented no testimony from him contesting Kolko's testimony about their conversations.

On January 25, 2022, the Respondent produced some additional information via email, specifically related to productions in which it invested. (Tr. 41); (Jt. Exh. 13). That information represents a partial response to the Union's request numbers 1 and 9, which requested that the Respondent identify all productions in which it had equity or other non-equity interests. (Jt. Exh. 2); (Tr. 41:10-22). The Respondent failed to respond to other requests not subject to the Respondent's third-party confidentiality agreements and failed to respond to the Union's proposal to produce all information not subject to those agreements. (Tr. 41); (Jt. Exh. 13). Theodore explained in his January 25 letter that the Respondent was withholding the outstanding information due to its confidentiality considerations. (Jt. Exh. 13).

10

A-385

After January 25, Kolko and Theodore spoke one more time, on January 27, about the production of information. (Tr. 41:23-25; 42:1-3). In that conversation, Kolko again told Theodore "that [he] wanted to get the stuff that wasn't covered by a third-party confidentiality agreement" and that he "didn't want that stuff held hostage by the bargaining over the third-party confidentiality agreement." (Tr. 42:4-5; 6-7). Theodore's response was only that he would see if the Respondent would accept Kolko's framework. (Tr. 42). Since then, the Respondent produced nothing, and made no attempt to justify its claim that the information it refused to provide is in fact entitled to be treated as confidential.

## PROCEDURAL HISTORY

The Union filed the charge in this case on November 26, 2021, after more than four months of fruitless efforts to obtain a complete response from the Respondent to the Union's information requests. (GC Ex. 1-b). Region 2 of the NLRB (the "Region") issued the Complaint on June 16, 2022 (GC Ex. 1-d); and the Respondent filed its Answer on June 30, 2022 (GC Ex. 1-f). The ALJ held a hearing on August 30, 2022. (Tr. 1).

## ARGUMENT

**I.      The ALJD Correctly Found that the Respondent Lacked a Legitimate and Substantial Confidentiality Interest in the Information it Withheld.**

The ALJ determined that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to provide information responsive to the Union's information requests (ALJD 8:40-41), which the Respondent concedes were relevant (ALJD 7:39-45; 8:1-41).[5] In doing so,

---

[5] In its exceptions brief, Respondent acknowledges the "relevance of the requested information . . . ." Resp. Exc. Br. at 9. Additionally, in its Answer, Respondent conceded the relevance of the requests at issue by admitting the Complaint's allegation that "[t]he information requested by the Charging Party . . . is necessary for, and relevant to, the Charging Party's performance of its duties as the exclusive collective bargaining representative of the Unit." (GC

11

A-386

the ALJD rejected the Respondent's argument that it had "legitimate and substantial" confidentiality interests that justified its refusal to provide responsive information. (ALJD 8:1-39). Respondent's contention that it is "undisputed that [it] immediately raised legitimate concerns about confidentiality" (Resp. Br. at 12) is wrong and contradicted by the ALJD. The ALJD specifically found that Respondent "has not met its burden of proof in establishing that any of the requested information comes with 'legitimate and substantial' confidentiality interests. (ALJD 8:32-35).

Instead, the ALJD found that Respondent had "effectively held hostage information" in one category of requests "in order to pressure the Union to sign a confidentiality agreement." (ALJD 8:36-37). The two categories of information at issue were: 1) Information that the Respondent considers confidential because it is not in the public domain (ALJD 8:11-17); and 2) information the Respondent "asserts is covered by third-party confidentiality agreements it has with other entities" (ALJD 8:20-21). With respect to the former category, the ALJD concluded that the Respondent lacked a legitimate and substantial confidentiality interest in the information because the Respondent had "maintained that it would turn over this information if the confidentiality concerns involving the second category of requests were resolved." (ALJD 8:15-17). That is, the Respondent only raised confidentiality concerns over the first category of information in order to leverage a confidentiality agreement from the Union with respect to the second category of information. Furthermore, Respondent never identified a proper basis for claiming that the first category of information was entitled to treatment as confidential. (ALJD 8:12-17). It didn't claim that it was proprietary information or contained

---

Ex. 1-d ¶7(a)); (GC Ex. 1-f ¶7(a)). The ALJ correctly concluded that it "is undisputed that that all of the requests at issue seek relevant information." (ALJD 7:34-35).

A-387

trade secrets, but instead claimed only that it considered the information to be non-public and that it was concerned about Union members displaying the information on social media. The ALJD correctly determined that such a tactic did not raise a legitimate and substantial confidentiality concern and did not justify the Respondent's refusal to provide information. (ALJD 8:11-17).

The ALJ also rejected the Respondent's confidentiality claims pertaining to information the Respondent claimed was subject to third-party confidentiality agreements, finding that such third-party agreements do not by themselves establish legitimate and substantial confidentiality concerns. (ALJD 8:25-31). Under *Crozer*, the ALJ concluded that "a third-party confidentiality agreement alone is insufficient to create legitimate and substantial confidentiality interest." (ALJD 8:27-31) (citing *Crozer-Chester Med. Ctr. v. NLRB*, 976 F.3d 276 (3d Cir. 2020). Here, the ALJ found that the Respondent failed to articulate a reason why the Union was not entitled to the information other than that it was covered by third-party confidentiality agreements. (ALJD 8:25-27).

We show below the ALJD was correct as a matter of law and the evidence presented at the hearing.

A. **Respondent Bears the Burden of Proving it Had Legitimate and Substantial Confidentiality Interests that Justified its Refusal to Provide the Requested Information.**

An employer's "legitimate and substantial confidentiality interests" may justify its refusal to furnish relevant information and a union's obligation to engage in accommodative bargaining over the terms of disclosure. *Detroit Newspaper Agency*, 317 NLRB 1071, 1074 (1995). *See also Strategic Resources, Inc.,* 364 NLRB No. 42, at *6 (2016) (same). Those confidentiality interests must be balanced against the union's need for information. *Detroit Newspaper Agency*, 317 NLRB at 1074. In order "[t]o invoke [the] balancing test . . . an

13

A-388

employer must first prove its confidentiality claim. . . ." *Id.* The party asserting confidentiality

bears the burden of proof. (ALJD 8:6-7) (citing *Pennsylvania Power & Light Co.*, 301 NLRB

1104, 1105 (1991)). Moreover, "[b]lanket claims of confidentiality . . . will not be upheld."

*Detroit Newspaper Agency*, 317 NLRB at 1072; *see also Lasher Service Corp.*, 332 NLRB 834,

834 (2000) (holding that the employer "must *establish* confidentiality as a defense, not merely

raise a naked confidentiality claim."). (ALJD 8:7) (citing *Pennsylvania Power & Light Co.*, 301

NLRB 1104, 1105 (1991)).

The Board limits confidentiality to the following "few general categories":

> [T]hat which would reveal . . . highly personal information, such as individual medical records or psychological test results; that which would reveal substantial proprietary information, such as trade secrets; that which could reasonably be expected to lead to harassment or retaliation . . . and that which is traditionally privileged, such as memoranda prepared for pending lawsuits.

*Detroit Newspaper Agency*, 317 NLRB at 1073. *See also Washington Hosp. Ctr. Corp.*, 360

NLRB 846, 849 (2014) ("The general rules regarding employer claims of confidentiality are set

forth in *Detroit Newspaper Agency*."). While those categories of confidential information are

not exhaustive, the categories of confidential information must be narrowly drawn so as not to

"encompass virtually any type of information that an employer does not wish to disclose."

*Washington Hosp. Ctr. Corp*, 360 NLRB at 849.

Where an employer has asserted a legitimate and substantial confidentiality

interest, it and the union must engage in accommodative, good faith bargaining regarding the

conditions under which the purported confidential information may be released. *See Delaware

Co. Mem'l Hosp.,* 366 NLRB No. 28, slip op. at *1 n.2 (noting that an employer has an

obligation to seek accommodative bargaining at the time it asserts a confidentiality defense).

Significantly, "[t]he obligation to engage in accommodative bargaining arises in circumstances

14

where a union requests otherwise relevant information for which an employer has 'legitimate and substantial' confidentiality interests." (ALJD 8:3-5) (citing *Pennsylvania Power & Light Co.*, 301 NLRB at 1104). That is, a party's obligation to engage in accommodative bargaining over the production of information only arises *if* the party asserting the objection proves it "has established a legitimate and substantial confidentiality interest. . . ." *Nexstar Broad., Inc.*, 370 NLRB No. 72 (2021), slip op. at *1 n.2. *See also Crozer*, 976 F.3.d at 293 ("But importantly, '[b]efore such a balancing takes place, the party seeking to withhold relevant information on the basis of confidentiality bears the burden of demonstrating a legitimate claim of confidentiality.'") (quoting *Resorts Int'l Hotel Casino v. NLRB*, 996 F.2d 1553, 1556 (3d Cir. 1993)); *Nat'l Grid USA Service Co., Inc.,* 348 NLRB No. 88, slip op. at *14 (2006) (holding that if an employer fails to establish a "legitimate and substantial" confidentiality interest, the employer must furnish the information).

The ALJD held, consistent with established Board law, that the Respondent bore the burden of proving that it had legitimate and substantial confidentiality interests in the requested information: "'The party asserting confidentiality has the burden of proof. Legitimate and substantial confidentiality and privacy claims will be upheld, but blanket claims of confidentiality will not.'" (ALJD 8:6-7) (quoting *Pennsylvania Power & Light Co.*, 301 NLRB at 1105). Respondent concedes that it bears the burden of proof for establishing its confidentiality interests. Resp. Br. at 10.

**B.** **The ALJ Correctly Held that Respondent Failed to Prove that it had Legitimate and Substantial Confidentiality Interests in the First Category of Information, Pertaining to Information it Claims is Not Normally in the Public Domain.**

Of the two categories of information that the Respondent failed to provide to the Union, the first consisted of requests seeking information that Respondent claimed "'is not

15

A-390

within the public domain and is held confidential.'" (ALJD 6:13-15) (quoting Jt. Exh. 12). Those requests, stated in Requests Nos. 17-19, 25, 31, 33, 35-39, 42 and 45, sought information regarding, among other things, common ownership and other types of interests in Respondent and entities the Union believed were affiliated with the Respondent. (ALJD 2-4) (identifying requests that were unanswered by the Respondent). The ALJD determined that Respondent had "nominally asserted" in communications with the Union that it "considers this information confidential." (ALJD 8:13-14).

But the ALJD nonetheless concluded that the Respondent had "at all times, including at trial and in its posttrial brief . . . maintained that it would turn over this information if the confidentiality concerns involving the second category of requests were resolved." (ALJD 8:15-17). In essence, the ALJD concluded that the Respondent held this information "hostage" in order to obtain leverage against the Union to force it to sign a confidentiality agreement concerning the second category of requests, which Respondent claims were covered by third-party confidentiality agreements. (ALJD 8:33-38).

The ALJD's conclusion was consistent with the Union's testimony concerning the parties' communications regarding the Respondent's refusal to provide responsive information. Thus, Kolko repeatedly sought to understand if Respondent was claiming that the information in the first category of information represented proprietary or trade secrets, and Theodore's response was that it did not, and that the information did not fall into any of the buckets of potentially confidential information described by Kolko. (Tr. 34-35). Similarly, when Kolko asked for the Respondent's rationale in withholding the information, Theodore told him that the Respondent had no specific rationale. (Tr. 36). Instead, Respondent's ostensible rationale for

16

A-391

refusing to provide this information is entirely circular: the information must be treated as confidential because the Respondent treats it as confidential.

Further, Kolko testified that he communicated to Respondent's counsel on January 20, 2022 that he did not want information "held up by bargaining over what we would do with regard to stuff covered by third-party NDAs." (Tr. 41:1-3). In another conversation with Respondent's counsel held on January 27, 2022, Mr. Kolko again communicated that he "didn't want… stuff held hostage by bargaining over the third-party confidentiality agreement." (Tr. 42:6-7).[6]

In its brief in support of its exceptions, Respondent contends that because it said there were confidentiality interests at stake, it had met its burden of proof so that the burden should shift to the Union to bargain over an accommodation. (Resp. Br. at 12). But that is precisely the type of "blanket" claim of confidentiality that the Board has repeatedly said will not be upheld. *See Detroit Newspaper Agency*, 317 NLRB at 1072; *Lasher Service Corp.*, 332 NLRB at 834. (ALJD 8:6-7).

Respondent also contends that the information sought in the first category of requests was confidential because the information was not public. (Resp. Br. at 14). In support of that argument, Respondent relies on *Good Life Beverage Co. (Silver Bros. Co.)*, 312 NLRB 1060 (1993). There, the employer claimed that it was in critical financial condition and advised the union that it would not extend the collective bargaining agreement after its expiration. *Id*. at 1061. In response, the union requested financial information that "there seem[ed] to be no

---

[6] The ALJ found Kolko's testimony to be "consistent with documentary evidence," that his demeanor was "forthright and honest," and that he "was extremely well-prepared with knowledge of the information requests . . . and had a clear recollection of the substance of the conversations he had with Mr. Theodore. . . ." (ALJD 6:25-29).

17

A-392

question . . . was confidential." *Id.* Specifically, the union sought information on the employer's interest expenses identified in its consolidated financial statement, a breakdown of various salaries, a summary of the costs of goods sold by the employer, a detailed breakdown of expenses, and financial statements of the employer and its subsidiaries. *Id.* The employer claimed the information was confidential, but before the parties had an opportunity to discuss the confidentiality objection, their contract bargaining broke down over a dispute as to where negotiations would happen. *Id.* The Board found that in light of that intervening dispute over bargaining, the employer did not violate the Act by withholding or delaying providing the information, and that it "was entitled to discuss confidentiality concerns . . . because of the nature of the information requested." *Id.* at 1062.

The Respondent's reliance on *Silver Bros.* is misplaced. There, as noted, there was no question that the detailed financial information sought by the Union implicated the employer's confidentiality concerns. The information sought by the Union in this case is substantially different from the detailed financial information at issue in *Silver Bros.* Here, the Union's second category of information requests go to the Respondent's organizational structure, its ownership interests in it, and in its affiliated entities. They do not seek detailed financial records like those sought by the union in *Silver Bros. See also Crozer*, 976 F.3d at 295 n.19 (rejecting employer's reliance on *Silver Bros.* because there the "specific financial information . . . was undoubtedly confidential.").

Respondent also takes exception to the ALJ's conclusion that Respondent held information hostage in order to pressure the Union to sign a confidentiality agreement. (Resp. Exc. Br. ¶27). It argues that it engaged in a legitimate negotiating tactic in which a party may "hold onto something in order to get something else." (Resp. Br. at 18). But it offers no

18

A-393

authority for that contention.  (*See generally* Resp. Br. at 18).  Respondent mischaracterizes

Kolko's testimony by arguing that he "begrudgingly" acknowledged that there are frequently

tradeoffs in negotiations. (Resp. Br. at 18 and n.3).  The record is clear that when asked if it is

"routine" in negotiations for there to be tradeoffs, Kolko said that in bargaining situations it was.

(Tr. 53:6-8).  But Kolko rejected the Respondent's attempt to extend that idea of tradeoffs to

discussions over confidentiality agreements for information requests made under Section 8(a)(5)

of the Act.  (Tr. 53:9-18) ("I don't think it's comparable to say that a party can hold on to

material that it doesn't have a rationale for treating confidential in order to get better terms for

material that it does have a rationale for.").  The ALJ correctly rejected Respondent's argument

that it was somehow privileged to violate the Act in order to compel the Union to negotiate over

a confidentiality agreement for its third-party confidentiality agreements.  (ALJD 8:13-17, 32-

38).

  **C.**    **The ALJD Concluded Correctly that Respondent's Third-Party Confidentiality Provisions do not Provide Blanket Protection from Disclosure to the Union without a Confidentiality Agreement.**

     The ALJD also correctly rejected the Respondent's blanket assertion of

confidentiality interests concerning information subject to confidentiality agreements between

the Respondent and third-party entities.  The ALJ found that "other than the fact that it has a

third-party confidentiality agreement concerning [the Union's second category of disputed

information requests], Respondent has not articulated specifically why the Union is not entitled

to them." (ALJD 8:25-26).  Relying on *Crozer*, the ALJD concluded that "a third-party

confidentiality agreement alone is insufficient to create a legitimate and substantial

confidentiality interest." (ALJD 8:27-30).

     In *Crozer*, the union requested a copy of an asset purchase agreement, which the

employer contended could not be produced because doing so "would violate the agreement's

19

A-394

clause that generally prohibits disclosure… to third parties."  976 F.3d at 293.  In rejecting the employer's argument, and affirming the Board's decision, the Third Circuit held that "[w]e agree with the ALJ that the [asset purchase agreement's] confidentiality provision, on its own, did not suffice to create a legitimate and substantial confidentiality interest."  *Id*. at 294.  Specifically, the court noted that aside from the existence of the confidentiality provision, the employer did not identify any reason the information contained in the asset purchase agreement was "inherently sensitive."  *Id*.  It noted that a "confidentiality agreement . . . is ultimately just a contract" and that though "[a]ny two parties can agree to keep certain matters secret . . . that does not mean that those matters are inherently sensitive."  *Id*.

Like the employer in *Crozer*, the Respondent contends that the confidentiality provisions of its agreements with third parties "prohibited [it] from sharing those agreements with Equity and its counsel without some type of understanding, or confidentiality agreement in place."  (Tr. 70).  In its October 13, 2021 response to the Union's information request, Respondent's only explanation was that "[t]he information is confidential because the equity arrangements are covered by confidentiality agreements with other entities."  (Jt. Exh. 12) (Respondent's responses to Union request numbers 1, 6, 9, 14, 21).  As with the employer in *Crozer*, the Respondent has not explained why the information sought by the Union is "inherently sensitive," other than because it is subject to a confidentiality agreement between the Respondent and a third party.  (ALJD 8:26-27).

Respondent attempts to distinguish *Crozer* by arguing that the employer in that case never asserted that the information at issue was sensitive.  (Resp. Br. at 12).  But that is precisely what Respondent has also failed to do.  The employer's concern in *Crozer* was that "providing the Union with a copy of the APA [the third-party agreement containing a

20

A-395

confidentiality provision] simply would violate the agreement's clause that generally prohibits disclosure of the agreement to third parties." *Crozer*, 976 F.3d at 293. Similar to the employer in *Crozer,* at the hearing, the Respondent's only witness, Sheila Lavu, its general counsel and secretary (Tr. at 65:4), testified that she reviewed the Union's information request and assisted in the Respondent's determination that information subject to third-party agreements could not be disclosed without a confidentiality agreement. (Tr. 67:8-12). As a result, she stated that she believed that "we, The John Gore Theatrical Group, were prohibited from sharing" those third-party agreements with the Union without having a confidentiality agreement (Tr. 70:5-8).

Her testimony—that the Respondent viewed its third-party agreements to bar production of information to the Union without a confidentiality agreement simply because the third-party agreements had confidentiality provisions—is consistent with the Respondent's written response to the Union's information requests. (Jt. Exh. 12) (responses to request numbers 1, 6, 9, 14 and 21). (ALJD 6:10-12). Respondent argues that the requests by their terms seek confidential information because they refer to Respondent's financial and equity interests (Resp. Br. at 13). But significantly, Respondent failed to identify any reason responsive information would be inherently sensitive. In short, Respondent, as found in the ALJD, failed to identify a reason other than the existence of a confidentiality provision in its third-party agreements for not disclosing information to the Union (ALJD 8:25-27).

**D.**     **Respondent's Argument that the Union's Members Might "Misuse" Information Provided to it is Based on Mere Speculation, and, in any Event, not a Proper Basis to Withhold the Information.**

The Respondent also contends that it was justified in withholding information based on its suspicions that if it provided information to the Union without a confidentiality agreement, the Union's members might disclose the information on social media. (Resp. Br. at 15). It argues that it has demonstrated the Union's members "have a propensity to disclose non-

21

A-396

public information," to discuss it on social media or leak it to the press. (Resp. Br. at 15). It further contends that the ALJ excluded or failed to consider evidence that Respondent presented on the actions of the Union's membership (Resp. Br. at 16).

Respondent's arguments must be rejected as based in pure speculation on what the Union might do with the information, and the ALJ was correct in refusing to entertain Respondent's irrelevant or speculative evidence. The Board has held that an employer's "subjective concerns regarding the use to which the Union might potentially put the information . . . unsupported by objective evidence of prior misuse" is insufficient to establish "substantial and legitimate confidentiality concerns." *Beverly Health & Rehab. Servs., Inc.*, 328 NLRB 959, 963 (1999). Respondent has not only failed to provide objective evidence, it has also failed to provide any evidence of the Union's misuse of information.

The best evidence that Respondent lacks an objective basis for claiming that the Union might misuse information is that it does not contend that the Union misused information that Respondent has already provided to the Union in response to the same information request. (Jt. Exh. 2); (Resp. Br. at 2 (claiming that the ALJD erred in not recognizing that the Respondent "has already produced a vast majority of the information requested by the Union in its July 7, 2021 information request.").

Instead of providing objective evidence, Respondent relies on Lavu's subjective impressions. Respondent first argues that the ALJ wrongly denied admission into evidence of a May 19, 2022 email from the general counsel of the Broadway League, a multiemployer organization in which the Respondent is a member. (Resp. Br. at 16). That email describes the Broadway League's contention that the Union leaked information regarding a settlement of a matter completely unrelated to this case to the press. (Resp. Exh. 3). The ALJ properly rejected

22

A-397

the email because it post-dates by nearly a year the information request in this case, post-dates the Respondent's response, post-dates all of the communications between the parties in which they discussed the Respondent's failure to provide information, and post-dates both the date the Union filed its charge and the date the Region issued a complaint. (Tr. 76:25; 77:1-25; 78:1-6). That is, the ALJD was correct, because Respondent could not possibly have used the Broadway League's May 19, 2022 email as a basis to deny the Union's July 7, 2021 information request. Respondent nonetheless fruitlessly argues that the Union has a "reputation for leaking confidential information . . . in the industry" but does not support that argument by any citation to the record. (Resp. Br. at 16).

In addition, Respondent attempted to introduce a YouTube video through Lavu's testimony as evidence of the Union's purported propensity to misuse confidential information. (Resp. Exh. 4). Respondent contends that the ALJ erred in excluding the video "for most purposes." (Resp. Br. at 16). In fact, contrary to Respondent's suggestion that the video was admitted into evidence for limited purposes, the ALJ refused to admit it. (Tr. 84:4-5) ("Well let me be clear. I'm not admitting the YouTube video."). He did receive the video just as a "reference to what it is [Lavu] was talking about." (Tr. 84:4-9). The ALJ was correct in refusing to admit the video as evidence. Lavu conceded that the production company discussed in the video was not the Respondent (Tr. 82:11-17). Further, Respondent did not even provide the most basic foundation for the video (Tr. 83:10-25; 84:1-3), failing to identify its date, who produced it, whether the individuals in the video were even members or representatives of the Union, and whether the Union had any involvement in it whatsoever.

Moreover, Respondent could have provided the ALJ with excerpts or time stamps of portions of the video that it considered relevant, but did not do so. Respondent's complaint

23

A-398

that the ALJ focused unnecessarily on the length of the video rather than accepting relevant portions into evidence begs the question of why Respondent failed to identify those supposedly relevant sections. (Resp. Br. at 16). Lavu's poor recollection of the video caused the ALJ to find her testimony "hesitating" and "uncertain." (ALJD 6:33-37).

Even though the video was not admitted into evidence, the ALJ allowed Lavu to testify regarding what she thought was troubling about it. (Tr. 80:15-25; 81:1-2). Lavu's testimony provides her subjective thoughts on the Union's potential use of confidential information, not objective evidence. Even though the video did not involve her company, Lavu testified that her "impression" of it was that there "was confidential information about a production being leaked and being editorialized on – by Equity [Union] members who were taking part in this show." (Tr. 79:12-17). She offered no basis for that "impression" that the video communicated confidential information or even that the individuals on the video were Union members; she made no attempt to connect this video to the Union; and she offered no testimony that she did anything to verify her impression. Instead, she concluded merely on the basis that the individuals in the video discussed how much money a touring production, "which was not a tour that [she], or [her] company, was involved in," made, it had to do with confidential information. (Tr. 82:11-17). She added that the video also talked about the Union's communications with its members, but did not specify what those communications were, by whom they were made or why the Union could not communicate with its members. (Tr. 82:17-18). She also said that she saw emails in the video regarding payments made to actors, and between the production company and actors. (Tr. 82:22-23). Conceivably, Lavu is complaining that the Union's members were discussing their wages with another employer, and views that basic exercise of their Section 7 rights as a breach of confidentiality.

24

A-399

The ALJ correctly rejected the Respondent's arguments that the Union had a propensity for misusing confidential information.

## II. The ALJD's Order Requiring Respondent to Produce the Disputed Information is Appropriate.

Among other remedies, the ALJD directs the Respondent to furnish the disputed information to the Union in a timely manner. (ALJD 10:1-6). Respondent contends that the directive to produce the information was inappropriate and that the ALJD should instead have ordered the parties to bargain over the Respondent's confidentiality concerns. (Resp. Br. at 19-20). Respondent's argument ignores the entire, central conclusion of the ALJD: that the Respondent failed to meet its burden of proof that it had legitimate and substantial confidentiality concerns. Only if Respondent were able to meet that burden would there be an obligation to engage in negotiations over the Respondent's confidentiality concerns. Since the ALJD determined that Respondent failed to meet its burden of proof, the appropriate remedy was to compel Respondent to produce the disputed information.

That is, the issue is not, as the Respondent would have it, that it (or the Union) failed to engage in good faith accommodative bargaining. The issue is whether, in light of the ALJD's conclusion that Respondent had failed to establish its confidentiality concerns, the ALJD's order was appropriate. Respondent's reliance on *Borgess Med. Ctr.*, 342 NLRB 1105 (2004), which it cites in support of that argument, is therefore misplaced. There, the Board found that the employer had established it had a legitimate and substantial confidentiality interest in the information requested by the union, but failed to fulfill its duty to engage in accommodative bargaining with the union. *Id*. 1105-06. *Minnesota Mining & Mfg. Co.*, 261 NLRB No. 2 (1982), which the Respondent cites for the same proposition, actually supports the remedy ordered by the ALJD. In that case, the Board rejected the employer's confidentiality

25

A-400

concerns with respect to several of the union's information requests and ordered, as the ALJ did

in this case, the employer to provide the information without requiring any accommodative

bargaining. *Id*. at 30-31. It was only with respect to one information request, which the

administrative law judge determined implicated the employer's "legitimate proprietary interests"

that the Board ordered accommodative bargaining. *Id*. at 32. In contrast, here, the ALJD

rejected the Respondent's confidentiality concerns.

The ALJD's order to Respondent to provide the disputed information is the

appropriate remedy. A directive for the parties to engage in accommodative bargaining in the

absence of legitimate and substantial confidentiality concerns would undermine the entire

finding that the Respondent violated the Act. It would allow the Respondent to violate the Act

without any consequences.

Finally, Respondent contends that the ALJD's notice posting requirement is

inappropriate because at the time of the trial in this case, Respondent did not have any Union-

represented employees. (Resp. Br. at 3; Resp. Exc. at 35). Despite Respondent's argument,

Respondent concedes that it is a party to a collective bargaining agreement, the SETA, with the

Union, and acknowledges that Union represents Actors (as defined in the agreement) employed

by it. (Jt. Exh. 1 at 3). Respondent's contention that because at the moment the trial occurred, it

did not have any employees covered by the collective bargaining agreement does not mean that

at the time such notice is posted, it would not have any covered employees to whom the posting

would be relevant.

## CONCLUSION

For the reasons stated above and in the ALJD, the ALJD correctly determined that

the Respondent failed to prove it had a legitimate and substantial confidentiality interest in the

information it refused to disclose, and violated Section 8(a)(5) and (1) of the Act by refusing to

26

A-401

disclose the information without a confidentiality agreement with the Union.  The ALJD should

be affirmed in its entirety.

Dated:  New York, New York
        January 31, 2023

                             Respectfully submitted,


                             */s/ Eyad Asad*
                             Eyad Asad
                             COHEN, WEISS AND SIMON LLP
                             900 Third Avenue, Suite 2100
                             New York, New York 10022-4869
                             Telephone: (212) 563-4100
                             Facsimile:  (646) 473-8249
                             easad@cwsny.com

                             *Attorneys for Actors' Equity Association*

27

A-402

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing brief to be served on this 31st

day of January 2023 by email on the following persons:

Tanya Kahn
Counsel for the General Counsel
National Labor Relations Board, Region 2
Tanya.Khan@nlrb.gov


Mark Theodore
Counsel for Respondent
Proskauer Rose LLP
mtheodore@proskauer.com


/s/ Eyad Asad
Eyad Asad

A-403

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **JOHN GORE THEATRICAL GROUP, INC.,** | |
| **Respondent,** | |
| **and** | **Case No. 02-CA-286802** |
| **ACTORS' EQUITY ASSOCIATION,** | |
| **Charging Party.** | |

**JOHN GORE THEATRICAL GROUP, INC.'S REPLY BRIEF IN SUPPORT OF**
**EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

Mark Theodore
Ariel Brotman
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel. No.: (310) 557-2900
Fax No.: (310) 557-2193
Attorneys for John Gore Theatrical
Group, Inc.

i

A-404

John Gore Theatrical Group, Inc. ("JGTG," "Respondent," or "Company") submits this Reply brief pursuant to Section 102.46(3) of the Board's Rules and Regulations.

JGTG has established that it raised legitimate confidentiality concerns in response to Actors' Equity Association's ("Union," Charging Party" or "Equity") information request. The Administrative Law Judge's ("ALJ") findings and conclusions to the contrary are erroneous. The arguments advanced by Counsel for the General Counsel ("General Counsel") and the Union in support of the ALJ's conclusions are unconvincing as they ignore or mischaracterize key evidence. As explained in JGTG's brief in support of its exceptions and this Reply brief, JGTG has not violated Section 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the "Act").[1]

**I.      THE ALJ ERRED IN CONCLUDING THAT THE COMPANY DID NOT MEET ITS BURDEN OF PROOF TO ESTABLISH THAT IT HAS "LEGITIMATE AND SUBSTANTIAL" CONFIDENTIALITY INTERESTS**

The arguments made by the General Counsel and Union in support of the ALJ's erroneous conclusion that JGTG did not meet its burden of proof to establish that it has "legitimate and substantial" confidentiality interests mischaracterize the record.

First, contrary to the General Counsel's assertions, there is no record evidence that JGTG admitted that the requested information was not confidential under Board law and the General Counsel does not provide any cite to the record reflecting otherwise. (*See* Counsel for the General Counsel's Answering Brief to Respondent's Exceptions, hereafter "GC Brief" at 4). The only relevant testimony, which the Union tries to cite for the same assertion, is the Union counsel's testimony that Mr. Theodore did not say which "buckets" of confidential information the non-

---

[1] Although the Union has raised arguments about JGTG's alleged delay in responding to the Union's information request, the Complaint did not allege delay in responding constituted a violation of the Act and the alleged delay is therefore irrelevant. (*See* Union's Answering Brief to Respondent's Exceptions, hereafter "Union Brief" at 5.)

A-405

public information fell under.  (Union Brief at 9; Tr. 35:8-9.)  However, this is not a concession that either category of information is not otherwise confidential.

Second, although the General Counsel concedes the record reflects that JGTG raised a confidentiality defense at the outset, ("The record reflects that Respondent raised a confidentiality defense to information request …"), the General Counsel later tries to assert that JGTG did not raise objections to production when the Union's request was made and is somehow not entitled to a second chance to raise objections.  (GC Brief at 3, 5.)  The Union similarly concedes that these concerns were expressed around the time the request was made, stating: "On September 23, 2021, Mark Theodore…emailed Kolko to advise him that the Respondent thought much of the information sought by the Union was proprietary, confidential information…Theodore provided a nondisclosure agreement to Kolko for the Union to execute."  (Jt. Exhs. 8, 9; Union Brief at 6.)  Thus, contrary to the General Counsel's assertions it is undisputed that JGTG immediately raised concerns about confidentiality and offered an accommodation, *i.e.* a confidentiality agreement.  (Tr. 16:6-18, 28:15-29:3).

Third, the Union and the General Counsel are incorrect in asserting that Respondent's reliance on *Good Life Beverage Co.* (*Silver Brothers Co.*), 312 NLRB 1060, 1060-62 (1993) is misplaced.  The General Counsel attempts to differentiate *Silver Bros. Co.* by stating there was no record evidence to indicate that the Union had a propensity to disclose confidential information.  (GC Brief at 5, 7.)  However, during the hearing, the Union's counsel conceded the matter of the public disclosure by the Union was raised by the Company in detailed fashion and the Union's counsel did not disagree that the Union had a propensity to release information to members who then publicized it on social media:

2

A-406

> Q [By Mr. Theodore] … I expressed to you that the company's position that the information given to Equity often finds its way out into the public?
> A     On multiple occasions, yes.
> Q     And I cited to you YouTube videos and tweets where it occurred. Isn't that right?
> A     Yeah. I think one time you'd said you didn't want stuff to end up on YouTube, and one time you said you didn't want stuff to end up on Twitter.
> Q     Okay. And you didn't necessarily disagree that that happened, right?
> A     I think that that's right. I don't think I said no, it doesn't happen. I think that that's correct, Mark.

(Tr. 54:23-55:10.)

The Union also does not cite or attempt to characterize this exchange, choosing instead to generally state the Union's propensity to disclose confidential information is "pure speculation." (Union Brief at 22.)

The Union's additional contention that JGTG's reliance on the *Silver Bros. Co.* case is misplaced because "the information sought by the Union in this case is substantially different from the detailed financial information at issue in *Silver Bros. Co.*" is also incorrect. (Union Brief at 18.)  As JGTG explained in its brief in support of its exceptions, the requested information itself is confidential as it concerns sensitive investment information such as "financial interest[s]" and "equity interest[s]." (JGTG Brief in Support of Exceptions at 13; Jt. Exh. 2.)  The Union similarly concedes that the information request sought financial information.  (Union Brief at 5 ("…the Union's request sought disclosure of Respondent's interests (financial or otherwise) in theatrical productions…its investments or other interests in NETworks's productions…").)  Thus, the information requested in the present case is similar to the information requested in the *Silver Bros Co.* case in that it seeks sensitive financial information.

A-407

A.      The Law Requires the Parties to Seek an Accommodation as to the Third Party Agreements

The requested information subject to third party agreements is inherently sensitive and raises a legitimate confidentiality concern, which the Union and General Counsel have recognized. The ALJD and the Union's answering brief utterly ignore the Union and General Counsel's implicit admission that the information covered by the third party agreements is confidential. (Tr. 16:22-24; 39:3-10).

In addition, contrary to the General Counsel's assertions and despite the Union's recognition of confidentiality, the Union's counsel never said he would execute a non-disclosure agreement as to the information covered by the third party agreements, never made any suggested changes to the draft non-disclosure agreement, and never suggested a non-disclosure agreement in another form. (Tr. 51:9-23; GC Brief at 6; 8.) The record evidence cited by the General Counsel contains no such representation. Instead, the record reflects that the Union's counsel continued to avoid reaching an accommodation stating Equity members did not like entering into nondisclosure agreements:

> Q      Okay. And at some point you told me during our conversations that the members at Equity do not like Equity to enter into nondisclosure agreements. Isn't that right?
> A      I'm -- I'm sure that I said that to you, yes…

(Tr. 51:24-52:15.).

Furthermore, despite the Union's argument otherwise, as JGTG explained in its brief in support of its exceptions, it is not just relying on the fact that the information is covered by a third party agreement as the basis for confidentiality, instead, the requested information itself is confidential as it concerns sensitive investment information such as "financial interest[s]" and "equity interest[s]." (JGTG Brief in Support of Exceptions at 13; Jt. Exh. 2; Union Brief at 21.)

4

B.      The Law Requires the Parties to Seek an Accommodation Related to the Company's Organizational Structure

As discussed above, JGTG has proven, through the Union's counsel's testimony, that the Union has a propensity to disclose confidential information, clearly supporting its confidentiality concerns and need for additional safeguards prior to the release of non-public information.  (Tr. 54:23-55:10; GC Brief at 6-7.)   Ms. Lavu—whose testimony was deemed honest—similarly testified as such.  (Tr. 74:4-19.)

During the hearing, Ms. Lavu also testified regarding a YouTube video, which the ALJ erroneously omitted as it further informed JGTG's confidentiality concerns.  (R. Exh. 4; Tr. 78:16-79:17, 82:5-23)  However, in its answering brief, attempting to undercut JGTG's confidentiality concerns, the Union asserts that Ms. Lavu failed to identify "whether the individuals in the video were even members or representatives of the Union" (Union Brief at 23).  However, Ms. Lavu clearly testified that the YouTube video included members from the Union, stating:

> A      This is from YouTube. This is a series that is a video with members of Actors' Equity, and this particular episode focused around the SETA agreement and the financials of one production."

(Tr. 78:7-23.)  The General Counsel similarly concedes that the YouTube video features members of the Union.  (GC Brief at 7 ("The only link between the instant case and the YouTube video is that the individuals featured in the video were members of the Charging Party Union.").)

In addition to mischaracterizing and ignoring testimony, the Union mischaracterizes the ALJ's opinion regarding the non-public information, stating "…the ALJD concluded that the Respondent lacked a legitimate and substantial confidentiality interest in the information **because** the Respondent had "maintained that it would turn over this information if the confidentiality concerns involving the second category of requests were resolved." (ALJD 8:15-17)." (emphasis added) (Union Brief at 12.)  However, this is simply the Union editorializing the ALJD.  Indeed,

5

A-409

the ALJD never made the leap that the information was not confidential due to the fact that JGTG agreed to turn it over. Instead, the ALJD was pointing out the fact that JGTG agreed to turn it over without ruling as to whether or not the information was in fact confidential.

## II. EQUITY HAS WAIVED ITS ENTITLEMENT TO THE REQUESTED INFORMATION BY REFUSING TO BARGAIN

The General Counsel is incorrect in arguing that the Union did not refuse to bargain and that JGTG engaged in bad faith. First, none of the cases cited by the General Counsel involve assertions of confidentiality in response to an information request and are thus irrelevant to the present case. (GC Brief at 9; *Pet Dairy*, 345 NLRB 1222, 1223 (2005); *Wallace Metal Products, Inc.*, 244 NLRB 41 fn. 2 (1979); *Sonat Marine, Inc.*, 279 NLRB 100, fn. 4 (1986).) Second, the General Counsel asserts that it was JGTG's responsibility to provide the third party confidentiality agreements to the Union and not the Union's responsibility to request them. (GC Brief at 9.) However, the Union's information request did not seek third party confidentiality agreements and the Union never once doubted they existed. To date, neither the Union's counsel nor anyone else from the Union has asked to see a copy of a third-party confidentiality agreements. (Tr. 52:16-19) JGTG was not required to produce third party confidentiality agreements that were not disputed by the Union especially when the agreements themselves are confidential. Nevertheless, as conceded by the Union, in good faith, "[o]n January 25, 2022, [JGTG] produced some additional information via email, specifically related to productions in which it invested." (Union Brief at 10.)

Lastly, the record evidence cited by the General Counsel does not stand for the proposition that "the Union was more than willing to engage in bargaining over the information which could feasibly be considered confidential." (GC Brief at 9.) Indeed, as discussed in JGTG's brief in support of its exceptions, the Union made no effort to bargain over the information covered by

6

third party agreements. (JGTG's Brief in Support of Exceptions at 17-18.) The Union never agreed to execute the non-disclosure agreement, never made any suggested changes to the draft non-disclosure agreement, and never suggested a non-disclosure agreement in another form. (Tr. 51:9-23.) The Union's purported excuse has been that it "didn't want the other stuff to be held hostage to third-party NDA stuff" and they "thought it was a two-step process, and. . . never got. . . what [they] needed to get to step two." (Tr. 52:19-23, 62:5-8). This of course is bad faith bargaining because the Union had an obligation to try to reach an accommodation over the confidential information. The Union acknowledged that it could not enter into such agreements because it received harsh criticism from the membership. (Tr. 51:24-52:2.) As discussed in JGTG's brief in support of its exceptions, there is no privilege of "member concerns" eliminating the Union's obligation to reach an accommodation over confidentiality. (JGTG's Brief in Support of Exceptions at 17-18.)

**III.    JGTG EXCEPTED TO ALL EXCEPTIONS IN ITS SUPPORTING BRIEF**

Contrary to the General Counsel's assertions, JGTG excepted to all exceptions in its supporting brief. (GC Brief at 1-2; 10.) JGTG excepted to Exceptions number 1 through 3, 5, 32 and 33 by stating: "Consequently, the ALJ's proposed remedy of a "Notice to Employees" (ALJD 10:8-22; APPENDIX) is ineffective because JGTG does not have any employees covered by the Short Engagement Touring Agreement ("SETA"), which it is a signatory to with Equity. [Exceptions 1-3, 5, 32, 33]." (JGTG's Brief in Support of Exceptions at 3.)

**CONCLUSION**

The Board should sustain the Company's exceptions and dismiss the Complaint in its entirety.

7

A-411

Dated: February 14, 2023

PROSKAUER ROSE LLP

By: _____

        Mark Theodore, Esq.
        Ariel Brotman, Esq.
        Attorneys for Respondent,
        John Gore Theatrical Group, Inc.

A-412

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**JOHN GORE THEATRICAL GROUP, INC.,**

**Respondent,**

**and**

**ACTORS' EQUITY ASSOCIATION,**

**Charging Party.**

**Case No. 02-CA-286802**

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **John Gore Theatrical Group, Inc.'s Reply Brief in Support of Exceptions to the Decision of the Administrative Law Judge** has been served on February 14, 2023 as indicated below upon:

*By email*
Tanya Khan, Esq.
Counsel for General Counsel
NLRB - Region 2
26 Federal Plaza, Suite 3614
New York, NY 10278-3699
Tanya.Khan@nlrb.gov

*By email*
Eyad Asad, Esq.
COHEN, WEISS, AND SIMON
900 Third Avenue, Suite 2100
New York, NY 10022-4869
EAsad@cwsny.com

Dated: February 14, 2023

_____
Robert Linton

A-413



United States Government

**NATIONAL LABOR RELATIONS BOARD**

**OFFICE OF THE GENERAL COUNSEL**

Washington, DC 20570-0001

August 23, 2023

Cathrine O'Hagan Wolfe
Clerk, U.S. Court of Appeals
 for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

> Re:  *NLRB v. John Gore Theatrical Group, Inc.*
> Board Case No. 02–CA–286802

Dear Ms. Wolfe:

I am enclosing the National Labor Relations Board's application for enforcement of its Order in this case. Within 40 days of the Court's docketing of this application, I will file the certified list of the contents of the agency record.

Please serve a copy of this application on the Respondent, John Gore Theatrical Group, Inc., whose address appears on the service list. I have served a copy of the application on each party admitted to participate in the Board proceedings, and their names and addresses also appear on the service list.

I am counsel of record for the Board, and all correspondence should be addressed to me. The Board attorneys directly responsible for this case are Elizabeth Heaney, (202) 273-1743, and Gregoire Sauter, (202) 273-1714.

A-414

Sincerely,

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2960

Encl.

A-415

<u>SERVICE LIST</u>
*NLRB v. John Gore Theatrical Group, Inc.*
Board Case No. 02–CA–286802

| | |
|---|---|
| Mark Theodore, Esq.<br>Proskauer Rose LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010<br>Phone: (310) 557-2900<br>Fax: (310) 557-2193<br>Email: mtheodore@proskauer.com | Respondent's Counsel |
| John Gore Theatrical Group, Inc.<br>1619 Broadway<br>New York, NY 10019<br>Phone: (310) 283-5640<br>Fax: (310) 557-2193 | Respondent |
| Eyad Asad, Esq.<br>Cohen, Weiss and Simon LLP<br>900 Third Avenue, Suite 2100<br>New York, NY 10022-4869<br>Phone: (212) 563-4100<br>Fax: (646) 473-8249<br>Email: easad@cwsny.com | Charging Party's Counsel |
| Actors Equity Association<br>165 West 46th Street<br>New York, NY 10036<br>Phone: (212) 869-8530 | Charging Party |

A-416

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case No. |
| v. | ) | 02–CA–286802 |
| | ) | |
| JOHN GORE THEATRICAL GROUP, INC. | ) | |
| | ) | |
| Respondent | ) | |

### APPLICATION FOR ENFORCEMENT
### OF AN ORDER OF THE
### NATIONAL LABOR RELATIONS BOARD

The National Labor Relations Board hereby applies to the Court for enforcement of its Order issued against John Gore Theatrical Group, Inc. on July 31, 2023, in Board Case No. 02–CA–286802, reported at 372 NLRB No. 114. The Board seeks enforcement of its Order in full.

The Court has jurisdiction over this application pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C. § 151, 160(e)). Venue is proper in this Circuit because the unfair labor practices occurred in New York, New York.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2968

Dated at Washington, DC
this 23rd day of August 2023

A-417

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case No. |
| v. | ) | 02–CA–286802 |
| | ) | |
| JOHN GORE THEATRICAL GROUP, INC. | ) | |
| | ) | |
| Respondent | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2023, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I further certify that the foregoing document is being served today, via first class mail, upon the following:

Mark Theodore, Esq.
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2968

Dated at Washington, DC
this 23rd day of August 2023